No. 13-2181

UNITED STATES COURT OF APPEALS

FOR THE FIRST CIRCUIT

_____

WILLIAM MICHAEL MCDERMOTT
Plaintiff - Appellant

v.

MARCUS, ERRICO, EMMER & BROOKS, P.C.
Defendant - Appellee

_____

On Appeal from a Final Judgment and Order under Fed.R.Civ.P. 59(e)
of the United States District Court for the District of Massachusetts

# PLAINTIFF-APPELLANT'S BRIEF

Philip H. Cahalin, Esq., Bar No. 39203
85 Exchange Street, Suite 206
Lynn, MA 01901
t. 781.598.3130
f. 781.598.3131
pcahalin@cahalinlaw.com

## TABLE OF CONTENTS

A. TABLE OF AUTHORITIES   .   .   .   .   .   .   .   .   .   .   .   .   .   .   i

B. JURISDICTIONAL STATEMENT   .   .   .   .   .   .   .   .   .   .   .   1

C. STATEMENT OF ISSUES PRESENTED FOR REVIEW   .   .   .   .   .   .   .   1

D. STATEMENT OF THE CASE   .   .   .   .   .   .   .   .   .   .   .   .   2

E. STATEMENT OF RELEVANT FACTS   .   .   .   .   .   .   .   .   .   .   5

F. SUMMARY OF ARGUMENT   .   .   .   .   .   .   .   .   .   .   .   .   10

G. ARGUMENT   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   13

    1. By the express terms of M.G.L. c. 93A, § 2(b) an attorney debt collector who violates the FDCPA has committed an unfair or deceptive act or practice in the conduct of any trade or commerce under M.G.L. c. 93A, § 2(a).   .   .   .   .   .   .   .   .   .   .   .   .   .   .   13

        a. Congress enacted the FDCPA, a federal consumer protection law under 15 U.S.C. § 45, because existing laws and procedures were inadequate to protect debtors from predatory debt collectors.   14

        b. M.G.L. c. 93A expressly incorporates federal consumer protection law under 15 U.S.C. § 45 into state law.   .   .   .   .   .   16

        c. Violations of the FDCPA are unfair or deceptive acts or practices in the conduct of any trade or commerce and therefore unlawful under M.G.L. c. 93A, § 2(a).   .   .   .   .   .   20

    2. M.G.L. c. 93A, § 2(c) expressly authorized the attorney general to promulgate 940 C.M.R. § 3.16(4) which makes violations of the FDCPA per se violations of G.L. c. 93A, § 2.   .   .   .   .   .   .   .   .   .   .   21

    3. Charging and collecting excessive, redundant, or otherwise unnecessary attorney fees and costs is not permitted by Massachusetts law and is therefore unfair under 15 U.S.C. § 1692f.   .   .   .   .   .   23

        a. MEEB did not sustain its burden of proving that its attorney fees and costs were necessary and otherwise not redundant or excessive.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   24

           i Massachusetts law concerning attorney fees and costs under fee shifting statutes.   .   .   .   .   .   .   .   .   .   .   25

ii.  The trial court did not adequately consider the factors relevant to determining whether MEEB's attorney fees and costs were necessary and not excessive or redundant. . . . . . 26

iii.  MEEB failed to sustain its burden of proving that the attorney fees and costs that it charged and collected for filing multiple lawsuits to collect the same debt were necessary and not redundant. . . . . . . . . . . . . . . 27

iv.  MEEB failed to sustain its burden of proving that its attorney fees and costs for preparing, filing, and prosecuting the lawsuits were necessary and would not have been avoided had it timely sent the pre-suit notices to McDermot's mortgagees. 28

1)  The trial court's failure to find that MEEB was obligated to send the pre-suit notices to McDermott's mortgagees was error of law. . . . . . . . . . . . 28

a)  Massachusetts condominium law concerning assessments, the lien for assessments, the priority of the lien, and the pre-suit notices. . . . . . . 29

b)  MEEB was obligated to timely mail the pre-suit notices to McDermott's mortgagees because it had been informed of their names and mailing addresses under M.G.L. c. 183A, § 6(c) and because it otherwise at all relevant times knew their names and mailing addresses 32

2) The trial court's ruling that it was not unfair under 15 U.S.C. § 1692f to fail to timely send the pre-suit notices was error of law. . . . . . . . . . . . . . . 37

3)  MEEB failed to sustain its burden of proving that its attorney fees and costs for preparing, filing, and prosecuting the lawsuits were necessary. . . . . . 38

4.  The measure of McDermott's damages for MEEB's violating 15 U.S.C. § 1692f by charging and collecting excessive, redundant, and otherwise unnecessary attorney fees and costs are the excessive, redundant, and otherwise unnecessary attorney fees and costs that McDermott became liable to pay and that MEEB charged and collected. 40

5.  McDermott is entitled to an award of multiple damages under M.G.L. c. 93A, § 9(3) because MEEB's violations of M.G.L. c. 93A, § 2 42

were willful or knowing and because MEEB refused to grant relief upon demand with knowledge or reason to know that the acts or practices complained of in the demand violated M.G.L. c. 93A, § 2.  .   .   .   .   .   .

a.  McDermott is entitled to an award of multiple damages under M.G.L. c. 93A, § 9(3) because MEEB's violations of M.G.L. c. 93A, § 2 were willful or knowing.  .   .   .   .   .   .   .   .   .   .   .   43

i.  Standard of review.  .   .   .   .   .   .   .   .   .   .   43

ii.  MEEB knowingly violated  M.G.L. c. 93A,  § 2 when it made false statements about the amount due and the character of the debt.  .   .   .   .   .   .   .   .   .   .   .   .   .   .   46

iii.  MEEB knowingly or willfully violated  M.G.L. c. 93A,  § 2 when it filed multiple lawsuits to collect the same debt.  .   .   .   47

iv.  MEEB knowingly or willfully violated  M.G.L. c. 93A,  § 2 when it failed to timely send McDermott's mortgagees the pre-suit notices, falsely inferred in its complaints that it did and falsely stated in the complaints that the lien for its attorney fees and costs as well as the lien for special assessments and late payment penalties were prior to the first mortgage.  .   .   .   .   .   49

b.  McDermott is also entitled to an award of multiple damages under M.G.L. c. 93A, § 9(3) because MEEB refused to grant relief upon demand in bad faith with knowledge or reason to know that the acts or practices complained of in the demand violated M.G.L. c. 93A, § 2.  .   .   .   .   .   .   .   .   .   .   .   .   .   .   51

H. CONCLUSION .   .   .   .   .   .   .   .   .   .   .   .   .   .   53

I. CERTIFICATES  .   .   .   .   .   .   .   .   .   .   .   .   .   .   55

J. ADDENDUM .   .   .   .   .   .   .   .   .   .   .   .   .   .   57

A.  TABLE OF AUTHORITIES

### 1.  Case Law

Anthony's Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 583 N.E.2d 806 (1991)  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   46

<u>Berish v. Bornstein</u>, 437 Mass. 252, 273, 770 N.E.2d 961 (2002)    22

<u>Berman v. Linnane</u>, 424 Mass. 867, 679 N.E.2d 174 (1997) .    .    .    .    23

Brennan v. Carvel Corp., 929 F.2d 801 (1st Cir. 1991) .    .    .    .    16

<u>Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.</u>, 754 F.2d 404 (1st Cir. 1985)    .    .    .    .    .    .    .    .    .    .    .    .    .    38

<u>Clark v. Capital Credit & Collection Serv.</u>, 460 F.3d 1162 (9th Cir. 2006) .    .    .    .    .    .    .    .    .    .    .    .    .    .    44

<u>Clymer v. Mayo</u>, 393 Mass. 754, 473 N.E.2d 1084 (1985)    26

<u>Commonwealth v. DeCotis</u>,  366 Mass. 234, 316 N.E.2d 748 (1974)    19, 42

<u>De Jesus Nazario v. Morris Rodriguez</u>, 554 F. 3d 196 (1st.Cir.2009)    27

<u>Demoulas v. Demoulas</u>, 428 Mass. 555, 703 N.E.2d 1149 (1998)   .    35, 36

<u>FTC v. Colgate-Palmolive Co</u>., 380 U.S. 374, 393, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965) .    .    .    .    .    .    .    .    .    .    .    44

<u>Grand Pacific Fin. Corp. v. Brauer</u>, 57 Mass. App. Ct. 407, 783 N.E.2d 849 (2003) .    .    .    .    .    .    .    .    .    .    .    .    46

<u>Heintz v. Jenkins</u>, 514 U.S. 291, 115 S. Ct. 1489, 131 L. Ed. 2d 395 (1995)    .    .    .    .    .    .    .    .    .    .    .    .    15

<u>Heller v. Silverbranch Construction Corp.</u>, 376 Mass. 621, 382 N.E.2d 1065 (1978) .    .    .    .    .    .    .    .    .    .    .    .    19, 52

<u>Hensley v. Eckerhart</u>, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) .    .    .    .    .    .    .    .    .    .    .    .    .    25

<u>In the Matter of the Estate of King</u>, 455 Mass. 796, 920 N.E.2d 820 (2010)    .    .    .    .    .    .    .    .    .    .    .    .    26, 27

<u>In the Matter of Fordham</u>, 423 Mass. 481, 668 N.E.2d 816  (1996)    44

<u>Jerman v. Carlisle, McNellie, Rini, Kramer</u>,  130 S. Ct. 1605, 559 U.S. 573, 176 L. Ed. 2d 519 (2010) .    .    .    .    .    .    .    .    15, 44

<u>Kattar v. Demoulas</u>, 433 Mass. 1, 739 N.E.2d 246 (2000) .    .    .    .    43

<u>Killeen v. Westban Hotel Venture, LP.</u>, 69 Mass. App. Ct. 784,  872 N.E.2d 731 (2007) .    .    .    .    .    .    .    .    .    .    .    25

<u>Klairmont v. Gainsboro Restaurant, Inc.</u>,  465 Mass. 165, 987 N.E.2d 1247 (2013) .    .    .    .    .    .    .    .    .    .    .    .    5, 11, 21, 23

Law v. Griffith, 457 Mass. 349, 930 N.E.2d 126 (2010) . . . .    41

Linthicum v. Archambault, 379 Mass. 381, 388-389, 398 N.E.2d 482 (1979) . . . . . . . . . . . . . . . . . . .    26

LoVuolo v. Gunning, 925 F.2d 22 (1st Cir.1991) . . . .    44

Mennonite Bd. of Missions v. Adams, 462 US 791, 798, 103 S. Ct. 2706, 77 L. Ed. 2d 180 (1983) . . . . . . . . . . . .    36

Meyer v. Wagner, 429 Mass. 410, 709 N.E.2d 784 (1999) . . . .    44

Milliken & Company v. Duro Textiles, LLC, 451 Mass. 547, 887 N.E.2d 244 (2008) . . . . . . . . . . . . .    20

Mullen Lumber Co. v. Lore, 404 Mass. 750, 537 NE 2d 123 (1989)    36

Nei v. Burley, 388 Mass. 307, 446 N.E.2d 674 (1983) . . . .    42

Ng Brothers Construction, Inc. v. Cranney, 436 Mass. 638, 642, 766 N.E.2d 864 (2002) . . . . . . . . . . . . . . . . .    36

Pepsi-Cola Metropolitan Bottling Co. v. Checkers, Inc., 754 F.2d 10 (1st Cir. 1985) . . . . . . . . . . . . . . . . .    46

Purity Supreme, Inc. v. Attorney General, 380 Mass. 762, 407 N.E.2d 297 (1980) . . . . . . . . . . . . . .    17, 19

Rex Lumber Co. v. Acton Block Co., 29 Mass. App. Ct. 510, 562 N.E.2d 845 (1990) . . . . . . . . . .    23, 26

Saladini v. Righellis, 426 Mass. 231, 687 N.E.2d 1224 (1997)    23

Schubach v. Household Finance Corp., 375 Mass. 133, 376 N.E.2d 140 (1978) . . . . . . . . . . . . . . . .    19

Slaney v. Westwood Auto, Inc., 366 Mass. 688, 322 N.E.2d 768 (1975)    19

Smith v. United States, 508 U.S. 223, 113 S. Ct. 2050, 124 L. Ed. 2d 138 (1993). . . . . . . . . . . . . . . .    33

Stefan v. Laurenitis, 889 F.2d 363 (1st Cir.1989). . . . .    27

Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 681 N.E.2d 1189 (1997) . . . . . . . . . . . . . . .    20

Trade Comm'n v. Bunte Bros., Inc., 312 U.S. 349, 61 S. Ct. 580, 85 L. Ed. 881 (1941) . . . . . . . . . . . . . . . .    16

US v. American Bldg. Maint. Industries, 422 U.S. 271, 95 S. Ct. 2150,    16, 17

45 L. Ed. 2d 177 (1975) . . . . . . . . . .

<u>United Sav. Assn. of Tex. v. Timbers of Inwood Forest Associates, Ltd.</u>,
484 U.S. 365, 108 S. Ct. 626, 98 L. Ed. 2d 740 (1988) . . . .     33

<u>US Bank National Association v. Ibanez</u>, 458 Mass. 637, 941 N.E.2d 40
(2011) . . . . . . . . . . . . . . .     36

<u>Williams v. Poulos</u>, 11 F. 3d  271  (1st.Cir.1993) . . . .     44


## 2.  Statutes and Regulations

15 U.S.C. §§ 41-58     . . . . . . . . . . .     16

15 U.S.C. § 45     . . . . . . . . . .     14,16,17,18,20,23,45,55

15 U.S.C. §§ 1692-1692p     . . . . . . . . . .     1

15 U.S.C. § 1692     . . . . . . . . . . .     14,15,38

15 U.S.C. § 1692f     . . . . . . . .     2,4,11,23,24,29,37,38,40,54

15 U.S.C. § 1692k     . . . . . . . . . .     1,4,54

15 U.S.C. § 1692l     . . . . . . . . . .     20

28 U.S.C. § 1331     . . . . . . . . . .     1

28 U.S.C.  §1367     . . . . . . . . . .     1


M.G.L. c. 93A     . . . . .     4,5,10,13,14,16,17,18,19,20,22,42,52,54

M.G.L. c. 93A, § 2     . . . . .     2,10,11,13,14,17,18,20,21,22,23,42,43,46,4
9,53,54

M.G.L. c. 93A, § 9     . . . . .     1,2,11,42,43,46,48,52,53,54

M.G.L. c. 183A, § 4 . . . . .     . . . . . . .     32,35,50

M.G.L. c. 183A, § 5 . . . . .     . . . . . . .     33,34,35

M.G.L. c. 183A, § 6 . . . .     25,29,30,31,32,33,34,35,37,41,47,50,51

M.G.L. c. 254, §5     . . . . .     . . . . . . .     30,34,36

M.G.L. c. 254, §5A     . . . .     . . . . . . .     30

940 C.M.R. 3.16(3) . . . . . . . . . . . . . 11,21,22

940 C.M.R. 3.16(4) . . . . . . . . . . . . 2,11,14,21,22

### 3. Other Authorities

7 Harv. J. on Legislation, 122 (1969) . . . . . 19

32 Santa Clara L. Rev. 347 (1992) . . . . . 16,17

## B. JURISDICTIONAL STATEMENT

The plaintiff, William M. McDermott ("McDermott"), a resident of Unit 104, Pondview Condominium,  605 Eastern Ave, Lynn, Massachusetts brought claims against the defendant Marcus, Errico, Emmer & Brooks, P.C. ("MEEB"), a Massachusetts professional corporation of attorneys with its offices located in Braintree, Massachusetts for its violations of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692-1692p ("FDCPA") and M.G.L. c. 93A, § 9 .  Appendix ("App.") 1-15.  The United States District Court for the District of Massachusetts had jurisdiction of McDermott's FDCPA claims under 28 U.S.C. § 1331 and 15 U.S.C.  § 1692k(d) and supplemental jurisdiction of his related state law chapter 93A claims under 28 U.S.C.  §1367(a).   The district court entered Final Judgment on November 20, 2012, Addendum ("A.") 204, and entered its Memorandum and Order amending the judgment under Fed.R.Civ.P. 59(e) on August 26, 2013, A. 205.   On September 23, 2013, McDermott filed his notice of appeal from both the final judgment and from the Order amending same.  App. 57.  The United States Court of Appeals for the First Circuit has jurisdiction of McDermott's appeal under 28 USC § 1291.

## C. STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1) Whether MEEB's violations of the FDCPA were per se unfair or deceptive

- 1 -

acts or practices in the conduct of any trade or commerce under M.G.L. c. 93A, §

2(a).

2) Whether MEEB's violations of the FDCPA were per se violations of M.G.L.

c. 93A, § 2 under 940 C.M.R. 3.16(4).

3)  Whether MEEB's means and methods of collecting McDermott's

assessments were intended to result in and did result in its charging and collecting

excessive, redundant or otherwise unnecessary attorney fees and costs which were

not permitted by state law and therefore which was unfair under 15 U.S.C. § 1692f.

4)  Whether the measure of McDermott's actual damages for MEEB's violating

15 U.S.C. § 1692f by charging and collecting excessive, unreasonable attorney fees

is the excess and unreasonable fees he became liable to pay or by which MEEB

was unjustly enriched.

5)  Whether multiple damages were warranted under M.G.L. c. 93A, § 9(3)

because MEEB's violations of M.G.L. c. 93A, § 2 were willful or knowing or

because MEEB refused to offer relief on demand when it knew or should have

known that the acts complained of in the demand violated G.L. c. 93A, § 2..

## D.  STATEMENT OF THE CASE

MEEB, an attorney debt collector under the FDCPA, A. 81-86, initiated nine

lawsuits from April, 2005 to September, 2008, to collect condominium

- 2 -

assessments from McDermott for the Pondview Condominium Association

("Pondview").  A.149.  McDermott filed suit against MEEB alleging that its means

and methods of collecting his assessments violated the FDCPA and M.G.L. c. 93A

by diverse means that escalated the attorney fees and costs which McDermott

became liable to pay and which MEEB received.  App. 69, ¶ 66 and the ad

damnums, App. 70 and 71.

     After a bench trial, the trial court found that MEEB violated the FDCPA by

engaging in numerous unlawful, unfair, and deceptive means and methods of

collecting McDermott's assessments such as filing multiple lawsuits to collect the

same debt, A. 146-147, 155, communicating with McDermott's mortgagees

without his permission or knowledge, A. 123-129, communicating directly with

McDermott while he was represented by counsel, A. 159, falsely overstating the

amount of common expenses due in complaints, sometimes substantially,  A.

116-117, 183, making intentionally false statements of amounts due in

communications and pleadings, A. 101-110 and  filing complaints in inconvenient

forums, A. 165-164.  The trial court also found that MEEB failed to timely send

pre-suit notices to  McDermott's mortgagees under M.G.L. c. 183A, § 6(c), A. 136-

145, but did not decide whether MEEB was obligated to do so[1] because it decided

_____

1 The court's findings were somewhat ambiguous on the issue.  It found that
  McDermott's mortgagees had not informed Pondview of their names and
  mailing addresses, A. 35 and 231, but that the statute did not entirely support

that even if it were its failure was not unfair to McDermott under 15 U.S.C. §

1692f.  A. 144-145.

The trial court determined that the violations of the FDCPA were per se

violations of M.G.L. c. 93A.  A. 170-173 and awarded McDermott $4,500 in

damages for emotional distress for MEEB's intentionally false statements

concerning amounts due in the first four lawsuits; A. 182; $500 in damages for

emotional distress for MEEB's overstated and false representations of the amount

of the legal fees in a May 2, 2005 letter, A. 184; and $5,000 in emotional distress

damages and $400 in economic damages caused by MEEB's filing multiple

lawsuits to collect the same debt, A. 191, for a total judgment of $10,400,00 in

damages under M.G.L. c. 93A.  It also awarded $800.00 in damages under 15

U.S.C. § 1692k(a)(2)(A), finding that the MEEB's violations were persistent but

not egregious and awarded $4,649.00 in prejudgment interest.  A. 201-202.

However, despite the various unlawful means and methods the court found that

MEEB employed to collect McDermott's assessments, it found that MEEB's

attorney fees and costs to collect the assessments were reasonable[2],  and that the

violations were not motivated by an intent to escalate its attorney fees and costs.[3]

_____

MEEB's understanding that it was not required to send the notices.  A. 138.  It
characterized its own handling of the issue as "side stepping" it.   A. 233, n. 22.
2  A. 32, 42, 56, 116, 142, 150, and 152.
3  A. 31, n. 43; 35; 42; 43; 45, n. 60; 50; 57, n. 73; 139; 153, n. 138; and 195.

The parties filed cross motions for reconsideration under Rule 59(e). Docket Nos. 68 and 69.[4] In reliance on the decision of the Massachusetts Supreme Judicial Court in Klairmont v. Gainsboro Restaurant, Inc., 465 Mass. 165, 987 N.E.2d 1247, 1255 (2013) entered after the hearing on the cross motions, the trial court reversed its ruling that MEEB's FDCPA violations were per se violations of M.G.L. c. 93A. A. 215-216. It also reversed its finding that MEEB had violated the FDCPA by bringing an action in an inconvenient forum on the ground that the claim had been waived. A. 224. As a result, the judgment was reduced from $11,200 to $800. A. 234.

There remains pending in the trial court McDermott's motion for attorney fees. Docket Nos. 85-90.

### E.  STATEMENT OF THE FACTS

McDermott owned two condominium's, units 104 and 105, at Pondview Condominium on 605 Eastern Ave, Lynn, Massachusetts ("Pondview"), A. 6, and had a mortgage on each property, Exhibits ("Ex.") 183 and 206, which were recorded in the registry of deeds.[5] MEEB is a Massachusetts professional corporation of attorneys, A. 1, which at the time of trial represented approximately

---

4  All references to docket entries are to the docket entries in the trial court, United States District Court for the District of Massachusetts, No.  09cv10159-MBB, unless otherwise noted.

5App. 271-272.

3500 condominium associations in Massachusetts, New Hampshire, and Rhode Island.  A. 85.  In 2004, a dispute arose between McDermott and Pondview over $150 in late payment penalties for both units.  A. 12.  Although McDermott eventually tendered payment of the late payment penalties and most of the amounts claimed due, A. 18-19, MEEB commenced two  lawsuits in April, 2005 for the overdue assessments, one for each unit.  These were the first of nine lawsuits MEEB was to file from April, 2005 to September, 2008 to collect assessments from McDermott for units 104 and 105.[6]  See A. 149.  The charges MEEB sought to collect from McDermott were debts under the FDCPA, A. 74-81, and MEEB acted as an attorney debt collector under the FDCPA in collecting same.  A. 81-86.

MEEB used the same forms, means and methods in prosecuting the nine

---

[6]  Lynn District Court, No. 05130511, dated April 26, 2005 ("first 104 lawsuit").  Ex. 38.
 Complaint dated June 23, 2006  ("second 104 lawsuit").  Ex. 100.
 Lynn District Court, No. 0813cv1380 dated June 30, 2008  ("third 104 lawsuit"). Ex. 436.
 Essex Superior Court, No. 2008-1839 dated September 16, 2008  ("fourth 104 lawsuit").  Ex. 449.
 Lynn District Court, No. 0513cv0508 dated April 26, 2005 ("first 105 lawsuit").  Ex. 42.
 Lynn District Court, No. 0513cv1482 dated October 27, 2005  ("second 105 lawsuit").  Ex. 16.
 Lynn District Court, No. 0613cv938 dated June 29, 2006 ("third 105 lawsuit"). Ex.  33.
 Lynn District Court, No. 0713cv0943 dated June 1, 2007  ("fourth 105 lawsuit").  Ex. 419.
 Lynn District Court, No. 0713cv 1802 dated October 10, 2007  ("fifth 105 lawsuit")  Ex. 424

lawsuits.  Prior to filing each lawsuit, MEEB commissioned an examination of title in the registry of deeds,[7] which it did to learn the identity of any recorded lienholders, including mortgagees. App. 273-274, Richard E. Brooks direct. Shortly before filing the lawsuits or at about the time it filed suit, MEEB mailed a form notice to McDermott stating the amount allegedly due.[8]  At about the same time it filed the lawsuits, A. 141[9], MEEB often, but not always, mailed two form notices to McDermott's mortgagees: one, stating the amount allegedly owed, Ex. 21, 29, 327, 367, 442, 435, and the other stating that MEEB intended to file suit to collect the overdue amount, Ex.  25,  326, 366, 443.[10]  The amounts that MEEB stated were due in these form notices were often false. A. 94; see A. 102 concerning MEEB's intentionally making false statements concerning the amount of attorney fees and costs due.

The nine complaints MEEB prepared and filed were essentially forms containing the same allegations except for the amounts alleged due. See A. 20-21

---

7  A. 13; 14; 33; 40; 46; 51; 57; 110; 117, n. 118; and 142.  See App. 130-131, Brooks direct.  See also MEEB's invoices at Ex. 58, 74, 92, 93, 120, 134, and 149 reflecting charges for examinations of title.

8  Ex.  5, 11, 180, 223, 263, 306, 322, 324, 360, 375, and 444.

9  The evidence shows that MEEB mailed both the notice of intent and the 60 day delinquency notices to the mortgagees at about the same time it filed the complaints.  Ex. 25, 29, 326, 327, 366, 367, 442, 443.  MEEB's invoices show that it typically drafted both pre-suit notices to the mortgagees at the same time it drafted and filed the complaints. Ex. 60-61; 74;  93-94; 120; 134; and 150.

10 MEEB did not send out a notice of intent to file suit letter to the first mortgagee prior to the first 104 and 105 lawsuits.  A. 22

noting similarity of allegations; see complaints listed in footnote 6 <u>supra</u>. Except for the first 104 lawsuit initially, the complaints always named McDermott and his mortgagee as parties. Id. The amounts claimed in the complaints to be due always included the attorney fees and costs MEEB charged to prepare and file the complaints[11] and always falsely claimed that these amounts had been duly assessed and not paid when due. A. 116-118. The complaints also always alleged that MEEB mailed to McDermott and to his mortgagee the notices stating the amount allegedly due[12] and sometimes alleged that MEEB mailed to his mortgagee the notice of its intent to file the suit.[13] The complaints also always alleged that the lien for the amounts claimed due were prior to the mortgages.[14]

On at least two occasions, MEEB filed a lawsuit to collect amounts already being sought in a prior pending suit, A. 146-147, 155. It also regularly communicated directly with him while he was represented by counsel, A. 159, and made intentionally false statements of amounts due in communications and pleadings, A. 101-110, 183-187.

11As well as all special assessments and late payment penalties allegedly due. See A. 31, 32, 36-37.

12Under the section titled "FACTS" at paragraph 7 in each of the complaints. Ex. 18, 35, 40, 44, 421, 426, 438, and 451.

13 Also under the section titled "FACTS" in the complaints. Ex. 44, ¶ 9; 421, ¶ 8. This was so even when no such notices had been sent. A. 21-22.

14Under the section in the complaintis titled "Count III, Establishing the Priority of the Lien." Ex. 18, ¶ 10; 35, ¶ 10; 40, ¶ 10; 44, ¶ 12; 421, ¶ 11; 426, ¶ 10; 438, ¶ 10; and 451, ¶ 10.

The evidence showed that throughout MEEB's collection actions, McDermott disputed and refused to pay MEEB's attorney fees and costs and the late payment penalties.  See A. 31.  After filing suit, MEEB communicated with McDermott's mortgagees without his knowledge or consent to settle the lawsuits.[15] A. 123-129. These communications resulted in his unit 105 mortgagee's promptly paying all amounts allegedly due shortly after being served the complaints in the first three lawsuits concerning unit 105.  A. 151 (first 105 lawsuit);  A. 152 (second 105 lawsuit); and A. 149 (the $3,454.00 payment on August 29, 2006 by the unit 105 mortgage, M & T,[16] which MEEB credited to the unit 104 account).  The only time that MEEB sent McDermott's mortgagee the pre-suit notices without at the same time filing suit resulted in a prompt payment by the 104 mortgagee of the amount claimed due, thereby preventing the filing of a suit.  A. 149-150 [17]; Ex. 366-374. In all, the unit 104 mortgagee paid $35,040.23[18]  and the unit 105 mortgagee paid $34,769.82[19] for total payments of $69,810.14 for McDermott's liabilities for

_____

15 Ex. 47,  274,  299, 301, 308, 317, 318, 320, 328, 329, 330, 368, 374, 430, 431, and 446.

16 McDermott testified that M & T mortgage was the mortgagee for unit 105 at the time.  App. 511, McDermott direct.  The trial court made no finding whether M & T was the unit 104 or the unit 105 mortgagee.

17 The February, 2007 payment of $2,226.83 by MERS which prevented another unit 104 suit being filed.

18 A payment of $2,226.83 in February, 2007, A. 149, and a payment of $34,813.40 on July 31, 2008, A. 150.

19 The payment of $3,454.00 by M & T on August 29, 2006 and credited to the 104 account, A. 149, a payment of $3,800.27 on May 20, 2005 , A. 151, a payment

- 9 -

assessments and attorney fees and costs..  Of that, MEEB admitted to receiving

$55,581.20 in attorney fees and costs,[20] which it credited toward its total charges of

$83,552.[21]

### F.  SUMMARY OF ARGUMENT

The express terms of M.G.L. c. 93A, its legislative history, and its consistent

construction by the Massachusetts courts make it clear that violations of the

FDCPA are per se violations of chapter 93A, without exception or qualification.

The FDCPA is a federal consumer protection statute expressly incorporated into

Massachusetts state law by M.G.L. c. 93A, § 2(b).  The Federal Trade Commission

("FTC") and Committee on Suggested State Legislation drafted M.G.L. c. 93A for

the express purpose of incorporating federal consumer protection law into

Massachusetts state law.  That intent is explicitly expressed in section 2 of chapter

93A which remains essentially unchanged since it was first enacted.   Since chapter

93A was first enacted, the Massachusetts courts have consistently construed it to

cover acts or practices regulated by federal consumer protection laws without

exception or qualification.

In addition, M.G.L. c. 93A, § 2(c) expressly authorized the Massachusetts

_____

of $3,015.55 on December 15, 2005, A. 152, and a payment of  $24,500.00 on
July 10, 2009, A. 153.
20  App. 350, Richard Brooks direct.
21 App. 351, Richard Brooks direct.

attorney general to promulgate 940 C.M.R. § 3.16(4) which makes violations of federal consumer protection statutes, such as the FDCPA, per se violations of M.G.L. c. 93A, § 2.  There was no similar authority given to the attorney general relative to general state safety, health, and welfare regulations and laws, such as building codes, which are the subject of 940 C.M.R. § 3.16(3).  Therefore, the decision in Klairmont v. Gainsboro Restaurant, Inc.,  supra, 465 Mass. 165, 987 N.E.2d 1247, that such violations were not per se violations of M.G.L. c. 93A, § 2 is inapplicable to 940 C.M.R. § 3.16(4).  Under the express terms of G.L. c. 93A, § 2 and 940 C.M.R. 3.16(4), violations of the FDCPA are per se violations of G.L. c. 93A, § 2 without exception or qualification.

Charging and collecting excessive, redundant, or otherwise unnecessary attorney fees and costs is not permitted by state law and is therefore unfair under 15 U.S.C., § 1692f(1).  A debt collector's failure to comply with state law requirements intended to avoid unnecessary attorney fees and costs is also unfair under 15 U.S.C., § 1692f(5) because it wrongfully causes the debtor to incur costs which could have been avoided.

Although the trial court found that MEEB's means and methods to collect McDermott's assessments violated numerous provisions of the FDCPA, it nonetheless found that MEEB's attorney fees and costs were reasonable.  In doing

- 11 -

so, it failed to indicate that it considered those factors which are relevant to determining the reasonableness of attorney fees and costs and its finding was otherwise predicated on errors of law and clear errors of fact.  MEEB's unfair and intentionally deceptive acts and practices were relevant in determining MEEB's attorney's reasonable fees and costs.   There should have been a downward adjustment if not an elimination of the attorney fees and costs MEEB charged and collected for pleadings and communications which were persistently and intentionally deceptive, harassing, or otherwise in violation of MEEB's obligations under the FDCPA; the attorney fees and costs MEEB charged and collected for unlawfully filing  redundant and unnecessary multiple lawsuits to collect the same debt were clearly redundant and unnecessary; and MEEB's attorney fees and costs which could have been avoided had it timely sent the pre-suit notices it was required by law to send to McDermott's mortgagees were clearly unnecessary.

McDermott was injured by the excessive, redundant, and otherwise unnecessary attorney fees and costs he became liable to pay, first to Pondview, and then to his mortgagees.  The economic measure of that injury is the excessive, redundant, and otherwise unnecessary attorney fees and costs he became liable to pay.  It is irrelevant that his mortgagees paid the fees and costs, because one, all that accomplished was to shift the identity of the person to whom McDermott was

- 12 -

liable to pay those fees and costs from Pondview to his mortgagees, and two,

MEEB is precluded by the collateral source rule from asserting such a defense.

Furthermore, as an alternative theory of recovery, MEEB is liable to McDermott

for the excessive, redundant, and otherwise unnecessary attorney fees and costs it

was paid because MEEB would be unjustly enriched were it allowed to keep same.

McDermott was entitled to at least two and not more than three times his

damages under M.G.L. c. 93A, § 9(3) under the facts and law because MEEB's

violations of G.L. c. 93A, § 2 were willful or knowing and because MEEB failed to

offer relief in response to McDermott's written demand for same when it knew or

should have known that the acts or practices he complained about violated M.G.L.

c. 93A, § 2.

## G.  ARGUMENT

**1.  By the express terms of M.G.L. c. 93A, § 2(b) an attorney debt collector who violates the FDCPA has committed an unfair or deceptive act or practice in the conduct of any trade or commerce under M.G.L. c. 93A, § 2(a).**

The trial court's ruling that MEEB's violations of the FDCPA were not per se

violations of M.G.L. c. 93A, A. 215-216, was an error of law because the express

statements of legislative intent in M.G.L. c. 93A, § 2, chapter 93A's legislative

history, the consistent construction of the statute by the Massachusetts courts, and

the express language in the FDCPA itself make it clear that violations of the

FDCPA are per se violations of M.G.L. c. 93A.  In addition, the Massachusetts

attorney general's regulation, 940 C.M.R. § 3.16(4), which makes violations of the

FDCPA per se violations of M.G.L. c. 93A, § 2 is expressly authorized by M.G.L.

c. 93A, § 2(c).  Indeed, the attorney general is prohibited by the express terms of

M.G.L. c. 93A, § 2(c) from issuing a regulation which imposes a limitation on the

liability of attorney debt collectors that is not found in the FDCPA.

### a. Congress enacted the FDCPA, a federal consumer protection law under 15 U.S.C. § 45, because existing laws and procedures were inadequate to protect debtors from predatory debt collectors.

Congress amended the Consumer Credit Protection Act ("CCPA") in 1977 by

adding the FDCPA, Title VIII, §§ 801-818. Pub.L. 95-109, 91 Stat. 883, because it

found that there was a compelling need to protect debtors from debt collectors, 15

U.S.C. 1692(a), that existing law was inadequate to accomplish.  "Existing laws

and procedures for redressing [injuries caused by abusive debt collection practices]

are inadequate to protect consumers."  15 U.S.C. 1692(b).  By 15 U.S.C. §

1692l(a), violations of the FDCPA were expressly made unfair or deceptive acts or

practices in or affecting commerce under 15 U.S.C. § 45(a)(1).  Jerman v. Carlisle,

McNellie, Rini, Kramer,  130 S. Ct. 1605, 1609, 559 U.S. 573, 176 L. Ed. 2d 519

(2010)

The term "debt collector," is defined as "any person who uses any

instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another," 15 U.S.C. § 1692a(6)   When it was originally enacted, "any attorney-at-law collecting a debt as an attorney on behalf of and in the name of a client" was expressly excluded from the definition of "debt collector."   CCPA, § 803(6)(F).  In 1986, Congress eliminated the exemption for attorneys from the definition of "debt collector."  In accord with the Congressional purpose of the FDCPA to compensate for the inadequacy of existing law to protect debtors, the Supreme Court has consistently construed the elimination of the exemption for attorneys to mean that attorney debt collectors are to be treated the same as non-attorney debt collectors under the FDCPA.  There is no exception for litigation activity.  Their status as attorneys is irrelevant.  Heintz v. Jenkins, 514 U.S. 291, 299, 115 S. Ct. 1489, 131 L. Ed. 2d 395 (1995) (the FDCPA "applies to attorneys who 'regularly' engage in consumer-debt-collection activity, even when that activity consists of litigation.");  Jerman v. Carlisle, McNellie, Rini, Kramer,  130 S. Ct. 1605, 1622, 559 U.S. 573, 176 L. Ed. 2d 519 (2010) (Congress intended FDCPA to apply to attorneys engaged in litigation activity even though it may "impose[] some constraints on a lawyer's advocacy on behalf of a client").  Hence,

the FDCPA represents a significant departure from the existing law concerning the liability of attorneys to non-clients and the liability of debt collectors for litigation activity.  As the Supreme Court has consistently held, Congress intended that departure because the existing law concerning those liabilities was inadequate to protect consumers from predatory debt collectors.

### b.  M.G.L. c. 93A expressly incorporates federal consumer protection law under 15 U.S.C. § 45 into state law.

M.G.L. c. 93A was specifically created by the Federal Trade Commission ("FTC") to incorporate federal consumer protection law under the Federal Trade Commission Act ("FTCA"), 15 U.S.C. §§ 41-58 into Massachusetts state law.[22]  In 1967, the Massachusetts legislature adopted the Model Unfair Trade Practices and Consumer Protection Law drafted by the FTC and by the Committee on Suggested State Legislation.[23]  32 Santa Clara L. Rev. 347, 357 1992.  At the time, the FTC had little, if any, jurisdiction over intrastate commerce, US v. American Bldg. Maint. Industries, 422 U.S. 271, 95 S. Ct. 2150, 45 L. Ed. 2d 177 (1975); Trade Comm'n v. Bunte Bros., Inc., 312 U.S. 349, 61 S. Ct. 580, 85 L. Ed. 881 (1941), and one of the strategies it adopted to overcome this limitation was to draft model laws for the states to enact in order to incorporate federal consumer protection laws

[22]M.G.L. c. 93A is sometimes referred to as the Massachusetts little FTC Act. See Brennan v. Carvel Corp., 929 F.2d 801, 811 (1st Cir. 1991).

[23]Chapter 183 of the Acts of 1967

into state law.[24]  32 Santa Clara L. Rev. at 359, n. 72;  see <u>Purity Supreme, Inc. v. Attorney General</u>, 380 Mass. 762, 766, 407 N.E.2d 297 (1980) (M.G.L. c. 93A was enacted "partly in response to an FTC policy to stop unfair practices on a State level before they become interstate problems.").

The intent to incorporate federal consumer protection law into Chapter 93A is expressly stated in M.G.L. c. 93A, § 2 which has not materially changed since the model code was first adopted and enacted by Massachusetts.  First, the language in M.G.L. c. 93A, § 2(a) parallels the language in 15 U.S.C. § 45(a)(1).[25]  Second, the plain meaning of the unambiguous terms under section 2(b) make it clear that all unfair or deceptive acts or practices under 15 U.S.C. § 45(a)(1) are " unfair or deceptive acts or practices in the conduct of any trade or commerce" under section 2(a).

> It is the intent of the legislature that in construing paragraph (a) of this section in actions brought under sections four, nine and eleven, the courts will be guided by the interpretations given by the Federal Trade

---

24Another was to convince Congress to amend the FTCA in 1970 to expand its jurisdiction from acts "in commerce" to acts "in or affecting commerce" to make its jurisdiction  coextensive with the constitutional power of Congress under the Commerce Clause.  <u>US v. American Bldg. Maint. Industries</u>, 422 U.S. 271, 277, n. 6, 95 S. Ct. 2150, 45 L. Ed. 2d 177 (1975).

2515 U.S.C. § 45(a)(1) as amended states:"Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful."  M.G.L. c. 93A, § 2(a) states: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

Commission and the Federal Courts to section 5(a)(1) of the Federal
Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time
amended.

M.G.L. c. 93A, § 2(b).[26] And third, M.G.L. c. 93A, § 2(c) is also clear that M.G.L.

93A has made federal consumer protection law the state law of Massachusetts.

The attorney general is expressly authorized to "make rules and regulations

interpreting the provisions of subsection 2(a) of this chapter", but only to the extent

that they are consistent "with the rules, regulations and decisions of the Federal

Trade Commission and the Federal Courts interpreting the provisions of 15 U.S.C.

45(a)(1)."  M.G.L. c. 93A, § 2(c).[27] For example, the attorney general would not be

authorized to create an exemption for litigating attorney debt collectors that was

inconsistent with the federal court's constructions of the FDCPA.  Finally, the

intent to incorporate into state law federal consumer protection law as it evolves is

clear from the phrase "as from time to time amended" in both sections 2(b) and

2(c).

   In light of the express statements of legislative intent in chapter 93A itself and

the statute's legislative history, the Massachusetts courts have been consistent in

construing Chapter 93A to incorporate, without exception or qualification, federal

_____

26The only change made to this provision since its original enactment was the
   addition of the phrase "in actions brought under sections four, nine and eleven."
   Chapter 459, § 2 of the Acts of 1978.
27Subsection 2(c)  is unchanged since its original enactment.

consumer protection law under the FTCA.  Slaney v. Westwood Auto, Inc., 366

Mass. 688, 694, n. 8, 322 N.E.2d 768 (1975) ("For purposes of national uniformity

and certainty of construction, Massachusetts, along with a few other States, has

thus wholly incorporated the Federal-act into its statute. See An Act to Prohibit

Unfair and Deceptive Trade Practices, comment to § 3-201, 7 Harv. J. on

Legislation, 122, 129 (1969)."); Purity Supreme, Inc. v. Attorney General, supra

380 Mass. at 766, 407 N.E.2d 297; Commonwealth v. DeCotis,  366 Mass. 234,

239, 316 N.E.2d 748 (1974); Schubach v. Household Finance Corp.,  375 Mass.

133, 135, 376 N.E.2d 140 (1978) (inconvenient forum case).  In doing so, the

Massachusetts courts have also consistently recognized that chapter 93A, like

federal consumer protection law, created new substantive rights and obligations

unconstrained by traditional concepts of common law.

> Both this court and the Supreme Court have consistently held that
> consumer protection statutes created new substantive rights by making
> conduct unlawful which was not previously unlawful under the common
> law or any prior statute. The statutory language is not dependent on
> traditional tort or contract law concepts for its definition.

Heller v. Silverbranch Construction Corp., 382 N.E.2d 1065, 376 Mass. 621, 626

(1978).  The reference to the Supreme Court in Heller only further underscores that

the consumer protection provided by M.G.L. c. 93A is coextensive with that

provided by federal consumer protection laws as construed by the Supreme Court.

- 19 -

**c. Violations of the FDCPA are unfair or deceptive acts or practices in the conduct of any trade or commerce and therefore unlawful under M.G.L. c. 93A, § 2(a).**

Violations of the FDCPA are unfair or deceptive acts or practices in or affecting commerce under 15 U.S.C., § 45(a)(1), 15 U.S.C., § 1692l, and therefore, by the express statements of legislative intent in M.G.L. c. 93A, § 2(b) and (c) they are unfair or deceptive acts or practices in the conduct of any trade or commerce under M.G.L. c. 93A, § 2(a).

None of the authorities cited by the trial court in denying MEEB's liability under c. 93A, A. 217-218,  hold to the contrary.  Indeed, none involved an instance where a violation of any federal consumer protection law was found not to be a violation of M.G.L. c. 93A.  None found that "trade or commerce" under section 2(a) could encompass different kinds of conduct than those covered by any federal consumer protection statute.  The authorities cited do little more than illustrate the types of limitations in "existing law and procedure" that the FDCPA was expressly intended to overcome.  The cases rely on common law principles ordinarily governing the liability of attorneys to non-clients, see A. 216, Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 463, 681 N.E.2d 1189 (1997), and liability for litigation activity, see A. 220; Milliken & Company v. Duro Textiles, LLC, 451 Mass. 547, 564, 887 N.E.2d 244 (2008).  It is clear that the FDCPA was

specifically intended to overcome these common law limitations on liability when

debt collectors are involved.  The Supreme Court twice has emphatically held the

FDCPA to reject those common law limitations on the liability of attorneys to non-

clients when the attorney acts as a debt collector under the FDCPA.  The rejection

of those common law limitations by the Supreme Court for attorney debt collectors

was expressly incorporated into M.G.L. c. 93A, § 2(a) by section 2(b).  There is no

instance cited by the trial court or by MEEB which would support their

conclusions that the Massachusetts courts would or could continue to impose

restrictions on the liabilities of attorney debt collectors under M.G.L. c. 93A, § 2

that Congress and the Supreme Court expressly rejected under the FDCPA.  When

an attorney debt collector has violated the FDCPA, they have violated M.G.L. c.

93A, § 2.

**2**.  **M.G.L. c. 93A, § 2(c) expressly authorized the attorney general to promulgate 940 C.M.R. § 3.16(4) which makes violations of the FDCPA per se violations of G.L. c. 93A, § 2.**

The SJC decision relied on by the trial court to reverse its ruling on per se

chapter 93A liability,  Klairmont,  supra, 465 Mass. 165, 174, 987 N.E.2d 1247,

dealt with the Massachusetts attorney general's regulation 940 C.M.R. § 3.16(3).

A. 215.

[A]n act or practice is a violation of M.G.L. c.93A, s. 2 if: . . . (3) It fails

> to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of this Commonwealth protection.

940 C.M.R. § 3.16(3).  There is nothing in M.G.L. c. 93A to suggest that the attorney general was authorized to make violations of state health, safety, or welfare regulations or laws per se violations of M.G.L. c. 93A, § 2.[28]  Indeed, violations of such regulations or laws do not generally constitute per se negligence in Massachusetts. Berish v. Bornstein, 437 Mass. 252, 273, 770 N.E.2d 961 (2002). In the absence of express statutory authority to the contrary, there would be no reason to expect that they would constitute per se violations of M.G.L. c. 93A, § 2.

However, violations of federal consumer protection laws, the subject of 940 C.M.R. § 3.16(4), stand on a very different footing.

> [A]n act or practice is a violation of M.G.L. c.93A, s. 2 if: . . . (4) It violates the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other Federal consumer protection statutes within the purview of M.G.L. c. 93A, s. 2.

940 C.M.R. § 3.16(4).  The terms of this regulation are clearly within the express authority granted to the attorney general by M.G.L. c. 93A, § 2(c) which gives the attorney general authority to "make rules and regulations interpreting the provisions of subsection 2(a) [which] . . .  shall not be inconsistent with the rules,

---

[28]This is not to say that the attorney general does not have that authority relative to state laws enacted specifically to protect consumers as opposed to general laws intended for everyone's benefit.

- 22 -

regulations and decisions of the Federal Trade Commission and the Federal Courts

interpreting the provisions of 15 U.S.C. 45(a)(1)."[29]   By 15 U.S.C. § 1692l,

violations of the FDCPA are violations of 15 U.S.C. § 45(a)(1); and, therefore, are

violations of a "Federal Trade Commission Act", "the Federal Consumer Credit

Protection Act," and "Federal consumer protection statutes within the purview of

M.G.L. c. 93A, s. 2."  M.G.L. c. 93A, § 2(c).  Therefore, the attorney general had

express authority to promulgate 940 C.M.R. § 3.16(4) which makes violations of

the FDCPA per se violations of M.G.L. c. 93A, § 2(a), without exception or

qualification.

**3.  Charging and collecting excessive, redundant, or otherwise unnecessary attorney fees and costs is not permitted by Massachusetts law and is therefore unfair under 15 U.S.C. § 1692f.**

Charging and collecting excessive, redundant, or otherwise unnecessary

attorney fees is not permitted by Massachusetts law.   Berman v. Linnane, 424

Mass. 867, 872 n.7, 679 N.E.2d 174  (1997); Saladini v. Righellis, 426 Mass. 231,

235-236,  687 N.E.2d 1224 (1997); Rex Lumber Co. v. Acton Block Co., 29 Mass.

App. Ct. 510, 521-522, 562 N.E.2d 845  (1990) (excessive attorneys fees

---

29  Indeed, the defendant in Klairmont argued that liability for violating a building code was precluded by M.G.L. c. 93A, § 2(c) because the FTC has never addressed such violations.  Klairmont,  supra, 465 Mass. at 175, n. 7, 987 N.E.2d 1247. The SJC rejected the argument, but only because it found that there was no FTC or federal court decision which foreclosed the possibility of such liability.  Id.

- 23 -

engendered by excessive litigation impairs the administration of justice); see S.J.C.

Rule 3:07, Massachusetts Rules of Professional Conduct, Rule 1.5(a) (lawyers are

prohibited from "charg[ing], or collect[ing] a[] . . . clearly excessive fee"); In the

Matter of Fordham, 423 Mass. 481 (1996). Therefore, charging and collecting

excessive, unnecessary, unreasonable attorney fees is "[t]he collection of any

amount (including any interest, fee, charge, or expense incidental to the principal

obligation) [which is not] permitted by law," 15 U.S.C. § 1692f(1), and therefore is

an "unfair . . . means to collect or attempt to collect any debt." 15 U.S.C. § 1692f.

Collection means and methods which fail to take those measures required by

law to avoid unnecessary attorney fees and costs or which otherwise result in the

charging and collecting excessive, redundant, or otherwise unnecessary attorney

fees and costs are unfair under 15 U.S.C. § 1692f because they cause or are likely

to cause "[t]he collection of any amount (including any interest, fee, charge, or

expense incidental to the principal obligation) [which is not] permitted by law," 15

U.S.C. § 1692f(1), and because they wrongfully cause debtors to incur avoidable

costs, 15 U.S.C. § 1692f(5).

### a. **MEEB did not sustain its burden of proving that its attorney fees and costs were necessary and otherwise not redundant or excessive.**

The standard of review of the trial court's finding that MEEB's attorney fees

were reasonable is that applicable to decisions involving issues of mixed fact and law.[30]  The trial court made some clear errors of fact, but mostly errors of law, including the failure to adequately indicate that it appropriately considered and evaluated relevant factors.

### i  Massachusetts law concerning attorney fees and costs under fee shifting statutes.

MEEB had the burden of proving the reasonableness of its fees and costs under the fee shifting statute, M.G.L. c. 183A, § 6(c).  Society of Jesus of New England v. Boston Landmarks Comm'n, 411 Mass. 754, 759, 585 NE 2d 326 (1992) (Party claiming fees and costs "ha[s] the burden of showing that the claimed rate and number of hours are reasonable"). The factors considered in Massachusetts to determine reasonable attorney fees under fee shifting statutes are similar to those considered in the federal courts.  "The first component of the basic measure amount is the amount of time reasonably expended on the case."  Killeen v. Westban Hotel Venture, LP., 69 Mass. App. Ct. 784, 790-791, 872 N.E.2d 731 (2007).  Attorneys seeking fees under fee shifting statutes are obligated to make good faith efforts to "exclude excessive, redundant, or otherwise unnecessary hours" from any request for fees.  Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct.

[30]The trial judge was not the presiding judge in the matter in which the services were performed for which the fees were charged; hence, any deference which might otherwise called for as a result of that status would be inappropriate.

1933, 1939, 76 L.Ed.2d 40 (1983). The standard of reasonableness is an objective

one which "requires consideration of 'the nature of the case and the issues

presented, the time and labor required, the amount of damages involved, the result

obtained, the experience, reputation and ability of the attorney, the usual price

charged for similar services by other attorneys in the same area, and the amount of

awards in similar cases.'" Rex Lumber Co. v. Acton Block Co., supra 29 Mass.

App. Ct. at 521-522, 562 NE 2d 845 quoting Linthicum v. Archambault, 379 Mass.

381, 388-389, 398 N.E.2d 482 (1979). Finally, attorney fees and costs under fee

shifting statutes "are to be awarded on `strictly conservative principles.'" In the

Matter of the Estate of King, supra, 455 Mass. at 808, 920 N.E.2d 820 quoting

Clymer v. Mayo, 393 Mass. 754, 773, 473 N.E.2d 1084 (1985).


### ii.  The trial court did not adequately consider the factors relevant to determining MEEB's whether MEEB's attorney fees and costs were necessary and not excessive or redundant.

The trial court gave little indication how it came to the conclusion that MEEB's

attorney fees were reasonable. It reviewed some of MEEB's billing records[31], but

not all, and gave no indication that it considered any of the relevant factors stated

above. Its failure to indicate that it evaluated the relevant factors is reversible

error. In the Matter of the Estate of King, 455 Mass. 796, 808-809, 920 N.E.2d

_____

31A. 42.

- 26 -

820 (2010) (error to fail to review billing records) see <u>Perdue v. Kenny A. Ex Rel.</u> <u>Winn</u>, 130 S. Ct. 1662, 1676, 559 U.S. 542, 176 L. Ed. 2d 494 (2010) ("It is essential that the judge provide a reasonably specific explanation for all aspects of a fee determination")

The court failed to adequately indicate that it considered MEEB's repeated violations of the FDCPA as they related to the reasonableness of its fees and costs, such as its filing multiple lawsuits to collect the same debt, communicating with McDermott directly when he was represented by counsel, communicating with McDermott's mortgagees without his knowledge or permission, and repeatedly communicating intentionally false amounts due and false characterizations of the nature of the debt. Its failure to do so was error of law. MEEB's unfair and deceptive conduct was clearly relevant to the reasonableness of its attorney fees and costs. <u>In the Matter of the Estate of King</u>, 455 Mass. 796, 807, 920 N.E.2d 820 (2010) ("Other important considerations are the necessity of the services, the extent to which duplicate or redundant effort was involved, and the conduct of the party seeking the award of fees."); see <u>De Jesus Nazario v. Morris Rodriguez</u>, 554 F. 3d 196, 200 (1st.Cir.2009) ("bad faith or obdurate" conduct is relevant), quoting <u>Stefan v. Laurenitis</u>, 889 F.2d 363, 371 (1st Cir.1989).

**iii. MEEB failed to sustain its burden of proving that the attorney**

**fees and costs that it charged and collected for filing multiple lawsuits to collect the same debt were necessary and not redundant.**

The trial court found that two of the lawsuits filed by MEEB, the fourth and fifth 105 lawsuits (June, 2007 and October, 2007 lawsuits respectively) sought to collect the same attorney fees and assessments as the pending third 105 lawsuit (June, 2006 lawsuit). A. 152-154. It found that these duplicative lawsuits violated the FDCPA and awarded McDermott $5,000 in emotional distress damages and $400 in out-of-pocket costs. A. 190-191. However, it made no finding that the attorney fees and costs charged for these redundant lawsuits were redundant or otherwise unnecessary. This was clear error. The title examination charges, pre-suit notice charges, and charges for drafting, filing, and recording the complaints were $1,291.00[32] for the fourth 105 lawsuit and $1,301.00[33] for the fifth 105 lawsuit. These charges were clearly unnecessary.

**iv. MEEB failed to sustain its burden of proving that its attorney fees and costs for preparing, filing, and prosecuting the lawsuits were necessary and would not have been avoided had it timely sent the pre-suit notices to McDermot's mortgagees.**

**1) The trial court's failure to find that MEEB was obligated to send the pre-suit notices to McDermott's mortgagees was error of law.**

The trial court found that McDermott's mortgagees had not informed Pondview

---

[32]The charges are located in the invoices at Ex. 120 and 122.
[33]Invoices at Ex. 131 and 134.

of their names and mailing addresses under M.G.L. c. 183A, § 6(c). This was clear error of fact predicated on misapprehension of the requirements of section 6(c). The record is replete with communications between MEEB and McDermott's mortgagees, any of which served to inform Pondview of the mortgagee's names and mailing addresses under M.G.L. c. 183A, § 6(c). The trial court's ruling that even if MEEB were obligated to send the pre-suit notices to the mortgagees, its failure to do so was not unfair under 15 U.S.C. § 1692f, A. 138, was an error of law. MEEB was obligated to send the pre-suit notices because not only had it been informed of their names and mailing addresses, it was undisputed that at all relevant times it in fact knew their names and mailing addresses. MEEB's sending the pre-suit notices in a manner which frustrated their purpose of avoiding unnecessary attorney fees and costs was unfair under 15 U.S.C. § 1692f because unnecessary attorney fees and costs are not permitted by state law, 15 U.S.C. § 1692f(1), and because it is unfair to wrongfully cause a debtor to incur liability for avoidable costs, 15 U.S.C. § 1692f(5).

> **a) Massachusetts condominium law concerning assessments, the lien for assessments, the priority of the lien, and the pre-suit notices.**

To understand the issues involved in this claim, as well as those involved in McDermott's challenge to the trial court's findings of good faith, some background

- 29 -

on Massachusetts condominium law is necessary.  Condominium organizations of unit owners may assess unit owners regularly recurring budgeted assessments, special assessments, late charges, fines, penalties, and interest.  M.G.L. c. 183A, § 6(a)(ii).  They may also assess to individual unit owners the attorneys fees and costs they incur to collect overdue assessments from them.  M.G.L. c. 183A, § 6(a) (ii)  There is an automatic lien on units for all of these assessments as they become due.  M.G.L. c. 183A, § 6(a)(i).  Mortgagees are not liable to pay these charges; however, some of the liens can be prior to the first mortgage.  Specifically, the lien for up to six months of regularly recurring budgeted assessments is prior to the first mortgage and the lien for attorneys fees and collection costs to collect the overdue assessments may be prior.  M.G.L. c. 183A § 6(c), ¶ 2.  The lien for other assessments, such as fines and penalties and special assessments, are never prior to the first mortgage.  M.G.L. c. 183A, § 6(c), ¶ 2.  The organization may seek to collect overdue assessments by a lien enforcement proceeding under sections five and five A of the mechanics lien statute,[34] M.G.L. c. 183A, § 6(c), ¶ 2.  If the organization determines to proceed by a lien enforcement action under M.G.L. c. 254, §§ 5 and 5A, the mortgagees and attaching creditors must be named as parties in interest in the suit.  M.G.L. c. 254, § 5.

   Prior to bringing a lien enforcement action, the organization must provide the

---

[34] M.G.L. c. 254, §§ 5 and 5A.

unit owner and their first mortgagee with notices stating the amount of the delinquency "[w]hen any portion of the unit owner's share of the common expenses has been delinquent for at least sixty days" ("sixty day delinquency notice") and must notify the first mortgagee of its intent to bring a lien enforcement action at least thirty days prior to the filing the action ("notice of intent") M.G.L. c. 183A,§ 6(c), ¶ 1.  If the organization fails to timely provide the first mortgagee with these notices, the lien for attorneys fees and costs is not prior to the mortgage. M.G.L. c. 183A, § 6(c), ¶ 2[35].

The purpose for the pre-suit notices is to provide the unit owner and their first mortgagee with an opportunity to avoid the costs of a lawsuit, particularly the attorney fees and costs.  The unit owner, by paying the amount alleged due.  The mortgagee, by agreeing to pay the arrears which are prior to the mortgage and the attorneys fees and costs incurred up to the time of the agreement, and to pay the regularly recurring budgeted assessments and some of the special assessments going forward ("pre-suit settlement procedure").[36]   M.G.L. c. 183A, § 6(c), ¶ 4.

---

[35] "The failure of the organization of unit owners to send the first mortgagee either the notice of sixty day delinquency of common expenses, as described above, or the thirty day notice of intent to file an action to enforce the lien for delinquent common expenses, as described above, shall not affect the priority lien of the organization of unit owners for up to six months' common expenses, but the priority amount shall not include any costs or attorneys' fees incurred in the action to enforce the lien."  M.G.L. c. 183A, § 6(c), ¶ 2.

[36] Both of McDermott's mortgagees were authorized under their mortgages to

**b)  MEEB was obligated to timely mail the pre-suit notices to McDermott's mortgagees because it had been informed of their names and mailing addresses under M.G.L. c. 183A, § 6(c) and because it otherwise at all relevant times knew their names and mailing addresses.**

M.G.L. c. 183A, § 6(c), ¶ 1 states that organizations of unit owners "shall" send the pre-suit notices to the mortgagees, "provided, that the first mortgagee has informed the organization of unit owners of its name and mailing address." At trial, MEEB contended that the mortgagees had not informed Pondview of their names and mailing addresses under section 6(c) because they had not given "written notice of the mortgagee's name and mailing address to the organization of unit owners" under M.G.L. c. 183A, § 4(5).  The trial court agreed.  A. 138-139. That was clear error predicated on error of law.  MEEB further contended that because it had not been informed by the mortgagees of their names and mailing addresses, it was not obligated to send them the pre-suit notices even though it in fact knew their names and mailing addresses.  The trial court made no ruling whether MEEB was obligated to send the pre-suit notices.

The plain meaning of the general term "inform" in section 6(c) does not specify any particular means by which information must be communicated.  "When a word is not defined by statute, we normally construe it in accord with its ordinary or

require McDermott to make payments into an escrow account from which these monthly and other payments may be made.  A. 7 and ex 28.

natural meaning." <u>Smith v. United States</u>, 508 U.S. 223, 228, 113 S. Ct. 2050, 124

L. Ed. 2d 138 (1993).  Furthermore, unlike other sections in chapter 183A, section

6(c) makes no express reference to the notices under section 4(5).  For example,

both sections 5(b)(1) and 5(b)(2)(i) of chapter 183A expressly state that the

mortgagee must have given the specific notice required by section 4(5) in order to

exercise their rights under those sections.[37]  Therefore, it is clear from the plain

meaning of the general term "inform" used and the lack of an express reference to

the notice under section 4(5) that the notice under section 4(5) is not the only way

that a mortgagee can inform the organization of its name and mailing address.

"Statutory construction, however, is a holistic endeavor. A provision that may

seem ambiguous in isolation is often clarified by the remainder of the statutory

scheme."  <u>United Sav. Assn. of Tex. v. Timbers of Inwood Forest Associates, Ltd.</u>,

484 U.S. 365, 371, 108 S. Ct. 626, 98 L. Ed. 2d 740 (1988).

   Another way by which a mortgagee may inform the organization of its name

and mailing address under section 6(c) is by recording their mortgage in the

---

[37] M.G.L. c. 183A, § 5(b)(1) states that readjustments to percentage interests in
certain instances can be made if "consent of 51 per cent of the number of all
mortgagees holding first mortgages on units within the condominium who have
given notice of their desire to be notified as provided in clause (5) of section 4 is
obtained" and M.G.L. c. 183A, § 5(b)(1) states that determinations concerning
easements needs "the consent of at least 51 per cent of the number of all
mortgagees holding first mortgages on units within the condominium who have
requested to be notified thereof, as provided in subsection (5) of section 4."
igrants, modifications, and amendments to easements over common areas

registry of deeds.  Organizations may not be required to do an examination of title under section 6(c)[38] but they are encouraged to do so.  The cost of a title examination is specifically made recoverable under the pre-suit settlement procedures, M.G.L. c. 183A, § 6(c), ¶ 4, and, irrespective of whether the organization has been informed of the mortgagee's name and mailing address, the organization's lien for attorney fees and costs is not prior to the mortgage unless it sends them the pre-suit notices, M.G.L. c. 183A, § 6(c), ¶ 2.   If the organization does an examination of title and thereby learns of the mortgagee's name and mailing address, the mortgagee has  informed them of their name and mailing address under section 6(c).

    Futhermore, even if the written notice under section 4(5) were the exclusive means by which a mortgagee may inform the organization of its name and mailing address under section 6(c), it is clear that McDermott's mortgagees did in fact provide such notice.  There is no formal requirement for such notice under section 4(5).  All that is required is a writing given by the mortgagee to the organization containing the mortgagee's name and mailing address.  The record is replete with such writings.  Ex.  47,  299, 317, 320, 329, 374, and 501.   Because it is clear that

---

[38] A mortgagee is a "party in interest" in any lien enforcement action and required to be included as a party in the action.  M.G.L. c. 254, § 5.  Hence a title examination to determine the identity of mortgagees and other lien holders would appear to be mandatory prior to bringing such an action.

McDermott's mortgagees had informed Pondview of their names and mailing addresses under section 6(c) in numerous ways, the trial court's finding that they had not was clear error.

In addition, it is clear under chapter 183A that the organization is obligated to send the pre-suit notices under section 6(c) to the mortgagee whenever it in fact knows their name and mailing address.  Section 4(5) is clear that the organization's reliance on any notice from the mortgagee under that section must be in good faith.[39]  "The term '[g]ood faith' means 'honesty in fact in the conduct or transaction concerned.' See G. L. c. 106, § 1-201 (19)."  Demoulas v. Demoulas, 428 Mass. 555, 575, 703 N.E.2d 1149 (1998).  The good faith of the organization is determined by its actual knowledge.  If the organization in fact has notice of the mortgagee's actual name and mailing address, regardless of how obtained, it is irrelevant whether the mortgagee has given it the written notice under section 4(5).

> A person has 'notice' of a fact when (a) he has actual knowledge of it; or (b) he has received a notice or notification of it, or (c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists.

---

[39] "The organization . . .may rely in good faith upon the most recent notice of name and address for the purpose of providing notices to the . . .mortgagees . . . under this chapter or under the provisions of the loan documents or condominium documents. . . . Any notices sent in writing to a mortgagee . . . as listed in the most recent notice of name and address, if relied upon in good faith, shall be deemed sufficiently given, provided that the organization . . . has given notice as required by this chapter."  M.G.L. c. 183A, § 4(5).

Demoulas v. Demoulas, supra 428 Mass. at 575, 703 N.E.2d 1149.  This

construction is consistent with the purpose and intent of the pre-suit notices under

section 6(c), the importance of the property rights involved, and the overall lien

enforcement procedure under state law.  Mortgagees have constitutionally

protected property interests which require that they receive notice of the lien

enforcement proceeding.  Mennonite Bd. of Missions v. Adams, 462 US 791, 798,

103 S. Ct. 2706, 77 L. Ed. 2d 180 (1983) (mortgagee which has a publicly

recorded mortgage must be notified by mail of a tax sale which creates a lien on

the property that is prior to mortgage).  State law requires that they be named as

parties in any such proceeding, M.G.L. c. 254, § 5, and has always required strict

compliance with the statutory requirements of such proceedings.  Mullen Lumber

Co. v. Lore, 404 Mass. 750, 752, 537 NE 2d 123; Ng Brothers Construction, Inc. v.

Cranney, 436 Mass. 638, 642, 766 N.E.2d 864  (2002); accord US Bank National

Association v. Ibanez, 458 Mass. 637, 646-647, 941 N.E.2d 40 (2011) (exercise of

power of sale in mortgage to foreclose on real estate must strictly comply with

statutory nc. v. Cranney, 436 Mass. 638, 642 (2002); accord US Bank National

Association v. Ibanez, 458 Mass. 637, 646-647 (2011) (exercise of power of sale in

mortgage to foreclose on real estate must strictly comply with statutory procedure).

Construing sections 4(5) and 6(c) to require the organization to send the pre-suit

- 36 -

notices to the mortgagees whenever it has notice of their names and mailing addresses is consistent with the overall intent and purpose of section 6(c) and the property rights involved. Meaningless, pointless technical requirements which defeat and frustrate this overall intent should not be read into the statute.

It was undisputed that MEEB at all relevant times in fact knew the names and mailing addresses of McDermott's mortgagees. MEEB repeatedly conducted title examinations for the express purpose of learning same, repeatedly did send the pre-suit notices to the mortgagees, albeit in an untimely manner which frustrated the purpose of the notices, repeatedly named the mortgagees as parties in the lawsuits, and repeatedly communicated with and received substantial payments from the mortgagees. It is also clear that McDermott's mortgagees repeatedly informed Pondview of their names and mailing addresses under section 6(c). Therefore, at all relevant times, MEEB was obligated to mail the pre-suit notices to McDermott's mortgagees in compliance with the requirements of section 6(c).

### 2) The trial court's ruling that it would not be unfair under 15 U.S.C. § 1692f to fail to timely send the pre-suit notices was error of law.

The trial court's ruling that it would not be unfair under 15 U.S.C. § 1692f to fail to timely mail the pre-suit notices to the mortgagees even if obligated to do so under M.G.L. c. 183A, § 6(c) was an error of law. If charging costs which can not

be charged by law, i.e. unnecessary attorney fees and costs, is unfair, 15 U.S.C. §

1692f(1), and wrongfully causing debtors to incur costs which could have been

avoided are unfair, 15 U.S.C. § 1692f(5), then deliberately failing to take those

measures required by law which are intended to prevent those costs is unfair.

"[W]hen Congress uses broad generalized language in a remedial statute, and that

language is not contravened by authoritative legislative history, a court should

interpret the provision generously so as to effectuate the important congressional

goals." Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc., 754 F.2d 404, 428 (1st

Cir. 1985). The FDCPA is a remedial statute. Brown v. Card Service Center, 464

F. 3d 450, 453 (3rd.Cir.2006). The term "unfair" is broad generalized language.

The FDCPA was expressly intended to provide consumers with protections from

predatory debt collectors which existing law was inadequate to provide. 15 U.S.C.

§ 1692(a) and (b). Unnecessary attorney fees and costs are prohibited by state law

and therefore unfair under 15 U.S.C. § 1692f(1) and causing debtors to incur

avoidable costs is also unfair under 15 U.S.C. § 1692f(5). Therefore, the deliberate

failure to take those actions required by law to avoid unnecessary attorney fees and

costs is also unfair under 15 U.S.C. § 1692f.

**3)  MEEB failed to sustain its burden of proving that its attorney fees and costs for preparing, filing, and prosecuting the lawsuits were necessary.**

- 38 -

The evidence was clear that McDermott's mortgagees took prompt, decisive action once notified of the claims for delinquent assessments. The only time that MEEB sent McDermott's mortgagee the pre-suit notices without at the same time filing suit resulted in a prompt payment by the 104 mortgagee of the amount claimed due, thereby preventing the filing of a suit. A. 149-150 [40]; Ex. 366-374. The first three times that MEEB filed suit on unit 105 also resulted in prompt payments by the 105 mortgagee. A. 151 (first 105 lawsuit); A. 152 (second 105 lawsuit); and A. 149 (the $3,454.00 payment on August 29, 2006 by the unit 105 mortgage, M & T,[41] which MEEB credited to the unit 104 account). The only delays occurred when the fees and costs had risen to substantial sums through no fault of the mortgagee. That occurred in the first 104 lawsuit when the mortgagee was given no notice of the suit until it was well underway[42] and occurred in the third 105 lawsuit when MEEB miscredited the 105 mortgagee' prompt payment to the unit 104 account and thereafter dismissed the second unit 104 lawsuit and not the contemporaneously filed third unit 105 lawsuit, A. 149 and 151. Nonetheless, the mortgagees invariably paid all amounts claimed due, whether promptly, or

40The February, 2007 payment of $2,226.83 by MERS which prevented another unit 104 suit being filed.

41McDermott testified that M & T mortgage was the mortgagee for unit 105 at the time. App. 511, McDermott direct. The court actually makes no finding whether M & T was the unit 104 or the unit 105 mortgagee.

42Ex. 272 and 273.

otherwise, and Pondview always accepted the payments in satisfaction of its

claims.  In all, the unit 104 mortgagee paid $35,040.23 and the unit 105 mortgagee

paid $34,769.82 for total payments of $69,810.14.  Of that, MEEB admitted to

receiving $55,581.20 which it credited toward its total charges of $83,552.  A

review of MEEB's invoices, Ex. 58-172, shows that most of MEEB's attorney fees

and costs were related to preparing, filing, and prosecuting the lawsuits it filed.

The pre-litigation fees were relatively minor, consisting essentially of the pre-suit

notices and examinations of title.  There is no reason to expect, nor any credible

contention which could be made that the mortgagees and Pondview would have

been any less willing and able to settle Pondview's claims had the mortgagees been

given the reasonable opportunity to do so prior to MEEB's filing the lawsuits when

those claims were substantially smaller.  MEEB did not and could not sustain its

burden of proving that those fees and costs would not have been avoided had it

complied with its obligations under law and thus were necessary.


**4.  The measure of McDermott's damages for MEEB's violating 15 U.S.C. § 1692f by charging and collecting excessive, redundant, and otherwise unnecessary attorney fees and costs are the excessive, redundant, and otherwise unnecessary attorney fees and costs that McDermott became liable to pay and that MEEB charged and collected.**

The trial court's conclusion that McDermott suffered only minimal economic

injury, A. 194, was predicated on its erroneous finding that MEEB's attorney fees

and costs were reasonable.  McDermott's economic injury consisted of his

becoming liable to pay excessive, redundant, and otherwise unnecessary attorney

fees and costs.

    The liability to pay MEEB's attorney fees and costs was McDermott's, not his

mortgagees'.  M.G.L. c. 183A, § 6.  The fact that his mortgagees paid those fees

did not change that.  There was no windfall, as MEEB contends, to McDermott

because his mortgagees made the payments.[43]  All their payments did was to

change the identity of the party to whom McDermott became liable to pay.  The

payments didn't change the fact that McDermott remained liable to pay.  See A.

188-189 (the mortgagees would simply add the amounts they paid to amount

McDermott owed them). There was no evidence that McDermott's mortgagees

intended to make a gift to McDermott by their payments or that they at any time

forgave his liability to them for those payments.  Moreover, even if they had,

MEEB would be precluded by the common law collateral source rule from

claiming a benefit as a result.  Law v. Griffith, 457 Mass. 349, 355, 930 N.E.2d

126 (2010) ("The purpose of the collateral source rule is tort deterrence. The

tortfeasor is required to compensate the injured party for the fair value of the harm

caused, and is not to benefit from either contractual arrangements of the injured

party with insurers or from any gifts from others intended for the injured party.").

[43]Ex's 47,  299, 320, 329, 374, and 501.

The measure of McDermott's economic damages against MEEB is the amount of excessive, redundant, or otherwise unnecessary attorney fees and costs he became liable to pay, irrespective of to whom he became liable to pay them.

Additionally, MEEB was clearly unjustly enriched by the unreasonable, excessive fees that it collected.  Lopes v. Commonwealth, 442 Mass. 170, 179, 811 N.E.2d 50 (2004) (plaintiffs' claim of unjust enrichment does not state a separate cause of action, but a theory of recovery).  There is little question that restitution and unjust enrichment are available remedies to consumers under M.G.L. c. 93A, § 9.

> Relief tailored for the consumer is a thread which is weaved throughout the entire consumer law fabric. This court said in Commonwealth v. DeCotis, 366 Mass. 234, 245 (1974): "We believe that, as originally enacted, M.G.L. c. 93A granted full authority to the courts to use their traditional equity power to fashion decrees to remedy the wrong complained of and to make the decree effective."

Nei v. Burley, 388 Mass. 307, 314, 446 N.E.2d 674 (1983).  "We believe that, as originally enacted, M.G.L.c. 93A granted full authority to the courts to use their traditional equity power to fashion decrees to remedy the wrong complained of and to make the decree effective."  Commonwealth v. DeCotis, 366 Mass. 234, 274, 316 N.E.2d 748 (1974).

**5.  McDermott is entitled to an award of multiple damages under M.G.L. c. 93A, § 9(3) because MEEB's violations of M.G.L. c. 93A, § 2 were willful or**

**knowing and because MEEB refused to grant relief upon demand with knowledge or reason to know that the acts or practices complained of in the demand violated M.G.L. c. 93A, § 2.**

McDermott is entitled to no less than two times and no more than three times his actual damages because MEEB's violations of M.G.L. c. 93A, § 2 were knowing or willful and because MEEB refused to provide relief in response to McDermott's demand when it knew or should have known that the acts McDermott complained of violated M.G.L. c. 93A, § 2.

> [I]f the court finds for the petitioner, recovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of said section two or that the refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated said section two.

M.G.L. c. 93A, § 9(3).

**a.  McDermott is entitled to an award of multiple damages under M.G.L. c. 93A, § 9(3) because MEEB's violations of M.G.L. c. 93A, § 2 were willful or knowing.**

**i.  Standard of review.**

As a general rule, conduct is willful under M.G.L. c. 93A, § 9 if it is reckless and knowing if it is intentional. Kattar v. Demoulas, 433 Mass. 1, 16-17, 739 N.E.2d 246 (2000).  Where MEEB's violations of the FDCPA were found to be intentional, the failure to find them knowing or willful under M.G.L. c. 93A, § 2

- 43 -

was error of law warranting de novo review.

The trial court's findings of MEEB's good faith involved the "resolution of mixed questions of law and fact" and therefore warrant de novo review because they were "infected by legal error" and based upon "mistaken impression[s] of applicable legal principles." Williams v. Poulos, 11 F. 3d 271, 278 (1st.Cir.1993) (quoting LoVuolo v. Gunning, 925 F.2d 22, 25 (1st Cir.1991)). This standard is particularly appropriate in this case because the trial court's findings of MEEB's good faith were based principally upon MEEB's claimed understandings of its obligations under law. Those claimed understandings are judged by an objective standard. See Meyer v. Wagner, 429 Mass. 410, 424, 709 N.E.2d 784 (1999) (objective standard of reasonableness applied to determine attorney negligence, not subjective standard of good faith); see also In the Matter of Fordham, 423 Mass. 481, 492-493, 668 N.E.2d 816 (1996) (reasonableness of attorney fees judged by objective standard). De novo review is also appropriate because one, there exists no bona fide error defense under the FDCPA for errors of law, A. 154-155; two, "one who deliberately goes perilously close to an area of proscribed conduct [under the FDCPA] shall take the risk that he may cross the line,"[44] and three, punitive damages under the FDCPA are determined on an objective basis. Jerman v.

_____

[44]Clark v. Capital Credit & Collection Serv., 460 F.3d 1162, 1171-1172 (9th Cir. 2006) quoting FTC v. Colgate-Palmolive Co., 380 U.S. 374, 393, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965)

Carlisle, McNellie, Rini, Kramer,  130 S. Ct. 1605, 1609, 559 U.S. 573, 176 L. Ed.

2d 519 (2010) (penalties are warranted "for debt collectors whose intentional

actions also reflected "knowledge fairly implied on the basis of objective

circumstances" that the conduct was prohibited."), quoting 15 U.S.C.  §§ 45(m)(1)

(A), (C).  It is not what MEEB claimed it understood, but what it reasonably

should have understood which determines whether it acted willfully or knowingly.

Those considerations warranting deference to the trial court, such as its

observations concerning the demeanor of witnesses, are irrelevant.   The reviewing

court is in as good a position as the trial court to judge the reasonableness of

MEEB's claimed understandings of its obligations under law.

   And finally, even if de novo review were not appropriate, a careful review of

the record concerning MEEB's collection practices shows that the trial court clearly

made a mistake when it determined that MEEB's mistakes of law were in good

faith.  First, the pattern is consistent.  MEEB's casuistic constructions of law

always served to facilitate and enable its charging and collecting attorney fees and

costs, from its alleged belief that it was authorized to file multiple lawsuits to

collect the same debt to its claimed belief that it was not obligated to send the pre-

suit notices to McDermott's mortgagees even though it clearly knew their names

and mailing addresses and routinely and regularly communicated with them after

filing suit.  If the mistakes were in good faith and not motivated by an intent to

generate greater attorney fees and costs, their effect on MEEB's attorney fees and

costs would have been neutral.  They wouldn't all lead to the same result, i.e.,

additional fees and costs.    Second, MEEB's claimed intent and understanding

were at odds with the actions it took.

### ii. **MEEB knowingly violated  M.G.L. c. 93A,  § 2 when it made false statements about the amount due and the character of the debt.**

The trial court found that MEEB intentionally and persistently made false

statements of amounts due and false characterizations of the nature of the debt.  A.

102-122.   The court awarded actual damages of $4,500 for emotional distress for

the overstatements of amounts due in the first four lawsuits, A. 183, and $500 for

emotional distress for intentionally false statements in a May 2, 2005 letter, A.

184.  Intentionally false statements to a consumer clearly qualify as knowing

violations of M.G.L. c. 93A, § 2.  Grand Pacific Fin. Corp. v. Brauer, 57 Mass.

App. Ct. 407, 421, 783 N.E.2d 849 (2003) (multiple damages warranted against

attorney under M.G.L. c. 93A, § 2 because "the deceptive acts and practices of the

defendants in this case "establishe[d] willfulness as a matter of law"", quoting

Anthony's Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 475, 583 N.E.2d 806

(1991) citing Pepsi-Cola Metropolitan Bottling Co. v. Checkers, Inc., 754 F.2d 10,

18 (1st Cir. 1985).  For the same reasons MEEB's misleading inferences in its
complaints concerning its delivery of the pre-suit notices and its false statements
concerning the priority of the lien were also knowing violations of section 2.

The trial court's award of $4,500 emotional distress damages for these
intentionally false statements should be multiplied by no less than two and no more
than three times under M.G.L. c. 93A, § 9(3) as should any and all unreasonable
attorney fees and costs McDermott became liable for or that MEEB collected as a
result of these statements.

### iii.  MEEB knowingly or willfully violated  M.G.L. c. 93A,  § 2 when it filed multiple lawsuits to collect the same debt.

The court accorded as good faith, MEEB's explanation for its filing multiple
lawsuits to collect the same debt.  MEEB contended that it was authorized to do so
by the state law's limitation of the priority lien to six months of regularly recurring
budgeted common expenses accruing prior to suit.  A. 146.  MEEB testified it did
this in order to obtain the benefit of the automatic priority of the lien under M.G.L.
c. 183A, § 6(c) for up to six months of regularly recurring budgeted assessments
accruing prior to filing suit.  A. 45.   MEEB's claimed interpretation of the statute
was patently unreasonable.  In effect MEEB claimed that it understood that the
Massachusetts legislature intentionally burdened consumer condominium unit

owners with multiple lawsuits to collect the same debt. The claim was not objectively reasonable.

Moreover, MEEB's actions were not consistent with the explanation. MEEB's alleged interpretation, as unreasonable as it was, may have offered an explanation had it filed lawsuits every six months while prior suits were pending. But the evidence shows that MEEB didn't do that. The first 104 lawsuit lasted nearly two years from its commencement in April, 2005 to the entry of final judgment in March, 2007. Had MEEB sincerely believed that it was authorized to file lawsuits every six months to protect Pondview's priority for assessments accruing after it filed the first suit, it would have filed no less than three additional lawsuits to collect the same debts sought in that lawsuit between April, 2005 to March, 2007. It did not do so. The evidence shows that MEEB filed multiple lawsuits only when McDermott's mortgagees scheduled a foreclosure sale of his property. A. 152-153. It enabled MEEB to record in the registry of deeds a far larger lien for its attorney fees and costs then had previously been recorded, again falsely asserting them to be prior to the mortgagee's mortgage, just prior to the foreclosure.

The trial court's award of $5,000 in emotional distress damages and $400 in out-of-pocket costs for the multiple lawsuits, A. 191, should be multiplied by no less than two and no more than three times under M.G.L. c. 93A, § 9(3) as should

any and all redundant and unnecessary attorney fees and costs that McDermott

became liable for or that MEEB collected as a result of these lawsuits.

### iv. MEEB knowingly or willfully violated M.G.L. c. 93A, § 2 when it failed to timely send McDermott's mortgagees the pre-suit notices, falsely inferred in its complaints that it did and falsely stated in the complaints that the lien for its attorney fees and costs as well as the lien for special assessments and late payment penalties were prior to the first mortgage.

It is clear from the timing of the pre-suit notices and the misleading and false

allegations in the complaints filed that MEEB sought to gain the benefit of sending

the notices, the priority of the lien for its attorney fees and costs, while at the same

avoiding their purpose. Such a scheme, involving a deliberate failure to comply

with the mandatory provisions of the law and deliberately misleading and false

allegations in a complaint clearly qualifies as a willful and knowing violation of

M.G.L. c. 93A, § 2.

MEEB was obligated to send the pre-suit notices because it knew the

mortgagees' names and mailing addresses and the mortgagees had otherwise

informed MEEB of same. It failed to send the notices as required by law but

always sent them at a time when they were useless. It then implied in its

complaints that it had complied with the pre-suit notice requirements. Its

implication relative to the thirty day notice of intent was particularly disingenuous

because it never stated the thirty day requirement..[45]   Because it failed to send the

pre-suit notices in compliance with the law, the lien for attorney fees and costs

were never prior to the mortgages.  M.G.L. c. 183A, § 6(c), ¶ 2 .  Yet MEEB

always falsely alleged in its complaints that the total amount claimed due, which

always included its attorney fees and costs, as well as all special assessments and

late payment penalties, were prior to the mortgages.

    The court found that MEEB's failure to timely send the pre-suit notices to the

mortgagees was in good faith because MEEB claimed that it believed that the

mortgagees had not informed Pondview of their names and mailing addresses

under M.G.L. c. 183A, §§ 4(5) and 6(c).  A. 138-139.   MEEB's alleged belief was

unreasonable given the volume of correspondence between MEEB and the

mortgagees and the fact that it is undisputed that MEEB at all times knew their

names and mailing addresses.  Furthermore, such an alleged belief might have

explained MEEB's failure to mail the mortgagees the pre-suit notices, but it didn't

explain why MEEB deliberately chose to mail them in a manner which frustrated

their purpose.  MEEB explained it did that because it "was attempting to resolve

the matter and therefore waited to send out the notice to avoid additional legal

fees." A. 44, 138.  In other words, MEEB's explanation for why it deliberately sent

the pre-suit notices in a manner which frustrated their purpose of saving costs was .

---

45 See Ex. 44, ¶ 9; 421, ¶ 8.

. . to save costs.   The explanation on its face strains credulity to the breaking point.
Moreover, there was no evidence of any attempt by MEEB to resolve the matter
prior to filing its nine lawsuits other than the pre-suit notices to McDermott, which
were sent anywhere from shortly before to at the time the suit was filed.[46]  There
was no evidence of any other communications with McDermott or his mortgagees
prior to suit.  MEEB's invoices reflect no attempts by MEEB to resolve the
disputes prior to filing suit.  As a matter of law, communications which the court
found to contain false statements of amounts due, do not constitute good faith
attempts to resolve a dispute.  Moreover, the evidence was clear that McDermott
disputed and contested MEEB's attorney fees and the late payment penalties from
the very beginning.  A. 31.  The only party who regularly did not contest them and
paid them was McDermott's mortgagees.   At no time could MEEB have
reasonably believed that pre-suit notices with intentionally false statements of
amounts due sent to McDermott alone just prior to suit would resolve anything.[47]

_____

[46]These notices were also untimely.  They were required to be sent "[w]hen any
portion of the unit owner's share of the common expenses has been delinquent
for at least sixty days M.G.L. c. 183A, § 6(c), ¶ 1.  The evidence was clear that
the notices were not sent whenever McDermott was at least sixty days in arrears.
Rather, they were sent to McDermott just weeks prior to filing suit and sent to
his mortgagees when the suits were filed.

[47]MEEB also charged for these letters which served no purpose, $110 for the
notice of intent and $100 for the notice of delinquency  See A. 93.  These were
obviously unnecessary charges.

**b. McDermott is also entitled to an award of multiple damages under M.G.L. c. 93A, § 9(3) because MEEB refused to grant relief upon demand in bad faith with knowledge or reason to know that the acts or practices complained of in the demand violated M.G.L. c. 93A, § 2.**

On December 11, 2008, McDermott mailed to MEEB a demand for relief under M.G.L. c. 93A, § 9(3) ("demand").  A. 198; Ex 79.  MEEB responded by letter dated January 16, 2009 ("response").  Ex 80; A. 199.   The response refused to grant relief.  Id.  However, the trial court found that the refusal was in good faith because MEEB "fully investigated the facts";  detailed "the facts and frame[ed] a number of reasonable, albeit unsuccessful, legal defenses to per se chapter 93A liability based upon the FDCPA violations" and "denie[d] certain facts and elaborate[d] upon other alleged facts which objectively justif[ied] the failure to offer a settlement amount."  A. 199.

A refusal to grant relief is in bad faith if the recipient of the demand has "knowledge or reason to know that the practice complained of violated § 2." Heller v. Silverbranch Construction Corp.,  supra 376 Mass. at 627, 382 N.E.2d 1065.   "The standard is objective and requires the defendant to investigate the facts and consider the legal precedents."  Id, 376 Mass. at 628, 382 N.E.2d 1065. Therefore, the issue is whether MEEB knew or had reason to know that the acts McDermott complained of were unfair or deceptive acts or practices in the conduct

of any trade or commerce under M.G.L. c. 93A, § 2(a).  Because the standard is

objective, the review is de novo.

McDermott's demand letter stated in part:

> You repeatedly sent communications to McDermott and filed pleadings
> in court which were misleading and deceptive because they . . made false
> claims that he had been "duly assessed" amounts he had had no notice
> of, nor been delinquent in paying . . .  communicating directly with him
> after you knew he had an attorney; and repeatedly providing him with
> inaccurate, incomplete, insufficient, and misleading information relative
> to amounts required to become current.  Additionally, you . . .  filed
> repeated, unnecessary, and frivolous lawsuits and sought to collect
> abusive, punitive, unnecessary, and frivolous legal fees and costs;
> undertook repeated actions relative to the collection of debts allegedly
> owed by McDermott without his knowledge or approval; and filed
> pleadings in court and made communications with third parties
> concerning amounts McDermott allegedly owed with no notice to him.
> Your actions demonstrated a deliberate and relentless intent to create
> unnecessary and grossly excessive legal fees and costs.

Ex. 455.  The trial court found that MEEB had committed all of these violations of

the FDCPA and M.G.L. c. 93A, § 2 except for the allegation that MEEB had

charged unnecessary, excessive attorney fees and costs.  MEEB knew or had

reason to know it committed these violations when it refused relief.  Therefore,

MEEB's refusal was not in good faith under M.G.L. c. 93A, § 9(3).  McDermott is

entitled to at least two times his actual damages as a result of these violations.

## H  CONCLUSION

Wherefore, McDermott respectfully requests the following relief:

- 53 -

1)  that the trial court's findings in its Order that MEEB's violations of the FDCPA were violations of M.G.L. c. 93A, § 2 be reinstated;

2)  that the trial court's findings and rulings that MEEB's attorney fees and costs were reasonable be reversed;

3)  that MEEB's unfair and deceptive acts and practices in violation of the FDCPA be found to have resulted in McDermott becoming liable for excessive, redundant, or otherwise unnecessary attorney fees and costs, which itself is unfair under 15 U.S.C. § 1692f;

4) that the measure of McDermott's economic damages as a result of MEEB's violations of the FDCPA and M.G.L. c. 93A, § 2 were the excessive, redundant, or otherwise unnecessary attorney fees and costs he became liable to pay or by which MEEB otherwise unjustifiably became enriched;

5) that McDermott's damages be multiplied by no less than two times nor more than three because MEEB's violations of the FDCPA and M.G.L. c. 93A were willing or knowing; and

6) that McDermott be awarded his reasonable attorney fees and costs for this appeal under M.G.L. c. 93A, § 9(4) and 15 U.S.C. § 1692k(a)(3).

Respectfully submitted,
WILLIAM M. MCDERMOTT, APPELLANT
By his attorney,

/s/ Philip H. Cahalin
Philip H. Cahalin, Esq., Bar No. 39203
85 Exchange Street, Suite 206
Lynn, MA 01901
t. 781.598.3130
f. 781.598.3131
pcahalin@cahalinlaw.com

## I. CERTIFICATES

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

I, Philip H. Cahalin, hereby certify that

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,787 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface, Times New Roman, with a font size of 14, using LibreOffice 3.4.6.

/s/ Philip H. Cahalin
Philip H. Cahalin, Esq., Bar No. 39203
Dated: November 18, 2013

### CERTIFICATE OF SERVICE OF BRIEF, ADDENDUM, APPENDIX, AND EXHIBITS

I, Philip Cahalin, hereby certify that the Plaintiff-Appellant's Brief with Addendum attached filed through the ECF system will be sent electronically to the

registered participants, Stephen J. Duggan, Esq. and Edmund A. Allcock, Esq., as identified on the Notice of Electronic Filing (NEF).  I further certify that I have served the Appendix and the Exhibits on all parties by mailing a true copy of same by first class mail to Stephen J. Duggan, Esq., c/o Lynch & Lynch, 45 Bristol Drive, S. Easton MA 02375 this 18th day of November, 2013.

/s/ Philip H. Cahalin
Philip H. Cahalin, Esq., Bar No. 39203

# J. Addendum

## 1. Judgment, Memoranda, and Orders

MEMORANDUM AND ORDER dated November 20, 2012, Docket No.
63 . . . . . . . . . . . . . . . 1

FINAL JUDGMENT, .
dated November 20, 2012, Docket No. 64 . . . . . . . . 4

MEMORANDUM AND ORDER RE:
PLAINTIFF'S MOTION UNDER RULE 59(E) TO AMEND THE
JUDGMENT RELATIVE TO THE FINDINGS AND RULINGS
CONCERNING THE PRE-SUIT NOTICES UNDER G.L.C.
183A, § 6(C) (DOCKET ENTRY # 66); MOTION OF
THE DEFENDANT, MARCUS, ERRICO, EMMER & BROOKS,
P.C., FOR RECONSIDERATION AND/OR TO
ALTER AND AMEND JUDGMENT
(DOCKET ENTRY # 68) ,
dated August 23, 2013, Docket No. 77 . . . . . . . . . 205

## 2. Statutes, Acts, and Regulations

15 U.S.C. § 45 . . . . . . . . . . . . . 236

15 U.S.C. §§ 1692-1692o . . . . . . . . . . . 243

28 USC § 1291 . . . . . . . . . . . . . 253

28 U.S.C. § 1331 . . . . . . . . . . . . 255

28 U.S.C. §1367(a) . . . . . . . . . . . . 257

M.G.L. c. 93A, §§ 2 and 9 . . . . . . . . . 258

M.G.L. c. 183A, §§ 4-6 . . . . . . . . . . 264

M.G.L. c. 254, §§ 5 and 5A . . . . . . . . . 276

940 C.M.R. §§ 3.16(3) and 3.16(4) . . . . . . . . 280

Fair Debt Collection Practices Act, 91 Stat. 874, P.L. 95-109 . . . . . 282

Chapter 813 of the Acts of 1967 . . . . . . . . . 292

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WILLIAM M. MCDERMOTT,
     Plaintiff,

     v.                                        CIVIL ACTION NO.
                                              09-10159-MBB

MARCUS, ERRICO, EMMER & BROOKS, P.C.,
     Defendant.

**MEMORANDUM AND ORDER**

**November 20, 2012**

**BOWLER, U.S.M.J.**

Plaintiff William M. McDermott ("plaintiff"), a resident of the Pondview condominiums in Lynn, Massachusetts, filed this action alleging improper debt collection activities against defendant Marcus, Errico, Emmer & Brooks, P.C. ("MEEB" or "defendant"), a professional corporation of attorneys located in Braintree, Massachusetts.  The two count verified complaint sets out violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 ("section 1692"), (Count One) and Massachusetts General Laws chapter 93A (Count Two).

The dispute involves MEEB's efforts, purportedly as early as the fall of 2004, to collect condominium, loan payback and late fees as well as attorney's fees from plaintiff on behalf of MEEB's client, the Pondview Condominium Trust ("Pondview").  Created under a September 1986 Declaration of Trust (Ex. B),

1

Pondview is the governing body of the Pondview condominiums and consists of a group of trustees.  The Declaration of Trust (Ex. B) along with the Master Deed (Ex. C) are recorded in the Essex South Registry of Deeds.

At the conclusion of plaintiff's case, defendant also rested and at the same time made a motion for judgment on partial findings under Rule 52(c), Fed. R. Civ. P. ("Rule 52(c)").[1] (Docket Entry # 46).  This court took the motion under advisement thereby reserving a ruling as allowed under the terms of the rule.  See International Union of Operating Engineers, Local Union 103 v. Indiana Construction Corp., 13 F.3d 253, 257 (7th Cir. 1994).  The request for a judgment on *partial* findings is denied because judgment on the entire record is appropriate.  See, e.g., W.L. Gore & Associates, Inc. v. Medtronic, Inc., 2012 WL 2308651, *10 (E.D.Va. June 18, 2012) (denying Rule 52(c) motion after initially reserving ruling because court "now concludes that the best course of action is to render a judgment based on all the evidence, testimony, and applicable law"); Warner Chilcott Laboratories Ireland Ltd. v. Impax Laboratories, Inc., 2012 WL 1551709, *7 (D.N.J. April 30) (adhering to same course of action).  This opinion thus constitutes the court's findings of fact and conclusions of law under Rule 52(a), Fed. R.

---

[1]  With one exception, defendant repeats and raises the same issues in a post trial brief.

Civ. P. <u>See</u>, <u>e.g.</u>, <u>W.L. Gore & Associates, Inc. v. Medtronic,</u>
<u>Inc.</u>, 2012 WL 2308651, at *1 & *10 (denying Rule 52(c) motion and
issuing Rule 52(a) findings and conclusions).

The parties filed post trial briefs. (Docket Entry ## 60 &
61). The merits based on the entire record are therefore ripe
for review.

FACTUAL BACKGROUND[2]

The September 1986 Declaration of Trust gives the trustees
the authority to determine the assessment for each fiscal year
and the unit owners' "respective shares of such assessment,
according to their percentages of interest in the common areas
and facilities."[3] (Ex. B, Art. V, § 5.3(B)). The Declaration of
Trust allows for monthly payment of the assessment and, "[i]f not
paid when due, the amount . . . *shall constitute a lien* on the
unit." (Ex. B, Art. V, § 5.3(B)) (emphasis added).[4] Under both

---

[2] The factual background sets out the facts found by this
court and Pondview's authority under certain documents and
statutes. A number of footnotes include legal rulings in
addition to those made in the discussion section. The discussion
section primarily addresses the legal arguments set out in
plaintiff's post trial brief.

[3] Massachusetts General Laws chapter 183A ("chapter 183A"),
the state condominium statute, requires Pondview to assess the
common expenses "against all units in accordance with their
respective percentages of undivided interest in the common areas
and facilities." Mass. Gen. L. ch. 183A, § 6(a)(i).

[4] Chapter 183A similarly allows Pondview to assess an
unpaid expense incurred by Pondview because of a unit owner's
failure to abide by the requirements of chapter 183A or a master
deed or trust "against the unit owner and such assessment shall

chapter 183A and the Declaration of Trust, Pondview has the
ability and the authority to assess attorney's fees, late charges
and costs of collection against the unit owner.  See Mass. Gen.
L. ch. 183A, § 6(a)(ii) & 6(b); (Ex. B, Art. V, § 5.3(C)).  The
Master Deed likewise provides that:

> The Trustees in their discretion may enforce collection of
> unpaid assessments for common expenses plus interest thereof
> by enforcing the lien by a court action or by other lawful
> means on account of which there shall be added to the amount
> due and payable the reasonable costs of such collection
> including reasonable attorney fees.

(Ex. B, Art. V, § 5.3(C)).

In 1986, plaintiff's parents purchased unit 104, a two
bedroom unit, at the Pondview condominiums.  In 1995, they bought
unit 105, a one bedroom unit across the hall with the
understanding that they would pay the mortgage and that plaintiff
would live in the unit and pay the costs associated with it.  The
assessed values of unit 104 between 2004 and 2011 determined by
the City of Lynn range from a low of $138,700.00 in 2011 to a
high of $214,900.00 in 2006.  (Ex. 86).[5]  The assessed values of
unit 105 between 2004 and 2011 range from a low of $115,500.00 in
2011, to a high of $167,900.00 in 2006.  (Ex. 86).

---

constitute a lien against the unit . . ..."  Mass. Gen. L. ch.
183A, § 6(a)(ii).

[5]  After hearing MEEB's position objecting to the admission
of exhibit 86, this court admitted the assessments "solely for
the purpose of setting forth the appraised value."  (Docket Entry
# 57, p. 82).

4

Plaintiff, who was 52 years old at the time of trial and had attended Northeastern University for two years, moved into unit 105 in 1995 and resided there until 2001. The social environment at the complex was "[v]ery friendly" in 1995. (Tr. IV, p. 91).[6] During this time period, plaintiff did not fall behind in the condominium charges for the unit.

Sandra Halbich ("Halbich"), a tenant at the complex living in another unit, moved into unit 105 in 2001 when plaintiff left the complex. In 2002, plaintiff returned to Pondview and moved into unit 104 with his parents. Plaintiff paid the assessments for both units in 2002. (Tr. V, pp. 7-8). In July 2002, his father died of liver cancer and his mother passed away a few months later in December. In November 2002, plaintiff's mother deeded unit 104 to plaintiff and his brother, Edward Williams ("Williams").

Plaintiff was close to his parents and became extremely depressed as a result of their deaths. He also experienced the stress of a strained relationship with Williams. Halbich described plaintiff as "very disturbed." (Tr. VI, p. 55). In fact, from 2002 to 2005, plaintiff "became very inward, didn't want to do anything" or talk to anyone. (Tr. VI, pp. 61-62).

Shortly after his parents' deaths, plaintiff and Halbich

---

[6] "Tr." refers to the trial transcript on the applicable day. At times, the trial transcript is identified by docket entry number.

switched units.  Plaintiff began residing in unit 105 and
Halbich, as a tenant, lived in unit 104.  Halbich eventually
moved back into unit 105 in 2005 and paid rent.  (Tr. VI, pp. 25
& 55-56).

In March 2003, when plaintiff was living in unit 105, he
took out a mortgage for unit 105.  Plaintiff took out the
mortgage "when [he] got title to the units."  (Tr. VI, p. 7).
The property description in the mortgage describes the unit as
conveyed to plaintiff by Richard Sideri ("Sideri").[7]  The
description reads that unit 105 is "the same premises conveyed to
the Mortgagor(s) by deed of Richard Sideri to be recorded
herewith."[8]  (Ex. 27).  This court therefore draws the reasonable
inference that plaintiff obtained title to unit 105 when he took
out the mortgage for the unit in March 2003.  Williams deeded
plaintiff unit 104 as well as a property in Florida around this
time period.

The property description in the unit 105 mortgage states
that the property "is intended for residential purposes only."
(Ex. 27).  Similarly, the occupancy clause of the mortgage
requires plaintiff to occupy the property as his principal
residence for a one year period.  Plaintiff's purpose for

---

[7]  The relationship between plaintiff and Sideri is not
clear.  There was no testimony about Sideri at the trial.

[8]  The mortgage defines plaintiff as the borrower as well as
the mortgagor under a security instrument.

becoming the owner of both units at the time was "[t]o have a place to live."  (Tr. V, pp. 9-10).

The mortgage included a condominium rider.  The rider allowed the lender to pay condominium dues and assessments in the event the borrower, plaintiff, did not pay them.  Any such "amounts disbursed by Lender . . . shall become additional debt of Borrower secured by the Security Instrument."  (Ex. 27).

In 2003, plaintiff, who was employed at the time, paid the condominium assessments for units 104 and 105 without falling behind.  Although continuing to receive rent from Halbich, plaintiff was not employed in 2004 and in July and August of 2004 he fell behind in the payment of condominium fees, late fees and loan payback charges for both units.  (Ex. 1 & 2).  The loan payback charge was either part of a special assessment or a line item in the budget.

Several years earlier, Pondview instituted a policy imposing a $25.00 late fee for condominium fees received after the 15th of each month.  After three consecutive months of nonpayment, Pondview's stated policy was to undertake legal action against the unit owner in "Small Claims Court."  (Ex. 1-3).  Because the complex had only 19 units, plaintiff's monthly payments amounted to almost 10% of the incoming fees for the complex.

In September 2004, "the four trustees for the building"[9]
knocked on plaintiff's door at unit 104. (Tr. V, p. 10). A
discussion took place between the trustees and plaintiff
regarding "[p]ayment on both units" and the trustees "presented
[plaintiff] with a statement for both units." (Tr. V, pp. 11-
12). As a result of this discussion, the group came to an
agreement that plaintiff would pay two months of condominium,
loan payback and condominium late fees for unit 105 by September
22, 2004. There was no agreement that such payments would make
plaintiff current. Rather, consistent with a September 16, 2004
letter, the agreement was that Pondview would file suit unless
plaintiff made the above payment by September 22, 2004. The
letter from Dawn-marie Bailey ("Bailey"),[10] Pondview's bookkeeper,
to plaintiff lists the delinquent condominium, loan payback and
condominium late fees for unit 105. It does not include late
fees for the loan payback charges. The letter then sets out the
agreement for plaintiff to pay $393.24, a figure that breaks down
to exactly two months of condominium fees, loan payback charges
and condominium late fees for unit 105. Plaintiff testified that

---

[9] The trustees at the time were Mary Felice, Betty Jo
Morrison, Joanne Vischetti ("Vischetti"), who has since died, and
Barbara Mann. Plaintiff felt uncomfortable living at Pondview in
part because of the environment Vischetti caused as opposed to
misconduct, if any, on the part of MEEB.

[10] Correspondence in the record spells Bailey's name as
Dawn-marie Bailey. Trial transcripts spell the name as Dawn-
Marie Bailey.

the letter embodied his understanding of the agreement.

Upon receiving the September 16, 2004 letter and on or before September 22, 2004, plaintiff paid the condominium fees, the loan payback charges and the condominium late fees set out in the letter for unit 105.  He also paid these charges for unit 104.  Plaintiff erroneously believed he had brought "both units up to date" (Tr. V, p. 14) even though he had not paid the late fees for the loan payback charges.  The September 16, 2004 letter did not identify overdue late fees for nonpayment of the loan payback charges.  Ledgers show a continued nonpayment of the late fees for loan payback charges.  Pondview, for its part, did not file suit until March 2005 and it did not file suit to recover charges contained in the September 2004 letter.  Finally, there was no agreement between Pondview and plaintiff that would encompass future delinquent fees or would bar Pondview from filing suit for delinquent charges not included in the September 16, 2004 letter.

In the fall, Pondview was considering changing the attorney it had been using since 1995.  On November 24, 2004, a member of MEEB sent Vischetti documentation about the firm.  Plaintiff remembers seeing the documentation near the end of November 2004.  Pondview did not engage, become a client or in any other manner employ MEEB until March 2005.

Meanwhile, plaintiff incurred late fees for October and fell

further behind in December on payments for unit 105.  A December 16, 2004 letter from Bailey shows delinquent charges totaling $346.62 for unit 105.[11]  Unlike the charges in the July and September letters, the charges in the December 2004 letter included late fees on the loan payback charges for July through October for unit 105.  Pondview had the ability to impose such late fees.  See Mass. Gen. L. ch. 183A, § 6.[12]  MEEB was not involved in the decision to impose a $25.00 charge for delinquent loan payback charges or to change any policy to impose late fees. Plaintiff did not agree with the fees and refused to pay them.[13]

---

[11]  Although the letter is addressed to plaintiff at a unit 104 address, the amounts in the body of the letter set out the condominium fee for unit 105 as opposed to unit 104.  The amounts also correspond to the amounts in a ledger for unit 105.  (Ex. 13.

[12]  The Master Deed submitted Pondview to the "provisions of Chapter 183A."  (Ex. C, p. 1); see Mass. Gen. L. ch. 183A, § 1 (defining "Master deed" as "the instrument by which the condominium is submitted to the provisions of this chapter"). The Declaration of Trust grants the trustees the power "to exercise all of the powers of the 'organization of unit owners' pursuant to Massachusetts General Laws, Chapter 183A."  (Ex. B, Art. III, § 3.6).  Under section six of chapter 183A, "The organization of unit owners may . . . assess any fees, attorneys' fees [and] late charges . . . against the unit owner." Mass. Gen. L. ch. 183A, § 6(a)(ii).

[13]  Massachusetts law does not condone plaintiff's decision. "[A] unit owner in a condominium may not challenge a common expense assessment by refusing to pay it."  Blood v. Edgar's, Inc., 632 N.E.2d 419, 421 (Mass.App.Ct. 1994).  Instead, an aggrieved unit owner "should timely pay-under protest-the common expense assessment" and may thereafter seek "a judicial determination of the legality of the assessment."  Id. at 421-422.

The remaining charges noted in the December 2004 letter for unit 105 consisted of October late fees on the October condominium fee and the October loan payback charge, the December condominium fee ($155.04), the December loan payback charge ($16.58) and two $25.00 December late fees for these items. Plaintiff did not pay these unit 105 fees ($346.62) which Pondview then carried over to the next year.

Pondview also carried over into 2005 the unpaid charges for unit 104 ($380.33). These charges included four $25.00 late fees for late payments of the loan payback charges for July through October, the December condominium fee ($188.75), the December loan payback charge ($16.58) and two $25.00 December late fees for these items.

The December letter repeats the policy at Pondview to charge a $25.00 late fee charge for any payments received after the 15th of the month and to file suit after three consecutive months of nonpayment. The letter also notes that, "The Association survives and pays its bills only through the collection of its condominium fees." (Ex. 4). Pondview remained solvent from 1992 until 2005. During this time period, Pondview filed two unrelated lawsuits to collect condominium assessments.

Plaintiff's failure to pay condominium charges for both

units continued in 2005.[14]  Drawing reasonable inferences from the
record, until sending an April 21, 2005 letter, plaintiff made it
clear to Pondview that he would not pay the late fees for the
loan payback charges for both units for the July to September
2004 period, an amount that totaled $150.00.  Plaintiff, who
remained emotionally distraught as a result of his parents'
deaths, decided not to pay the late fees because he disagreed
with them.  By the end of March 2005, plaintiff had not paid
condominium fees, loan payback charges and late fees for these
two items for January, February and March for both units.[15]
Plaintiff's unilateral decision not to pay these late fees led to
Pondview's decision to file suit.

It was not until around March 23, 2005, that Pondview hired
MEEB as its attorney.  On March 23, 2005, MEEB sent plaintiff,
who was still living in unit 104, a letter by certified and first
class mail notifying him that he owed Pondview the accurate
amount of $1,495.61 on unit 104 "through the date of this

---

[14]  The condominium fees for each unit increased from
$188.75 to $215.18 for unit 104 and from $155.04 to $176.75 for
unit 105.

[15]  Plaintiff testified that he sent a letter to Bailey in
January 2005 with checks in an amount that he did not identify
except that they did not include amounts for the July through
October 2004 late fees.  Plaintiff further testified that he did
not pay the February and March 2005 assessments because he
believed Pondview would not cash his checks upon advice of
counsel.  This self serving testimony is not credible.  Moreover,
MEEB was not involved with Pondview until on or about March 23,
2005.

letter."[16]  (Ex. 8).  Richard E. Brooks, Esq. ("Brooks"), a
principal of MEEB, wrote and signed the letter.  The letter is
addressed to Michael McDermott.  Plaintiff's full name is William
Michael McDermott.

The letter informed plaintiff he was responsible for
Pondview's "collection costs, including its attorney's fees," and
that "the amount stated" included "those costs which" Pondview
has incurred.  The letter enclosed a ledger that MEEB received
from Pondview for unit 104 listing outstanding charges that
totaled $1,225.61.[17]  The remaining amount was attorney's fees
Pondview owed MEEB consisting of $195.00 to draft the letter,
order a title search and review the examiner's report and $75.00
for the examiner's fee.  The letter explained that certain
"amounts are at least sixty days overdue."[18]  (Ex. 8).

---

[16]  Plaintiff's testimony that he did not receive the letter
is not credible.

[17]  The letter refers to "copy enclosed" of the
condominiums's records in the first paragraph as well as an
"enclosure" below and to the left of the signature line.  In
light of such evidence, this court finds that it included the
ledger.

[18]  Section six of chapter 183A imposes a requirement on a
condominium association such as Pondview to send a so called 60
day letter to the owner of a unit when any portion of a unit
owner's share of common expenses is delinquent for at least 60
days ("60 day letter" or "60 day delinquency letter").  Section
six also requires Pondview to send the first mortgagee a 60 day
letter and a notice 30 days in advance of filing suit of its
intention to file suit ("30 day notice letter") "provided that
the first mortgagee has informed the condominium association of
its name and mailing address."  Mass. Gen. L. ch. 183A, § 6(c).

MEEB sent plaintiff a second letter dated March 23, 2005, again addressed to Michael McDermott, by certified and first class mail notifying him of the delinquency on the unit 105 account. Plaintiff also received this letter within a few days of its date. The letter advised him of Pondview's intent to collect rent directly from the tenant occupying unit 105 and that the Massachusetts Condominium Act allowed the direct collection from his tenant.[19] The letter, which included an attached ledger MEEB received from Pondview, set out the amount plaintiff owed on unit 105 ($1,431.61) as of the March 23, 2005 date and, in accordance with chapter 183A, that certain amounts "are at least twenty-five days overdue." (Ex. 9).

By the end of March 2005, MEEB received the result of a title search on unit 105. The search uncovered Williams as another owner and, drawing reasonable inferences from the record, plaintiff's name as William M. McDermott. Accordingly, in order to comply with chapter 183A, MEEB sent plaintiff two more letters by certified and first class mail on March 31, 2005, similar to the March 23, 2005 letters, although addressed to William M. McDermott as opposed to Michael McDermott and Edward F. Williams. The March 31, 2005 letter notifying plaintiff of Pondview's

---

[19] The relevant provision of section six of chapter 183A gives Pondview the ability to collect rent directly from the tenant where, as here, the unit owner fails to pay common expenses for at least 25 days. See Mass. Gen. L. ch. 183A, § 6.

intent to collect rent directly from the unit 105 tenant set out
an amount due and owing on unit 105 ($1,689.61) as of March 31,
2005.[20]  In accordance with MEEB's office policy, the March 31,
2005 letter notifying plaintiff that he owed Pondview $1,545.61
on unit 104 as of March 31, 2005, attached a statement or ledger
identifying the fees and charges.[21]  The letter accurately stated
that certain of the "amounts are at least sixty days overdue."
(Ex. 5).

Both the March 23 and 31, 2005 letters informed plaintiff
that he could telephone MEEB if he had any questions.  (Ex. 5, 8
& 9).  Likewise, the majority of the other notices of intent to
collect rent and the 60 day letters advised plaintiff to
telephone MEEB if he had any questions.  (Ex. 25, 40, 44, 49 &
50).

---

[20]  The fact that plaintiff received this letter on or after
April 1, 2005, when the April assessment was due would not
mislead or confuse the least sophisticated consumer that the
amount included the April assessment.  The short and simple
letter set out the amount due "as of March 31, 2005," the date of
the letter, and advised the recipient that "the amount due on the
day you pay may be greater than this stated amount."  (Ex. 5).
The same ruling and reasoning applies to the other notices of
intent to collect rent letters.

[21]  The March 31, 2005 letter for unit 104 submitted at
trial did not include the ledger.  MEEB's files included "a draft
of the statement with the letter."  (Tr. I, pp. 46-47).  The
ledger or statement was more than likely misplaced during related
litigation in state court.  Plaintiff's self serving testimony
that he did not receive the March 31, 2005 letters is further
discredited by the fact that MEEB sent the letters by certified
and first class mail and that plaintiff resided at the unit 104
address noted in the letters at this point in time.

The March 23 and 31, 2005 letters also advised plaintiff that he was responsible for "the Condominium's collection costs." (Ex. 5, 8, 9 & 29). In addition, each letter accurately and unambiguously stated that, "Because of common expense assessments . . . and other charges that may become due, including additional attorney's fees and costs, the amount due on the day you pay may be greater than this stated amount." (Ex. 5, 8, 9 & 29). The letters also stated in a straight forward manner that, "the amount stated in this letter includes those costs," which the previous sentence defined as including attorney's fees.[22] (Ex. 5, 8, 9 & 29).

The March 23 and 31, 2005 letters relative to unit 104 also informed plaintiff that certain amounts were overdue by at least 60 days. The March 23 and 31, 2005 letters relative to both units all contained a notice of important rights required by the FDCPA. The notice reads as follows:

> ***You have thirty days after you receive this letter to dispute the validity of the debt, or any part of it.[23] If you don't dispute it within that period, we will assume that it's valid. If you do dispute it-by notifying us in writing to this effect-we will obtain and mail you verification of***

---

[22] The least sophisticated consumer would understand that the stated amounts included attorney's fees.

[23] On cross examination, plaintiff testified that there was nothing about this sentence that he did not understand and characterized it as self explanatory.

16

*the debt.[24]  And if, within the same period, you request the name and address of the original creditor, if the original creditor is other than the Condominium named above, we will furnish that information too.*

*<u>Please note, we are not required to wait until the end of this thirty day period before taking further steps to collect this debt</u>.[25]  If, however, you request proof of the debt or the name and address of the original creditor, if other than the Condominium named above, within that thirty day period, we will suspend our efforts to collect the debt until we mail the requested information to you.*

*We additionally note that this firm is acting as a debt collector for the Condominium named on the first page of this letter, to collect the debt discussed in this letter. Any information obtained by us will be used for that purpose.*

(Ex. 5, 8, 9 & 29) ("validation notice") (emphasis in original).

By the end of March 2005, plaintiff recognized he owed $1,545.61 on unit 104 and $1,689.61 on unit 105.  He also recognized his responsibility for the attorney's fees that Pondview incurred to collect the fees on his units and that Pondview had incurred attorney's fees in the drafting of the letters.[26]

---

[24]  On cross examination, plaintiff testified that he also understood the meaning of this sentence.

[25]  The notice of intent to collect rent letters included the same notice of important rights language except that the letters added before the end of the above sentence the language, "<u>including sending a Direction to your tenant to pay their rent to the Condominium as discussed above</u>."  (Ex. 9 & 29).

[26]  Plaintiff testified that he was not aware that he owed any legal fees until he received a May 2, 2005 letter.  The testimony is not credible because plaintiff received the March 23 and 31, 2005 letters which explicitly informed him that he was

17

Unbeknownst to MEEB at the time, on April 16, 2005, Bailey sent plaintiff a letter detailing the delinquent charges for unit 104 as of April 15, 2005. The April 16, 2005 letter stated the total as $1,507.37 for unit 104 as of April 15, 2005, and listed the items that comprised this total.[27] Accrued attorney's fees were not on the list. Plaintiff recognized the discrepancy between the higher amount in the March 31, 2005 letter for unit 104 ($1,545.61) that included attorney's fees and the lower amount in the April 16, 2005 letter ($1,507.37), which did not include attorney's fees but did include additional amounts from April ($281.76).[28] Plaintiff therefore decided to pay the lower amount for unit 104 in the April letter with a $1,507.37 check marked "Full payment on Unit 104." He also decided to pay the outstanding charges for unit 105 with a second check ($1,310.24) marked "Full payment on Unit 105." By letter dated April 21, 2005, plaintiff sent the checks marked payment in full to Bailey. The April 21, 2005 letter reiterated that, "These checks

---

responsible for collection costs including attorney's fees.

[27] The letter included the $380.33 carry over from 2004. It also included identical amounts for the condominium fee ($215.18), the condominium late fee ($25.00), the loan payback charge ($16.58) and the loan payback late fee ($25.00) for the four months of January through April 2005.

[28] The $281.76 figure reflects the April condominium fee ($215.18), the April condominium late fee ($25.00), the April loan payback charge ($16.58) and the April loan payback late fee ($25.00).

represent payment in full" even though "I still disagree with the amounts" and "would like to reserve my right to dispute this in the future." (Ex. 20).

The April 16, 2005 letter also totaled the outstanding amount through March 2005, which did not include attorney's fees, as $1,225.61. Attorney's fees and costs for unit 104 in MEEB's invoice to Pondview totaled $348.00 as of March 31, 2005. The resulting $1,573.61 total differs from the slightly lower $1,545.61 amount in MEEB's March 31, 2005 notice of delinquency letter to plaintiff for unit 104. MEEB would credit a client the $28.00 difference for the time spent to draft a delinquency letter if the client paid the charged amount.

On April 28, 2005, a date more than 30 days after MEEB sent the initial March 23, 2005 letters to plaintiff, MEEB filed the first and second of a number of lawsuits in the Massachusetts District Court Department (Lynn Division) ("Lynn District Court")[29] to collect delinquent fees on units 104 and 105 on behalf of its client, Pondview. As a party to these suits, plaintiff received notice of filings including dismissals.

Once Brooks became aware of Bailey's April 16, 2005 letter, he advised her not to communicate by letter with plaintiff. MEEB

---

[29] MEEB filed one of the lawsuits in Massachusetts Superior Court (Essex County) ("Essex Superior Court"). (Ex. 78). The complaint in this action asserts that the filing of the suit "in Essex Superior Court violated 15 U.S.C. §§ 1692i." (Docket Entry # 1, ¶ 35).

did not instruct Bailey or anyone else at Pondview to refuse to speak with plaintiff. Brought by the Pondview Board of Trustees, the collection suit on unit 104 ("April 2005 unit 104 suit") against plaintiff stated that plaintiff was "assessed common expenses and charges in the amount of $2,567.37 (hereinafter 'common expenses'), which have not been paid when due."[30] (Ex. 15, ¶ 5). Brooks knew about plaintiff's submission of checks or a check to Pondview before filing the April 2005 unit 104 suit. The next paragraph states, "Interest and late fees have been charged for these overdue payments of common expenses." (Ex. 15, ¶ 6).

The collection suit on unit 105 ("April 2005 unit 105 suit") identified unpaid "assessed common expenses and charges in the amount of $2,694.94" in paragraph six. (Ex. 16, ¶ 6). The referenced "assessed common expenses and charges" included attorney's fees as noted and explained in the next paragraph. (Ex. 16, ¶ 7). The cover form accompanying the complaint in the April 2005 unit 105 suit reads, "There are common expenses due as of this date in the amount of $2,694.94 which expenses continue to accrue on a monthly basis together with attorneys' fees and costs incurred in connection with this matter." (Ex. 16).

Similar to the other lawsuits MEEB filed, paragraph six in

---

[30] The least sophisticated consumer would understand that the $2,567.37 amount included interest and late fees in light of the next paragraph.

the complaint in the April 2005 unit 104 suit states that, "Defendants are liable for attorneys' fees and costs incurred by the Plaintiffs in pursuing this matter in accordance with" provisions of the condominium documents and section six of chapter 183A.[31]  (Ex. 15, ¶ 6).  Also similar to the other lawsuits MEEB filed, paragraph eight in the complaint in the April 2005 unit 104 suit states that, "Defendants are, pursuant to [chapter 183A, section 6(b),] and the applicable provisions of the Condominium's documents, indebted to the Plaintiffs for the amount of unpaid common expenses" and "attorneys' fees and collections costs."  (Ex. 15, ¶ 8).  Paragraph seven in the April 2005 unit 104 complaint, like corresponding paragraphs in the other lawsuits MEEB filed, states that, "Pursuant to M.G.L. c. 183a, s. 6(c) of chapter 183A, the Plaintiffs did give the Defendants notice by certified mail and first class mail of the aforesaid delinquency, such delinquency having existed for at least sixty days."  (Ex. 15, ¶ 7).

The complaint in the April 2005 unit 105 suit states, "Pursuant to M.G.L. c. 6(c), the Plaintiffs did give notice to the First Mortgagee, by certified and first class mail of their intent to file this action."  (Ex. 16, ¶ 9).  The complaint in

---

[31]  Section six of chapter 183A allows the organization of unit owners to assess attorney's fees against the unit owner and such fees constitute part of the automatic lien against the unit "enforceable as common expense assessments under this chapter." Mass. Gen. L. ch. 183A, § 6.

the April 2005 unit 104 suit contains similar language. (Ex. 15, ¶ 7). MEEB did not send out a notice of intent to file suit letter to the first mortgagee with respect to either the April 2005 unit 105 or the April 2005 unit 104 suits.

On May 2, 2005, before cashing the aforementioned checks from plaintiff, Bailey contacted MEEB by telephone and spoke to Brooks. Consistent with MEEB's practice, Brooks advised Bailey not to send any more letters to plaintiff.[32] Brooks also advised Bailey not to cash the checks. After speaking with Bailey, Brooks sent plaintiff a letter on Pondview's behalf informing him that Pondview would be returning the checks because they "do not represent payment in full" because "you did not include any legal fees."[33] (Ex. 21). Notwithstanding plaintiff's testimony to the contrary, Pondview returned the checks.

The May 2, 2005 letter listed $1,507.37 as the amount owing on unit 104, $1,319.94 as the amount owing on unit 105, $1,389.00 as the amount of legal fees on unit 104, $1,772.00 as the amount of legal fees on unit 105 and $150.00 as the amount of dismissal fees. The legal fees were greater than those disclosed in the

---

[32]  Contrary to plaintiff's position, there was nothing inappropriate about this practice. Moreover, the vast majority of MEEB's letters to plaintiff instructed or invited plaintiff to contact the MEEB attorney sending the letter if plaintiff had any questions.

[33]  Such statements would not have confused the least sophisticated consumer.

ledger attached to the March 31, 2005 letters because they
included fees associated with filing the April 2005 unit 105 and
104 suits.  The letter explained that these amounts "are due" and
set out these specific amounts.[34]  The letter also informed
plaintiff, who had been served with the April 2005 unit 104 and
unit 105 suits, that Pondview had "filed suit on each unit."
(Ex. 21).  The amount of legal fees included the amount MEEB
charged Pondview for filing the April 2005 unit 104 and unit 105
suits.

On May 9, 2005, after receiving the May 2, 2005 letter,
plaintiff telephoned MEEB and spoke to Brooks.[35]  Contrary to
plaintiff's testimony, Brooks did not tell plaintiff "he would
run up $30,000 on each unit and within a year he would own them."
(Docket Entry # 52, p. 32).  Brooks also never told plaintiff
that he would own the units if plaintiff did not pay his
attorney's fees and he never told plaintiff that "MEEB would run
up legal fees."  (Docket Entry # 52, p. 36).  Although the

---

[34]  The least sophisticated consumer would recognize that
the fees were due as of May 2, 2005, and therefore differed from
those in the ledgers attached to the March 31, 2005 letters.

[35]  Although Brooks did not recall the conversation at the
time of trial and testified that plaintiff left a message, this
court finds there was a conversation albeit not containing the
content detailed by plaintiff.  MEEB's time slips describe a
telephone conference with the owner, i.e., plaintiff, on May 9,
2005.  (Ex. 85).

conversation took place, Brooks did not threaten plaintiff.[36]

By letter dated May 16, 2005, MEEB, acting on behalf of Pondview, notified the tenant of unit 105 to forward the rent checks to Pondview, in care of Brooks, to MEEB's Braintree address. MEEB addressed the letter to plaintiff or the current occupant.

On May 17, 2005, MEEB sent plaintiff a one sentence letter enclosing two "current ledgers," one for unit 104 and the other for unit 105, of the amounts owed "[a]s of May 10, 2005." (Ex. 22). Pondview sent the ledgers to MEEB with the amounts except for certain amounts typed on the bottom of each ledger. MEEB added these typed amounts. The typed portion for unit 105

---

[36] On cross examination, MEEB's counsel convincingly impeached plaintiff. At trial, plaintiff testified to remembering the events "very clearly" and that he was a passenger in a car driven by a friend when he made the telephone call. (Docket Entry # 57, p. 94). At a prior deposition, however, plaintiff used the same words, "very clearly," to describe that *he* "was driving [a friend] to the hospital." (Docket Entry # 57, p. 95). In addition, whereas at trial plaintiff testified that Brooks said he would run up $30,000 on each unit, at the April 2010 deposition plaintiff testified that Brooks said, "'he would run up approximately $25,000 in legal fees on each unit and would own them within a year.'" (Docket Entry # 53, p. 18). Plaintiff's demeanor when he described the conversation was not convincing.

Plaintiff also testified that, after he "mentioned the water damage on Unit 104, which Pondview had agreed to pay for," Brooks responded "that since I didn't have anything in writing, it didn't matter whether they agreed to it or not, that I would not see a penny for water damage." (Docket Entry # 57, p. 33). Although this court finds that plaintiff mentioned the water damage to Brooks, this court does not find that Brooks responded in the controversial and threatening manner plaintiff describes.

identifies the fees and costs added by MEEB as legal fees for March ($536.00), April ($1,013.00) and through May 17, 2005 ($488.00), as well as estimated "outstanding sheriff bills" ($100.00)[37] and a "dismissal fee" ($150.00).[38]  The typed portion for unit 104 identifies the fees and costs added by MEEB as legal fees for March ($348.00), April ($798.00) and through May 17, 2005 ($317.00), as well as estimated "outstanding sheriff bills" ($100.00) and a "dismissal fee" ($150.00).

The dismissal fees were not entirely accurate.  The $150.00 charge was a standard rate.  If a dismissal was "very simple," Brooks would charge $75.00 and credit the client in the event of a prior payment of the $150.00 charge.  Likewise, if plaintiff paid the $150.00 set out in the ledger attached to the May 17, 2005 letter, he "would have ended up with a credit of $75."  (Tr. II, p. 40).  Before receiving any payment, on May 27, 2005, Brooks decided not to charge the $150.00 normal fee and instead

---

[37]  The invoice MEEB prepared for Pondview sets out a different and lower amount of out of pocket expenses for sheriff's service on May 12, 2005, a date prior to the May 17, 2005 letter.  The MEEB administrator had not entered the sheriff's fees into the computer at the time Brooks' assistant looked at the computer to add the fees.  Plaintiff did not see this invoice at the time and had no knowledge of any discrepancy.

[38]  The fact that the cover letter is dated May 17, 2005, and the top of each ledger states "[a]s of May 10, 2005," would not confuse the least sophisticated consumer that the amounts reflect amounts as of May 17 as opposed to the stated May 10th date on each ledger.  The marked legal fees "THROUGH 5/17/05" is also not confusing with respect to the dates.

to charge the $75.00 fee for a dismissal of the April 2005 unit
105 suit.  The May 27, 2005 dismissal charge for unit 105 on
MEEB's invoice to Pondview was $75.00 as opposed to the $150.00
in the ledger attached to the May 17, 2005 letter.

The Pondview portion of each ledger consisted of legible
amounts owed on the particular unit for the July through October
2004 late fees on the loan payback charges, the October and
December 2004 condominium late fees, the December 2004
condominium fee and the December 2004 late fee on the loan
payback charge.  The other remaining Pondview portion of each
ledger set out the outstanding amounts for the condominium fees,
the condominium late fees, the loan payback charges and the loan
payback late fees for the four months of January through April
2005.  The letter did not include May 2005 late fees because the
foregoing charges "[a]s of May 10, 2005" were not overdue until
May 15, 2005.

Notably, the Pondview portion of each ledger included the
May condominium fee, the May loan payback charge and additional
legal fees.  The additional legal fees for unit 105 ($536.00) and
unit 104 ($348.00) are included in the ledger's total for unit
105 ($2,049.27) and the ledger's total for unit 104 ($2,087.13).
These totals appear before the aforementioned legal fees and
costs typed and added by MEEB at the bottom of each ledger.  The
legal fees in the ledger prepared by Pondview thus duplicated the

same legal fees for March 2005 for unit 105 ($536.00) and unit 104 ($348.00) added by MEEB.

On or about May 17, 2005, MEEB corrected the duplication error by sending out another letter dated May 17, 2005, which was the same except for an underlined and capitalized heading "<u>CORRECTED NOTICE</u>." (Ex. 24). The second letter was more than likely a photocopy of the first letter with the foregoing heading typed onto the photocopy. The attached ledgers for unit 105 and unit 104 credited the duplicate legal fees ($536.00 for unit 105 and $348.00 for unit 104) at the bottom of each ledger. Plaintiff received the second May 17, 2005 letter with the corrected and credited legal fees no more than a few days after receiving the first May 17, 2005 letter.

MEEB has a practice in place to ensure the accuracy of ledgers received from its clients. MEEB initially asks the client for an accurate ledger with up to date payments of amounts owed. It also asks for any communications from the unit owner. Once MEEB receives the ledger, if the dates and amount of a condominium fee appear accurate, MEEB relies on the ledger. If the amount appears odd or unusual, MEEB makes an inquiry to the client. MEEB typically requests a ledger "at each step of the process." (Docket Entry # 51, p. 45).

Brooks' practice is to have his assistant, who has an accounting background, first examine a ledger from the client to

determine if it looks accurate.  She may then examine prior bills on the computer to determine if the current ledger looks correct. Thereafter, Brooks examines the ledger to see if it makes sense and all of the numbers look correct.

In mid May, MEEB provided a $3,800.27 payoff amount to Bayview Loan Servicing, LLC ("Bayview"), the servicer for the mortgage on unit 105.  On May 20, 2005, Bayview paid Pondview $3,800.27.  Pondview credited the amount to the unit 105 account. Plaintiff always received information about the amounts paid to Pondview with letters from the bank "with figures stated in them."  (Docket Entry # 57, p. 40).  Bayview informed plaintiff of the payment "near the end of May."  (Docket Entry # 57, p. 35).[39]  Bayview more than likely added the $3,800.27 to the amount plaintiff owed on the mortgage for unit 105.  Bayview's payment did not include two $25.00 charges for late fees on the May condominium fee and loan payback charge on unit 105.[40]  It also

---

[39]  Plaintiff complains that MEEB did not inform him of the payment until "over one year letter[sic] in a ledger included with a letter dated June 23, 2006 sent to him just prior to filing the third 105 lawsuit."  (Docket Entry # 60, p. 14, n.1). Even assuming the truth of the argument and that MEEB's delay in sending this information was misleading to plaintiff, plaintiff was not damaged because Bayview informed him of the payment near the end of May 2005.

[40]  Plaintiff fails to establish that the check included the $150.00 dismissal fee.  MEEB's invoices show the $75.00 charge as of May 27, 2005.  Based on the date of the payment and the date Brooks changed the $150.00 amount as well as the failure of MEEB's invoices to reflect to the $150.00 charge, this court finds that Bayview did not add the $150.00 dismissal fee to

did not include legal fees incurred in late May, the June
condominium fee, the June loan payback charge and a June special
assessment ($42.75).  Brooks posited that approximately half of
the $3,800.27 overdue amount constituted legal fees.

On behalf of Pondview, Brooks filed a dismissal of the April
2005 unit 105 suit shortly after receiving the check.  Plaintiff
received notice of the dismissal.

On or about June 1, 2005, plaintiff submitted a $400.00
check to Pondview with the designation, "Payment May + June 2005
Unit 105."  (Ex. 30).  Bailey applied the $400.00 check to the
oldest outstanding balance in the unit 105 account, which
consisted entirely of the requested May and June charges.
Bailey thereby complied with plaintiff's notation on the check to
apply the amounts to unit 105's May and June charges.  A $98.18
credit remained in the unit 105 account at the end of June 2005.

Plaintiff also submitted a $500.00 check dated June 1, 2005,
to Pondview with the designation, "Payment May + June 2005 Unit
104."  (Ex. 30).  Bailey applied this check to the oldest
outstanding balance in the unit 104 account thereby leaving a
credit of $119.67 as of the end of 2004, which she applied
against the $215.18 January condominium fee.  Plaintiff received
full credit in the unit 104 account for the $500.00 amount.

---

plaintiff's mortgage but instead added the actual $75.00 charge
to the mortgage.

In June 2005, Pondview began imposing a monthly special assessment on unit owners such as plaintiff. Pondview had the authority to impose such assessments. See Mass. Gen. L. ch. 183A, § 6.[41] Plaintiff's proportionate share of the special assessment was $42.75 for unit 105 and $52.25 for unit 104. In a June 23, 2005 letter from Alison Forbes, Esq. ("Forbes"), a MEEB attorney who took over the Pondview file from Brooks, plaintiff received a copy of his unit 105 account as of June 16, 2005, which included the charge.[42] The letter invited plaintiff to contact her if he had any questions. Plaintiff did not contact Forbes.

In mid to late August 2005, plaintiff submitted another two checks to Bailey. He marked one check "Unit 104 July August 2005" in the amount of $500.00 and the other "Unit 105 July

---

[41] See fn. 12. Elaborating on the authority outlined in footnote 12, section six of chapter 183A requires the organization of unit owners to assess common expenses against each unit owner in accordance with the owner's percentage of undivided interest in the common areas and facilities. Mass. Gen. L. ch. 183A, § 6(a). The Master Deed likewise authorizes the trustees to assess against a unit owner the expenses of maintaining, repairing, replacing and improving the common areas and facilities as common expenses. (Ex. C, Art. V, §§ 5.2 & 5.4(B)). Finally, section six of chapter 183A allows the organization of unit owners to assess a "unit owner his proportionate share of the costs for water and other utilities." Mass. Gen. L. ch. 183A, § 6(a)(ii).

[42] Plaintiff's testimony that he never became aware of the special assessment until a 2006 trial is not credible. He received a number of ledgers for both units reflecting the special assessment charges in 2005.

August 2005" in the amount of $400.00.  (Ex. 35).  Plaintiff accompanied the checks with typed instructions that Pondview should only cash the checks for condominium fees and not late fees or legal fees.  As instructed, Pondview applied the $400.00 check to the July and August condominium fees for unit 105 and the $500.00 check to the July and August condominium fees for unit 104.

Throughout the summer, Pondview continued to incur legal fees in relation to units 104 and 105 because plaintiff refused to pay late fees, loan payback charges and special assessments and because of ongoing charges for the April 2005 unit 104 suit.[43] As with the March, April and May 2005 legal fees, Pondview charged these fees to plaintiff by adding them to the unit's account.  The June legal fee of $253.00 for unit 105 however is designated as July legal fees on Pondview's ledger.  MEEB did not

---

[43]  Plaintiff complains that MEEB continued to charge attorney's fees after the dismissal of the April 2005 unit 105 suit in late May.  The unnecessary charges consist of a $180.00 charge on June 23, 2005, to prepare a motion for a default and a $75.00 charge on August 9, 2005, for a title examiner at a time when a unit 105 suit was not contemplated.  MEEB did not include these charges in a November 30, 2005 letter to Bayview in response to Bayview's request for a payoff figure for unit 105. Taken in the context of all the other charges in the billing records, these charges do not show that MEEB acted in a manner to escalate its attorney's fees.

Plaintiff similarly argues that MEEB's "aggressive actions in the first 104 enforcement suit" ran "up legal fees of $5,840.70 by the end of August, 2005."  (Docket Entry # 60, ¶ 17).  This court finds that MEEB did not intentionally escalate these fees.

31

bill Pondview for legal fees for unit 105 for July 2005.
Similarly, MEEB billed Pondview $931.00 for June legal fees and
$1,547.00 for July legal fees for unit 104.  Pondview's ledger
correctly reflects the amounts but designates the $931.00 as July
legal fees.[44]

In addition to legal fees, plaintiff failed to pay the June
loan payback charge, the special assessment and the late fees for
both charges on unit 104.  Also in addition to legal fees,
plaintiff failed to pay the July through September condominium
late fees, loan payback charges, late fees on the loan payback
charges, the special assessments ($42.75 for unit 105 and $52.25
for unit 104) and late fees on the special assessments for both
units.  Plaintiff's nonpayment of the foregoing, legitimately
imposed and reasonable charges led to a second suit on unit 105.

By letters dated August 15, 2005, MEEB, on Pondview's
behalf, sent Mortgage Electronic Registration Systems, Inc.
("MERS") a 60 day letter.  MEEB also sent MERS a letter notifying
MERS of MEEB's "intent to file/continue an action to enforce our
lien for delinquent common expenses."  (Ex. 36 & 37).

In mid October 2005, plaintiff submitted another two checks

---

[44]  MEEB properly relied on the ledger.  The FDCPA does not
"require a debt collector to independently investigate the merit
of the debt" and "a debt collector can rely on its clients'
representations regarding the validity of the debt."  Poulin v.
The Thomas Agency, 760 F.Supp.2d 151, 160 (D.Me. 2011)
(collecting cases).  In addition, plaintiff was not damaged by
this erroneous designation.

to Bailey.  He again instructed Bailey to apply the $500.00 check only to unit 104's condominium fees and not to any late fees or legal fees.  He gave Bailey similar instructions to apply the $400.00 check for unit 105's condominium fees and not to any late fees or legal fees.  Bailey complied with each request.  She applied the $500.00 check to the September and October condominium fees for unit 104 and the $400.00 check to the September and October condominium fees for unit 105.  She applied the remaining balance from the $400.00 check ($46.50) as a credit toward condominium fees for unit 105.  She applied the remaining balance from the $500.00 check ($69.64) as a credit toward condominium fees for unit 104.

On October 4, 2005, MEEB drafted and sent plaintiff by certified and first class mail another 60 day delinquency letter and a notice of intent to collect rent letter relative to unit 105.  Both letters directed plaintiff to submit a written payment plan in the event he wished to submit such a plan and informed him he needed to notify MEEB in writing if he decided to dispute the debt.  They also stated that MEEB "is acting as a debt collector for [Pondview]."  (Ex. 25 & 26).

In light of the passage of time since ordering the March 2005 title search on unit 105, MEEB made a reasonable decision to order another title search on unit 105.  MEEB included the $101.00 charge in the October 2005 invoice to Pondview.  The

invoice totaled $1,440.00.  Pondview added these charges to plaintiff's unit 105 account.

The letters set out the amount of the unit 105 debt ($1,098.14) "incurred through the" October 4, 2005 date of the letter.  The unit 105 ledger attached to each letter listed the fees including a $95.00 charge set out the with the exception of an inaccuracy of $1.00 in a $95.00 charge to draft each delinquency letter.[45]  The ledger attached to each letter also did not include certain legal fees incurred on October 4, 2005.  The omitted fees consisted of $101.00 to order title and $180.00 for drafting the notice to collect rent letter.

Due to the aforementioned delinquencies in the unit 105 account, on October 27, 2005, Forbes prepared a complaint for a second collection action in Lynn District Court on unit 105.  Forbes also prepared an October 27, 2005 letter to send to MERS,

---

[45]  The corresponding legal bill for the $95.00 charge for drafting the delinquency letter sets out a $96.00 charge.  The $1.00 difference in amount is immaterial.  See Miller v. Javitch, Block & Rathbone, 561 F.3d 588, 596 (6th Cir. 2009).  In addition, the letter was not false or misleading to the least sophisticated consumer because the ledger includes "as of October 1" in the heading and therefore did not include an amount for October legal fees.

Plaintiff disingenuously testified that he did not understand what a parentheses around a number on the ledger meant.  Plaintiff made this statement even though he had received the August 16, 2005 unit 104 ledger which has the figure "$(119.57)" across from the item, "Unit 104 Credit Total."  (Ex. 84).  Such testimony adds weight to the view of this court that plaintiff at certain times tailored and designed his testimony to suit his position at trial.

the first mortgagee of unit 105, regarding Pondview's intent to
file or continue "an action to enforce Pondview's lien for
delinquent common expenses."  (Ex. 11).   MEEB also sent MERS a 30
day notice letter on October 27, 2005.  Throughout MEEB's debt
collection efforts, it never sent a 30 day notice letter 30 days
before filing suit.[46]  Plaintiff's first mortgagees had not
informed Pondview of their names and addresses.  Brooks estimated
that 99% of banks do not comply with the provision in section
four of chapter 183A that a mortgagee with a mortgage on a unit
"give written notice" of its name and "address to the
organization of unit owners."  Mass. Gen. L. ch. 183A, § 4.

On October 31, 2005, MEEB filed the collection suit in Lynn
District Court to collect delinquent charges on unit 105 in the
amount of $1,866.14 on behalf of its client, Pondview ("October
2005 unit 105 suit").  The suit named plaintiff as a defendant
and the first mortgagee on unit 105, MERS, as a party in
interest.  See Mass. Gen. L. ch. 254, § 5.  The complaint
included the amount of unpaid common expenses which in turn
included attorney's fees.  The October 2005 unit 105 suit
resulted from plaintiff's nonpayment of unit 105 charges as
opposed to any intent on the part of MEEB to unnecessarily
escalate its legal fees.  Attorney's fees for the month totaled
$1,526.00.

_____

[46]  See fn. 18.

35

In late November 2005, plaintiff again submitted two checks to Bailey. He instructed Bailey to apply the $500.00 check only to unit 104's condominium fees and the $400.00 check only to unit 105's condominium fees. Plaintiff did not specify the particular "condo fees" by month. Bailey complied with each request. She applied the $500.00 check to unit 104's condominium fees for January, February and a portion of March 2005. She applied the $400.00 check to the November and December 2005 condominium fees for unit 105.

On November 30, 2005, plaintiff and Forbes appeared at a summary judgment and assessment of damages hearing in Lynn District Court for the April 2005 unit 104 suit. During a conversation, plaintiff asked Forbes for a breakdown of the amount owed for unit 104. She did not supply the information at that time and plaintiff did not submit a request in writing.

In addition to legitimately imposed legal fees, the following charges remained outstanding in the unit 104 account after Bailey applied the November 21, 2005, $500.00 check: January through November condominium late fees; January through November loan payback charges; January through November loan payback late fees; a portion of the March condominium fee; April, May, June and November condominium fees; June through November special assessments; and June through November special assessment late fees. Similarly, in addition to legitimately imposed legal

36

fees, the following charges remained outstanding in the unit 105 account after Bailey applied the November 21, 2005 $400.00 check: July though November condominium late fees; July through November loan payback charges; July through November loan payback late fees; July through November special assessments; and July through November special assessment late fees.

On November 30, 2005, MEEB responded by letter to a request by Bayview for a current payoff amount.[47]  MEEB's letter attached accumulated legal fees for unit 105 ($2,074.00) and a unit 105 ledger.[48]  It noted additional legal fees to prepare, file and record a dismissal of the suit as well as the December condominium fee ($176.75) and loan payback charge ($16.58).  A handwritten notation on the letter reflects a total of $3,015.55 through December 5, 2005.  Bayview paid the $3,015.55 amount by check dated December 15, 2005, and Pondview credited the amount

---

[47]  MEEB's invoices reflect a telephone conference with Bayview on November 23, 2005, during which Bayview more than likely made the request.  MEEB did not send this letter to plaintiff.

[48]  At various times, plaintiff submits that ledgers were illegible or partially illegible.  The facts do not support this contention.  Having reviewed all of the ledgers, they are not illegible.  Although not cited by plaintiff, a Justice of the Lynn District Court noted in dicta in a decision that a ledger before her was "barely legible."  (Ex. 80).  Another decision by a Circuit Justice of the same court however sets out the amounts culled from exhibits in detail.  Similarly, although certain amounts are not a model of clarity, the amounts are legible.  The facts therefore fail to support plaintiff's attempt to impose liability on MEEB based on illegible and incomprehensible ledgers.

to plaintiff's unit 105 account.  Bayview more than likely added
this amount to plaintiff's unit 105 mortgage and provided him
notice in the following month's mortgage bill.[49]  Plaintiff
testified that he received a copy of Bayview's check when he
requested and received documents from MEEB believing he would
need the documents for a February 2006 trial.  In light of the
payment, MEEB filed a stipulated voluntary dismissal of the
October 2005 unit 105 suit in late December 2005.

    In addition to condominium charges, Pondview applied
Bayview's May and December 2005 payments to unit 105 legal
charges.  Plaintiff only instructed Bailey not to apply his
payments to legal fees.  He did not provide written instructions
regarding payments made by any mortgagee for units 105 or 104.

    As a result of Bayview's two payments and plaintiff's four
payments limited to condominium fees, the unit 105 account
carried forward a $250.00 credit into January 2006.  Plaintiff's
continued nonpayment of unit 104 fees, other than the
aforementioned payments, and the legal fees associated with the
April 2005 unit 104 suit resulted in a carry over debit in excess
of $12,000.00 in the unit 104 account.  MEEB's invoices set out
legal fees for the year of $11,537.70 for unit 104 and $4,763.74
for unit 105.  (Ex. 23).

---

    [49]  Plaintiff complains that MEEB did not inform him about
Bayview's payment until a June 23, 2006 60 day letter relative to
unit 105.

On January 31, 2006, plaintiff sent Bailey two postal money orders, one for $185.59 and the other for $225.94. As before, he instructed Bailey to apply the $185.59 money order to unit 105 condominium fees and the $225.94 money order to unit 104 condominium fees.[50] Bailey complied with each request. She applied $185.59 to the January 2006 condominium fee for unit 105 ($185.59) and the $225.94 to the outstanding November 2005 condominium fee for unit 104 ($215.18) with the remainder ($10.76) applied as a credit only toward condominium fees. These January 2006 money orders were the last payments plaintiff made toward the balance in either the unit 104 or the unit 105 account.

On February 13, 2006, Forbes had a telephone conference with MERS and Aegis Lending Corporation ("Aegis").[51] At Aegis' request, she sent a payoff letter dated February 14, 2006 to Aegis reflecting the outstanding unit 104 condominium charges ($2,450.89) and legal fees ($13,223.70). Lenders often request the entire amount of an associations' lien. This court finds by a preponderance of the evidence that Aegis requested the amount

---

[50] In January 2006, condominium fees increased to $225.94 for unit 104 and $185.59 for unit 105.

[51] A February 14, 2006 letter from Forbes to Aegis identifies Aegis as the servicer for MERS. An April 2005 mortgage on unit 104 identifies Aegis as the lender, plaintiff as the borrower and MERS as nominee for Aegis as well as a mortgagee under a related security instrument.

of the entire lien.  The letter attached a copy of Pondview's
current ledger and enclosed the legal bills to date.  It also
advised Aegis that trial was set to begin on February 24, 2006.
Similar to some but not all of MEEB's letters to MERS, Forbes did
not send plaintiff a copy of the February 14, 2006 payoff
letter.[52]

On February 24, 2006, a bench trial in the April 2005 unit
104 suit commenced.  To prepare for trial, MEEB drafted requests
for rulings of law and findings of fact, communicated with
Pondview, drafted an exhibit list, performed another title search
at a cost of $160.00, prepared for trial, drafted a motion to
exclude expert witnesses at a cost of $190.00, drafted a number
of other motions, communicated with MERS and its loan servicer
and drafted a letter to plaintiff about Halbich's misconduct in
picking a lock.  MEEB's unit 104 legal fees for January and
February 2006 respectively totaled $1,173.00 and $6,346.00.[53]

The second and final day of the trial took place on March
13, 2006, and the court took the matter under advisement.  The

_____

[52]  Plaintiff maintains that MEEB communicated directly with
the mortgagees for units 104 and 105 without giving him notice of
these communications.  The 60 day delinquency letters to
plaintiff all included the information that the Massachusetts
Condominium Act "provides that your Mortgage Lender . . . be
given notice of your delinquency."  (Ex. 5, 8, 26, 44, 49, 50 &
72).

[53]  As discussed below, the Circuit Justice in the April
2005 unit 104 suit left the January bill intact and reduced the
February bill.

opinion, which issued a year later, found that Pondview
established its lien under section six of chapter 183A for all
outstanding condominium charges as of February 2006.  Judgment
entered in the amount of $3,106.17 against plaintiff, Williams
and MERS for the condominium charges.[54]

The opinion also addressed the legal fees and determined a
fair and reasonable fee in the amount of $18,803.00.[55]  The
calculation involved applying a number of the customary factors.[56]
(Ex. 80).  Applying the relevant factors, the Circuit Justice
left the March and April 2005 monthly charges the same and
reduced the May 2005 charges by $71.70 for reviewing the
complaint in the April unit 104 suit.  He also left the June and
September 2005 requested charges the same as well as the January
2006 monthly charge.  His reductions to the July, August and
October through December 2005 monthly charges are modest and

---

[54]  The amount appears in a corrected judgment that issued
on March 28, 2007.

[55]  This amount likewise appears in the corrected judgment.

[56]  The Circuit Justice noted the following factors as
pertinent to the determination:

the ability and reputation of the attorney, the demand for
his services by others, the amount and importance of the
matter involved, the time spent, the prices usually charged
for similar services by other Attorney's[sic] in the same
neighborhood, the amount of money or the value of the
property affected by controversy, and the results secured.

(Ex. 80).

primarily based upon excess time spent on tasks that could be accomplished in a shorter time period.  He also reduced the February 2006 monthly charge to eliminate charges for filing a motion in limine to exclude certain witnesses at trial.  In total, the opinion reduced the initial request for legal fees ($18,106.70) by less than $3,000.00 to $15,601.00.  The corrected judgment increased the amount of the legal fees awarded to $18,803.00 in light of Pondview's March 9, 2007 motion to amend the judgment.

This court's independent review of the unit 104 legal fees through February 2006 finds they were not excessive.[57]  Brooks' demeanor[58] and testimony confirm that from March 2005 through February 2006 MEEB was not acting in a manner intending to escalate its attorney's fees.[59]

In the first half of 2006, plaintiff also fell behind in making payments in the unit 105 account.  Except for the money order payment of the January 2006 condominium fee, plaintiff

---

[57]  This finding therefore moots any assertion on the part of defendant that the amount of the fee was fair and reasonable. (Docket Entry # 37, p. 4).

[58]  Unlike plaintiff's demeanor, which markedly changed on cross examination, Brooks' demeanor did not change when he testified on direct, cross examination, redirect and recross.

[59]  Plaintiff argues that MEEB deliberately and in bad faith engaged in a collection process intended to escalate its attorney's fees in violation of the FDCPA.  (Docket Entry # 60, pp. 18-31).

failed to pay the condominium fees for February through June and
the condominium late fees for January through June 2006.  In June
and July 2006, Pondview imposed another special assessment which
totaled $100.43.  Plaintiff failed to pay the special assessment
thus incurring a $25.00 late fee for both months.  He also failed
to pay the modest amount of legal fees incurred during this time
period.  The lack of any significant legal fee during this time
lends further credence to the fact that MEEB did not
intentionally or even carelessly act in a manner to escalate its
legal fees.

On June 23, 2006, Forbes sent MERS a 60 day letter that
plaintiff was delinquent in the payment of common expenses for
unit 105 in excess of $3,096.04.  The letter attached a ledger
accurately setting out the unit 105 charges.  Forbes also sent
plaintiff a copy of the letter with the attached ledger.

Forbes sent plaintiff a separate 60 day letter by certified
and first class mail setting out the same $3,096.04 arrearage.
The letter attached a complete ledger for unit 105 reflecting the
May and December 2005 payments by Bayview.  The ledger
additionally informed plaintiff that Pondview applied his three
earlier $400.00 checks toward the requisite condominium fees.
Like the other 60 day letters, Forbes informed plaintiff that the
Massachusetts Condominium Act provides that his mortgage lender
"be given notice of your delinquency."  (Ex. 40).

Because of the continued delinquency, on June 23, 2006, Forbes sent a 30 day letter notifying MERS of Pondview's intent to file suit on unit 105.  Chapter 183A gives the first mortgagee a means to stop further collection action if it complies with certain statutory conditions.  The conditions include agreeing in writing that a priority lien exists and paying certain categories of charges within 60 days.  See Mass. Gen. L. ch. 183A, §§ 6(a)(ii) & 6(c), ¶ 4.  Similar to what took place in the filing of the previous suits, MEEB filed suit on unit 105 on June 30, 2006 ("June 2006 unit 105 suit"), seeking to collect unpaid common expenses of $3,771.04 without waiting the 30 days proscribed in section 6(c) of chapter 183A.  Brooks explained that MEEB waited before sending 60 day delinquency and notice of intent to collect rent letters to avoid additional attorney's fees in the event the matter was resolved.

Meanwhile, plaintiff fell further behind in making payments against the balance in the unit 104 account.  He also failed to make payments of monthly condominium fees, condominium late fees and legal fees from January to June 2006 as well as the June and July special assessments and related late fees.  The March legal fees totaled $1,993.00, the bulk of which ($1,615.00) entailed attending the second and final day of trial in the April 2005 unit 104 suit.  The April and May 2006 legal bills totaled a

modest $38.00 and $19.00 respectively.[60]

Because of MEEB's actual, albeit mistaken, belief of a continuing need to protect Pondview's chapter 183A, section 6(c) priority lien,[61] MEEB filed a second suit on unit 104 in late June 2006 ("June 2006 unit 104 suit"). MEEB did not wait the 30 days proscribed in section 6(c) of chapter 183A to notify the first mortgagee.

On June 22, 2006, MEEB sent plaintiff a 60 day delinquency letter. By letter dated June 22, 2006, Forbes also sent MERS a 60 day delinquency letter with copies sent to plaintiff, Williams, Pondview and Aegis. Forbes additionally sent MERS a 30 day notice letter dated June 22, 2006. The 60 day letter to plaintiff asked him to contact the firm if he had any questions

---

[60] This court finds that these necessary and reasonable fees do not evidence intentional or even negligent conduct designed to escalate MEEB's attorney's fees.

[61] Section 6(c) of chapter 183A creates a lien with priority over a first mortgagee for "common expenses assessments based on the budget . . . which would have become due . . . during the six months immediately preceding institution of an action to enforce the lien . . .." Mass. Gen. L. ch. 183A, § 6(c); see In re Ames, 447 B.R. 680, 682 (Bkrtcy.D.Mass. 2011). Brooks, who lobbied the Massachusetts legislature to enact the super lien provision in section 6(c) and whose partner received credit for drafting the legislation, explained that the reason MEEB filed multiple lawsuits against plaintiff was "to protect the super lien status" every six months. (Docket Entry # 52, pp. 25-26). As explained in the discussion section, however, a July 2011 decision by the Massachusetts Appellate Division in Drummer Boy Homes Assoc., Inc. v. Britton, 2011 WL 2981374 (Mass.App.Div. July 20, 2011), rejects this view. Id. at *2-3 (condominium association's filing successive suits does not extend the lien priority beyond the initial and single six month period of time).

and, if he wished to propose a payment plan, to submit the plan to MEEB in writing.  Even though MEEB repeatedly instructed him to contact the firm if he had any questions, plaintiff never telephoned or contacted the firm after May 2005 with questions about the debt.  Similar to the other 60 day letters, the June 22, 2006 letter advised plaintiff about the need to inform MEEB in writing if he disputed the debt or desired to propose a payment plan.  At no time did plaintiff send a written communication to MEEB disputing the debt or proposing a payment plan.  The June 2006 legal fees for unit 104 included a $75.00 charge for a title examination and a $675.00 charge for reviewing the condominium documents and charges, preparing the complaint and drafting correspondence.  By letter dated June 27, 2006, Forbes informed Aegis that Pondview was willing to cease legal activity against plaintiff if Aegis agreed in writing to pay the arrears on unit 104.  (Ex. 53).

On or about August 10, 2006, Forbes had a telephone conference with the unit 104 lender during which the lender requested a payoff amount.  (Ex. 23, Aug. 31, 2006 invoice).  By letter dated August 18, 2006, Forbes sent M & T Mortgage Corporation ("M & T"), which the letter identifies as the servicing company for MERS,[62] a payoff amount totaling $3,454.00

_____

[62]  MERS is the first mortgagee on the March 2003 mortgage for unit 105 as well as on a April 2005 mortgage for unit 104. East West Mortgage is the lender for the March 2003 mortgage for

for the June 2006 unit 104 suit.  The amount included legal fees from June through August 14, 2006 ($1,703.00), outstanding condominium charges at the $225.94 monthly amount applicable to unit 104 from January to August 2006 ($1,286.00)[63] and anticipated legal fees to resolve the matter ($190.00) and the dismissal fee ($275.00) for the June 2006 unit 104 lawsuit.  Forbes attached a ledger for unit 104 dating back to July 2004 and time slips with the amount of legal fees incurred dating back to June 8, 2006.

By check dated August 29, 2006, payable to Pondview, M & T

---

unit 105 whereas Aegis is the lender for the April 2005 mortgage for unit 104.  Plaintiff is the borrower under both mortgages and the mortgagor under the accompanying security instruments. MEEB's invoice (Ex. 23, Aug. 31, 2006 invoice) does not identify the name of the lender.  The August 18, 2006 letter identifying M & T as the servicing company for MERS includes a mortgage loan number different than either the March 2003 mortgage for unit 105 or the April 2005 mortgage for unit 104.  While the record may support a contrary finding, this court finds that the payoff letter to M & T was for unit 104.  Plaintiff does not seek collateral estoppel on an issue regarding this payment made in a decision by the Lynn District Court in the June 2006 unit 105 suit.  Similarly, plaintiff does not raise an argument about a misapplication, if any, of a $3,545 check from M & T payable to Pondview.  See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999) ("district court is free to disregard arguments that are not adequately developed").

[63]  These fees duplicated the January and February 2006 condominium fees sought in the April 2005 unit 104 suit then under advisement with the Circuit Justice.  Pondview applied $1,737.80 of the amount to the January through August 2006 condominium fees and other non-legal unit 104 charges.  Plaintiff was not damaged or injured as a result of the oversight because the entire payment reduced his outstanding condominium charges for which he remained responsible by virtue of chapter 183A and the Declaration of Trust.  Plaintiff did not receive a copy of the August 18, 2006 letter.

paid the $3,545.00 amount.  On September 1, 2006, MEEB sent
Pondview a letter regarding the payment.  No further litigation
in the June 2006 unit 104 suit took place.  The $3,545.00 amount
tallied by Forbes included a dismissal fee.  This court therefore
draws the reasonable assumption that MEEB dismissed the June 2006
unit 104 suit shortly after receiving the payment and forwarding
it to Pondview.

　　　Pondview credited the entire amount to the unit 104 account.
Pondview applied $1,737.80 of the amount to the January through
August condominium fees and the remaining $1,716.20 amount to
legal fees.[64]

　　　By letter dated September 22, 2006, an attorney with Harmon
Law Offices, P.C. ("Harmon") who represented MERS, wrote to
Brooks requesting a payoff amount for unit 104.  In the letter,
MERS requested "the entire amount [Pondview] claims is owed by
[plaintiff]" and "the claimed six month priority amount."  (Ex.
46).

　　　In an October 16, 2006 reply letter, Forbes set out the
entire amount due on the unit 104 account ($26,035.10).  Forbes
attached a ledger for unit 104 dating back to July 2004 and time

---

[64]　The latter payment that Pondview applied to legal fees
does not contravene plaintiff's instructions to Pondview.
Plaintiff instructed Bailey to apply certain payments that
plaintiff made to condominium fees and not to late fees or legal
fees.  Plaintiff did not instruct Pondview to apply the payments
of a first mortgagee in any particular manner.

slips with the amount of legal fees incurred dating back to March
23, 2005.  The ledger and time slips enabled Harmon to calculate
the six month priority lien.[65]

Lenders often request the entire balance as opposed to the
six month priority amount under section 6(c) of chapter 183A.
(Tr. III, p. 83).  Accordingly, this court finds that the request
that prompted a June 6, 2008 letter from MEEB to Harmon (Ex. 70)
and the conversation that prompted a May 13, 2008 letter from
MEEB to Harmon (Ex. 69) were requests for the entire amount of
Pondview's lien at the time.

The bulk of the amount owed ($26,035.10) consisted of legal
fees ($22,118.70).  The latter amount, while significantly
larger than the amount of the debt, included fees for preparing
summary judgment papers and fees associated with the trial in the
April 2005 unit 104 suit.  MERS did not make a payment at this
time.  By the end of 2006, the unit 104 account was running a
deficit of $27,140.88.

MEEB charged Pondview less in certain months such as July
($95.00), August ($138.00) and September ($114.00) 2006 because
relatively little activity took place with respect to unit 104.
Whereas Pondview incurred $901.00 in legal fees in October 2006
due to the need to attend a court proceeding and to respond to

---

[65]  Plaintiff argues that MEEB never provided plaintiff's
mortgagees with the amount of the priority lien the mortgagees
requested.  (Docket Entry # 60, § 1(b), pp. 25-26).

Harmon's request for a payoff, Pondview did not incur any more legal fees for the remainder of the year relative to unit 104. Such minimal activity belies the existence of any intention on the part of MEEB to escalate legal fees.

After MEEB filed the June 2006 unit 105 suit, plaintiff filed a counterclaim in August 2006 to recover for "[w]ater damage and overpayment of condo fees" with respect to unit 105. (Docket Entry # 57, p. 71).  Pondview incurred additional legal fees ($665.00 in August and $972.00 in September) in seeking to dismiss the counterclaim.  Although the Justice denied the motion to dismiss the counterclaim, it was eventually severed from the claim for unpaid assessments.  Drafting interrogatories and a request for production of documents in November 2006 engendered additional and necessary legal fees ($760.00).  Reviewing these and other legal fees MEEB billed to Pondview from June through December 2006 reaffirms that MEEB did not intentionally or unnecessarily escalate Pondview's legal fees for unit 105. Pondview charged these fees to the unit 105 account.

Plaintiff's continued nonpayment of condominium fees, the locksmith charge and the June and July special assessments and late fees resulted in an approximate delinquency of $3,100.00 by the end of 2006 for these unit 105 charges.  Legal fees, which primarily involved activity related to the June 2006 unit 105 suit, totaled slightly more than $8,000.00 by the end of the year

50

50

for unit 105. As of December 31, 2006, the unit 105 account carried forward a total and accurate arrearage of $11,448.37. (Ex. 61).

On January 24, 2007, Forbes sent plaintiff another 60 day letter for unit 104 with an attached ledger.[66] She also made a reasonable decision to update the title resulting in a modest $75.00 charge to Pondview which Pondview then charged to the unit 104 account.

In January and February 2007, Forbes communicated with MERS, the first mortgagee under the April 2005 mortgage for unit 104, and Harmon, MERS' counsel, without advising plaintiff.[67] A communication on January 23, 2007, with the lender led to a letter from Forbes to Harmon stating the amount of MEEB's priority lien as $2,226.83. In early February 2007, MERS paid this amount with a check to Pondview. Forbes confirmed the payment in a February 15, 2007 letter to Harmon. As a result of the payment, MEEB did not file a third unit 104 suit in the first

---

[66] There was no testimony about this letter. It was entered into evidence without objection. Plaintiff does not discuss the letter in the post trial brief. He refers to the exhibit number twice in the post trial brief as evidence that MEEB communicated with plaintiff and sent the delinquency notices at or around the time it drafted the complaints.

[67] As previously indicted, plaintiff argues that MEEB's "secret communications" with plaintiff's mortgagees shows its bad faith and violates the FDCPA. Plaintiff characterizes the communications as "deceptive, misleading, and extortive." (Docket Entry # 60).

six months of 2007.

On March 28, 2007, the aforementioned judgment in the April 2005 unit 104 suit issued. The judgment totaled $22,622.99, consisting of condominium charges ($3,106.17), legal fees ($18,803.00) and prejudgment interest ($713.82). Pondview continued to incur legal fees for unit 104 in April and May 2007 to draft an opposition to plaintiff's motion for a new trial as well as respond to two other motions filed by plaintiff and to attend court hearings on the new trial motion. The lack of any unit 104 legal fees in June and only a $72.00 fee in July 2007 to respond to Harmon's communication regarding a payoff amount evidences the absence of any intentional escalation of legal fees on the part of MEEB.

Court hearings, motion practice, preparation for and continuation of an April 2007 trial, preparation for and rescheduling of a number of pretrial conferences, mediation proceedings and various telephone conferences in the June 2006 unit 105 suit during the first six months of 2007 led to an increase in Pondview's legal fees of $17,907.00. The largest monthly charge consisted of $9,664.00 in April 2007 to prepare for the then scheduled April 11, 2007 trial. The work appears necessary and, although certain tasks took longer than necessary, there was no duplication of effort.

On April 9, 2007, plaintiff's attorney filed an appearance

in the April 2005 unit 104 suit.  Three weeks later, he filed an appearance in the June 2006 unit 105 suit.

On May 3, 2007, a MEEB attorney reviewed a notice of foreclosure.  On May 30, 2007, MEEB prepared 60 day delinquency letters for plaintiff and the first mortgagee.  At the same time, MEEB sent the first mortgagee a 30 day notice letter of Pondview's intent to file or continue an action on unit 104.  MEEB did not wait 30 days to file another lawsuit.  Thus, on June 1, 2007, MEEB filed another unit 105 suit ("June 2007 unit 105 suit").  Thereafter, Pondview incurred additional legal fees related in part to the start of foreclosure proceedings on unit 105.[68]  Specifically, Pondview incurred legal fees which it debited to the unit 105 account in July ($426.70), August ($856.00) and September ($411.00) of 2007.

In July 2007, Halbich left Pondview and no longer resided in unit 105.  In or around October 2007, plaintiff moved into unit 105 where he resided until January 2008.  Foreclosure proceedings began in May 2007 on unit 105, which plaintiff owned at the time.  A foreclosure took place in September 2007 which led to an eviction proceeding.  The foreclosure resulted from plaintiff's failure to pay his mortgage debt.  MEEB's filing of the June 2006 and June 2007 unit 105 suits did not result in or cause the

---

[68]  Plaintiff's calculations of unit 105 legal fees after June 30, 2007 (Docket Entry # 60, p. 16, fn. 4) do not contain accurate numbers for a number of the monthly charges.

foreclosure.[69]  In January 2008, plaintiff was evicted from unit
105 and moved into unit 104.  Plaintiff continues to live in unit
104 without paying condominium fees, rent or mortgage payments.
In September 2008, a separate foreclosure took place on unit 104.
Plaintiff felt devastated by the foreclosures especially unit 104
because it was his "mother and father's place."  (Docket Entry #
57, p. 87).  He testified to going to a hospital in Lynn,
Massachusetts in September 2008 experiencing chest pains.[70]

Plaintiff testified that as a result of the September 2007
and September 2008 foreclosures, he lost sleep, was prescribed
Valium at a five milligram dosage and experienced anxiety.
Previously in 2003 and 2004, however, plaintiff took Valium at
the same dosage.  In 2003, a physician also prescribed plaintiff
Paxil, an antidepressant.  He received these prescriptions and
took these medications before MEEB's involvement.  As an issue of
fact, this court finds that plaintiff's sleeplessness, Valium
prescription and need to take antidepressant medication did not
result from misconduct, if any, on the part of MEEB.  He
additionally experiences high blood pressure.

On October 10, 2007, MEEB sent plaintiff another 60 day

_____

[69]  As discussed later in this opinion, filing these
lawsuits violated section 1692d.

[70]  In a deposition in a prior lawsuit plaintiff brought
against MERS and another banking entity, plaintiff attributed the
hospital admission not to MEEB but rather to the stress and
anxiety of the mortgage at issue in that lawsuit.

delinquency letter for unit 105. MEEB sent the letter to plaintiff as opposed to his attorney. On October 11, 2007, MEEB filed another unit 105 suit on Pondview's behalf again due to a perceived need to obtain a priority lien for the proceeding six months given the increased risk of foreclosure ("October 2007 unit 105 suit"). The suit alleges common expenses, including attorney's fees, in the amount of $34,012.07.[71]

On November 26, 2007, a MEEB attorney, Andrew Brooslin, Esq. ("Brooslin"), had a telephone conference with an attorney at Harmon, Neil Heiger, Esq. ("Heiger"), about the current lien payoff amount for unit 104. Brooslin provided the figures to Heiger in a letter the following day. The total ($29,764.19) included the outstanding $22,622.99 amount from the March 28, 2007 judgment, additional condominium fees from April to November 2007 ($2,328.00), legal fees for the same time period ($4,538.00) and a dismissal fee ($275.00). Brooslin did not provide plaintiff with a copy of the November 27, 2007 letter.

Plaintiff continued not to pay condominium fees and corresponding late fees for the remainder of 2007 for both unit 104 and unit 105. At the end of the year, he had a balance due

---

[71] Plaintiff does not specifically identify or allege that this amount is inaccurate. See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d at 260 ("district court is free to disregard arguments that are not adequately developed"); see also fn. 81 infra.

in the unit 104 account of $34,482.22.[72]

In March 2008, the June 2006 unit 105 suit went to trial thereby necessitating a legal fee in March of $8,536.05.  A review of the entries shows 34 hours of work on matters such as attending court proceedings, preparing affidavits and proposed stipulations of fact, telephone conferences with court personnel and Vischetti, drafting motions and appearing at trial.  Drawing the reasonable inference that Pondview debited the unit 105 account for these March legal fees, they relate to the trial and, while large, do not show an excessive duplication of effort on tasks let alone an intentional escalation of legal fees by a preponderance of the evidence.

In June 2008, the Justice in the June 2006 unit 105 suit issued a decision.  Finding that plaintiff had "failed to pay the condominium fees and assessments since February 2006 and incurred late fees and collection fees as a result," she awarded Pondview $7,234.54 for unpaid condominium fees, late fees and assessments up to the date of the March 28, 2008 trial.  Without itemizing the reductions by billing entry but noting that MEEB represents it redacted "all legal services rendered in connection with the defense of the counterclaim," she reduced Pondview's request for

---

[72]  Plaintiff's calculations for the unit 105 legal fees after June 30, 2007 (Docket Entry # 60, p. 16, fn. 4) do not contain accurate numbers for a number of the monthly charges.

$29,792.72 in legal fees to $14,000.00.[73]  (Ex. 80).  Plaintiff did not pay the judgment.

Meanwhile, during the first six months of 2008, MEEB charged Pondview a total of $2,002.00 for unit 104 collection activities. Plaintiff's nonpayment of condominium fees and accompanying late fees after the March 2007 corrected judgment ($22,622.99) led to another perceived need on the part of MEEB to file a unit 104 suit to protect the priority lien.

Consequently, on June 30, 2008, MEEB ordered another title examiner's report.  It also sent plaintiff, as opposed to his attorney, another 60 day delinquency letter stating that Pondview's records "as of April 2, 2007 through June 30, 2008 indicate" that plaintiff was "delinquent in meeting [his] financial obligations."  (Ex. 50).  The 60 day letter, which state law requires Pondview to send to "the unit owner," see Mass. Gen. L. ch. 183A, § 6(c), informed plaintiff of the amount of the debt set forth in Pondview's records "as of April 2, 2007 through June 30, 2008" at the time of the letter ($10,351.33). (Ex. 50).

Like the other 60 day letters, it explained that the amount

---

[73]  Defendant's request for a finding that the $14,000.00 amount was fair and reasonable (Docket Entry # 37, p. 37), such a finding is not required in this action at this point in time.  It is also moot in light of this court's finding that MEEB did not act with a bad faith intention to escalate its legal fees.

due ($10,351.33)[74] may be greater than the amount due "on the day
you pay" and, accordingly, "an additional payment may be
necessary to bring your account current."[75] (Ex. 50). Also like
the other 60 day letters, it identified MEEB as a debt
collector.[76]

After also sending the first mortgagee a 60 day delinquency
letter (Ex. 23, 7/16/08 invoice, p. 2) and a 30 day notice letter
on July 1, 2008 (Ex. 71), MEEB filed suit on July 3, 2008 ("the
July 2008 unit 104 suit") without waiting 30 days.[77] The
complaint states that plaintiff was "assessed common expenses and
charges in the amount of $10,351.33 since April 1, 2007
(hereinafter 'common expenses'), which have not been paid when
due." (Ex. 72, ¶ 5). The next paragraph provides that,

---

[74] Plaintiff does not argue that this specific amount is
inaccurate. See Higgins v. New Balance Athletic Shoe, Inc., 194
F.3d at 260.

[75] The least sophisticated consumer would recognize that
the amount stated ($10,351.33) was the amount due on June 30,
2008, and that a greater amount might be "due on the day you
pay." (Ex. 50).

[76] Because plaintiff filed the present suit on February 3,
2009, the above letter falls within the one year limitations
period applicable to the FDCPA.

[77] Summarily referring to 17 exhibits, including exhibit
71, plaintiff states that MEEB communicated with plaintiff's
"mortgagees after filing enforcement lawsuits" and that plaintiff
"was given no notice of these communications." Again referring
to these exhibits, plaintiff complains that Pondview failed to
"notify the mortgagees that [plaintiff] disputed MEEB's
attorneys['] fees." (Docket Entry # 60, ¶ 16).

"Interest and late fees have been charged for these overdue payments of common expenses" and that plaintiff and MERS, a defendant/party in interest, "are liable for attorneys' fees and costs . . . ."[78]   (Ex. 72, ¶ 6).

Before filing the July 2008 unit 104 suit, MEEB, on behalf of Pondview, sent Harmon, MERS' counsel, a letter setting out the amounts plaintiff owed on unit 104.  The June 9, 2008 letter set out a total amount as of June 9, 2008 ($33,249.32) for unit 104. The amount included the April 2005 unit 104 suit judgment ($22,622.99), the condominium charges after the March 2007 judgment through June 6, 2008 ($4,947.33), the legal fees from April 24, 2007 through June 6, 2008 ($5,404.00) and a dismissal fee ($275.00).[79]  The legal fees and condominium charges total the exact amount in the July 2008 unit 104 suit, i.e., $10,351.33.

On July 31, 2008, MERS, added as a defendant and party in interest in 2005 in the April 2005 unit 104 suit, paid Pondview a slightly greater amount ($34,813.40) representing the amount of legal fees and costs "through July 2008."  (Ex. 48 & 77).  The $34,813.40 payment included the amounts in the June 9, 2008

---

[78]   The least sophisticated consumer would understand that the $10,351.33 amount included interest, late fees and common expenses including attorney's fees.

[79]   A prior letter dated May 13, 2008, from MEEB to Harmon set out a slightly lower total of $31,309.09.  (Ex. 69). Plaintiff alleges he had no notice of this communication to the attorney for MERS in violation of 15 U.S.C. § 1692c(b).

letter which in turn includes the $275.00 dismissal fee.[80] Plaintiff did not receive copies of these communications. As the borrower on the April 2005 mortgage, this court draws the reasonable inference that he received notice of MERS' payment shortly thereafter in a mortgage statement. On August 1, 2008, MEEB filed a notice of voluntary dismissal of the April 2005 unit 104 suit. As a party, plaintiff received a copy of the dismissal notice. On August 4, 2008, MEEB notified the Lynn District Court that the judgment in the April 2005 unit 104 suit was satisfied in full. MEEB's invoices reflect that no further litigation took place relative to the July 2008 unit 104 suit.

Pondview received judgments totaling $45,334.30 and MEEB received $55,581.20 in attorney's fees. MEEB billed Pondview a total of $83,552.00 in legal fees and costs, an amount that the courts in the April 2005 unit 104 and the June 2006 unit 105 suits reduced. (Docket Entry # 51, pp. 84-85).

On September 16, 2008, MEEB sent plaintiff another 60 day delinquency letter for unit 104.[81] The letter stated a

---

[80] Thus, MERS paid a greater dismissal fee than the $150.00 dismissal fee in the unit 104 ledger attached to the May 17, 2005 letter.

[81] Plaintiff has not challenged the statement in *this* letter that "certain of those amounts are at least 60 days overdue" as false in violation of section 1692e of the FDCPA. He had ample opportunity to make the argument when this court extended the page limit for his post trial brief. The argument is therefore waived. See Vallejo v. Santini-Padilla, 607 F.3d at 7; Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d at 260

delinquency in the amount of $2,401.68.[82]  On September 16, 2008,
MEEB also sent MERS a 60 day delinquency letter and a 30 day
notice of intent to file or continue an action.  (Ex. 74; Ex. 23,
Aug. 31, 2008 invoice).  MEEB sent a copy of MERS' 60 day letter
to plaintiff.  Without waiting 30 days, MEEB filed suit on
Pondview's behalf to collect the unpaid "common expenses and
charges in the amount of $2,401.68" on unit 104 ("September 2008
unit 104 suit") in Essex Superior Court.[83]  (Ex. 78, ¶ 5).

MEEB adheres to a procedure in drafting and sending out the
form 60 day delinquency letters.  Brooks or Janet Aronson
("Aronson"), the other partner in the collection department,
supervise the attorneys in the collection department, including
Brooslin and other MEEB attorneys involved in the collection
activities for units 104 and 105.  Brooks and Aronson show the

---

("district court is free to disregard arguments that are not
adequately developed"); see also United States v. Zannino, 895
F.2d at 17 (court cannot expected to do counsel's work); see
generally U.S. v. Dyer, 589 F.3d 520, 527 (1st Cir. 2009) (before
"district court, Dyer never used the term 'specific intent' to
set forth the legal requirements for applying § 2G2.4(c)(2), and
has waived the argument"); Jennings v. Jones, 587 F.3d 430, 444
(1st Cir. 2009) ("Jennings did not present the argument to the
district court until his motion to reconsider the court's
decision to grant a new trial, and it is waived").

[82]  Again, plaintiff does not specifically address, let
alone argue, that this amount is false or misleading under
section 1692e or otherwise in violation of the FDCPA.  Based on
the reason and the legal authority set out in the previous
footnote, the argument is waived.

[83]  See fn. 29.

attorneys the relevant forms and are available for questions. Brooks, who has lectured at approximately 40 condominium law seminars during the past 15 years, receives questions on a daily basis from various attorneys in the collection department. Brooks served as president of the New England chapter of Community Associates Institute ("CAI"), a national organization for condominium associations, on two occasions.

MEEB also has a practice in place in the collection department to ensure compliance with the FDCPA. The collection department develops and readjusts, if necessary depending on case law and information obtained at legal seminars, the 60 day delinquency letters. Attorneys in the collection department attend seminars concerning the FDCPA. When significant cases are decided, MEEB circulates the cases around the office. The 60 day delinquency letters all have a telephone number that is exclusive for calls from condominium owners and debtors. When dialed, the caller hears a pre-recorded message which repeats the FDCPA validation notice in the letter. Preprinted facsimile sheets also include the language. MEEB based the FDCPA validation notice on language approved by the court in <u>Bartlett v. Heibl</u>, 128 F.3d 497, 501-502 (7th Cir. 1997), as not confusing to the least sophisticated consumer.[84]

---

[84] As discussed infra, the bona fide error defense, <u>see</u> 15 U.S.C. § 1692k(c), is not available for mistakes of law.

MEEB does not send the 60 day letters to the unit owners in order to harass, embarrass or cause the owner concern.  Rather, MEEB sends the 60 days letters because chapter 183A requires them and MEEB's clients were unable to collect the funds themselves from the unit owners.

On June 29, 2009, MEEB sent Pondview a letter enclosing a $25,500.00 check relative to unit 105 from an attorney.  The letter requested that Pondview pay MEEB $24,500.00 to pay the outstanding attorney's fees.  It also noted that "the Board of Trustees agreed to compromise the amount of the lien in order to resolve this matter."  (Ex. 81).  On July 10, 2009, MEEB received and applied the $24,500.00 payment toward the outstanding legal fees for unit 105.

Plaintiff testified that he "spent several thousand dollars" to make copies of various documents "for the courts" to defend himself against MEEB during the time he was proceeding pro se. (Docket Entry # 57, p. 79).  With respect to legal fees, he incurred attorney's fees of $400.00 at an undetermined time.[85] There was no evidence that plaintiff incurred any medical costs.[86]

---

[85]  Prior to trial, MEEB filed a motion in limine to preclude evidence of legal fees, except for a $400.00 payment allegedly paid to Charles Sachetta, Esq., due to plaintiff's non-production during discovery.  This court allowed the motion in limine on January 24, 2011, and on February 3, 2011, excluded any testimony above a $400.00 amount.

[86]  This court excluded the evidence at trial.  Plaintiff did not object to the exclusion at trial.

Plaintiff also experienced stress and anxiety due to one of the mortgages and brought suit against MERS and another banking entity under the Truth in Lending Act, 15 U.S.C. § 1643 ("TILA"). In a December 2009 deposition in that suit, plaintiff testified that the mortgage at issue financially harmed him "'[b]ecause it's tied up the last five years of my life.'" (Docket Entry # 53, p. 30). Plaintiff elaborated that, "'It's caused a lot of stress, anxiety'" (Docket Entry # 53, p. 32) and attributed the September 2008 hospital visit to that stress and anxiety, similar to the alleged anxiety and stress purportedly caused by MEEB in this action. Plaintiff also testified that another TILA lawsuit he brought relating to the interest rate on the March 2003 unit 105 mortgage caused him stress.

Plaintiff was unemployed from 2004 to the time of trial except for a period in 2005. In April 2005, he took a position as a general laborer at Testa Corporation ("Testa"), a demolition company. He worked at the company until August or September 2005. The time constraints of the litigation with Pondview did not force plaintiff to leave work. Rather, he became depressed and a recluse initially as a result of his father's death and even more so as a result of his mother's death. In another lawsuit, he also testified under oath that he stopped working at Testa because of a car accident. See Rule 32(a), Fed. R. Civ. P. The accident resulted in injuries to his lower back and upper

neck. This court finds that the misconduct identified below on
the part of MEEB was not causally connected to plaintiff leaving
Testa.

<u>DISCUSSION</u>

The complaint sets out violations of the FDCPA and chapter
93A. It also refers to sections 1692d, 1692e, 1692f and 1692h as
the basis of MEEB's liability. Turning to the arguments in
plaintiff's trial brief,[87] plaintiff submits that MEEB engaged in
collection efforts that violated the FDCPA with the intention to
escalate its legal fees. (Docket Entry # 60, § 1). With respect
to this argument, plaintiff identifies sections 1692d, 1692e,
1692f, 1692c(b), 1692h and 1692g(a)(1) as the basis for the
violations.[88]

Plaintiff subdivides the argument that MEEB intentionally
escalated its attorney's fees into four categories. First,
plaintiff maintains that MEEB communicated false amounts of its
attorney's fees to plaintiff and his mortgagees and communicated
to plaintiff in a consistently vague, ambiguous and confusing

---

[87] A prior Memorandum and Order denied plaintiff's request
in footnote one of the brief to incorporate by reference all
previous statements of law and arguments. (Docket Entry # 62).

[88] Plaintiff also relies on the definitions of the terms
"communication" and "debt collector" in sections 1692a(2) and
1692a(6) to hold MEEB responsible for the conduct of Pondview and
plaintiff's mortgagees. In the course of rendering decisions on
MEEB's liability under the FDCPA, this court has fully considered
plaintiff's argument that MEEB is responsible for the conduct of
Pondview and plaintiff's mortgagees.

manner in violation of sections 1692e(2)(A) and 1692g(a)(1).
(Docket Entry # 60, § 1(a)).

Second, plaintiff contends that MEEB secretly communicated
with plaintiff's mortgagees without his consent in violation of
sections 1692c(b) and 1692(e)(8).  Plaintiff adds that the
communications with plaintiff's mortgagees were deceptive,
misleading and extortive in violation of sections 1692d, 1692e
and 1692f.  (Docket Entry # 60, § 1(b)).

Third, plaintiff argues that MEEB never sent the 30 day
notice letters informing him of the intent to file suit 30 days
before filing suit as required under state law.  See Mass. Gen.
L. ch. 3A, § 6(c).  Plaintiff attributes the delay to MEEB's
desire to escalate its legal fees by recovering the additional
costs associated with filing the lawsuit and performing title
searches.  According to plaintiff, sending the summons and the
complaint at the same time as the 30 day notice letter violated
sections 1692d and 1692f.  (Docket Entry # 60, § 1(c)).

Fourth, plaintiff argues that MEEB's "bad faith" filing of
multiple lawsuits to collect the same debt violated sections
1692d and 1692f.  Plaintiff also complains that MEEB violated
section 1692c(b) by contacting plaintiff when it knew he was
represented by an attorney.  (Docket Entry # 60, § 1(d)).

Overall, the post trial brief focuses on MEEB's liability
under the foregoing sections of the FDCPA as opposed to chapter

93A.  Except for chapter 93A damages, plaintiff devotes only a
single sentence in the 37 page brief to MEEB's substantive
liability under chapter 93A.  (Docket Entry # 60).  Therein, he
argues that MEEB's violations of sections 1692d and 1692f
constitute "unfair and deceptive acts in violation of" section
two of chapter 93A.  (Docket Entry # 60).  The complaint,
however, asserts that MEEB's violations of the FDCPA are
independent as well as per se violations of chapter 93A.  (Docket
Entry # 1, ¶¶ 74 & 75).  Accordingly, this court addresses both
theories of chapter 93A liability.

I.  FDCPA

     Before turning to the particular sections of the FDCPA that
MEEB purportedly violated with respect to each of the four
arguments, MEEB raises three overarching arguments.  First, it
submits that the FDCPA's one year statute of limitations bars any
claims under the FDCPA prior to February 3, 2008.  As a matter of
state sovereignty, MEEB further argues that plaintiff cannot
recover under chapter 93A for FDCPA violations occurring before
February 3, 2008.  (Docket Entry # 61, ¶¶ 8-9; Docket Entry #
34).  Plaintiff submits that the four year limitations period
applies to the chapter 93 claims when based on FDCPA violations
and also relies on the continuing violation doctrine.  (Docket
Entry # 39).  Second, MEEB maintains that the fees and conduct
associated with the collection efforts for unit 105 during the

rental period lie outside the reach of the FDCPA.  Third, MEEB contends that it is not a "debt collector" within the meaning of the FDCPA.

A.  Statute of Limitations

Section 1692k(d), captioned jurisdiction, allows a party to bring "[a]n action to enforce any liability" under the FDCPA "within one year from the date on which the violation occurs." 15 U.S.C. § 1692k(d).  Absent an FDCPA violation after February 3, 2008, the FDCPA claims are time barred.  15 U.S.C. § 1692k(d); see Harrington v. CACV of Colorado, LLC, 508 F.Supp.2d 128, 131-132 (D.Mass. 2007) (quoting section 1692k(d) and summarily stating that FDCPA bars FDCPA claims for violations occurring prior to the one year period).

The statute does not define the accrual date and the First Circuit has not addressed the issue.  Simard v. LVNV Funding, LLC, 2011 WL 4543956, at *3 (D.Mass. Sept. 28, 2011) (section 1692k "'does not specifically define the date on which the violation occurs' thereby triggering the one year statute of limitations period").  Where, as here, an FDCPA claim "arises from a debt collection suit filed in state or municipal court, the statute of limitations runs from the day the complaint is filed or the day the plaintiff is served with a copy of the complaint."  Id. (citing Johnson v. Riddle, 305 F.3d 1107, 1113 (10th Cir. 2002), and Naas v. Stolman, 130 F.3d 892, 893 (9th Cir.

1997)); see Egbarin v. Lewis, Lewis & Ferraro LLC, 2006 WL 236846, at *9 (D.Conn. Jan. 31, 2006) ("FDCPA claims based on the filing of a lawsuit generally accrue when a claim is filed").

Moreover, plaintiff's reliance on the continuing violation doctrine (Docket Entry # 39) does not salvage the FDCPA claims arising prior to February 3, 2008. The doctrine typically applies "to the employment discrimination context." Schaffhauser v. Citibank (S.D.) N.A., 2009 WL 2400254, at *2 (3rd Cir. Aug. 6, 2009) (declining to extend doctrine to FDCPA claim) (not selected for publication).[89] Numerous courts therefore reject the doctrine's application to claims under the FDCPA. Fisk v. ARS National Services, Inc., 2012 WL 3236569, at *1 (N.D.N.Y. Aug. 7, 2012); Wilhelm v. Credico, Inc., 455 F.Supp.2d 1006, 1009 (D.N.D. 2006) (collecting cases); Egbarin v. Lewis, Lewis & Ferraro LLC, 2006 WL 236846, at *9 (collecting cases). Furthermore, each new discrete communication on the part of a debt collector "may constitute a separate violation of the FDCPA and commence a new statute of limitations period." Simard v. LVNV Funding, LLC,

---

[89] Rule 32.1, Fed. R. App. Pro., allows citations of unpublished opinions issued on or after January 1, 2007. In addition to Schaffhauser, this opinion cites a number of unpublished opinions. The local rule applicable to each unpublished opinion allows the citation but designates the opinion as non-precedential. The applicable Third Circuit local rule provides that unpublished opinions are not binding precedent. See Third Circuit LAR, App. I, IOP 5.7. Accordingly, although this court cites a number of unpublished decisions for their persuasive authority, they do not provide precedent and are not binding.

2011 WL 4543956, at *3; see Solomon v. HSBC Mortgage Corp., 2010 WL 3069699, at *3 (10th Cir. Aug. 6, 2010) (collecting authority for principle that, "discrete violations of the FDCPA should be analyzed on an individual basis" for statute of limitations purposes) (not selected for publication).[90]

Accordingly, each suit MEEB filed constitutes a discrete and independent alleged violation of the FDCPA. Incurring additional legal fees during the course of the litigation is simply a continuation of the escalation of fees incurred by filing the suit. See Ball v. Ocwen Loan Servicing, LLC, 2012 WL 1745479, at *5 (N.D.Ohio May 16, 2012) ("course of litigation is not, in itself, a 'continuing violation' of the FDCPA"). Thus, the March 2008 trial in the June 2006 unit 105 suit is not a discrete act unrelated to the filing of the suit or the debt alleged therein. See, e.g., Calka v. Kucker, Kraus & Bruh, LLP, 1998 WL 437151, at *3 (S.D.N.Y. Aug. 3, 1998) (continued prosecution of collection suit, including filing amended complaint and summary judgment motion, did not constitute continuing violation and all such "claims" accrued on date suit was filed). Similarly, attorney's fees and costs to collect the March 2007 judgment in the April 2005 unit 104 suit after February 3, 2008, do not constitute an independent, discrete FDCPA violation.

---

[90] The applicable Tenth Circuit local rule provides that unpublished opinions are not binding precedent. See Tenth Cir. R. App. P. 32.1(A).

The only two, timely filed suits are the July and September 2008 unit 104 suits.  In large part, plaintiff's arguments do not address these two lawsuits.  These timely acts, to the extent raised by plaintiff as an FDCPA violation, are discussed below under the relevant section of the FDCPA in the event they provide a basis for liability.  The vast majority of the testimony and exhibits at trial involve conduct that took place before February 3, 2008.

In a related limitations argument, MEEB asserts that chapter 93A does not provide liability for the untimely FDCPA misconduct.  (Docket Entry # 61, ¶ 9, p. 13).  It is well established that an FDCPA violation "constitutes a per se violation of ch. 93A." French v. Corporate Receivables, Inc., 489 F.3d 402, 403 n.1 (1st Cir. 2007).  Chapter 93A has a four year statute of limitations. See Mass. Gen. L. ch. 260, § 5A.  MEEB submits that the longer, four year statute of limitations under state law "cannot 'trump'" the "'more restrictive period'" set out in the FDCPA.  (Docket Entry # 61, ¶ 9, p. 13) (quoting Crooker v. Wachovia Bank, N.A., 2008 WL 2066943, at *1 n.4 (D.Mass. May 14, 2008)).  The foregoing dicta in Crooker v. Wachovia Bank, N.A., 2008 WL 2066943, at *1 n.4, supports MEEB's position.  As stated in Crooker:

> Nor as a matter of sovereignty can a state statute of limitations trump a more restrictive limitations period set out in a federal statute creating a federal cause of action. Cf. Cambridge Literary Props., Ltd. v. W. Goebel

71

> *Porzellanfabrik G.m.b.H. & Co. KG.*, 510 F.3d 77, 86-87 (1st Cir. 2007) (state-law cause of action which involves a threshold determination of plaintiff's copyright ownership "arises under" the federal Copyright Act and thus is subject to the federal three-year statute of limitations).

*Id.*

The issue MEEB raises presents a question of federal preemption based on chapter 93A's limitations period as opposed to jurisdiction. Moreover, the timely and colorable FDCPA violations, detailed below, provide the necessary jurisdiction under section 1692k(d). *See* 15 U.S.C. § 1692k(d) ("action to enforce any liability created by this subchapter may be brought in any appropriate United States district court"). Thus, even assuming that the one year statute of limitations in section 1692k(d) is jurisdictional, the timely FDCPA claims provide the basis for supplemental jurisdiction of the chapter 93A claims. *See* 28 U.S.C. § 1367(a); *Rhode Island Fishermen's Alliance, Inc. v. Rhode Island Dept. of Environmental Management*, 585 F.3d 42, 48 (1st Cir. 2009).

The issue MEEB raises is one of first impression in the First Circuit. "The doctrine of federal preemption is rooted in the Supremacy Clause, which provides that 'the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any thing in the Constitution or Laws of any State to the Contrary notwithstanding.'" *SPGGC, LLC v. Ayotte*, 488 F.3d 525, 530 (1st

Cir. 2007) (quoting U.S. Const. art. VI, cl. 2).  Here, Congress

expressly addressed preemption of state laws in section 1692n of

the FDCPA which reads:

§ 1692n.  Relation to State laws

This subchapter does not annul, alter, or affect, or exempt
any person subject to the provisions of this subchapter from
complying with the laws of any State with respect to debt
collection practices, except to the extent that those laws
are inconsistent with any provision of this subchapter, and
then only to the extent of the inconsistency.  For purposes
of this section, a State law is not inconsistent with this
subchapter if the protection such law affords any consumer
is greater than the protection provided by this subchapter.

15 U.S.C. § 1692n.

The four year, state statute of limitations applicable to

chapter 93A goes farther to protect consumers against unfair and

deceptive conduct in collection practices than the FDCPA's one

year limitations period.  As such, the four year limitations

period is not preempted by the FDCPA.  Indeed, "No revealed case

law suggests that Chapter 93A and the related Massachusetts

statutes and regulations dealing with debt collection practices

are inconsistent with, and thus preempted by, the FDCPA."  Dean

v. Compass Receivables Management Corp., 148 F.Supp.2d 116, 119

(D.Mass. 2001) (citing 15 U.S.C. § 1692n); see also

Gonzales v. Arrow Financial Services, LLC, 660 F.3d 1055, 1067

(9th Cir. 2011) (section 1692n "coupled with the FDCPA's express

purpose to 'promote consistent State action,' 15 U.S.C. §

1692(e), establishes that Congress did not intend the FDCPA to

preempt consistent state consumer protection laws"); <u>see</u>, <u>e.g.</u>,
<u>Harrington v. CACV of Colorado, LLC</u>, 508 F.Supp.2d at 132
(summarily noting FDCPA claims barred by one year statute of
limitations period and related chapter 93A claims barred by four
year statute of limitations).

B.   <u>Unit 105 as Outside Reach of FDCPA</u>

   MEEB next maintains that because unit 105 was a commercial,
rental unit, all of the fees and conduct associated with MEEB's
collection efforts lie outside the reach of the FDCPA.  More
specifically, MEEB argues that expenses plaintiff owed for the
rental unit constituted commercial as opposed to personal "debts"
within the meaning of section 1692a(5).  (Docket Entry # 61, ¶
14, p. 15).[91]

   "The basic premise of the statutory scheme" of the FDCPA is
that its protection "applies in connection with the collection of
debts."  <u>Arruda v. Sears, Roebuck & Co.</u>, 310 F.3d 13, 23 (1st Cir.
2002) (citing section 1692e).  Consequently, "At a minimum," a
complaint alleging FDCPA liability "must allege a scenario
involving the collection (or attempted collection) of a debt."
<u>Id.</u>

   Section 1692a(5) defines the term "debt" as:

_____

   [91]  MEEB limits the one sentence argument to unit 105.
(Docket Entry # 61, ¶ 14, p. 15).

any obligation or alleged obligation of a consumer[92] to pay
money arising out of a transaction in which the money,
property, insurance, or services which are the subject of
the transaction are primarily for personal, family, or
household purposes, whether or not such obligation has been
reduced to judgment.

15 U.S.C. § 1692a(5).  Examining the statutory language as a

whole, see Lawson v. FMR LLC, 670 F.3d 61, 68 (1st Cir.), petition

for cert. filed, 80 U.S.L.W. 3007 (U.S. June 28, 2012) (No. 12-

3), (First Circuit "and Supreme Court precedent require"

examination of "broader statutory framework, including

particularly the nearby language and the title and caption")

(citations omitted), the breadth of the phrase "any obligation or

alleged obligation" is not limited to a particular set of

obligations.  Bass v. Stolper, Koritzinsky, Brewster & Neider,

S.C., 111 F.3d 1322, 1325 (7th Cir. 1997) (the "absolute language"

of "any obligation to pay" does not "reference only a limited set

of obligations").  The obligation must, however, be one "to pay

money."  15 U.S.C. § 1692a(5); see Arruda v. Sears, Roebuck &

Co., 310 F.3d at 23 (interpreting section 1692a(5) and finding

bankruptcy discharge did not extinguish Sears' lien on consumer

goods purchased by plaintiffs but obligation to Sears after

bankruptcy discharge was only in rem right of repossession as

opposed to obligation to pay money).  Here, plaintiff had an

---

[92]  Section 1692a(2) broadly defines "consumer" as "any
natural person obligated or allegedly obligated to pay any debt."
15 U.S.C. § 1692a(2).  The "debt" of a consumer therefore
encompasses the debt of any person, including plaintiff.

obligation to pay money in the form of common expenses for unit
105, including attorney's fees.   The definition of a "debt" in
section 1692a(5) additionally states that the debt consists of
any obligation to pay money "arising out of a transaction."  15
U.S.C. § 1692a(5); see also Newman v. Boehm, Pearlstein & Bright,
Ltd., 119 F.3d 477, 481 (7th Cir. 1997) (definition of "debt"
centers "on the transaction creating the obligation to pay").
The language of section 1692a(5) then focuses on the "*subject* of
the transaction," i.e., the "money, property, insurance or
services" which must be "primarily for personal, family, or
household purposes."  15 U.S.C. § 1692a(5) (emphasis added); see
Newman v. Boehm, Pearlstein & Bright, Ltd., 119 F.3d at 481
(under section 1692a(5), "'the money, property, insurance, or
services which are the subject of the transaction' must primarily
be 'for personal, family, or household purposes'"); see also
Bloom v. I.C. System, Inc., 972 F.2d 1067, 1068 (9th Cir. 1992)
(FDCPA "applies to consumer debts and not business loans" and
then quoting section 1692a(5)); Fleet National Bank v. Baker, 263
F.Supp.2d 150, 153 (D.Mass. 2003) (whether debt constitutes
consumer debt "covered by the FDCPA, depends on the character of
the lending transaction with particular attention to the purpose
for which the credit was extended"); Business Lenders, LLC v.
Gazak, 2005 WL 1353378, at *4 (D.Me. June 6, 2005) ("standards
and duties set forth in the FDCPA do not extend to efforts to

collect on debts unrelated to transactions entered into 'primarily for personal, family, or household purposes'") (quoting section 1692a(5)); see, e.g., Dikun v. Streich, 369 F.Supp.2d 781, 785 (E.D.Va. 2005) ("[p]roperty owners association assessments for a plaintiff's residence are debts subject to the FDCPA").

In addition, the antecedent of the clause beginning "in which the money, property insurance or services" is the "transaction" out of which the obligation to pay arose as opposed to the "obligation" itself.  Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, and Clark, L.L.C., 214 F.3d 872, 875 (7th Cir. 2000) (antecedent of this clause "as a matter of grammar" is "the transaction out of which the obligation to repay arose, not the obligation itself"); see Pollice v. National Tax Funding, L.P., 225 F.3d 379, 401 (3rd Cir. 2000) ("plain meaning of section 1692a(5) indicates that a 'debt' is created whenever a consumer is obligated to pay money as a result of a transaction whose subject is primarily for personal, family, or household purposes").  Here, the obligation of plaintiff "to pay money" consists of the common expenses, including attorney's fees, for unit 105.  In light of the statutory language and grammar, however, it is the subject of the transaction, as opposed to the debt or obligation, that must be "primarily for personal, family, or household purposes."  15 U.S.C. § 1692a(5).  The issue

therefore reduces to identifying the transaction out of which the obligation to pay the common expenses for unit 105 arose.

The FDCPA does not define the term "transaction." Determining if the term is plain and unambiguous "begin[s] with the ordinary meaning of the term[] as of the time when the statutory provision was enacted."[93]  Hernandez-Miranda v. Empresas Diaz Masso, Inc., 651 F.3d 167, 171 (1st Cir. 2011).  To determine the ordinary meaning, it is permissible to "consult dictionary definitions, interpretations given to the same terms by judicial construction, and the statutory context in which the words are used."  Id.  Resorting to a dictionary definition, the Seventh Circuit in Bass defined the term "transaction" in section 1692a(5) as a "reference to many different types of business dealings between parties, and does not connote any specific form of payment."  Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C., 111 F.3d at 1325 (quoting definition of "transaction" in Webster's New World Dictionary 1509 (2nd ed. 1986), as "'a business deal or agreement'"); see also The Random House Dictionary of the English Language 2008 (2nd ed. 1987) (defining "transaction" as "the act of transacting or the fact of being transacted" and the verb "transact" as "to carry on or conduct (business, negotiations, activities, etc.) to a conclusion or settlement").

---

[93]  Section 1692a(5) was enacted in 1977.

In addition, the statute's use of the singular form of the term "a transaction" and "the transaction" reveals Congress' intent to limit "transaction" to a single business deal or transaction.  The nearby language of "transaction," as noted above, also connects the "debt" at issue, i.e., the common expenses for unit 105, as one "arising out of the transaction." 15 U.S.C. § 1692a(5).

Applying these meanings to the case at bar, the debt or obligation to pay the common expenses of unit 105 arose out of the transaction in which plaintiff took title to the property.[94] The debt to the condominium association also arose out of this transaction under which plaintiff became the unit owner.  Upon becoming the owner of unit 105, he became obligated to pay unit 105's respective share of the assessment as stated in the Declaration of Trust and by virtue of the Master Deed and chapter 183A, section six.[95]  Likewise, as a "unit owner," plaintiff became liable for his respective share of the assessment. (Docket Entry # B, Art. V, § 5.3); see, e.g., Newman v. Boehm, Pearlstein & Bright, Ltd., 119 F.3d at 481 (by purchasing condominium, Newmans became obligated at the time of that transaction "to pay any assessments" under "by-laws of their

---

[94]  See footnote eight and related text.

[95]  See fn. three, four and 12.

79

79

association" and Illinois condominium statute).[96]

Plaintiff became the owner of unit 105 when he obtained title to the unit and took out the mortgage in March 2003.  He was living in the unit at that time and the terms of the mortgage documents describe the unit as plaintiff's residence.  The purpose of becoming the owner was to have a place to live.[97]  The transaction was therefore primarily for personal, family or household purposes within the meaning of section 1692a(5).

Case law confirms and supports this interpretation.  See Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, and Clark, L.L.C., 214 F.3d at 874-876; Ladick v. Van Gemert, 146 F.3d 1205, 1206 (10th Cir. 1998); see also Newman v. Boehm, Pearlstein & Bright, Ltd., 119 F.3d at 481.  As explained by the Tenth Circuit in Ladick, "Ladick became obligated upon purchasing his condominium unit to pay any assessments pursuant to the governing documents of his association" and the assessment "therefore qualifies as an 'obligation of a consumer to pay money arising out of a transaction.'"  Ladick v. Van Gemert, 146 F.3d at 1206 (quoting section 1692a(5)).  Indeed, when an individual purchases a home with a mortgage but later moves to another city and then rents the home, the loan debt remains subject to the FDCPA

---

[96]  See fn. three, four and 12.

[97]  Footnotes seven and eight and the related text detail the relevant facts.

because the character of the debt is determined "when it arose rather than when it is to be collected" and at the time of the loan the individual purchased the property for a personal reason. Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, and Clark, L.L.C., 214 F.3d at 874-876.  The language of section 1692a(5) readily supports this conclusion because the "debt," defined as the obligation of a consumer to pay money, is one *arising out of a transaction*."  15 U.S.C. §§ 1692a(5) (emphasis added).

Accordingly, MEEB's one sentence argument that the common expenses plaintiff owed relative to unit 105 were commercial, as opposed to personal or consumer, debts is unavailing.  Unit 105's expenses therefore fall within the reach of the FDCPA.

C.  Underline MEEB as Debt Collector

MEEB submits that enforcing a security interest, such as the lien created under chapter 183A,[98] "does not qualify as debt collection activity under the FDCPA, except for the purposes of 15 U.S.C. § 1692f(6)."  (Docket Entry # 61, ¶ 12).  MEEB further reasons that because of the statutory lien under chapter 183A, the condominium assessments are not debts within the meaning of the FDCPA.  Accordingly, MEEB was not acting as a "debt collector."  (Docket Entry # 61, ¶ 13).  MEEB also points out, correctly, that plaintiff does not rely on section 1692f(6).

---

[98]  As explained in footnote four and the related text, MEEB is correct insofar as chapter 183A establishes a lien.

(Docket Entry # 61, ¶ 12).

The FDCPA defines a "debt collector" as one who "regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."  15 U.S.C. § 1692a(6); see Heintz v. Jenkins, 514 U.S. 291, 292 (1995) (FDCPA "applies to a lawyer who 'regularly,' through litigation, tries to collect consumer debts") (emphasis omitted).  In pertinent part, the definition, which contains a reference to the statute relied upon by MEEB, section 1692f(6), reads as follows:

> (6) The term "debt collector" means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another . . . For the purpose of section 1692f(6) of this title, such term *also* includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests.

15 U.S.C.A. § 1692a(6) (emphasis added).

"[T]here is a split of authority as to whether enforcers of security interests are 'debt collectors' for purposes of section 1692f(6) only, or whether they are subject to the entire FDCPA if they meet the general definition of a 'debt collector.'"  Payne v. Reiter & Schiller, P.A., 2012 WL 1054873, at *2 (D.Minn. March 8, 2012) (citing Montgomery v. Huntington Bank, 346 F.3d 693, 700-01 (6th Cir. 2003), and Kaltenbach v. Richards, 464 F.3d 524, 529 (5th Cir. 2006)).  Principles of statutory construction clarify the meaning of section 1692a(6) and its reference to

section 1692f(6).

The plain language of the last sentence in section 1692a(6) "distinguishes debt collection from security interest enforcement in its definition of a 'debt collector.'" Speleos v. BAC Home Loans Servicing, L.P., 824 F.Supp.2d 226, 232 (D.Mass. 2011). Section 1692a(6) gives "a general definition of 'debt collector' but then adds that, under § 1692f(6), the term also includes an entity enforcing security interests." Id. (emphasis added)  To avoid rendering the latter language surplusage, "[t]he plain implication is that a 'debt collector' under any other provision" of the FDCPA "does not include" a person in "any business the principal purpose of which is the enforcement of security interests." Id.; accord Derisme v. Hunt Leibert Jacobson P.C., 2012 WL 3000386, at *12 (D.Conn. July 23, 2012) (because "Section 1692a(6) expressly includes enforcers of security interests only in reference to Section 1692f(6), courts have held that an enforcer of security interest is therefore not a debt collector for purposes of the other sections of the FDCPA").  Thus, the purposeful inclusion of an enforcer of a security interest for "'one section of the FDCPA [section 1692f(6)] implies that the term "debt collector" does not include [that] enforcer of a security interest for any other section of the FDCPA.'" Montgomery v. Huntington Bank, 346 F.3d 693, 700 (6th Cir. 2003) (quoting Jordan v. Kent Recovery Serv., Inc., 731 F.Supp. 652,

657 (D.Del. 1990)); see Derisme v. Hunt Leibert Jacobson P.C.,
2012 WL 3000386, at *13 (collecting authority supporting same
conclusion).[99]

The issue therefore reduces to whether MEEB is a "business
the principal purpose of which is the enforcement of security
interests" within the meaning of section 1692a(6).  The plain
meaning of "a security interest is not a promise to pay a debt;
it is an interest in some collateral that a lender can take if a
debtor does not fulfill a payment obligation."  Reese v. Ellis,
Painter, Ratterree & Adams, LLP, 678 F.3d 1211, 1216 (11th Cir.
2012) (interpreting section 1692a(6)) (citing Black's Law
Dictionary 1384 (8th ed. 2004) and its definition of "a 'security'

---

[99]  The Derisme court collected the following cases which
illustrate that courts interpret the security enforcer as an
entity primarily involved in foreclosure activities such as the
repossession agency at issue in Montgomery, 346 F.3d at 699-700.
The citations and parentheticals in Derisme are as follows:

> See e.g., Chomilo, 2007 WL 2695795, at *3 (concluding that
> an enforcer of security interest, such as a law firm
> foreclosing on mortgages of real property, fall "outside the
> ambit of the FDCPA except for the provisions of section
> 1692f(6)."); . . . ; Hulse v. Owen Fed. Bank, FSB, 195
> F.Supp.2d 1188, 1204 (D.Or. 2002) (finding that foreclosing
> on property pursuant to a deed of trust was not the
> collection of a debt within the meaning of the FDCPA); . . .
> ; Beadle v. Haughey, No.Civ. 04-272-SM, 2005 WL 300060, at
> *3 (D.N.H. Feb. 9, 2005) ("Nearly every court that has
> addressed the question has held that foreclosing on a
> mortgage is not debt collection activity for purposes of the
> FDCPA since [s]ecurity enforcement activities fall outside
> the scope of the FDCPA") (internal quotation marks and
> citation omitted); . . . .

Derisme v. Hunt Leibert Jacobson P.C., 2012 WL 3000386, at *13.

as '[c]ollateral given or pledged to guarantee the fulfillment of an obligation'").  In contrast, condominium assessments are obligations to pay money, i.e., a debt.  See Ladick v. Van Gemert, 146 F.3d at 1207 ("condominium assessment owed by Mr. Ladick to his condominium association qualifies as a debt under the FDCPA"); Dikun v. Streich, 369 F.Supp.2d at 785 ("[p]roperty owners association assessments for a plaintiff's residence are debts subject to the FDCPA"); Garner v. Kansas, 1999 WL 262100, at *2 (E.D.La. April 30, 1999) (condominium assessment "qualifies as an 'obligation of a consumer to pay money arising out of a transaction,' thereby meeting the definition of a 'debt' under Section 1692a(5)").

At the time of trial, MEEB had approximately 3,500 condominium associations as clients located in Massachusetts, New Hampshire and Rhode Island.  In representing those clients, MEEB engaged in "the collection of overdue condominium assessments." (Tr. I, p. 23).  Moreover, "MEEB admits that it regularly collects or attempts to collect, directly or indirectly, condominium assessments owed or due or asserted to be owed or due condominium associations."  (Docket Entry # 21, p. 2).  It also admits that, to the extent the FDCPA applies, "MEEB was attempting to collect a debt."  (Docket Entry # 21, p. 2).  The majority of MEEB's correspondence with plaintiff states "that this firm is acting as a debt collector for [Pondview] to collect

the debt discussed in this letter."  (Ex. 5, 8, 9, 25, 26, 29, 40, 44, 49, 50 56, 61 & 76).[100]  The principal purpose of MEEB's business is not seeking to obtain a pledged interest in collateral, such as a condominium unit in a foreclosure sale.  It is to collect the money owed condominium associations in overdue assessments.  The fact that assessments of common expenses "shall constitute a lien against the unit,"[101] Mass. Gen. L. ch. 183A, § 6(a)(ii), does not convince this court otherwise.  In sum, MEEB is not engaged in a "business the principal purpose of which is the enforcement of security interests," 15 U.S.C. § 1692a(6).  Rather, it is a "debt collector" within the meaning of section 1692a(6).

D.  <u>False Amounts and Vague Communications</u>

In the first of the aforementioned four arguments in the post trial brief, plaintiff asserts that MEEB consistently stated false amounts to plaintiff of the amount owed for attorney's fees and costs.  He submits that such conduct violates sections 1692e(2)(A) and 1692g(a)(1).  (Docket Entry # 60, § 1(a)).

Briefly turning to the history and purpose of the statute, Congress enacted the FDCPA in 1977 "'"to protect consumers from a host of unfair, harassing, and deceptive collection practices

---

[100]  The letters also include the language that Pondview "may" file suit and that a sale of your unit "may" result from that suit.

[101]  <u>See</u> fn. four.

86

86

without imposing unnecessary restrictions on ethical debt collectors."'" F.T.C. v. Check Investors, Inc., 502 F.3d 159, 165 (3rd Cir. 2007) (quoting Staub v. Harris, 626 F.2d 275, 276-77 (3rd Cir. 1980) (quoting Consumer Credit Protection Act, S.Rep. No. 95-382, at 1-2 (1977)); accord Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA, 130 S.Ct. 1605, 1608 (2010) (Congress enacted FDCPA inter alia "to eliminate abusive debt collection practices" and "ensure that debt collectors who abstain from such practices are not competitively disadvantaged"); 15 U.S.C. § 1692e.  The statute accomplishes this goal by imposing strict liability on a "debt collector" for certain enumerated collection activities while allowing a bona fide error defense in section 1692k(c).  See Allen ex rel. Martin v. LaSalle Bank, N.A., 629 F.3d 364, 368 (3rd Cir. 2011) ("FDCPA is a strict liability statute to the extent it imposes liability without proof of an intentional violation") (collecting cases from Eleventh, Ninth, Seventh and Second circuits); Som v. Daniels Law Offices, P.C., 573 F.Supp.2d 349, 356 (D.Mass. 2008).  Courts evaluate the proscribed collection activities and communications to the debtor under a "least sophisticated consumer" standard.  See McMurray v. ProCollect, Inc., 687 F.3d 665, 669 (5th Cir. 2012).

The least sophisticated consumer is an objective standard. See Easterling v. Collecto, Inc., 692 F.3d 229, 234 (2nd Cir. 2012) ("least sophisticated consumer test is an objective

inquiry"); <u>Kistner v. Law Offices of Michael P. Margelefsky, LLC</u>, 518 F.3d 433, 438 (6th Cir. 2008) (least sophisticated consumer "test is objective"); <u>Pettway v. Harmon Law Offices, P.C.</u>, 2005 WL 2365331, at *3 (D.Mass. Sept. 27, 2005). It protects "'the gullible as well as the shrewd'" but preserves "'a quotient of reasonableness'" by preventing liability for "'bizarre or idiosyncratic interpretations of collection notices.'" <u>Hartman v. Great Seneca Financial Corp.</u>, 569 F.3d 606, 612 (6th Cir. 2009) (quoting <u>Barany-Snyder v. Weiner</u>, 539 F.3d 327, 332-33 (6th Cir. 2008)); <u>accord</u> <u>Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.</u>, 653 F.3d 241, 251 (3rd Cir. 2011) ("'least sophisticated consumer standard' . . . includes the 'gullible as well as the shrewd,' because the Act is a consumer protection law, but we 'preserv[e] a quotient of reasonableness and presum[e] a basic level of understanding and willingness to read with care'") (quoting <u>Wilson v. Quadramed Corp.</u>, 225 F.3d 350, 354-55 (3rd Cir. 2000), in parenthetical). The least sophisticated consumer "'possesses rudimentary knowledge about the financial world and is capable of making basic logical deductions and inferences.'" <u>Pettway v. Harmon Law Offices, P.C.</u>, 2005 WL 2365331, at *3 (quoting <u>Pettit v. Retrieval Masters Creditors Bureau, Inc.</u>, 211 F.3d 1057, 1060 (7th Cir. 2000), in parenthetical) (internal ellipses omitted); <u>accord</u> <u>Marino v. Hoganwillig, PLLC</u>, 2012 WL 1424733, at *4 (W.D.N.Y. April 24, 2012).

The proscribed collection methods in the statute prohibit inter alia debt collectors from:

> engaging in any conduct "the natural consequence of which is to harass, oppress, or abuse any person," 15 U.S.C. § 1692d; from using "any false, deceptive, or misleading representations or means in connection with the collection of any debt," 15 U.S.C. § 1692e; or from using "unfair or unconscionable means to collect or attempt to collect any debt," 15 U.S.C. § 1692f.

F.T.C. v. Check Investors, Inc., 502 F.3d at 166.  These broad categories of proscribed collection activity each "include examples of prohibited activity."  Id.  For example, the false or misleading representations proscribed in section 1692e include false representations about a debt's "character, amount or legal status."  15 U.S.C. § 1692e(2)(A).

(1) Section 1692g(a)(1)

In the post trial brief, plaintiff maintains that MEEB failed to state "the amount of the debt" in a number of communications in violation of section 1692g(a)(1).  (Docket Entry # 60, p. 22).  As discussed below, section 1692g(a) only applies to an "initial communication."  15 U.S.C. § 1692g(a).  In the complaint, plaintiff additionally asserts that the March 31, 2005 letters do not comply with section 1692g.  (Docket Entry # 1, ¶ 25).

Section 1692g proscribes the notice and contents of a debt collector's "initial communication" to a debtor.  15 U.S.C. §

1692g (captioned "Notice of debt; contents").[102]  15 U.S.C. §
1692g(a)(1); <u>McKinney v. Cadleway Properties, Inc.</u>, 548 F.3d 496,
502 (7th Cir. 2008) ("FDCPA requires debt collectors to provide
certain information 'in the initial communication' with the
consumer or '[w]ithin five days after the initial
communication'") (quoting section 1692g(a)); <u>Silva v. National</u>

---

[102]  The complete language reads as follows:

(a) Notice of debt; contents

Within five days after the initial communication with a
consumer in connection with the collection of any debt, a
debt collector shall, unless the following information is
contained in the initial communication or the consumer has
paid the debt, send the consumer a written notice
containing--

(1) the amount of the debt;

(2) the name of the creditor to whom the debt is owed;

(3) a statement that unless the consumer, within thirty days
after receipt of the notice, disputes the validity of the
debt, or any portion thereof, the debt will be assumed to be
valid by the debt collector;

(4) a statement that if the consumer notifies the debt
collector in writing within the thirty-day period that the
debt, or any portion thereof, is disputed, the debt
collector will obtain verification of the debt or a copy of
a judgment against the consumer and a copy of such
verification or judgment will be mailed to the consumer by
the debt collector; and

(5) a statement that, upon the consumer's written request
within the thirty-day period, the debt collector will
provide the consumer with the name and address of the
original creditor, if different from the current creditor.

15 U.S.C. § 1692g.

Telewire Corp., 2000 WL 1466149, at *1 (D.N.H. Jan. 3, 2000)
(section 1692g(a) requires "debt collector to send the consumer
written notice containing specific information either with the
initial communication or within five days of it").

By its terms, section 1692g(a)(1) requires inclusion of "the
amount of the debt" in the "initial communication" or five days
thereafter.  15 U.S.C. § 1692g(a)(1).  A more specific statutory
section, to wit, section 1692e(2)(A), proscribes the debt
collector's continuing obligation to avoid making a false
representation of the amount of the debt after the initial
communication.  Where, as here, "'"Congress includes particular
language in one section of a statute but omits it in another
section of the same Act, it is generally presumed that Congress
acts intentionally and purposely in the disparate inclusion or
exclusion."'" Duncan v. Walker, 533 U.S. 167, 173 (2001)
(quoting Bates v. United States, 522 U.S. 23, 29–30 (1997))
(internal brackets omitted); In re 229 Main Street Limited
Partnership, 262 F.3d 1, 5-6 (1st Cir. 2001) (recognizing
presumption that Congress acts intentionally "'in the disparate
inclusion or exclusion'" of terms in statutory sections) (quoting
Duncan v. Walker, 531 U.S. at 173).

The common meaning of "initial" denotes "the beginning" or
"first." Random House Dictionary of the English Language 982 (2nd
ed. 1987) (defining "initial").  Principles of statutory

construction thus limit the reach of section 1692g(a) to the "initial communication" or the written notice sent within five days thereafter. See Newman v. Ormond, 2010 WL 3623174, at *2 (11th Cir. Sept. 20, 2010) (unpublished).[103]

As aptly expressed in a recent Third Circuit opinion:

> We agree with the common-sense conclusion reached by other courts that "there can be only one 'initial communication' between a debt collector and a consumer, and any communication that follows the 'initial communication' is necessarily not an 'initial' communication." Derisme v. Hunt Leibert Jacobson, PC, 2010 WL 4683916, at *5 (D.Conn. Nov. 10, 2010). Faced with cases in which a validation notice did accompany an initial communication, but the plaintiff argued that the FDCPA was violated by subsequent communications lacking such a notice, courts have concluded that a debt collector has no obligation to send a validation notice with any communication other than the initial communication. Weber v. Computer Credit, Inc., 259 F.R.D. 33, 39 (E.D.N.Y. 2009); Spira v. Ashwood Fin., Inc., 358 F.Supp.2d 150, 158–59 (E.D.N.Y. 2005); see also Ehrich v. RJM Acquisitions LLC, 2009 WL 4545179, at *2 (E.D.N.Y. Dec. 4, 2009) ("Any letters after [the first communication between a debt collector and a consumer] are irrelevant for purposes of the notice requirement in Section 1692g(a).").

Peterson v. Portfolio Recovery Associates, LLC, 2011 WL 2181508, at *2 (3rd Cir. June 6, 2011) (unpublished).[104] As to section 1692g(a)(1), the issue therefore devolves into identifying the "initial communication" (or the written communication five days thereafter) and whether it contains "the amount of the debt."

---

[103] See fn. 89. The applicable Eleventh Circuit rule allows citations of unpublished opinions. "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2.

[104] See fn. 89.

The FDCPA does not define the term "initial communication" but it does define the term "communication."  See 15 U.S.C. § 1692a(2).  A "communication" within the meaning of the FDCPA "means the conveying of information regarding a debt directly or indirectly to any person through any medium."  15 U.S.C. § 1692a(2).  The statute also uses the singular as opposed to the plural form of the term "initial communication" thus evidencing an intent to limit the requirement to a single, initial communication as opposed to communications that follow.

Here, MEEB's first or initial communication with plaintiff in connection with the unit 104 debt was the March 23, 2005 letter relative to unit 104.  Likewise, MEEB's initial communication with plaintiff in connection with the unit 105 debt was the March 23, 2005 letter relative to unit 105.  Each letter included an amount of the debt for the respective unit.  MEEB did not send a previous communication and each letter is a communication "in connection with the collection of any debt" within the meaning of section 1692g(a).  Accordingly, it is the March 23, 2005 letters as to the unit 104 and the unit 105 debts that constitute the "initial communication" within the meaning of section 1692g(a).

The stated $1,495.61 amount of the debt in the March 23, 2005 letter for unit 104 was the actual amount owed as explained in the factual background.  Accordingly, MEEB did not violate section 1692g(a)(1) with respect to the amount of the unit 104 debt.

The stated amount of the debt "incurred through the date of" the March 23, 2005 letter for unit 105 was $1,431.61.  (Ex. 9). The amount was not correct.  Pondview carried over a balance of $346.62 in the unit 105 account into 2005.  Adding three months of condominium fees ($530.25), three months of loan payback charges ($49.74) and three months of late fees for both items ($150.00) yields a total of $1,076.61.  Legal fees as of March 23, 2005, totaled $280.00.  Accordingly, the March 23, 2005 letter overstated the amount of the debt, which included legal fees, owed by $75.00.  MEEB therefore violated section 1692g(a)(1).  The effect of this untimely FDCPA violation with respect to MEEB's chapter 93A liability is addressed later in this opinion.

The complaint challenges the validation language in the March 31, 2005 letters for unit 104 and 105 as not compliant with section 1692g(a).  As previously discussed, the March 31, 2005 letters are not the initial communications within the meaning of section 1692g.  Because they contain the same validation language as the initial communications in the March 23, 2005 letters, however, this court construes the allegations as based on the March 23, 2005 letters.

Plaintiff submits that the validation language "misleadingly inferred" that plaintiff:

> had only thirty days to dispute the validity of the debt
> (including the disputed retroactively charged late fees)
> instead of making it clear that the thirty days applied only
> to [MEEB's] right to assume that the debt was valid.  This

94

94

> confusion was compounded by the letter's subsequent emphatic
> statement that [MEEB] was not required to wait thirty days
> before undertaking further collection efforts which
> overshadowed and otherwise obfuscated [MEEB's] subsequent
> unemphasized statement concerning its suspension of such
> efforts upon receipt of notice of a dispute.

(Docket Entry # 1, ¶ 25).  Fairly construed, plaintiff raises a claim based on violations of sections 1692g(a)(3) and (4).

Section 1692g(a)(3) requires the debt collector to send the consumer a written "statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector."  15 U.S.C. § 1692g(a)(3).  Section 1692g(a)(4), in turn, requires the debt collector to include a statement "that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt . . .."  15 U.S.C. § 1692g(a)(4).

Section 1692g(b) instructs that a debt collector may engage in collection activities during the 30 day period "unless the consumer has notified the debt collector in writing that the debt . . . is disputed or . . . requests the name and address of the original creditor."  15 U.S.C. § 1692g(b).  Plaintiff did not provide MEEB with a written request disputing the debt let alone one within 30 days of receiving the March 23, 2005 letters. Accordingly, MEEB's collection activities consisting of the March 31, 2005 letters and Bailey's April 2005 letter did not contravene

this aspect to section 1692g(b).

Section 1692g(b) also prohibits "[a]ny collection activities and communication during the 30-day period" that "overshadow or" are "inconsistent with . . . the consumer's right to dispute the debt or request the name and address of the original creditor." 15 U.S.C. § 1692g(b).  The March 31, 2005 collection letters and Bailey's April 2005 letter did not overshadow plaintiff's right to dispute the debt or otherwise violate section 1692g(b).  The April 2005 suits did not overshadow or otherwise violate section 1692g(b) because MEEB filed them more than 30 days after plaintiff received the March 23, 2005 letters.

Turning to the actual content of the validation notice and contrary to plaintiff's assertion (Docket Entry # 1, ¶ 25), the language did not misleadingly infer or imply that plaintiff had only 30 days to dispute the debt.  The first sentence states that plaintiff has 30 days to dispute the validity of the debt but then immediately follows this language with two sentences.  The first of the two sentences outlines what happens if plaintiff disputes the debt.  The second of the two sentences outlines what happens if plaintiff does not dispute the debt.  See Wilson v. Quadramed Corp., 225 F.3d at 356 (letter, giving option of immediate payment or notification in 30 days did "not emphasize one option over the other, or suggest that Wilson forego the second option in favor of immediate payment").  This language does not confuse or mislead

the least sophisticated consumer that he has only 30 days to
dispute the debt's validity.  See, e.g., Bartlett v. Heibl, 128
F.3d at 501-502 (setting out almost identical language as not
confusing or in violation of section 1692g).

Taking the foregoing language in the context of the next
paragraph, it is true that the notice underlines and therefore
emphasizes the first sentence that MEEB is "not required to wait
until the end of" the 30 day period "before taking further steps
to collect" the debt.  (Ex. 8 & 9) (omitting bolding, italics and
underlining).  The entire notice, however, is in bold and in
italics.  Only the first sentence of the second paragraph is
underlined.  The sentence immediately following this language also
explains that if plaintiff "request[s] proof of the debt or the
name and address of the original creditor" within the 30 day
period, MEEB "will suspend our efforts to collect the debt until
we mail you the information."  (Ex. 8 & 9) (italics and bolding
omitted).  Although this sentence is not underlined, it is still
emphasized with italics and bolding.  It also has the same type
face as the underlined sentence.  See Wilson v. Quadramed Corp.,
225 F.3d at 356 ("first two paragraphs of the letter do not
overshadow the validation notice" because notice had "same font,
size and color type-face as the first two paragraphs"); see also
Peter v. GC Services L.P., 310 F.3d 344, 349 n.2 (5th Cir. 2002)
("validation letter engages in overshadowing when the

contradictory language is in 'screaming headlines' or the notice language is in fine print, faint print, or confusing typeface") (citation omitted).

In sum, from the viewpoint of the least sophisticated consumer, see Russell v. Equifax A.R.S., 74 F.3d 30, 34 (2nd Cir. 1996) ("[w]hen determining whether § 1692g has been violated, an objective standard, measured by how the 'least sophisticated consumer' would interpret the notice . . . is applied"), the March 23, 2005 letters comply with sections 1692g(a) and (b) except for the false amount of the unit 105 debt in the March 23, 2005, unit 105 letter (Ex. 9).

    (2) Section 1692e(2)(A)

Turning to section 1692e(2)(A), plaintiff identifies the following documents in the post trial brief as the basis for MEEB's liability:  the May 2, 2005 letter (Ex. 21); the first May 17, 2005 letter (Ex. 22); the October 4, 2005, 60 day letter relative to unit 105 (Ex. 25); the October 4, 2005 notice of intent to collect rent letter relative to unit 105 (Ex. 25); the complaint in the April 2005 unit 104 suit (Ex. 15); and the complaint in the April 2005 unit 105 suit (Ex. 16).  (Docket Entry # 60, § 1(a)).  Plaintiff argues that the foregoing communications contained false representations of the character, amount and legal

status of the debt in violation of section 1692e(2)(A).[105]

Alternatively, he asserts that the communications were

"consistently vague, ambiguous, misleading and confusing" in

violation of section 1692e.  (Docket Entry # 60, § 1(a)).

Section 1692e prevents a debt collector from using "any

false, deceptive, or misleading representation or means in

connection with the collection of any debt."[106]  15 U.S.C. § 1692e.

The section provides a non-exclusive list of examples that

contravene this general prohibition.  15 U.S.C. § 1692e(1)-(16);

see F.T.C. v. Check Investors, Inc., 502 F.3d at 166.  Plaintiff

relies on section 1692e(2)(A) which prohibits a false

representation of "the character, amount, or legal status of any

debt."  15 U.S.C. § 1692e(2)(A).

Stating an incorrect amount of the debt undeniably violates

section 1692e(2)(A).  See Hepsen v. Resurgent Capital Services,

---

[105]   As explained in greater detail in footnote 113,
plaintiff limits the challenge to the April 2005 suits to the
character and legal status of the debt.

[106]   In pertinent part, section 1692e(2)(A), states that:

A debt collector may not use any false, deceptive, or
misleading representation or means in connection with the
collection of any debt.  Without limiting the general
application of the foregoing, the following conduct is a
violation of this section: . . .

(2) The false representation of--

(A) the character, amount, or legal status of any debt.

15 U.S.C.A. § 1692e.

LP, 2010 WL 2490734, at *3 (11th Cir. June 17, 2010)
(unpublished).[107]  Although a debt collector is not necessarily
required to take affirmative steps to verify the creditor's debt,
the debt collector remains liable for including an incorrect
amount unless he can establish the bona fide error defense.  Id.
at *3-4.  On the other hand, a debt collector's letter stating a
correct amount ($3,864.09) as the "current amount due" for a
credit card debt and a letter more than two months later
accurately stating the "total due" as a different amount
($3,904.97) does not violate section 1692(2)(A) simply because the
initial letter did not inform the consumer that the debt would
increase over time.  Schaefer v. ARM Receivable Management, Inc.,
2011 WL 2847768, at *5 (D.Mass. July 19, 2011).

It is also not a false representation of the character of the
debt under section 1692e(2)(A) to identify the "interest due" as a
certain amount without subdividing the amount into principal and
interest.  See Hahn v. Triumph Partnerships LLC, 557 F.3d 755, 757
(7th Cir. 2009).  To provide another example, stating that the
amount of the "debt may vary daily based on additional interest,
late charges, and collection costs" is not a misrepresentation
under section 1692e "simply because the amount listed . . .
differed from the amount ultimately sought in settlement and
judgment." Newman v. Ormond, 2010 WL 3623174, at *2.

---

[107]  See fn. 89 & 103.

Gauging the standard from the objective viewpoint of the least sophisticated consumer, this court turns to the May 2, 2005 letter. Plaintiff argues that the statements that plaintiff owed $1,389.00 for attorney's fees for unit 104 and $1,772.00 for attorney's fees for unit 105 were false representations of the amount of the debt under section 1692e(2)(A). MEEB's invoices to Pondview evidence legal fees for unit 104 of $1,194.00 as of May 2, 2005, and $1,605.00 for unit 105 as of May 2, 2005. Because the amounts in the letter differ from the amounts due in the invoices as of May 2, 2005, plaintiff establishes that MEEB violated section 1692e(2)(A).

With respect to the existence of a bona fide error, a debt collector may avoid liability if he "shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c). The defense requires that: "'(1) The alleged violation was unintentional, (2) the alleged violation resulted from a bona fide error, and (3) the bona fide error occurred despite procedures designed to avoid such errors.'" LaRocque ex rel. Spang v. TRS Recovery Services, Inc., 2012 WL 2921191, at *12 (D.Me. July 17, 2012) (quoting Beck v. Maximus, 457 F.3d 291, 297-98 (3rd Cir. 2006), and noting that First Circuit has not addressed the defense); see Owen v. I.C. System, Inc., 629 F.3d

1263, 1271 (11th Cir. 2011) ("§ 1692k(c) is an affirmative

defense" under which debt collector bears "burden of showing that

its FDCPA violation (1) was 'not intentional'; (2) was 'a bona

fide error'; and (3) occurred despite the maintenance of

procedures 'reasonably adapted to avoid any such error'"); <u>Johnson

v. Riddle</u>, 443 F.3d 723, 729 (10th Cir. 2006) (in addition to

intent, "debt collector's error must be bona fide and he must have

maintained procedures reasonably adapted to avoid error").

It is true that MEEB has a practice in place before legal

bills go out to clients such as Pondview to ensure the accuracy of

such bills.  Associates review their time slips for accuracy and a

partner then "looks at the bills before they go out."[108]  (Tr. IV,

p. 48).  Brooks testified that the legal fees in the letter are

those due at that time (May 2, 2005) and are correct.  (Tr. IV, p.

12 & 18).  Such testimony, in addition to other evidence,

establishes that the error was intentional.  MEEB therefore fails

in its burden to establish the bona fide error defense.

Accordingly, although now untimely, MEEB violated section

1692e(2)(A) by including two false amounts of its attorney's fees

in the May 2, 2005 letter in violation of the FDCPA.  The false

representation of the amount of the unit 104 debt totals $195.00

and for the unit 105 debt totals $231.00.

---

[108]  MEEB also has a practice tailored to avoiding an error
in a ledger supplied by a client which MEEB then sends to a
consumer debtor.

Plaintiff also contends that the May 2, 2005 letter violates section 1692e(2)(A) because it falsely represents that "[t]he following amounts are due" (Ex. 21) but the amounts did not include the May 1, 2005 condominium fees for unit 105 ($176.75) and unit 104 ($155.04). It is true that the monetary amounts in the letter that follow do not include the May condominium fees. The letter however does not state that the following amounts "are the total due" or "are all of the amount due." See Schaefer v. ARM Receivable Management, Inc., 2011 WL 2847768, at *5. The letter accurately states that "the following amounts are due." (Ex. 21). Notably, immediately after the listed monetary amounts, the letter states that, "In addition, the May condominium fee was due on May 1st for each unit." (Ex. 21). Accordingly, the letter is not a false representation of the character of the debt vis-à-vis the condominium fees. To the contrary, it is an accurate representation of the character and amount of the debt. It accurately and forthrightly gives the monetary amounts along with a statement that the May condominium fees are also due.

Plaintiff's reliance on Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, and Clark, L.L.C., 214 F.3d at 875, is misplaced. That case involved the requirement in section 1692g(a)(1) to state "the amount of the debt" in the "initial communication" or five days thereafter. 15 U.S.C. § 1692g(a)(1). Furthermore, the statement of the debt in Miller as the "'unpaid principal

balance'" without giving a statement of the full amount of the debt, id., differs factually from the May 2, 2005 letter. Here, MEEB made a representation of amounts that "are due" and that the May condominium fee is also "due." (Ex. 21). The latter is a known monetary amount that did not change from April to May 2005. Viewed by the least sophisticated consumer, the May 2, 2005 letter does not falsely represent the character or the amount of the debt.

Plaintiff also submits that the May 2, 2005 letter violates section 1692e(2)(A) because it "falsely inferred" that Pondview did not accept the checks because plaintiff failed to pay legal fees when the amounts of such fees consisted "largely" of fees for "preparing, filing, and recording" the April 2005 unit 104 and unit 105 suits. (Docket Entry # 60, § 1(a)). Plaintiff also complains that the letter falsely accuses plaintiff of not paying condominium fees even though he sent the two April 22, 2005 checks to Bailey.

The letter, however, correctly and in a straight forward manner states, "These checks do not represent payment in full. When you made payment, you did not include *any* legal fees." (Ex. 21) (emphasis added). The statement is true and not false or misleading to the least sophisticated consumer. The checks ($1,597.37 for unit 104 and $1,310.24 for unit 105) did not include any legal fees. As of the date of the April 16, 2005

letter, Pondview owed MEEB the legal fees in the March 2005 invoices. Plaintiff, in turn, owed these fees to Pondview. Thus, although marked "full payment" for the particular unit, the amount of the checks was not a full payment of the debt for the designated unit. In addition, the fact that legal fees increased after plaintiff tendered the checks does not render the letter misleading or a mischaracterization of the debt.

The letter further states that, "The following amounts are due" and lists the amounts, including the unit 104 and unit 105 fees. (Ex. 21). It does not falsely represent or misleadingly accuse plaintiff of not paying condominium or attorney's fees. As of May 2, 2005, plaintiff had not paid the listed fees including the unit 104 fee of $1,507.37 and the unit 105 fee of $1,319.94. Plaintiff had not paid these condominium fees because a check marked "full payment" for the "unit" is not full payment of the condominium fees for the unit where, as here, the debt for the unit included additional legal fees and Pondview never cashed the checks. Indeed, cashing such a check under certain circumstances extinguishes the debt for the unpaid legal fees. See McDonald v. U.S., 13 Cl.Ct. 255, 261 (Cl.Ct. 1987).[109]

---

[109] In greater detail, the Macdonald court explains that:

Retention or cashing of the debtor's check can, in some circumstances, operate as an acceptance by the creditor of the debtor's offer to give substituted performance. "Where the amount is in dispute, and the debtor sends cash or check for less than the amount claimed, clearly expressing his

105

In addition and notwithstanding plaintiff's argument to the contrary, the fact that MEEB did not include copies of the complaints in the April 2005 unit 104 and unit 105 suits does not render the letter a violation of section 1692e(2)(A). In short, except for the aforementioned false amounts of attorney's fees in the May 2, 2005 letter, viewing the letter as a whole, it is not a false representation of the character or amount of the debt under section 1692e(2)(A).

Next, plaintiff points to section 1692e(2)(A) violations in the first May 17, 2005 letter. Like the May 2, 2005 letter, the May 17, 2005 letter incorrectly states the amount of the debt. In particular, it includes two, duplicate legal fees for March 2005. The two ledgers from Pondview attached to the letter already included the legal fees for March for each unit. MEEB, however, then typed the same fee at the bottom of each ledger and added each fee to the balance as of May 17, 2005. The letter thus adds the attorney's fees for unit 104 ($348.00) and for unit 105 ($536.00) twice to the balance as of May 17, 2005. (Ex. 22).

---

intention that it is sent as a settlement in full, and not on account or in part payment, the retention and use of the money or the cashing of the check is almost always held to be an acceptance of the offer operating as a full satisfaction, even though the creditor may assert or send word to the debtor that the sum is received only in part payment." 6 <u>Corbin on Contracts</u> § 1279 (1962) (emphasis added).

<u>McDonald v. U.S.</u>, 13 Cl.Ct. at 261 (emphasis omitted).

Although plaintiff did not suffer any economic or emotional injury due to MEEB's prompt correction of the amounts in the second May 17, 2005 letter (Ex. 24), the false amounts of the debt violate section 1692e(2)(A).  See Eads v. Wolpoff & Abramson, LLP, 538 F.Supp.2d 981, 986 (W.D.Tex. 2008) (FDCPA liability imposed even though debt collector amended state court petition to reflect accurate value of arbitration award).

MEEB fails to establish a bona fide error defense.  Its practice of reviewing the statements in ledgers received from its clients to ferret out inaccurate amounts does not insulate it from liability for the false statements because the practice was not reasonably adapted to avoid the error at issue.  See 15 U.S.C. § 1692k(c) (violation must result "from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any *such* error") (emphasis added); Owen v. I.C. System, Inc., 629 F.3d at 1274 (describing the relevant inquiry as "'whether the procedures were "reasonably adapted" to avoid the specific error at issue'").  The error resulted from MEEB's conduct typing in the additional amounts as opposed to Pondview's initial and accurate inclusion of the legal fees in each ledger.

Plaintiff additionally argues that the May 17, 2005 letters are misleading because the figures at the bottom of each ledger setting out the "BALANCE AS OF 5/17/05" do not include the late fees for May 2005.  The least sophisticated consumer, however,

would not be misled.  The ledgers itemize the late fees and
identify each late fee with a particular month.  The ledgers
therefore include late fees for January, February, March and
April.  They do not include late fees for May.  Accordingly, they
adequately and forthrightly depict the late fees included in the
balance.

Plaintiff next asserts that the May legal fees "THROUGH
5/17/05" in the letter incorrectly state the amount as $317.00 for
unit 104 and $488.00 for unit 105.  MEEB's May 2005 invoice
evidences actual fees as of May 17, 2005, as $443.70 for unit 104
and $566.74 for unit 105.  MEEB therefore understated the amount
of legal fees owed for both units in the first May 17, 2005
letter.  MEEB's false representation of the amount of the debt
through May 17, 2005, thus violated section 1692e(2)(A).  MEEB
fails to meet its burden of showing that the inclusions were bona
fide errors and that such errors resulted from a procedure
reasonably adopted to avoid the error.  Although the FDCPA
violation is untimely, the misconduct provides support for a per
se chapter 93A violation.

Finally, the first May 17, 2005 letter included a dismissal
fee of $150.00 in each ledger and an estimate of a sheriff's bill
of $100.00 in each ledger.  Plaintiff submits that both
representations are false under section 1692e(2)(A).  As of May
17, 2005, there was no dismissal of either the April 2005 unit 105

suit or the April 2005 unit 104 suit.  "'A debt collector that inflates the amount of the debt, whether through unauthorized service fees or otherwise, violates [section 1692e(2)(A)].'" Gathuru v. Credit Control Services, Inc., 623 F.Supp.2d 113, 122 (D.Mass. 2009) (collecting cases).  Because MEEB fails to establish a bona fide error defense relative to these errors, MEEB's inclusion of the dismissal fees violates section 1692e(2)(A).  Although untimely, the failure supports a per se chapter 93A claim.  In contrast, the $100.00 *estimated* amounts of the sheriff's fees accurately represent the actual sheriff's fees of $93.74 for unit 105 and $70.70 for unit 104.

The next section 1692e(2)(A) violations plaintiff identifies in the post trial brief arise from the two October 4, 2005 letters that MEEB sent plaintiff.  The notice of intent to collect rent letter identifies the amount of the debt as $1,098.14 and the 60 day letter for unit 105 identifies the same figure.  MEEB attached the ledger it received from Pondview to both letters reflecting the accurate amount owed of $1,003.14.  The ledger did not include Bayview's May 20, 2005 payment of $3,800.27 except insofar as it reflected reduced amounts.[110]  At the bottom of both ledgers, MEEB typed in the October 4, 2005 charge of $95.00 for drafting the "notice of delinquency letter."  (Ex. 25 & 26).

---

[110]  The failure to include the credit would not mislead the least sophisticated consumer.

Each letter contains the characterization of the unit 105 debt as being "through the date of the letter," i.e., October 4, 2005.  MEEB's invoice for unit 105 as of October 4, 2005, however, reflects charges of $96.00 for drafting the delinquency letter, $101.00 for ordering the title search and $180.00 for drafting the notice of intent to collect rent letter.  Plaintiff therefore argues that each letter falsely represents the character of the debt.  Plaintiff is correct.  MEEB violated section 1692e(2)(A) by incorrectly stating the amount of the debt ($1,098.14) as of the October 4, 2005 letter when, in fact, the debt was $282.00 greater for a total amount of $1,380.14.

As the last violation of section 1692e(2)(A) in section 1(a) of the post trial brief, plaintiff relies on the complaints in the April 2005 unit 104 suit and the April 2005 unit 105 suit. Defendant argues that a complaint is not a "communication" within the meaning of the FDCPA.  (Docket Entry # 61, ¶ 38).

The FDCPA defines "communication" as "the conveying of information regarding a debt directly or indirectly to any person through any medium."  15 U.S.C. § 1692a(2).  The language does not expressly exclude a legal pleading.

In a different section, however, the statute makes an exception for "a formal pleading made in connection with a legal action" as outside the reach of section 1692e(11) liability.  15 U.S.C. § 1692e(11).  As explained in <u>Goldman v. Cohen</u>, 2004 WL

2937793 (S.D.N.Y. Dec. 17, 2004), "'If a legal pleading was not
included within the meaning of communication under the FDCPA, then
it would have been unnecessary for Congress to except formal
pleadings from the requirements of § 1692e(11).'" Id. at *2
(rejecting argument "communication" does not include legal
pleadings); see also In re 229 Main Street Limited Partnership,
262 F.3d at 5-6 (noting presumption that Congress acts
intentionally "in the disparate inclusion or exclusion" of terms
in statutory sections).  The "exclusion of a legal pleading from
the scope of the term 'communication'" in section 1692e(11)
therefore "implies the drafters' understanding that the term
'communication' would otherwise include legal pleadings." Goldman
v. Cohen, 2004 WL 2937793, at *2.  Accordingly, in the sections
"of the statute that mention 'communication' without expressly
excluding legal pleadings, legal pleadings are included." Id.
Section 1692e(2)(A) does not expressly exclude legal pleadings
from its reach.

In addition, defendant's reliance on *Federal Trade
Commission-Statements of General Policy or Interpretation Staff
Commentary on the Fair Debt Collection Practices Act*, 53 Fed.Reg.
50097, 50100 (1988) ("staff commentary"), is misplaced.  The
relevant portion of the staff commentary reads as follows:

> Attorneys or law firms that engage in traditional debt
> collection activities (sending dunning letters, making
> collection calls to consumers) are covered by the FDCPA, but
> those whose practice is limited to legal activities are not

covered.  Similarly, filing or service of a complaint or
other legal paper (or transmission of a notice that is a
legal prerequisite to enforcement of a debt) is not a
"communication" covered by the FDCPA, but traditional
collection efforts are covered.

<u>Id.</u>  In citing this staff commentary, the Supreme Court in <u>Heintz
v. Jenkins</u>, 514 U.S. at 298, considered it nonbinding because it
states "it 'is not binding on the Commission or the public.'"  <u>Id.</u>
at 298 (quoting staff commentary).  Here too, the nonbinding
staff commentary does not supplant the statutory language that
excludes a "formal pleading" in a legal action in section
1692e(11) but makes no exception for a formal pleading in section
1692e(2) or the act's definition of a "communication."  15 U.S.C.
§ 1692a(2).  Accordingly, section 1692e(2)(A), which proscribes
false representations of "the character, amount or legal status of
any debt," encompasses false representations in the state court
complaints filed by MEEB.[111]  <u>See</u>, <u>e.g.</u>, <u>Delawder v. Platinum
Financial Services</u>, 443 F.Supp.2d 942, 948 (S.D.Ohio 2005)
(attaching false affidavit to complaint may violate section
1692e(2)).  Having rejected defendant's argument with respect to
its FDCPA liability,[112] this court turns to the statements in the

_____

[111]  It is also worth noting that the state court lawsuits
were not foreclosure actions on a piece of property.  <u>See</u> <u>Trent
v. Mortgage Electronic Registration Systems, Inc.</u>, 618 F.Supp.2d
1356, 1361 (M.D.Fla. 2007) (foreclosing on mortgage is not debt
collection activity within scope of FDCPA) (collecting cases).

[112]  The litigation privilege, which does not apply to the
FDCPA, is addressed later in this opinion.

April 2005 unit 104 suit and the April 2005 unit 105 suit that plaintiff challenges.

Plaintiff initially submits that paragraph five in the April 2005 unit 104 suit and paragraph six in the April 2005 unit 105 suit falsely represent the character and legal status of the debt under section 1692e(2)(A).[113]  (Docket Entry # 60, § 1(a), pp. 24-

---

[113]  The post trial brief quotes *only* the portion of section 1692e(2)(A) that proscribes the false representation "of the 'character . . . [and] legal status' of the debt" (Docket Entry # 60, p. 24) (quoting section 1692e(2)(A)) as opposed to the prohibition in section 1692e(2)(A) that the "amount" is false. Paragraphs 34 and 35 of the complaint do not refer to the amounts as false but they do state that, "The amounts stated *as due* were greater than the amounts shown *as due* in Marcus, Errico's own records at the time." (Docket Entry # 1, ¶ 34) (emphasis added). This unadorned allegation does not, without more, raise the issue that the entire figure designated as the common expenses in each of the nine enforcement suits was a false representation of the "amount . . . of any debt" under section 1692e(2)(A). Rather, it raises the same issue raised and developed in the post trial brief with respect to the April 2005 suits, to wit, that the amounts stated were not due at the time and were not duly assessed. As such, they purportedly misrepresent the character and legal status of the debts. The issue of the common expenses in each of the nine enforcement suits as a "false representation" of "the . . . amount . . . of any debt" is therefore waived. See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999) ("district court is free to disregard arguments that are not adequately developed"); see also U.S. v. Dyer, 589 F.3d 520, 527 (1st Cir. 2009) (before "district court, Dyer never used the term 'specific intent' to set forth the legal requirements for applying § 2G2.4(c)(2), and has waived the argument"); Jennings v. Jones, 587 F.3d 430, 444 (1st Cir. 2009) ("Jennings did not present the argument to the district court until his motion to reconsider the court's decision to grant a new trial, and it is waived"); see generally Vallejo v. Santini-Padilla, 607 F.3d 1, 7 (1st Cir. 2010) ("[p]laintiffs have not cited a single authority in support of their assertion that their failure to timely oppose the motion to dismiss did not constitute waiver").

25).  The paragraphs state that plaintiff has "been duly assessed common expenses and charges" in the designated amount "which have not been paid when due."  (Ex. 15, ¶ 6; Ex. 16, ¶ 6).  Plaintiff points out that the amounts included attorney's fees and costs to prepare and file the complaints on April 26, 2005.  Plaintiff thus asserts that, "Brooks knew [that plaintiff] received no notice of [these legal fees and costs], and that consequently [plaintiff] had not been assessed and failed to pay [sic] when due."  (Docket Entry # 60) (§ 1(a)).[114]

The least sophisticated consumer would recognize that each monetary figure in the two paragraphs at issue included legal fees.  The paragraphs state that plaintiff has "been duly assessed common expenses and charges in the amount of [$2,567.37 in the unit 104 suit and $2,694.94 in the unit 105 suit]."  The next paragraph in each complaint states that plaintiff is "liable for attorney's fees and costs incurred by [Pondview] in pursuing this matter."[115]  "'[C]apable of making basic logical deductions and inferences,'" <u>Pettway v. Harmon Law Offices, P.C.</u>, 2005 WL

---

[114]  Except for quoting section 1692e(2)(A) and setting out the above sentence, plaintiff does not offer any legal authority to support the argument or elaborate the basis of argument.

[115]  Although not necessary to this aspect of the decision, the March 23 and 31, 2005 letters all informed plaintiff that, "[Y]ou are responsible for [Pondview's] collection costs, including its attorney's fees."  (Ex. 5, 8, 9 & 29).  The same letters also advised plaintiff that Pondview "may file a lawsuit against you to establish your debt and enforce its lien."  (Ex. 5, 8, 9 & 29).

2365331, at *3, the least sophisticated consumer would therefore realize his responsibility for the attorney's fees Pondview incurred for filing the lawsuit.

The amounts, however, included attorney's fees and costs for preparing and filing the complaints.  The complaints represent that the amounts "have not been paid *when due*."  (Ex. 15 & 16) (emphasis added).  MEEB generates its invoices to Pondview on a monthly basis.  Pondview's ledgers reflect legal fees categorized by month, for example, "February Legal Fees" or "July Legal Fees." (Ex. 61).  The Declaration of Trust states that the Trustees shall render statements to the unit owners of their percentages of interest and, "Unless otherwise provided, such statements *shall be due and payable within thirty days* after being rendered to the unit owners."  (Ex. B, § 5.3) (emphasis added).  Attorney's fees were therefore due and payable within 30 days of the unit owner's statement.  The April 2005 unit 104 and unit 105 suits describe the $2,567.37 and $2,694.94 amounts as "assessed" and not "paid when due."  At the time MEEB filed the two suits, however, the amounts attributable to "attorney['] s fees and costs for preparing and filing the complaint," as argued by plaintiff (Docket Entry # 60, p. 24), were not due and plaintiff had not failed to pay the amounts "when due."  (Ex. 15 & 16).  The amounts in paragraph six in the April 2005 unit 105 suit and paragraph five in the April 2005 unit 104 suit were therefore false representations of the

character and the status of the debts in violation of section
1692e(2)(A) insofar as they included the attorney's fees and costs
for preparing the complaints.  MEEB's invoices reflect the amounts
as $1,138.00 for preparing and filing the April 2005 unit 104 suit
and a slightly larger amount for preparing and filing the April
2005 unit 105 suit.

The violation did not, however, result in an economic or
pecuniary injury because plaintiff remained responsible for these
reasonable attorney's fees.  (Ex. C, § 5.3).  In light of
plaintiff's demeanor and lack of credibility, this court finds
that the violation also did not result in any emotional or mental
injury to plaintiff.  He was at all relevant times aware that he
was responsible for the collection costs.[116]

Paragraphs 34 and 35 in the complaint likewise assert that
the state court complaints violated section 1692e because "the
amounts claimed had not been 'duly assessed' and had not been paid
when due" even though plaintiff had no notice that the amounts
were due "much less a reasonable opportunity to pay same."
(Docket Entry # 1, ¶ 34).  These complaints all use the same
language contained in the April 2005 unit 104 and the April 2005
105 suits that describes the common expenses and charges as
"assessed" and "not paid when due."  (Ex. 10, 14, 65, 66, 72 &

---

[116]  See fn. 115.

116

116

78).[117]  MEEB's practice was to include "the legal fees for filing the complaint" and "the overdue assessments" in the amount identified as the common expenses and charges in the lawsuits it filed.  (Tr. 2, p. 61).[118]

For reasons discussed above, MEEB therefore violated section 1692e(2)(A) by including the following legal fees for filing the complaints in the following suits at a time when such fees had neither been "duly assessed" or not paid "when due":  (1) the $1,440.00 legal fees in the "assessed common expenses and charges" of $1,866.14 in the October 2005 unit 105 suit (Ex. 10 & 23); (2) the $1,454.00 legal fees in the "assessed common expenses and charges" of $3,771.04 in the June 2006 unit 105 suit (Ex. 14 & 23); (3) the $1,196.00 legal fees in the "assessed common expenses and charges" of $26,966.42 in the June 2007 unit 105 suit (Ex. 65 & 23); (4) the $1,143.00 legal fees in the "assessed common

---

[117]  Plaintiff fails in his burden to establish a section 1692e(2)(A) violation relative to the June 2006 unit 104 suit. He did not offer the complaint into evidence or otherwise sufficiently establish the delinquent amount stated therein.

[118]  In making this statement, Brooks was also testifying in response to questions about the legal fees included in the $2,567.37 figure in the April 2005 unit 104 suit.  Legal fees for filing that suit consisted of charges for drafting the 60 day delinquency letter, drafting the notice of intent to collect rent letter and reviewing documents as well as fees for a title examiner and a court filing.  This court draws the reasonable inference that MEEB's practice encompassed the inclusion of these fees as "the legal fees for filing the complaint" (Tr. 2, p. 61) and therefore includes these charges and fees in calculating the legal fees included for filing the other suits.

117

117

expenses and charges" of $34,012.07 in the October 2007 unit 105 suit (Ex. 66 & 23); (5) the $1,195.00 legal fees in the "assessed common expenses and charges" of $10,351.33 in the July 2008 unit 104 suit (Ex. 72 & 23); and (6) the $305.00 legal fees in the "assessed common expenses and charges" of $2,401.68 in the September 2008 unit 104 suit (Ex. 78 & 23). Chapter 93A liability, if any, based on these untimely and timely suits is addressed later in this opinion. Likewise, actual damages and statutory damages under section 1692k are addressed later in this opinion.

Plaintiff next argues in the post trial brief that including legal fees and costs in the amounts in paragraphs five in the April 2005 unit 104 suit and paragraph six in the April 2005 unit 105 suit but not identifying their inclusion of "legal fees and costs" was a false representation of "the character" of the debt under section 1692e(2)(A). (Docket Entry # 60, § 1(a), p. 24). The next paragraph in each complaint, however, clarifies that the amount included legal fees and costs to file the complaint. It states that plaintiff "is liable for attorneys' fees and costs." (Ex. 15, ¶ 6; Ex. 16, ¶ 7). Furthermore, the paragraphs at issue state that plaintiff was assessed the amount "pursuant to . . . the applicable provisions of the Condominium's documents." (Ex. 15, ¶ 5; Ex. 16, ¶ 6). The next paragraph in each complaint refers to the "the applicable provisions of the Condominium

documents" and states that plaintiff is liable for the attorney's fees "in accordance with said provisions." (Ex. 15, ¶ 6; Ex. 16, ¶ 7). Hence, from the standpoint of the least sophisticated consumer, there was no false representation of the character of the debt.

Plaintiff also complains that paragraph seven in the April 2005 unit 105 suit and paragraph six in the April 2005 unit 104 suit do not reflect whether each figure in the preceding paragraph included the late fees due at the time of the April 28, 2005 filing of each complaint. Plaintiff submits that the failure made the representations "ambiguous and confusing." (Docket Entry # 60). In each of the two complaints, the paragraph that follows the paragraph at issue unambiguously states that, "Interest and late fees have been charged for these overdue payments of common expenses." (Ex. 15, ¶ 6; Ex. 16, ¶ 7). The late fees were due on the fifteenth of each month. Accordingly, late fees for April had been charged and were overdue at the time MEEB drafted and filed the complaints. The least sophisticated consumer would not be confused or mislead about whether the amount included late fees for April 2005. Hence, the representation was not a false characterization of the debt under section 1692e(2)(A) or even a deceptive or misleading representation under section 1692e.

The final purported violation of section 1692e(2)(A) in the post trial brief appears in paragraph seven in the April 2005 unit

119

104 suit and paragraph eight in the April 2005 unit 105 suit.  The language of each paragraph is identical.  It reads, "Pursuant to M.G.L. c. 183A, § 6(c), the Plaintiffs did give the Defendants notice by certified and first class mail of the *aforesaid delinquency*, such delinquency having *existed for at least sixty days*."  (Ex. 15, ¶ 7; Ex. 16, ¶ 8) (emphasis added).  Plaintiff submits that the language is a false representation of the character and legal status of the debt under section 1692e(2)(A) because the amount "had not been delinquent for at least sixty days."  (Docket Entry # 60, § 1(a), pp. 24-25).

First, defendant's position that use of the word delinquency "recited the language of M.G.L. c. 183A, § 6(c)" (Docket Entry # 61, ¶ 40, p. 20) is misguided because it ignores the adjective "aforesaid."  Section 6(c) does not contain the word "aforesaid."  Moreover, the least sophisticated consumer would not interpret "aforesaid delinquency" to mean the language in section 6(c) that reads, "the amount of delinquency."  Mass. Gen. L. ch. 183A, § 6(c).

Second, the common understanding of "aforesaid" is "said or mentioned earlier or previously."  Random House Dictionary of the English Language (2nd ed. 1987) (defining "aforesaid"); United Truck Leasing Corp. v. Cornucopia Natural Foods, Inc., 1997 WL 839909, at *3 (R.I.Super. April 23, 1997) (defining "aforesaid" in similar manner); City of Allentown v. Pennsylvania Public Utility

Commission, 96 A.2d 157, 158 (Pa.Super. 1953) (defining "aforesaid" in similar manner). Prior to paragraph seven in the April 2005 unit 104 suit and paragraph eight in the April 2005 unit 105 suit, neither complaint uses the word "delinquency." In previous paragraphs, however, each complaint defines the designated amounts ($2,567.37 in the unit 104 suit and $2,694.94 in the unit 105 suit) as "'common expenses'" followed by the language "which have not been paid when due." (Ex. 15, ¶ 5; Ex. 16, ¶ 6). The next paragraph refers to "these overdue payments of common expenses." (Ex. 15, ¶ 6; Ex. 16, ¶ 7). The complaint therefore defines the $2,567.37 figure and the $2,694.94 figure as common expenses and adds the description that such common expenses are "overdue" and "not paid when due," in other words, a delinquency. See Random House Dictionary of the English Language (2nd ed. 1987) (defining "delinquency" as inter alia "something, as a debt, that is past due or otherwise delinquent"); see generally Grider v. Cavazos, 911 F.2d 1158, 1163 (5th Cir. 1990) ("[d]elinquent is a word the meaning of which is universally understood by lawyer and layman alike when used in reference to a debt"). Reading each complaint as a whole, see Miller v. Javitch, Block & Rathbone, 561 F.3d 588, 595 (6th Cir. 2009) (assessing section 1692e claim and noting that lower "court properly assessed the complaint's meaning as read in its entirety"), "aforesaid delinquency" in paragraph seven of the unit 104 suit and paragraph

eight of the unit 105 suit refers to the overdue payments of the common expenses in the amount of $2,567.37 in paragraph five of the unit 104 suit and $2,694.94 in paragraph six of the unit 105 suit. The least sophisticated consumer reading each complaint would interpret the words in this manner.

Neither amount, however, was delinquent for at least 60 days because each amount included inter alia attorney's fees incurred in March and April 2005. (Tr. II, p. 69 & Ex. 23). The representations that the amounts were delinquent for at least 60 days in the unit 104 and the unit 105 suits were therefore false representations of the character and legal status of the debts. Although the FDCPA claim is untimely, MEEB nevertheless made a false representation of the character as well as the legal status of the debts in violation of section 1692e(2)(A).

Under the facts, however, these two false representations did not result in any financial damage to plaintiff. Plaintiff remained responsible for the amounts. (Ex. C, § 5.3); Mass. Gen. L. ch. 183A, § 6(c). The fact that the amounts were not overdue for 60 days was inconsequential.

E.  Communications with Mortgagees

Plaintiff argues that defendant engaged in a number of secret communications with plaintiff's mortgagees without his consent. According to plaintiff, such conduct provides further evidence of defendant's "bad faith." (Docket Entry # 60, § 1(b)). Citing 17

exhibits (Ex. 17, 38 41, 42, 45, 46, 47, 48, 53, 54, 55, 59, 60, 68, 69, 71 & 77), plaintiff asserts that defendant collected payments from plaintiff's mortgagees without obtaining plaintiff's permission in violation of section 1692c(b) and without advising the mortgagees that plaintiff disputed the attorney's fees in violation of section 1692e(8).[119] (Docket Entry # 60, § 1(b)). These secret communications were also "deceptive, misleading, and extortive" in violation of sections 1692d, 1692e and 1692f, according to plaintiff. (Docket Entry # 60, § 1(b)). With respect to this argument, plaintiff submits that defendant did not provide the mortgagees with the amount of the six month, priority lien under section 6(c) of chapter 183A thereby causing the mortgagees to pay "the full amount of the lien rather than the amount that was prior to their mortgages." (Docket Entry # 60, § 1(b)).

1. Section 1692c(b)

Section 1692c(b) proscribes the debt collector's

---

[119] The argument portion of plaintiff's post trial brief (Docket Entry # 60, § 1(b)) does not reference these exhibits but it does reference fact paragraph 16. Fact paragraph 16 identifies these exhibits as the secret communications. (Docket Entry # 60, p. 13).

Plaintiff acknowledges that the "the pre-suit notices to the mortgagees required under G.L.c. 183A, § 6(c) are likely permissible under 15 U.S.C. § 1692n." (Docket Entry # 60, § 1(b)). Accordingly, he does not challenge the notices defendant sent to the mortgagees under section 6(c) of chapter 183A. Two of the above 17 exhibits fall under this category. (Ex. 53 & 71).

communications with third parties except to obtain location information as provided in section 1692b.  15 U.S.C. § 1692c(b).  The language reads as follows:

> (b) Communication with third parties
>
> Except as provided in section 1692b of this title, without the prior consent of the consumer given directly to the debt collector, or the express permission of a court of competent jurisdiction, or as reasonably necessary to effectuate a postjudgment judicial remedy, a debt collector may not communicate, in connection with the collection of any debt, with any person other than the consumer, *his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector*.

15 U.S.C. § 1692c(b) (emphasis added).  There is a dearth of authority regarding the application of this section to a debt collector's direct communications with a first mortgagee where, as here, the communications lie outside a foreclosure proceeding.  Cf. Acosta v. Campbell, 2009 WL 190089, at *5 (11th Cir. Jan. 28, 2009) (affirming summary judgment of section 1692c(b) claim because confidential payoff letter sent by the defendant, a law firm, at request of second mortgagee's attorney during foreclosure action was not a "communication" under section 1692c(b)) (unpublished).[120]

Turning to the statutory language, the italicized portion lists the individuals that a debt collector may contact without obtaining the debtor's permission.  All of the aforementioned

---

[120]  See fn. 89 & 103.

exhibits plaintiff cites involve Bayview, Aegis, M & T or MERS. These entities do not fall under any of the excepted categories.[121] Where, as here, "'Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.'" TRW Inc. v. Andrews, 534 U.S. 19, 28 (2001); see, e.g., Muzuco v. Re$ubmitIt, LLC, 2012 WL 3242013, at *4 (S.D.Fla. Aug. 7, 2012) (using this principle to find that debt collector's communication with debtor's bank fell within plain meaning of section 1692c(b) because bank did not fall under one of the excepted categories).

Citing Resler v. Messerli & Kramer, PA, 2003 WL 193498 (D.Minn. Jan. 23, 2003), defendant asserts that the communications did not violate section 1692c(b). (Docket Entry # 61, ¶¶ 20 & 22). Resler relied on the language in section 1692c(a) that excepts a communication given with "'the express permission of a court of competent jurisdiction'" to dismiss a section 1692c(a)(2) claim.[122] Id. at *4. The Resler court reasoned that because

---

[121] Pondview, as opposed to plaintiff's mortgagees, is the "creditor" within the meaning of section 1692c(b) with respect to the debt in the unit 104 and 105 accounts.

[122] Section 1692c(b) also contains the language allowing a communication given "with the express permission of a court of competent jurisdiction." See Mertens v. Hewitt Associates, 508 U.S. 248, 260 (1993) (agreeing with the petitioners "that language used in one portion of a statute . . . should be deemed to have the same meaning as the same language used elsewhere in the statute"); Hanif v. Attorney General of U.S., 694 F.3d 479,

"Minnesota law requires service of a garnishment levy on the judgment debtor" and a default judgment "was in effect that court's permission to follow the collection procedures outlined in Minnesota law, including service of the levy directly on the judgment debtor." Id. With all due respect, this court disagrees with the Resler court's interpretation of section 1692c(a).

The plain language of section 1692c(b) refers to "the express permission of a court." 15 U.S.C. § 1692c(b). "Express" commonly means "directly stated" or "to put (thought) into words." See Random House Dictionary of the English Language 683 (2nd ed. 1987) (defining "express" as inter alia "to put (thought) into words"); Black's Law Dictionary 601 (7th ed. 1999) (defining "express" as "directly stated"). A court issues a direct or express statement in a judicial opinion or order. In contrast, a state law connotes the express permission of the legislative body that wrote the law. Interpreting "express permission of a court" to mean "express permission" in a law also fails to afford "court" its plain and ordinary meaning. See Black's Law Dictionary 356 (7th ed. 1999) (defining "court" as "[a] government body consisting of one or more judges"); see, e.g., House v. Bank United, 2002 WL 32496179, at *1-3 (W.D.N.Y. March 28, 2002) (dismissing section 1692c(b)

---

484 (3rd Cir. 2012) (absent contrary indication, "we must presume that Congress intended to give those terms the meaning ascribed to them elsewhere in the statute"). As discussed below, however, section 1692c(b) contains additional language not present in section 1692c(a).

claim because "the notice was ordered by" state court judge in context of foreclosure proceedings and debt collector therefore "had the express permission of [the judge] to make the publication").

Furthermore, the provision at issue in this case, section 1692c(b), as opposed to the provision at issue in _Resler_, section 1692c(a), contains the additional phrase, "a consumer reporting agency if otherwise _permitted by law_."  15 U.S.C. § 1692c(b) (emphasis added).  Thus, Congress knew how to state "permitted by law" in section 1692c(b) yet chose not to use that phrase when setting out the exception for "the express permission of a court." See Lawson v. FMR LLC, 670 F.3d at 68 (First Circuit and "Supreme Court precedent require that we examine the broader statutory framework, including particularly the nearby language").  Defendant's interpretation transports and substitutes the language "permitted by law," i.e., permitted by chapter 183A, § 6(c), for the phrase "express permission of a court."  The argument is unavailing.

Section 1692n also provides defendant no support to extend the reach of section 1692c(b).  The more specific statutory language at issue, section 1692c(b), controls over the more general language in section 1692n.  See In re Lazarus, 478 F.3d 12, 19 (1st Cir. 2007) ("[i]n statutory construction, the more specific treatment prevails over the general").

127

Defendant additionally contends that plaintiff gave his prior consent for the communications "in light of the requirements of M.G.L. c. 183A." (Docket Entry # 61, ¶ 34, p. 19). Accordingly, defendant did not violate section 1692c(b). It is true that section 1692c(b) only prohibits communications "without the prior consent of the consumer given directly to the debt collector." 15 U.S.C. § 1692c(b). Here, plaintiff never gave his prior consent to communicate with his mortgagees to MEEB let alone "*directly* to" MEEB. 15 U.S.C. § 1692c(b) (emphasis added). In short, the requirements of a state statute do not constitute the prior consent of a debtor given directly to a debt collector.

Turning to the exhibits that plaintiff identifies as communications in violation of section 1692c(b), a number of the exhibits are communications sent by Bayview, M & T and attorneys representing MERS *to* MEEB. (Ex. 17, 41, 46, 48, 54 & 77). The terms of the statute state, "a debt collector may not communicate" with third parties. 15 U.S.C. § 1692c(b). They do not state, "a third party may not communicate" with the debt collector. The plain language of section 1692c(b) does not expressly prevent the third party or a mortgagee from communicating with the debt collector. Rather, it is the "debt collector" that "may not communicate" with the third party. 15 U.S.C. § 1692c(b). Plaintiff's construction would interpret the statute to apply to communications by the third party to the debt collector. The

plain language does not allow such a construction.  Similarly, the court in McLain found that a violation of section 1692c(b) occurs when "an improper communication *to* third parties is made" as opposed to when the debt collector requests a court for "leave to make proper contact regarding the debt."  McLain v. Gordon, 2010 WL 3340528, at *6 (W.D.Wash. Aug. 24, 2010) (emphasis added).  Accordingly, no section 1692c(b) violation occurred by virtue of these letters (Ex. 17, 41, 46, 48, 54 & 77).

The remaining exhibits prior to February 2008 consist of letters written by MEEB to Bayview, Aegis, M & T or MERS' attorney.  (Ex. 38, 42, 45, 47, 55, 59, 60 & 68).  The letters all respond to requests by the particular mortgagee for a payoff amount or confirm a payment.  These communications fall within the reach of section 1692c(b).  Although untimely, MEEB's communications (Ex. 38, 42, 45, 47, 55, 59, 60 & 68) violated section 1692c(b) and therefore provide a basis for a per se chapter 93A violation.[123]

The remaining alleged section 1692c(b) violations consist of the timely May 13, 2008 letter from MEEB to Heiger and a letter

---

[123]  It is therefore not necessary to address the other arguments plaintiff raises in this section of the post trial brief (Docket Entry # 60, § 1(b)) that these same letters violated sections 1692d, 1692e and 1692f.  Even if these letters violated these sections, this court finds that such violations would not result in an additional injury to plaintiff or a change to the chapter 93A damages award.  The award would remain the same.

from another Harmon attorney to MEEB dated July 31, 2008.  (Ex. 48 & 69).  The second timely communication was from Harmon to MEEB. It was not a communication by the debt collector, MEEB.  (Ex. 48). As previously discussed, section 1692c(b) states that, "a debt collector may not communicate" with certain third parties.  The language does not prohibit a third party from communicating with the debt collector.  The July 31, 2008 letter therefore fails to provide a basis to impose liability on MEEB under section 1692c(b).

The first letter, however, is a communication by the debt collector, MEEB, to MERS' attorney.  (Ex. 69).  MERS' attorney does not fall into one of the categories of permissible individuals in section 1692c(b).  Defendant's bona fide error defense addresses errors in Pondview ledgers as opposed to errors in sending a communication to the attorney of a mortgage servicer. The communication therefore violates section 1692c(b).

Turning to the amount of damages for this timely FDCPA violation, plaintiff is "entitled to actual damages, statutory damages of up to $1,000, and 'the costs of the action, together with a reasonable attorney's fee as determined by the court.'" French v. Corporate Receivables, Inc., 489 F.3d at 403 (quoting section 1692k(a)(3)).  An award of actual damages may "include damages for emotional distress caused by the debt collector's

statutory violation."[124] <u>Sweetland v. Stevens & James, Inc.</u>, 563 F.Supp.2d 300, 303 (D.Me. 2008) (collecting authority); <u>see</u> <u>Thomas v. Smith, Dean & Associates, Inc.</u>, 2011 WL 2730787, at *3 (D.Md. July 12, 2011) (actual damages under section 1692k include "damages for embarrassment and emotional distress") (collecting cases). A causal connection is required with respect to an award of actual damages. <u>See</u> 15 U.S.C. § 1692k(a)(1) (allowing award of "actual damage[s] sustained by [the plaintiff] *as a result of*" the debt collector's failure "to comply with any provision" of the FDCPA) (emphasis added); <u>see</u> <u>also</u> <u>Johnson v. Eaton</u>, 80 F.3d 148, 152 (5th Cir. 1996) (section 1692k requires debt collector to compensate debtor "for any monetary damage, emotional distress or other injury that the debtor can prove the debt collector caused").

Plaintiff did not experience a financial loss as a result of MEEB's non-compliance with section 1692c(b). There is also little, if any, evidence that plaintiff suffered emotionally as a result of the May 13, 2008 letter. He did not testify to experiencing any loss as a result of this letter. He began taking Valium and Paxil years before this letter. He did not testify

---

[124] MEEB raises a number of arguments attacking the ability of plaintiff to recover damages for emotional distress. (Docket Entry # 61, ¶¶ 54-56). MEEB's failure to raise an argument to limit such damages to severe emotional distress waives the issue. <u>See</u> fn. 81 & 113.

about seeking medical treatment as a result of the letter.[125]
Contrary to plaintiff's position, he did not lose his home or
experience a destroyed social community as a result of MEEB's
failure to comply with section 1692c(b). Plaintiff therefore
failed to prove by a preponderance of the evidence that he
suffered actual damages as a result of MEEB's failure to abide by
section 1692c(b).[126] Statutory damages under section 1692k(a)(2),
which apply to the action as a whole, are addressed later in this
opinion.

    2. Section 1692e(8)

    Plaintiff next asserts that these secret communications all
failed to notify the mortgagees that plaintiff disputed the
attorney's fees in violation of section 1692e(8). (Docket Entry #
60, § 1(b)). Section 1692e(8) proscribes the communication of
"credit information" which is "known to be false, including the
failure to communicate that a disputed debt is disputed." 15
U.S.C. § 1692e(8). It is one of a list of examples of the general

---

[125] This court recognizes that it is not necessary for an
FDCPA plaintiff to seek medical treatment in order to recover
emotional distress damages. See Ortega v. Collectors Training
Institute of Illinois, Inc., 2011 WL 241948, at *6 (S.D.Fla. Jan.
24, 2011) (noting "that failing to seek medical treatment . . .
did not preclude recovery of emotional distress damages under the
FDCPA").

[126] For the same reasons, the lack of a causal connection to
a loss demonstrates that plaintiff is not entitled to chapter 93A
damages. See Hershenow v. Enterprise Rent-A-Car Company of
Boston, Inc., 840 N.E.2d 526, 533 (Mass. 2006).

prohibition against false and misleading representations in section 1692e.  It reads as follows:

> (8) Communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed.

15 U.S.C. § 1692e(8).

By its terms, the language of the statute prohibits communications of "credit information."  15 U.S.C. § 1692e(8). "The duty to report a debt under this section [therefore] arises only if one elects to report credit information."  <u>Jacques v. Solomon & Solomon P.C.</u>, 2012 WL 3581172, at *4 (D.Del. Aug. 21, 2012).

Here, none of the communications plaintiff summarily references (Ex. 17, 38, 41, 42, 45, 46, 47, 48, 53, 54, 55, 59, 60, 68, 69, 71 & 77) involves a communication of plaintiff's credit information.  Defendant therefore did not make a communication that triggered the requirement under section 1692e(8) to report that the debt was disputed.  <u>See</u> <u>id.</u> (dismissing section 1692e(8) claim because the plaintiff did "not allege that Northland reported the debt to any credit agency"); <u>Edwards v. Velocity Investments, LLC</u>, 2011 WL 4007394, at *7 (N.D.Ohio Sept. 8, 2011) (allowing summary judgment of section 1692e(8) claim because there was "no evidence indicating that defendants ever reported any false credit information about plaintiff"); <u>Redhead v. Winston & Winston, P.C.</u>, 2002 WL 31106934,

133

at *3 (S.D.N.Y. Sept. 20, 2002) (dismissing section 1692e(8) claim because the plaintiff "failed to allege any facts . . . establishing that the Winston Defendants communicated or threatened to communicate any credit information concerning him"); see generally Brady v. Credit Recovery Co., Inc., 160 F.3d 64, 67 (1st Cir. 1998) (dicta noting that section 1692e(8) requires a debt collector who knows or should know "debt is disputed to disclose its disputed status to persons inquiring about a consumer's credit history"). The section 1692e(8) claim is therefore devoid of merit.

3. Deceptive, Misleading and Extortive Mortgagee Communications

Plaintiff's final argument regarding defendant's communications with plaintiff's mortgagees maintains that MEEB was "deceptive, misleading, and extortive in its communications to McDermott's mortgagees in violation of 15 U.S.C. §§ 1692d, 1692e, and 1692f." (Docket Entry # 60, § 1(b), pp. 25-26). Plaintiff submits that MEEB gave plaintiff's mortgagees the amount of the full lien held by Pondview as opposed to the requested amount of the priority lien under section 6(c). As a result, the mortgagees paid the full amount rather than the lower amount of the priority lien, according to plaintiff.[127]

---

[127] The paragraph in the post trial brief that sets out this argument does not cite to any communication on the part of MEEB except for the September 22, 2006 letter. (Ex. 46). It does

134

The argument assumes that the mortgagees requested the amount of the six month priority lien.[128]  The only direct evidence of a request for the amount of the priority lien is the September 22, 2006 letter from Harmon.  (Ex. 46).  Under the facts, MEEB adequately responded to that letter.[129]  No violation of sections 1692d, 1692e, and 1692f occurred by virtue of this communication.  A number of other letters from MEEB to various mortgagees or their attorneys simply refer to a "request," a "conversation" or a "condominium lien" as opposed to a request for the priority amount.  (Ex. 42, 45, 47, 53, 55, 68 & 69).[130]

The January 31, 2007 letter from MEEB to Harmon does include the amount of the priority lien and attaches a ledger.  (Ex. 59).  In response and contrary to plaintiff's argument, Aegis paid the amount MEEB represented as the priority lien, $2,226.83.  (Ex. 60).  Thus, although this letter contravenes section 1692c(b),

---

cite to paragraph 16 in the facts which, in turn, cites the aforementioned 17 exhibits, a number of which constitute payments as opposed to communications by MEEB.  Having found section 1692c(b) violations with respect to a number of these exhibits, see fn. 123, the analysis addresses the remaining exhibits plaintiff summarily cites.

[128]  Plaintiff cites the September 22, 2006 letter as the basis to argue that the mortgagees' principal concern was the priority lien.  (Docket Entry # 60, p. 26).  The letter, however, asks for both "the entire amount" owed by plaintiff and "the claimed six month priority amount."  (Ex. 46).

[129]  See fn. 65 and related text.

[130]  These letters already provide a basis for per se chapter 93A liability.  See fn. 123.

there is insufficient evidence that the mortgagee made a payment of the full amount as plaintiff suggests.

The remaining letters plaintiff cites consist of payments or correspondence to MEEB attaching a payment. (Ex. 17, 41, 48, 54 & 77). They do not reflect that MEEB engaged in conduct the natural consequence of which was to harass, oppress or abuse plaintiff in violation of section 1692d. They also fail to evidence a misrepresentation of an amount of a priority lien. They do not evidence of a false and misleading representation under section 1692e and do not provide a basis to impose liability on MEEB under this section. In addition, the letters were not an unfair or unconscionable means to collect the unit 104 or unit 105 debt under section 1692f.

Turning to the remaining timely letter, the July 30, 2008 letter is a cover letter accompanying a payment by Harmon. (Ex. 77). It does not sufficiently evidence a misrepresentation by MEEB of an amount of a priority lien. The July 1, 2008 letter does not include a representation of the amount of the priority lien. (Ex. 71).

In sum, limited to the argument plaintiff presents, which concerns the requests for priority amounts and MEEB's representations of a six month priority lien, MEEB's conduct does not violate sections 1692d, 1692e or 1692f in the manner alleged.

F. <u>Failure to Send 30 Day Notices</u>

In the next section of the post trial brief, plaintiff argues that defendant's repeated failure to send plaintiff's mortgagees the 30 day notice at least 30 days before filing suit provides additional evidence of defendant's "bad faith intent to escalate" legal fees. (Docket Entry # 60, § 1(c)). Plaintiff also complains about MEEB's failure to send any 30 day letter before the April 2005 unit 104 suit thereby allowing MEEB to "run up its fees and costs." (Docket Entry # 60, § 1(c), p. 29).

To support the argument, plaintiff challenges Brooks' explanation for not sending the mortgagees notice 30 days in advance because the statute (chapter 183A, section 6(c)) does not support Brooks' interpretation. Brooks relied on language in the statute that requires notice 30 days prior to filing suit "provided that the first mortgagee has informed the organization of unit owners of its name and mailing address." Mass. Gen. L. ch. 183A, § 6(c); (Tr. I, pp. 71-74) (Docket Entry # 61, ¶ 21, p. 17). Plaintiff submits "there is no possible good faith construction of G.L. c. 183A, § 6(c) which would justify MEEB's procedure of sending out the thirty day notices of intent at the same time it filed an enforcement lawsuit." (Docket Entry # 60, § 1(c)). MEEB did not send the 30 day notice in advance because it derived its legal fees from filing and prosecuting the lawsuits as opposed to sending out the pre-suit notices, according to plaintiff. (Docket Entry # 60, § 1(c)).

A number of reasons refute plaintiff's position.  First,
Brooks convincingly testified that MEEB was attempting to resolve
the matter and therefore waited to send out the notice to avoid
additional legal fees.  Second, the statute provides support,
albeit not entirely, for MEEB's interpretation.

Massachusetts law requires a plaintiff to name the mortgagee
as a party when filing suit to protect a chapter 183A, section six
lien.  See Mass. Gen. L. ch. 254, § 5.  The applicable provision
imposing the 30 day notice requirement reads as follows:

> Furthermore, thirty days prior to the filing of an action by
> the organization of unit owners to enforce its lien for
> delinquent common expenses, the organization of unit owners
> shall send a notice stating its intention to file said action
> to the first mortgagee by certified and first class mail,
> *provided that the first mortgagee has informed the
> organization of unit owners of its name and mailing address*.

Mass. Gen. L. ch. 183A, § 6(c) (emphasis added).  A "[f]ailure to
send notice to the first mortgagee of . . . [the] intent to file
action to enforce the lien, does not affect the priority lien for
an amount up to six months' common expenses" but the failure "does
exclude attorneys' fees and costs from the priority amount."
Davey v. Moorshead, 2001 WL 197943, at *2 n.14  (Mass.App.Ct. Feb.
28, 2001).

Brooks and other MEEB attorneys sent out the notice of intent
to file suit less than 30 days before filing suit because of an
honest and good faith belief that the first mortgagees had not
informed Pondview of their names and mailing addresses within the

138

meaning of section 6(c).  Under the facts, plaintiff's first mortgagees did not apprise Pondview of their names and mailing addresses.  MEEB's pattern of sending the 30 day notice of intent to file suit in and around the time MEEB filed suit was therefore not intended to escalate its legal fees.  It was based on a reading of the statute that the language supports.

In light of the above, MEEB did not intend to violate the 30 day notice requirement, did not act in bad faith and did not send out the late notices to escalate its legal fees.  As to the chapter 93A claim, such conduct does not rise to the level of an unfair or deceptive act or practice.

Third, plaintiff cites sections 1692d and 1692f as the FDCPA violations based on MEEB's conduct of not sending the mortgagees the required notice 30 days before filing suit.  (Docket Entry # 61, § 1(c), p. 29).  Even if MEEB did not comply with section 6(c) by sending the first mortgagees notice 30 days before filing suit, its failure to comply with state law does not necessarily establish a violation of the FDCPA.  "The FDCPA was designed to provide basic, overarching rules for debt collection activities; it was not meant to convert every violation of a state debt collection law into a federal violation."  Carlson v. First Revenue Assurance, 359 F.3d 1015, 1018 (8th Cir. 2004); see Beler v. Blatt, Hasenmiller, Leibsker & Moore, LLC, 480 F.3d 470, 474 (7th Cir. 2007) ("§ 1692f creates its own rules" and "does not so

139

much as hint at being an enforcement mechanism for other rules of state and federal law"); see also Akar v. Federal National Mortgage Association, 843 F.Supp.2d 154, 164 (D.Mass. 2012).

Moreover, liability under sections 1692d and 1692f does not depend on MEEB's intent.  What is determinable under section 1692d "is *not* the debt collector's intent, but the natural consequence of his actions."  Taylor v. Heath W. Williams, L.L.C., 510 F.Supp.2d 1206, 1216 (N.D.Ga. 2007) (citing Horkey v. J.V.D.B. & Assocs., Inc., 333 F.3d 769, 774 (7th Cir. 2003)) (emphasis added).  Section 1692f likewise examines the misconduct from the objective viewpoint of the least sophisticated consumer.

Turning to sections 1692d and 1692f respectively, section 1692d proscribes "conduct the natural consequence of which is to harass, oppress or abuse any person in connection with the collection of a debt."  15 U.S.C. § 1692d.  Filing an enforcement action, without more, "is not sufficient to state a claim under Section 1692d."  Williams v. Zucker, Goldberg & Ackerman, LLC, 2011 WL 843943, at *5 (D.N.J. March 8, 2011); see Harvey v. Great Seneca Financial Corp., 453 F.3d 324, 330 (6th Cir. 2006) (even "viewed from the perspective of an unsophisticated consumer, the filing of a debt-collection lawsuit without the immediate means of proving the debt does not have the natural consequence of harassing, abusing, or oppressing a debtor" under section 1692d). Whether conduct harasses, oppresses or abuses the least

sophisticated consumer is ordinarily "a question for the jury."
Jeter v. Credit Bureau, Inc., 760 F.2d 1168, 1179 (11th Cir.
1985); accord Harvey v. Great Seneca Financial Corp., 453 F.3d at
330.

The non-exhaustive list of examples of oppressive conduct in
section 1692d concern tactics that have the natural tendency to
embarrass, upset, or frighten a debtor. See generally Harvey v.
Great Seneca Financial Corp., 453 F.3d at 330. The first four
examples respectively prohibit the use of violence, the use of
obscene language, the publication of a list of consumers who
refuse to pay a debt and the advertisement of the sale of a debt
to coerce payment. 15 U.S.C. § 1692d(1)-(4). The last two
examples proscribe repeatedly and continuously causing the
telephone to ring with the intent to annoy, harass or abuse and
placing telephone calls without disclosing the caller's identity.
15 U.S.C. § 1692d(5)-(6).

MEEB's conduct of repeatedly sending the notices of intent to
file suit close to the time it filed suit is more akin to the type
of conduct that does not violate section 1692d. See Barney v.
LVNV Funding LLC, 2012 WL 2995471, at *3 (N.D.Ohio July 23, 2012)
(serving deposition notice falls within the natural inconvenience
of debt collection); Bryant v. Bonded Accounts Serv./Check
Recovery, Inc., 208 F.R.D. 251, 256 (D.Minn. 2000) (dunning letter
asking, "WILL YOU BE REFUSED CREDIT BECAUSE OF THIS UNPAID ACCOUNT

WE HAVE FOR COLLECTION?," did not violate section 1692d).  It is not harassing or coercive to the least sophisticated consumer to send, on a repeated basis, letters to a first mortgagee asking for payment.  The letters were not threatening in any manner.  MEEB's failure to send the letters earlier does not have the natural consequence of embarrassing plaintiff or oppressing or abusing him even if the failure increased the litigation costs.  The additional costs of ordering title examinations, preparing complaints and ordering service were reasonable costs and part of an ordinary collection action.  See Johnson v. Capital Management Services, 2011 WL 6012509, at *5 (W.D.N.Y. Dec. 1, 2011) ("[s]ection 1692d is meant to protect debtors from oppressive and outrageous conduct, but not from every negative consequence of debt collection"); Bieber v. Association Collection Services, 631 F.Supp. 1410, 1417 (D.Kan. 1986) (noting that "[s]ome inconvenience or embarrassment to the debtor is a natural consequence of debt collection").

In sum, filing suit rather than waiting for a mortgagee's payment does not constitute harassing, abusive or oppressive conduct within the meaning of section 1692d.  It is not abusive to collect or charge the costs of an ordinary collection action where, as here, the condominium documents gave Pondview the ability to charge those costs to plaintiff.  From the viewpoint of the least sophisticated consumer, MEEB's conduct relative to the

untimely letters to plaintiff's mortgagees as well as the failure to send a letter prior to the April 2005 unit 104 and the April 2005 unit 105 suits do not violate section 1692d.

Turning to section 1692f, plaintiff simply and summarily states that the conduct "was an 'unfair or unconscionable means to collect or attempt to collect any debt' in violation of 15 U.S.C. § 1692f." (Docket Entry # 60, § 1(c), p. 29). The general proscription in section 1692f that plaintiff cites addresses the use of "unfair and unconscionable means" to collect the debt. 15 U.S.C. § 1692f. The statute does not define either "unfair" or "unconscionable." See Beler v. Blatt, Hasenmiller, Leibsker & Moore, LLC, 480 F.3d at 473 (statute "does not say" what "is 'unfair or unconscionable'"). Resorting to a dictionary, the LeBlanc court notes that, "The plain meaning of 'unfair' is 'marked by injustice, partiality, or deception.'" LeBlanc v. Unifund CCR Partners, 601 F.3d 1185, 1200 (11th Cir. 2010) (quoting Merriam-Webster Online Dictionary (2010)). "The term 'unconscionable' means 'having no conscience'; 'unscrupulous'; 'showing no regard for conscience'; 'affronting the sense of justice, decency, or reasonableness.'" Id. (quoting Black's Law Dictionary 1526 (7th ed. 1999)).

To the extent plaintiff argues that MEEB did not comply with section 6(c) by sending the letter 30 days before filing suit, MEEB's noncompliance with state law does not constitute a

143

143

violation of section 1692f's prohibition of unfair and
unconscionable collection methods.[131]   See Fick v. American
Acceptance Co., LLC, 2012 WL 1074288, at *3 (N.D.Ind. March 28,
2012) (dismissing plaintiff's claim that "defendants violated
Section 1692f when they filed a lawsuit in state court without
being licensed" as a collection agency "as required by" Indiana
state statute).   The gravamen of plaintiff's argument is that MEEB
delayed sending the first mortgagees the 30 day notice letters to
increase its legal fees and costs.   MEEB's subjective motivation
is irrelevant to its liability under section 1692f.

Viewing the conduct through the lens of the least
sophisticated consumer, it was neither unfair nor unconscionable
to send the mortgagees the letters at or around the time MEEB
filed suit.   Avoiding the cost of preparing and filing the
complaint does not increase the fees to such an extent that the
failure to send the notice earlier was unconscionable or unfair.
Filing suit as a means to collect unpaid condominium fees is an
ordinary, usual and expected consequence of not paying the
required charges.   It is also expressly authorized under the
Declaration of Trust.   (Ex. B, ¶ 5.3(C)).   There was little if any
injustice or unscrupulous behavior in failing to wait the
additional time period.   Similarly, not sending the letter at all

---

[131]   MEEB, in turn, asserts that it complied with section
6(c) because the mortgagees never informed Pondview of their
names and addresses.   (Docket Entry # 61, ¶ 21, p. 17).

144

144

before the April 2005 suits was neither unfair nor unconscionable. Accordingly, MEEB did not violate section 1692f by not sending or by delaying sending the mortgagees the 30 day notice 30 days before filing suit.[132]  See generally Rizzo v. Pierce & Associates, 351 F.3d 791, 794 (7th Cir. 2003) (finding nothing unfair or unconscionable under section 1692f in collection of late fees because "note and mortgage explicitly require payment of all sums which would then be due had no acceleration occurred"); Turner v. J.V.D.B. & Associates, Inc., 330 F.3d 991, 998 (7th Cir. 2003) (collection letter furnishing information required under section 1692g was not "an 'unfair or unconscionable means' of debt collection" under section 1692f even "when directed toward  .  .  . consumer whose debt had been discharged in bankruptcy").

G.  Filing Multiple Lawsuits

   1.  Sections 1692d and 1692f

   In perhaps plaintiff's best argument, he contends that the filing of multiple lawsuits to collect the same debt was abusive and oppressive under section 1692d and a violation of section 1692f.  Plaintiff asserts that Brooks' rationale for filing multiple suits because it protected the six month priority lien

---

   [132]  In light of the absence of MEEB's liability under section 1692f here and elsewhere, it is not necessary to address MEEB's section 1692f(1) argument (Docket Entry # 61, ¶ 16, p. 16).  In addition, as discussed above and elsewhere, this court has considered the argument that the condominium documents and section 6(c) allows certain conduct.

"was ludicrous."  (Docket Entry # 60, § 1(d)).  According to plaintiff, the more rational construction of section 6(c) is that Pondview only gets one six month priority period for the lien. (Docket Entry # 60, § 1(d)).

MEEB submits that it filed the multiple lawsuits to protect the priority of the successive, six month liens of its client, Pondview.  (Docket Entry # 61, ¶ 54, p. 9).  MEEB maintains that chapter 183A, section six, allows an organization of unit owners such as Pondview to file additional lawsuits to protect the priority liens for common expenses.  (Docket Entry # 61, ¶ 41, p. 21).

Except for the statute itself, the only case law or legal authority cited by either plaintiff or MEEB consists of a 1988 Massachusetts Superior Court decision that is not published in the North Eastern Reporter, the Massachusetts Reports, the Reports of Massachusetts Appellate Division or any electronic legal database such as Westlaw or Lexis.  MEEB did not attach a copy of the decision to its post trial brief.

Recent Massachusetts case law does not support MEEB's position.  In particular, after discussing the language and purpose of section 6(c), the Massachusetts Appellate Division court in <u>Drummer Boy</u> rejected the association's position that it could extend the six month lien by filing successive suits. <u>Drummer Boy Homes Ass'n, Inc. v. Britton</u>, 2011 WL 2981374, at *2

(Mass.App.Div. July 20, 2011); see also In re Longyear Properties, LLC, 2011 WL 6010219, at *1 (Bkrtcy.D.Mass. Dec. 1, 2011) (noting that earlier ruling "rejected the Trust's so-called 'rolling lien theory' and ruled instead that the Trust's liens on each unit enjoy priority over Citizens' mortgage only to the extent of a single six-month lien"); see generally In re Ames, 447 B.R. 680, 682 (Bkrtcy.D.Mass. 2011) (outlining and explaining general procedure under section 6(c)).[133]

The issue therefore devolves into whether the filing of multiple lawsuits to collect the same debt violates either section 1692d or section 1692f. A recent decision in the Western District of New York is instructive with respect to a section 1692d claim based on filing successive lawsuits. See Curto v. Palisades Collection, LLC, 2011 WL 5196708, at *6 (W.D.N.Y. Oct. 31, 2011) ("successive filings may be in violation of § 1692d, if their natural consequence is to harass, oppress, or abuse Plaintiff in connection with the collection of the debt"). As explained in Curto:

> Bringing suit where a prior collection action has been dismissed with prejudice could constitute violations under § 1692d (harassment or abuse) or § 1692f (unfair practices). See Parkins v. Arrow Fin. Servs., LLS, No. 07 C 410, 2008 WL 94798 (N.D.Il. Jan. 8, 2008) ("[T]hreatening of a lawsuit which the debt collector knows or should know is unavailable or unwinnable by reason of a legal bar such as the statute of limitations is the kind of abusive practice the FDCPA was intended to eliminate."). While a consumer would legally

---

[133]    See fn. 61.

prevail on each successive claim on the basis of res judicata, these proceedings would nevertheless serve to harass him and compel him to expend resources defending himself in court.  Hess, 637 F.3d at 124.[134]  Accordingly, this Court must consider whether any of Defendants' collection actions were dismissed on the merits such that successive filings would constitute abuse, harassment, or an unfair practice.  See Havens-Tobias v. Eagle, 127 F.Supp.2d 889, 897-98 (S.D.Ohio 2001) (merely bringing collection action on disputed suit not deceptive, unconscionable, or unfair); Parkins, 2008 WL 94798 (denying summary judgment where a debt collector filed state court complaint to recover time-barred debt).

Id. at *5.

In contrast and as previously noted, filing a single collection lawsuit, even without the immediate means to prove the debt, does not violate either section 1692d or section 1692f.  See Harvey v. Great Seneca Fin. Corp., 453 F.3d at 330; Kavalin v. Global Credit & Collection Corp., 2011 WL 1260210, at *5 (W.D.N.Y. March 31, 2011).  Furthermore, the court in Curto denied the debtor's summary judgment motion.  Curto v. Palisades Collection, LLC, 2011 WL 5196708, at *6 ("this Court is unprepared to say that bringing one lawsuit after another, and failing to fully prosecute any of them, cannot rise to the level of abusive or oppressive behavior in violation of § 1692d").  The four successive lawsuits in Curto consisted of two dismissals because the defendants failed to accurately ascertain Curto's residence and one dismissal

---

[134]    Hess is not directly on point because it involved filing suit in a distant forum in violation of the FDCPA's venue provision, section 1692k.  Hess v. Cohen & Slamowitz LLP, 637 F.3d 117 (2nd Cir. 2011).

because of the defendants' failure to appear.  Id.  The Curto
court could not determine the basis for the final dismissal which,
in any event, was not relevant because the record did not show
that the defendants filed a fifth lawsuit.  Id.

Here, over the course of three and a half years, MEEB filed
four lawsuits to collect the debt on unit 104 and five lawsuits to
collect the debt on unit 105.  A brief summary of the lawsuits
with respect to each unit places the filings in context.

With respect to the unit 104 lawsuits, MEEB filed the April
2005 unit 104 suit on Pondview's behalf seeking to collect common
expenses and charges in the amount of $2,567.47.  MEEB filed the
second unit 104 suit in June 2006 to collect six months of charges
and common expenses preceding the filing of the June 2006 unit 104
suit.  By check dated August 29, 2006, M & T paid the amount of
the alleged priority lien ($3,454.00).  (Ex. 45 & 54).  Pondview
credited the amount to the unit 104 account thereby avoiding any
further duplication, if any, of fees sought in the April 2005 unit
104 suit.  Shortly thereafter, MEEB dismissed the June 2006 unit
104 suit.

The April 2005 unit 104 suit remained pending.  As previously
discussed in depth, MEEB filed a motion for default and a motion
for summary judgment.  A bench trial commenced in February 2006.

In February 2007, MERS paid the amount of MEEB's alleged
priority lien ($2,226.83) with a check to Pondview.  As a result

of the payment, MEEB did not file a third unit 104 suit in the first six months of 2007.

The judgment in the April 2005 unit 104 suit issued on March 28, 2007. The judgment ($22,622.99) included an award of modestly reduced legal fees ($18,803.00) as well as delinquent condominium related charges ($3,106.17) and prejudgment interest ($713.82).

Plaintiff's failure to pay condominium fees and related charges after the March 28, 2007 judgment led to the need for a third unit 104 suit. The July 2008 unit 104 suit sought ($10,351.33) consisting of the legal fees *from* April 2007 through June 6, 2008 ($5,404.00) and condominium related charges incurred *after* the March 2007 judgment though June 6, 2008 ($4,947.33).

On July 31, 2008, MERS paid Pondview a check ($34,813.40). On behalf of Pondview, MEEB filed a voluntary notice of dismissal of the April 2005 unit 104 suit.

MEEB filed the last unit 104 suit in Essex Superior Court on September 17, 2008. MEEB did not bill Pondview for filing the complaint. MEEB's invoices show only a modest charge of $305.00 for preparing the 60 day delinquency letters to MERS and plaintiff and the 30 notice of intent letter to MERS. Thereafter, MEEB did not bill Pondview for any work relative to unit 104 until June 2009. The status of the July 2008 and the September 2008 unit 104 suits remains unclear. MEEB did not escalate its legal fees in either suit.

The unit 104 suits each sought to collect different charges incurred at different times.  MEEB's conduct involved filing successive but not overlapping suits to collect legitimately imposed charges.  Once Bayview paid the charges, MEEB promptly dismissed the suit.  The repetitive filings were not abusive given the differences between the charges each suit sought to collect.  None of the four unit 104 suits were frivolous or misrepresented the debt.  See Eichman v. Mann Bracken, LLC, 689 F.Supp.2d 1094, 1100-1101 (W.D.Wis. Feb. 25, 2010).  MEEB was not seeking to collect the same charges twice or recover fees awarded or denied from a previous lawsuit dismissed with prejudice.  Accordingly, this court finds that the multiple filings of the four unit 104 suits does not violate either section 1692d or section 1692f.[135]

Turning to the unit 105 lawsuits, MEEB filed the April 2005 unit 105 suit on Pondview's behalf seeking to collect common expenses and charges in the amount of $2,694.94.  Bayview, the mortgagee, paid the full amount of accrued common expenses on May 20, 2005, except for the two $25.00 late fees for the May condominium fee and loan payback charge.  Brooks filed a dismissal of the suit shortly after receiving Bayview's check in the amount of $3,800.27.

---

[135]  The foregoing conduct related to filing the four unit 104 suits also does not violate section 1692d or section 1692f when considered in conjunction with MEEB's filings of the five unit 105 suits.

The continued accrual of unpaid common expenses led MEEB to file a second unit 105 suit in October 2005.  The October 2005 unit 105 suit sought to collect common expenses and charges in the amount of $1,866.14.  Bayview paid the full amount of accrued common expenses on December 15, 2005, with a check in the amount of $3,015.55.  In late December 2005, MEEB filed a stipulated dismissal of the October 2005 unit 105.

In 2006, plaintiff accrued additional charges for unpaid condominium fees, special assessment charges and late fees.  As a result, MEEB filed the June 2006 unit 105 suit seeking to collect unpaid common expenses in the amount of $3,771.04.  The August 2006 counterclaim led to additional and reasonable legal fees.  In April 2007, the Lynn District Court rescheduled the April 11, 2007 trial.

Plaintiff's nonpayment of condominium related charges and legal fees posted to the unit 105 account continued throughout 2007.  Rather than seek leave to file a supplemental complaint in the June 2006 unit 105 suit, see Mass. R. Civ. P. 15(d), MEEB filed the June 2007 unit 105 suit.[136]  In light of the amount of the common expenses and charges sought ($26,966.42) and MEEB's invoices (Ex. 23), the June 2007 unit 105 suit sought legal fees

_____

[136]  A May 2007 foreclosure notice and a perceived need to obtain another six month priority lien led to the filing thereby dispelling any bad faith on the part of MEEB relative to a chapter 93A claim.

152

152

and to a lesser extent condominium charges that MEEB previously included and/or incurred in the June 2006 unit 105 suit.

In September 2007, a foreclosure took place on unit 105.[137] (Tr. V, p. 84).  The perceived need to protect Pondview's six month priority lien caused MEEB to file another unit 105 suit on October 11, 2007.  The October 2007 unit 105 suit sought $34,012.07 in common expenses including legal fees.  In light of the large amount ($34,012.07) and MEEB's invoices (Ex. 23), the amount sought included legal fees incurred in connection with the June 2006 unit 105 suit and sought in the June 2007 unit 105 suit.

The June 2008 decision in the June 2006 unit 105 suit reflects that MEEB, on behalf of Pondview, sought legal fees in the amount of $29,792.70 in that suit.  The Justice awarded Pondview $14,000.00 in legal fees.  On July 10, 2009, MEEB received and applied the $24,500.00 payment toward the outstanding legal fees for unit 105.

MEEB's 2007 through 2009 invoices do not show the dismissal of the June and October 2007 unit 105 suits.[138]  Although not all

---

[137] This finding is based on plaintiff's testimony.  It is not clear whether unit 105 was sold at that time.  MEEB's invoices show that it prepared a "foreclosure sale bidder letter to Bank counsel" for unit 105 on October 23, 2007.  (Ex. 23). The same invoices note an "identification of new owner" of unit 105 on November 26, 2007.  (Ex. 23).

[138] The charges incurred do not indicate any intention on the part of MEEB to escalate its legal fees in violation of chapter 93A.  With respect to any independent chapter 93A violation, this court finds that MEEB's dismissal of the April

of the legal fees duplicated those sought in the prior unit 105

suits, a significant portion of the amounts sought duplicated the

prior legal fees sought.  Based on the totality of the conduct,

MEEB's filing of the June 2007 and the October 2007 unit 105 suits

seeking overlapping amounts of the same legal fees had the natural

consequence to harass as well as to abuse the least sophisticated

consumer.[139]  The conduct therefore violated section 1692d.[140]

MEEB fails to establish the affirmative, bona fide error

defense under section 1692k(c).  See Gathuru v. Credit Control

Services, Inc., 623 F.Supp.2d at 122 (discussing section 1692k(c)

---

and October unit 105 suits and other evidence in the record shows
that MEEB did not engage in the bad faith plaintiff alleges with
the intent to escalate its attorney's fees.

[139]  The complaint alleges that "at least two" of the
lawsuits filed by MEEB "sought the same relief for the same
claims."  (Docket Entry # 1, ¶ 45).

[140]  Unlike the last two unit 104 suits, none of the unit 105
suits fall within the one year limitations period of the FDCPA.
Accordingly, statutory damages under the FDCPA, 15 U.S.C. §
1692k(a)(2)(A), do not apply.  The section 1692d violations based
on the duplicate fees sought in the June and October 2007 unit
105 suits nonetheless support a per se violation of chapter 93A.
As previously indicated, the conduct does not rise to the level
of an independent chapter 93A violation.  In light of finding a
section 1692d violation, it is not necessary to address the
existence of a section 1692f violation based on the same conduct.
The same injury and damages result from the same misconduct.
This court finds no section 1692f violation based on the other
conduct plaintiff alleges in this section of his brief (Docket
Entry # 61, § 1(d)).  In addition, even assuming for purposes of
argument that MEEB's conduct in filing the two unit 105 suits
violated section 1692f, this court would still not find MEEB's
conduct a willful or knowing violation of section two of chapter
93A.

and noting that, "FDCPA provides an affirmative defense to debt collectors").  The defense does not apply to a debt collector's mistaken interpretation of the federal law of the FDCPA.  <u>Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA</u>, 130 S.Ct. at 1608.  Three principles used to support the holding in <u>Jerman</u> lead to the conclusion that section 1692k(2) does not encompass mistakes based on state law.  They are that:  (1) "'ignorance of the law will not excuse any person, either civilly or criminally,'" <u>Id.</u> at 1611; (2) "when Congress has intended to provide a mistake-of-law defense to civil liability, it has often done so more explicitly than" in section 1692k(c), <u>Id.</u> at 1612; and (3) section 1692k(c)'s use of the term "procedures" indicates a mechanical kind of process whereas "legal reasoning is not a mechanical or strictly linear process."  <u>Id.</u> at 1614.

Here, any error on the part of MEEB in interpreting the reach of the priority lien in section 6(c) is an error based on state law.  Such legal errors do not provide a basis for a section 1692k(c) defense.

2.  <u>Section 1692c(a)(2)</u>

Plaintiff next submits that MEEB communicated with plaintiff at a time when it knew he was represented by an attorney in violation of section 1692c(a)(2).  Plaintiff submits that this provides further evidence of MEEB's bad faith.  (Docket Entry # 60, § 1(d)).

155

Plaintiff's counsel entered appearances in the April 2005 unit 104 suit and the June 2006 unit 105 suit in April 2007. Plaintiff bases the section 1692c(a)(2) violations on three 60 day delinquency letters MEEB sent in October 2007 and June and September 2008 to plaintiff. (Docket Entry # 60, ¶ 19, fact para. 19, p. 15) (citing only exhibits 49, 50 & 76); (Docket Entry # 60, § 1(d), p. 30) (citing fact para. 19 as basis for MEEB's post-counsel communications). Plaintiff contends that MEEB's direct communications with plaintiff when it knew he was represented by an attorney are evidence of MEEB's bad faith. (Docket Entry # 60, § 1(d), p. 30 & ¶ 19, p. 15).

Chapter 183A, section 6(c), requires Pondview to send the 60 day letters to the "unit owner," i.e., plaintiff. See Mass. Gen. L. ch. 183A, § 6(c). MEEB argues that because state law, i.e., section 6(c), required the communications, it did not violate section 1692c(a)(2). (Docket Entry # 61, ¶¶ 18-19, pp. 16-17).

Section 1692c(a)(2) prohibits a debt collector from communicating with a consumer in connection with collecting a debt "if the debt collector knows the consumer is represented by an attorney." 15 U.S.C. § 1692c(a)(2). MEEB knew of plaintiff's representation by an attorney by the end of April 2007 with respect to unit 105 debt and the unit 104 debt in light of the appearances of counsel in the above two enforcement suits. Section 6(c) of chapter 183A, however, requires Pondview to send

156

156

"the unit owner" the 60 day notice.  <u>Drummer Boy Homes Ass'n, Inc.
v. Britton</u>, 2011 WL 2981374, at *2 (when "portion of a unit
owner's share of the common expenses has been delinquent for at
least sixty days, the condominium association must notify the unit
owner") (citing chapter 183A, section 6(c))

    Turning to one of the cases cited by MEEB, the decision
notes that, "A 1999 Federal Trade Commission report indicates that
the 'cease communication' provision in section 1692c(a) of the
FDCPA does not prevent collectors or creditors from filing suit
against the consumer."[141]  <u>Hulse v. Ocwen Federal Bank, FSB</u>, 195
F.Supp.2d 1188, 1211 (D.Or. 2002).  The court in <u>Hulse</u> therefore
found no violation of section 1692c(a)(2) based on a foreclosure
notice letter sent directly to the plaintiffs as opposed to their
attorney.  <u>Id.</u> at 1210-1211; <u>accord</u> <u>Vitullo v. Mancini</u>, 684
F.Supp.2d 747, 758-769 (E.D.Va. 2010) (citing <u>Hulse</u>, 195 F.Supp.
at 1210-11, for principle that pursuit of state foreclosure
remedies does not violate section 1692c(a)(2)).  Although MEEB
cites both <u>Hulse</u> and <u>Vitullo</u> (Docket Entry # 61, ¶¶ 18-19, pp. 16-
17), neither case relies on the language of the statute.  <u>See</u>
<u>Zimmerman v. Puccio</u>, 613 F.3d 60, 71 (1st Cir. 2010) ("as with any
act of Congress, '"our analysis begins with the language of the
statute"'").

---

    [141]  MEEB does not argue that it acted in conformity with a
Federal Trade Commission advisory opinion.  <u>See</u> 15 U.S.C. §
1692k(e).

Turning to the statutory language, section 1692c(a)(2), like the previously discussed language in section 1692c(b), excuses any communication with the debtor's attorney if the communication was made with "the express permission of a court of competent jurisdiction."  15 U.S.C. § 1692c(a).  Again, the plain language refers to "the express permission of a court."  15 U.S.C. § 1692c(b).  It does not refer to the permission of a state law or contain the "permitted by law" language in subsection 1692c(b).  For reasons previously explained, interpreting "express permission of a court" to mean "express permission" in a state law fails to afford "court" its plain and ordinary meaning.  See Black's Law Dictionary 356 (7ᵗʰ ed. 1999).  Furthermore, the fact that the next subsection of section 1692c expressly allows a communication that is "otherwise permitted by law" evidences a Congressional intention not to allow such an exception in section 1692c(a)(2).  See In re 229 Main Street Limited Partnership, 262 F.3d at 5-6 (recognizing presumption that Congress acts intentionally "in the disparate inclusion or exclusion" of terms in statutory sections).  Accordingly, the language of section 1692c(a)(2) provides MEEB no relief based on its argument that state law requires it to send the communication to the "unit owner" as opposed to the unit owner's attorney.

In addition, the state law (section 6(c) of chapter 183A) is inconsistent with the requirement in section 1692c(a)(2) not to

send the consumer the letter when the debt collector knows he is represented by an attorney with respect to the debt. Thus, although the FDCPA does not displace or "annul" state law, it does prevent the enforcement of state "laws that are inconsistent with any provision" of the FDCPA "to the extent of the inconsistency." 15 U.S.C. § 1692n. Here, it is inconsistent to send the "unit owner" the 60 day letter required by section 6(c) when section 1692c(a)(2) requires MEEB to send the communication to plaintiff's attorney after April 2007.

MEEB therefore violated section 1692c(a)(2) by sending plaintiff the 60 day delinquency letters on October 10, 2007, June 30, 2008, and September 16, 2008, to plaintiff. (Ex. 49, 50 & 76). On the other hand, this court finds that sending these notices in conformity with state law evidences an absence of any bad faith on the part of MEEB.[142] Contrary to plaintiff's assertion that the communications were "intended to annoy [plaintiff]," state law justified the communications and dispels any suggestion of bad faith let alone warrant a finding of willfulness under chapter 93A.

In addition, the October 10, 2007 letter does not provide a basis for FDCPA liability because it is untimely. See 15 U.S.C. § 1692k(d). As a per se violation of chapter 93A, sending the

---

[142] The conduct therefore does not amount to or support an independent chapter 93A violation under the standard set out below.

159

letter to plaintiff as opposed to his attorney did not result in any loss of property or a personal injury loss such as emotional distress. See Hershenow v. Enterprise Rent-A-Car Company of Boston, Inc., 840 N.E.2d at 533. Rather, the clear and concise letter apprised plaintiff of MEEB's activity in a direct and immediate manner.

Turning to the two, timely letters, plaintiff did not sustain any emotional distress, mental anguish, monetary or property loss "as a result of" the section 1692c(a)(2) violation. 15 U.S.C. § 1692k(a)(1). He did not incur additional attorney's fees as a result of MEEB's failure to send the June 30 and September 16, 2008 letters to plaintiff's attorney. Plaintiff's prior familiarity with 60 day letters belies the existence of any emotional distress as a result of MEEB sending the letter to him as opposed to his counsel. Plaintiff did not testify to experiencing emotional distress as a result of MEEB's failure to comply with section 1692c(a)(2) by sending the letter to him as opposed to his attorney. Cf. Donahue v. NFS, Inc., 781 F.Supp. 188, 194 (W.D.N.Y. 1991) (awarding $100.00 actual damages because plaintiff's "affidavit and testimony show" she "had suffered from hyperventilation, irritability, nervousness and anxiety when she received" three collection notices but "was able to work, sleep and eat"). Plaintiff's September 2008 visit to the hospital with chest pains was most probably the result of the foreclosure

proceedings on unit 104 and the loss of his parents' place as opposed to a result of MEEB's June 30 and September 16, 2008 letters to him.[143]  Statutory damages under section 1692k(a)(2) are addressed later in this opinion.

As a final matter, the complaint cites section 1692c(a)(2) and alleges that, after April 2007, MEEB "filed and served most of the above lawsuits directly on McDermott."[144]  (Docket Entry # 1, ¶ 46).  Plaintiff fails to establish by a preponderance of the evidence that MEEB served these state court lawsuits on plaintiff as opposed to his attorney.  MEEB filed the complaints at issue (Ex. 65, 66, 72 & 78) either in Lynn District Court or Essex Superior Court.  Plaintiff did not provide a copy of any summons for these suits or a docket sheet indicating that service was made on plaintiff as opposed to plaintiff's attorney.  Plaintiff did not testify to being served or to receiving these four complaints.  The four state court complaints do not include a certificate of service that would reflect service on plaintiff as opposed to his attorney.  As the finder of fact, this court finds the evidence insufficient to establish that plaintiff satisfied his burden to prove by a preponderance of the evidence that MEEB served these

---

[143]  For the same reasons, plaintiff did not meet his burden to demonstrate that these two per se deceptions caused him a loss.  See Hershenow v. Enterprise Rent-A-Car Company of Boston, Inc., 840 N.E.2d at 533.

[144]  The post trial brief does not develop this argument.

lawsuits on plaintiff.  Accordingly, there is insufficient
evidence to show a section 1692c(a)(2) violation based on the
lawsuits filed after April 2007 (Ex. 65, 66, 72 & 78).

H.  Section 1692h

In addition to the four arguments plaintiff raises in the
post trial brief, the trial brief separately argues that MEEB
violated section 1692h.  (Docket Entry # 60, p. 19).  Plaintiff
submits that MEEB knew that plaintiff disputed its attorney's fees
because he made it clear on the checks and accompanying
correspondence that Pondview should not apply the checks to MEEB's
attorney's fees.

Section 1692h prevents a debt collector from applying
payments to any debt that is disputed when a consumer owes
multiple debts.  15 U.S.C. § 1692h.  The section also requires the
debt collector to apply "payment[s] in accordance with the
consumer's direction."  15 U.S.C. § 1692h.

Turning to the latter basis, under the facts Pondview
complied with plaintiff's directions on the checks and
accompanying correspondence.  After MEEB became Pondview's
attorney in or around March 23, 2005, neither MEEB nor Pondview
applied a payment made by plaintiff to any debt in a manner that
contravened plaintiff's instructions on the checks and
accompanying correspondence.  As explained in the factual
background, Bailey complied with the instructions plaintiff made

on the checks and correspondence accompanying those checks.

Plaintiff also contends that MEEB "contrived . . . to have the mortgagees' payments made out to Pondview, and to show the application of the payments only on ledgers that it had Pondview prepare for the pre-suit notices and affidavits in order [for MEEB] to evade this obligation" under section 1692h.  (Docket Entry # 60, p. 19).  Whether these mortgagee payments violate section 1692h initially turns upon the language of the statute. See Zimmerman v. Puccio, 613 F.3d at 71.

Section 1692h, captioned "Multiple Debts," reads as follows:

§ 1692h.  Multiple debts

If any consumer owes multiple debts and makes any single payment to any debt collector with respect to such debts, such debt collector may not apply such payment to any debt which is disputed by the consumer and, where applicable, shall apply such payment in accordance with the consumer's directions.

15 U.S.C. § 1692h.  By its terms, section 1692h applies to "any consumer" who "owes multiple debts" and "makes any single payment to any debt collector with respect to such debts."  15 U.S.C. § 1692h.  In other words, the consumer who owes the debt must also make the payment with respect to such debt.  Here, the mortgagees who made the payments did not owe the multiple debts and the payments they made were not "with respect to" their non-existent multiple debts.  Consistent with this interpretation, the FDCPA's definition of the term "consumer" means a person "obligated or allegedly obligated to pay any debt."  15 U.S.C. § 1692a(3).

163

Although plaintiff's mortgagees may wish to protect their interest in the mortgaged property, they are not obligated to pay the debt plaintiff, as the "unit owner" under section 6(c), incurred to Pondview for outstanding common expenses.

The statute's purpose confirms that section 1692h applies to consumers who owe the multiple debts and who make the payment with respect to "such debts." 15 U.S.C. § 1692h. The overall purpose of the FDCPA is "to eliminate abusive debt collection practices" while not competitively disadvantaging debt collectors who refrain from such practices.[145] 15 U.S.C. § 1692(e). Extending the reach of section 1692h to apply to all payments made by a debtor's mortgagees does not directly effect or eliminate the abusive practices of the debtor's debt collector. Plaintiff's argument seeking to apply the statute to payments made by plaintiff's mortgagees is therefore without merit.

I. Section 1692i

As a final matter, the complaint identifies an additional FDCPA violation not raised in the post trial brief. (Docket Entry # 1, ¶ 35). Specifically, paragraph 35 alleges that MEEB violated section 1692i by filing the September 2008 unit 104 suit in Essex Superior Court.[146] MEEB points out (Docket Entry # 61, ¶ 23, p.

---

[145] The FDCPA also seeks to "promote consistent State action to protect consumers against debt collectors." 15 U.S.C. § 1692(c).

[146] See fn. 29.

17) that state law requires it to file a suit enforcing section 6(c) of chapter 183A "in the superior court for the county where such land lies or in the district court in the judicial district where such land lies." Mass. Gen. L. ch. 254, § 5.

Section 1692i provides that:

(A) Venue

Any debt collector who brings any legal action on a debt against any consumer *shall* . . . bring such action *only* in the judicial district or similar legal entity (A) in which such consumer signed the contract sued upon; or (B) in which such consumer resides at the commencement of the action.

15 U.S.C. § 1692i (emphasis added). Congress' purpose in enacting section 1692i "was 'to prevent debt collectors from bringing collection suits in forums located at great distances from debtors' residences.'" Harrington v. CACV of Colorado, LLC, 508 F.Supp.2d at 134.

At the time MEEB commenced the September 2008 unit 104 suit, plaintiff resided in Lynn. Lynn is part of the judicial district of the district court of southern Essex. Mass. Gen. L. ch. 218, § 1 ("district court of southern Essex, held at Lynn" includes "Lynn, Swampscott, Saugus, Marblehead and Nahant"). MEEB filed the September 2008 unit 104 suit in Essex Superior Court which sits in Salem, Lawrence and Newburyport, Massachusetts. Mass. Gen. L. ch. 212, § 14. It is not located in the judicial district in which plaintiff resides.

The plain language of section 1692i uses the mandatory term

165

"shall." 15 U.S.C. § 1692i. The statute therefore imposes a mandatory requirement to bring "any legal action on a debt against" a consumer such as plaintiff "*only* in the judicial district or similar legal entity . . . in which such consumer resides." 15 U.S.C. § 1692i (emphasis added). For reasons previously discussed, the bona fide error defense does not encompass a mistake of law regarding proper venue. The statutory language of section 1692i does not expressly allow for filing suit in a judicial district permitted under state law. Furthermore, "Numerous courts have rejected the argument that 'judicial district or similar legal entity' merely incorporates state venue provisions." Harrington v. CACV of Colorado, LLC, 508 F.Supp.2d at 133-134 (quoting section 1692i and collecting authority). Filing the September 2008 unit 104 suit in Essex Superior Court therefore violated section 1692i.

Plaintiff fails to provide any evidence of damages caused by this violation. The Lynn District Court was six or seven miles from plaintiff's residence. There was no testimony, however, about the distance from Essex Superior Court to plaintiff's residence. Even if this court took judicial notice of the distance, there was little if any evidence that plaintiff traveled to the Essex Superior Court courthouse. Plaintiff did not testify to experiencing any emotional distress as a result of the filing

in Essex Superior Court.[147]  Statutory damages are addressed in the

next section.[148]

J.   Statutory Damages

     Section 1692k(a)(2) gives the court discretion to award

statutory damages up to $1,000.00.  See Savino v. Computer Credit,

Inc., 164 F.3d 81, 86 (2nd Cir. 1998) ("decision whether to award

statutory damages" and the amount "of the award are matters

committed to the sound discretion of the district court").  The

language allows an award "in the case of any action by an

individual . . . damages as the court may allow, but not exceeding

$1,000."  15 U.S.C. § 1692k(a)(2)(A).  Section 1692k(b) dictates

that the court "*shall* consider, among other relevant factors[,] .

. . the frequency and persistence of noncompliance by the debt

collector, the nature of such noncompliance, and the extent to

which such noncompliance was intentional."  15 U.S.C. § 1692k(b)

(emphasis added).

     "Generally, courts have awarded less than the $1,000

statutory maximum damages 'where there is no repeated pattern of

intentional abuse or where the violation was technical.'"  Mira v.

_____

     [147]  For the same reasons, plaintiff fails to demonstrate
that this per se deception under chapter 93A caused a loss.  See
Hershenow v. Enterprise Rent-A-Car of Boston, Inc., 840 N.E.2d at
533.

     [148]  The absence of an actual damages award under section
1692a(1) makes it unnecessary to address MEEB's related section
1692a(1) argument (Docket Entry # 61, ¶ 51, p. 22).

Maximum Recovery Solutions, Inc., 2012 WL 4511623, at *3 (E.D.N.Y. Aug. 31, 2012) (collecting cases); see, e.g., Arthur v. Robert James & Associates Asset Management, Inc., 2012 WL 1122892, at *2 (S.D.Ohio April 3, 2012) (single FDCPA violation warranted "$100.00 in statutory damages").  In contrast, "Awards of the statutory maximum are typically granted in cases where the defendants' violations are egregious."  Cook v. First Revenue Assur., LLC, 2012 WL 272894, at *2 (E.D.N.Y. Jan. 9, 2012).

Here, MEEB committed a number of timely FDCPA violations. See Mira v. Maximum Recovery Solutions, Inc., 2012 WL 4511623, at *3 ("at least three personal contacts with threats of legal action and noncompliance with the FDCPA" warranted $1,000.00 maximum award); Gilmore v. Account Management, Inc., 2009 WL 2848278, at *10 (N.D.Ga. April 27, 2009) (awarding maximum amount of $1,000.00 "[i]n light of Defendant's repeated violations of the FDCPA over a period of several months").  The conduct was relatively persistent although far less persistent than plaintiff asserts.  Cf. Coles v. Lieberman, Michaels & Kelly, LLC, 2011 WL 3176467, at *3 (W.D.N.Y. July 27, 2011) ("calling Plaintiff five times in May and June 2010" was "not so persistent or egregious as to warrant" maximum amount and finding $250.00 appropriate).  On the other hand, the the noncompliance at issue was not intentional.  See 15 U.S.C. § 1692k(b) ("court shall consider . . . extent to which such noncompliance was intentional").  On balance and considering all

of the relevant factors, a maximum award of $800.00 is
appropriate.

II.  <u>CHAPTER 93A</u>

Plaintiff submits that MEEB's violations of the FDCPA
constitute per se violations of chapter 93A.  Plaintiff also seeks
chapter 93A liability based on an independent violation because
MEEB's collections actions were intended to escalate its
attorney's fees.  Plaintiff additionally requests triple but no
less than double the amount of actual damages because MEEB acted
willfully and/or knowingly and it refused to tender any relief in
response to the demand letter "when it knew or should have known
that its actions violated the FDCPA."  (Docket Entry # 60, § 3).

MEEB argues that chapter 93A does not apply because the
matter is a private dispute and it was not engaged in trade or
commerce.  (Docket Entry # 61, ¶¶ 46-47).  Plaintiff disagrees.

Section two of chapter 93A applies "to unfair or deceptive
acts or practices in the conduct of any trade or commerce."  Mass.
Gen. L. ch. 93A, § 2(a).  Furthermore, the statute "is
inapplicable to a private dispute between a condominium unit
owners' association and a member of that association for failure
to pay condominium fees."  <u>Berish v. Bornstein</u>, 770 N.E.2d 961,
979 (Mass. 2002) (citing <u>Office One, Inc. v. Lopez</u>, 769 N.E.2d
749, 759 (Mass. 2002)).  Both <u>Berish</u> and <u>Office One</u> involved
private disputes between the volunteer trustees of a condominium

trust and a unit owner, board member or developer.  See Berish v. Bornstein, 770 N.E.2d at 966-968 & 971-972; Office One, Inc. v. Lopez, 769 N.E.2d at 759.  Each case rejects the application of a chapter 93A because, "Transactions that are principally private in nature do not fall within the purview of G.L. c. 93A."  Office One, Inc. v. Lopez, 769 N.E.2d at 759 (internal ellipses and quotations marks omitted); accord Berish v. Bornstein, 770 N.E.2d at 979.

Berish and Office One are distinguishable because this case involves the condominium associations's debt collector, MEEB, against a unit owner.  In addition, unlike Berish and Office One, this case involves a per se chapter 93A violation based on the FDCPA.  Thus, while instructive outside the context of a per se violation based on the FDCPA, Berish and Office One are not determinative of whether MEEB and plaintiff were engaged in a private transaction as opposed to "trade or commerce" within the meaning of section 2(a) of chapter 93A.

Here, plaintiff relies on the fact that violations of the FDCPA on the part of attorney debt collectors are per se violations of section two.  He also relies on regulation 3.16(4).  (Docket Entry # 1, ¶ 74).

Section 2(c) of chapter 93A provides that, "The attorney general may make rules and regulations interpreting the provisions of subsection 2(a) of this chapter."  Mass. Gen. L. ch. 93A, §

2(c).  Section 2(c) gives the Attorney General of the Commonwealth
the power "to promulgate substantive rules of law."  <u>Purity
Supreme, Inc. v. Attorney General</u>, 407 N.E.2d 297, 299 (Mass.
1980) (finding that the regulation at issue, enacted under section
2(c), carries "the force of law normally accorded to an agency's
regulations").  Exercising this power, the Attorney General of the
Commonwealth enacted 940 C.M.R. § 3.16 ("regulation 3.16").  The
regulation states that:

> . . . an act or practice is a violation of M.G.L. c.93A, § 2
> if:
>
> (1) It is oppressive or otherwise unconscionable in any
> respect; or
>
> (2) *Any person or other legal entity subject to this act*
> fails to disclose to a buyer or prospective buyer any fact,
> the disclosure of which may have influenced the buyer or
> prospective buyer not to enter into the transaction; or
>
> (3) It fails to comply with existing statutes, rules,
> regulations or laws, meant for the protection of the public's
> health, safety, or welfare promulgated by the Commonwealth or
> any political subdivision thereof intended to provide the
> consumers of this Commonwealth protection; or
>
> (4) It violates the Federal Trade Commission Act, the Federal
> Consumer Credit Protection Act or other Federal consumer
> protection statutes within the purview of M.G.L. c. 93A, § 2.

940 C.M.R. 3.16 (emphasis added).

Plaintiff grounds the chapter 93A claim on per se FDCPA
violations declared as violations of section 2(a) under regulation
3.16(4).[149]  In contrast to the restrictive language in subsection

---

[149]  As discussed in the next section, this theory of chapter
93A liability is well established.

two of regulation 3.16 that restricts itself to a person "subject to the act," subsection four omits this language and simply declares a violation of a federal consumer protection statute is an act or practice in violation of section two.  See generally In re 229 Main Street Limited Partnership, 262 F.3d at 5-6 (Congress acts intentionally "in the disparate inclusion or exclusion" of terms in statutory sections).  The language "act or practice" in regulation 3.16 therefore refers to "acts or practices in the conduct of any trade or commerce" in section 2(a).

The FDCPA is federal consumer protection statute within the meaning of regulation 3.16(4).  See 15 U.S.C. § 1692(e); F.T.C. v. Check Investors, Inc., 502 F.3d at 165 (purpose of FDCPA is "'"to protect consumers from a host of unfair, harassing, and deceptive collection practices without imposing unnecessary restrictions on ethical debt collectors"'"); In re Pharmaceutical Industry Average Wholesale Price Litigation, 491 F.Supp.2d at 84.  Indeed:

> The types of federal statutes that courts have found to be consumer protection statutes under section 3.16(4) include: the Truth in Savings Act (TISA),[150] *Fair Debt Collection Practices Act (FDCPA)*, and Truth in Lending Act (TILA)[151] . . . [which] all focus on the conduct of buyers and sellers in the marketplace, and specifically reference the protection of consumers in these transactions.

In re Pharmaceutical Industry Average Wholesale Price Litigation, 491 F.Supp.2d at 84 (emphasis added).  The focus on the

---

[150]   12 U.S.C. §§ 4301 et seq.

[151]   15 U.S.C. §§ 1601 et seq.

172

172

marketplace is inherent in the FDCPA because it only applies to a "debt collector." A debt collector  means "any person who uses any instrumentality of interstate commerce or the mails *in any business* the principal purpose of which is the collection of any debts . . .." 15 U.S.C. § 1692a(6) (emphasis added).

Finally, direct precedent in this district, albeit not cited by either party, instructs that a per se violation of chapter 93A based on the FDCPA and 3.16(4) does not require proof that the defendants are engaged in trade or commerce. See <u>Andrews v. South Coast Legal Services, Inc.</u>, 582 F.Supp.2d 82, 89-90 (D.Mass. 2008). The <u>Andrews</u> court rejected the defendants' argument that they were not engaged in "trade or commerce" under section two because:

> Regulations promulgated under ch. 93A, in particular 940 C.M.R. 3.16(4), make a violation of the Federal Consumer Credit Protection Act, of which the FDCPA is a part, a per se violation of ch. 93A. These regulations have the force of substantive law. See <u>Purity Supreme, Inc. v. Attorney General</u>, 380 Mass. 762, 763, 407 N.E.2d 297, 299 (1980). Since Andrews has alleged a violation of the FDCPA, she also has alleged sufficient facts to establish an unfair and deceptive act or practice in violation of Mass. Gen. Laws ch. 93A. See <u>Martin v. Sands</u>, 62 F.Supp.2d 196, 201 (D.Mass. 1999) (violation of the FDCPA is a per se violation of ch. 93A).

<u>Id.</u> Distinguishing cases relied upon by the defendants because they did not involve the FDCPA, the <u>Andrews</u> court denied a motion to dismiss "[s]ince a violation of the FDCPA is a per se violation of ch. 93A." <u>Id.</u> at 90.

Here too, neither <u>Berish</u> nor <u>Office One</u> involve a per se

chapter 93A violation based on the FDCPA.  Regulation 3.16(4),
which carries the force of law, establishes that a violation of
the FDCPA is a violation of section two of chapter 93A thus
supporting section nine liability.[152]

B.   Per Se Violations of the FDCPA

Plaintiff alleges chapter 93A violations based on timely as
well as untimely violations of the FDCPA.  MEEB asserts that the
common law litigation privilege applicable to chapter 93A claims
bars all liability under the statute.

The FDCPA and chapter 93A diverge with respect to liability
based upon litigation activities.  "[T]he FDCPA does not contain
an exemption from liability for common law privileges."  Allen ex
rel. Martin v. LaSalle Bank, N.A., 629 F.3d at 369; accord Akar v.
Federal National Mortgage Association, 843 F.Supp.2d at 164
("'FDCPA applies to the litigation activities of attorneys who
qualify as debt collectors'") (quoting Sayyed v. Wolpoff &
Abramson, 485 F.3d 226, 232 (4th Cir. 2007)); Harrington v. CACV
of Colorado, LLC, 508 F.Supp.2d at 135.  For reasons more fully
explained by the court in Sayyed, "The statutory text makes clear
that there is no blanket common law litigation immunity from the
requirements of the FDCPA."  Id. at 230-234 (analyzing statutory
text); Akar v. Federal National Mortgage Association, 843

---

[152]  As discussed infra, section nine carries with it the
additional requirement of an injury.

174

174

F.Supp.2d at 164 (quoting Sayyed, 485 F.3d at 230); see also Heintz v. Jenkins, 514 U.S. at 293-294.

In contrast, "Under Massachusetts law, an attorney's statements are absolutely privileged 'where such statements are made by an attorney engaged in his function as an attorney whether in the institution or conduct of litigation or in conferences and other communications preliminary to litigation.'" Blanchette v. Cataldo, 734 F.2d 869, 877 (1st Cir. 1984) (quoting Sriberg v. Raymond, 345 N.E.2d 882, 884 (Mass. 1976)); Shirokov v. Dunlap, Grubb & Weaver, PLLC, 2012 WL 1065578, at *22 (D.Mass. March 27, 2012) (same). The privilege applies "not only in defamation cases, but as a general bar to civil liability based on the attorney's statements." Blanchette v. Cataldo, 734 F.2d at 877; see, e.g., Doe v. Nutter, McClennen & Fish, 668 N.E.2d 1329, 1331 (Mass.App.Ct. 1996) (affirming dismissal of chapter 93A claim and other state law claims based on litigation privilege). As shown by the cases MEEB cites, which include Blanchette and Nutter, McLennan & Fish, the privilege therefore ordinarily applies to chapter 93A claims.

The privilege serves the commendable "public policy of permitting attorneys complete freedom of expression and candor in communications in their efforts to secure justice for their clients." Sriberg v. Raymond, 345 N.E.2d at 884. Determining if it applies entails "a fact-specific analysis" on "a case-by-case

basis." <u>Giuffrida v. High Country Investor, Inc.</u>, 897 N.E.2d 82, 98 (Mass.App.Ct. 2008).  As the proponent of the privilege, MEEB has the burden to establish it.  <u>See Shirokov v. Dunlap, Grubb & Weaver, PLLC</u>, 2012 WL 1065578, at *22 ("as the parties asserting the privilege, the defendants have the burden of establishing entitlement to the privilege").

As previously explained with respect to the per se chapter 93A violations, the Attorney General of the Commonwealth is authorized to issue regulations to enforce chapter 93A's prohibition against unfair or deceptive acts or practices.  Mass. Gen. L. ch. 93A, § 2(c)); <u>Barnes v. Fleet National Bank, N.A.</u>, 370 F.3d 164, 176 (1st Cir. 2004).  Regulation 3.16(4) "states that violation of 'Federal consumer protection statutes' constitutes  a per se violation of Chapter 93A, § 2(a)." <u>Id.</u>  Notably, the plain and unambiguous language of the regulation does not expressly or impliedly create an exception for litigation activity.

Moreover, the only additional requirement for per se violations identified by the Massachusetts Supreme Judicial Court ("SJC") in <u>Hershenow</u> is causation.  <u>See Hershenow v. Enterprise Rent-A-Car Company of Boston, Inc.</u>, 840 N.E.2d at 532-533; <u>Haddad v. Gonzales</u>, 576 N.E.2d 658, 665 (Mass. 1991).  The causation requirement arises from language in section 9(1) as opposed to language in section two.  The SJC has yet to create an exception to per se chapter 93A liability for a federal consumer protection

statute encompassed by regulation 3.16(4) based on the litigation privilege. This federal court declines to restrict the reach of this category of chapter 93A liability by applying the litigation privilege and thereby sharply curtail per se chapter 93A liability of debt collectors who violate the FDCPA. Accordingly, the privilege does not apply to the per se chapter 93A claims based on the FDCPA violations.

MEEB also argues that plaintiff fails to establish actual damages under the FDCPA and chapter 93A. (Docket Entry # 61, § 52, p. 23). As previously noted, an FDCPA violation "constitutes a per se violation of ch. 93A." French v. Corporate Receivables, Inc., 489 F.3d at 403 n.1 (citing Barnes v. Fleet Nat. Bank, 370 F.3d at 176); Barnes v. Fleet Nat. Bank, 370 F.3d at 176 (collecting cases wherein FDCPA claims constitute per se violations of chapter 93A).[153] Establishing a violation of the FDCPA does not, however, automatically lead to an award of damages under chapter 93A. See Hershenow v. Enterprise Rent-A-Car Company of Boston, Inc., 840 N.E.2d at 533. A plaintiff seeking a remedy under chapter 93A, section nine, must still demonstrate that a per se violation of the FDCPA "caused a loss." Hershenow v. Enterprise Rent-A-Car Company of Boston, Inc., 840 N.E.2d at 533

---

[153] In finding that a violation of the FDCPA constitutes a per se violation of chapter 93A, the Barnes court relied on regulation 3.16(4), the same Massachusetts regulation relied upon by plaintiff.

("a plaintiff seeking a remedy under G.L. c. 93A, § 9, must demonstrate that even a per se deception caused a loss"); Kassner v. Chase Home Finance, LLC, 2012 WL 260392, at *9 (D.Mass. Jan. 27, 2012) ("[a] plaintiff seeking a remedy under Mass. Gen. L. c. 93A, § 9, must still demonstrate that even a per se deception caused an actual loss"); Mass. Gen. L. ch. 93A, § 9(1) (creating cause of action for "[a]ny person . . . *who has been injured* by another person's use or employment of any method, act or practice declared to be unlawful by section two or any rule or regulation issued thereunder") (emphasis added); see Haddad v. Gonzalez, 576 N.E.2d at 665 (actual damages "consist of all damages foreseeably flowing from an unfair or deceptive act or practice"); DiMarzo v. American Mutual Ins. Co., 449 N.E.2d 1189, 1200 (Mass. 1983) (under chapter 93A, "the plaintiff is entitled to recover for all losses which were the foreseeable consequences of the defendant's unfair or deceptive act or practice).

The SJC in Hershenow rejected the plaintiff's argument that a per se chapter 93A violation based on a state consumer protection statute within the reach of regulation 3.16(3) was by itself a "'per se injury' and that no more [was] needed to establish injury under G.L. c. 93A, § 9." Hershenow v. Enterprise Rent-A-Car Company of Boston, Inc., 840 N.E.2d at 533. Here too, a per se chapter 93A violation based on a federal consumer protection

statute such as the FDCPA[154] within the reach of regulation 3.16(4) does not constitute a per se injury under chapter 93A, section 9(1).

An injury under section 9(1) occurs when the unfair or deceptive act (the FDCPA violation) "caused loss of money, loss of property," "a personal injury loss such as emotional distress" or "'the invasion of any legally protected interest of another.'" Id. at 533; see also Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 57 (1st Cir. 1998) (dicta noting that the term "injury" with respect to section nine "is a broader term" than "'loss of money or property' under § 11" "and includes, for example, emotional distress"). Thus, by enacting the 1979 amendments to chapter 93A, the Legislature clarified its intent "to permit recovery when an unfair or deceptive act caused a personal injury loss such as emotional distress, even if the consumer lost no 'money' or 'property.'" Hershenow v. Enterprise Rent-A-Car Company of Boston, Inc., 840 N.E.2d at 533(citing Haddad v. Gonzalez, 576 N.E.2d at 665).

With these principles in mind, this court turns to the untimely FDCPA violations established above and the amount of damages, if any, plaintiff established under chapter 93A, section

---

[154] A violation of the FDCPA does not require the plaintiff to show actual damages. Som v. Daniels Law Offices, P.C., 573 F.Supp.2d at 356.

nine.[155]  Taking the FDCPA violations in chronological order, the first violation consists of the incorrect amount of the unit 105 debt in the "initial communication" in violation of section 1692g(a)(1).  The March 23, 2005 letter overstated the amount by $75.00.  (Ex. 9).  There is insufficient evidence to show that Bayview's May 2005 payment included the overstated $75.00 amount and, hence, that Bayview added the $75.00 to plaintiff's mortgage.  There is also insufficient evidence that MEEB received the additional $75.00 in the form of legal fees.[156]  Rather, Bayview's payment reflects the legal fees and costs in MEEB's invoices and the overdue condominium related charges.  Accordingly, the overstatement was not causally connected to a monetary loss or injury.  Plaintiff did not lose any property as a result of the violation.  As to any emotional or mental suffering, plaintiff disavowed receiving the letter and therefore disavowed any emotional and mental suffering as a result of the letter.  He also knew he was in arrears on late fees dating back eight months and condominium fees dating back to December 1, 2004.  In addition, he knew about Pondview's stated policy to take legal action against the unit owner after three consecutive months of non-payment of

---

[155]  Plaintiff's argument that he is entitled to damages measured by MEEB's unjust enrichment is addressed later in this opinion.

[156]  Plaintiff's request to measure damages based on a disgorgement of MEEB's profits is addressed later in this opinion.

condominium fees and late fees.  He also knew he was responsible

for the court costs.  (Ex. 1-4).  The per se deception of the

section 1692g(a)(1) violation therefore did not cause plaintiff

any emotional distress or mental anguish.

Turning to the April 2005 unit 104 and unit 105 suits, MEEB

violated section 1692e(2)(A)'s prohibition against falsely

representing "the character . . . or legal status" of the debt

because the complaints depicted the assessed amounts as having

"not been paid when due."  (Ex. 15 & 16).  Each suit stated that

the assessed amounts "have not been paid when due."  (Ex. 15 &

16).  The figures, however, included attorney's fees and costs

that were not due at that time.  MEEB additionally violated the

same prohibition by stating that the delinquency, i.e., the

assessed amounts, had "existed for at least sixty days."  (Ex. 15

& 16).  The violations resulted in larger amounts for the "common

expenses" figure stated in paragraph five of the April 2005 unit

104 suit and paragraph six in the April 2005 unit 105 suit.

Respectively, the amounts were larger by $1,138.00 and $1,869.00[157]

MEEB committed the same section 1692e(2)(A) violations with

respect to six of the seven other suits resulting in the

aforementioned increases in the "common expenses" figure stated in

the first fact paragraph in each of the six complaints.

---

[157]  The $1,869.00 figure consists of the legal fees for unit
105 for filing the complaint up to and including the April 28,
2005 filing date.

Here, plaintiff fails to show that these per se violations caused him a monetary or a property loss.  See Hershenow v. Enterprise Rent-A-Car Company of Boston, Inc., 840 N.E.2d at 533 (a chapter 93A plaintiff "must demonstrate" that "a per se deception caused a loss").  Plaintiff was at all relevant times responsible for the attorney's fees and costs.  The fees and costs became due within a short period of time.  The fact that MEEB falsely represented the character or legal status of the debt because the attorney's fees and costs were not due at the time MEEB filed each suit or because they were not delinquent for at least 60 days did not cause plaintiff a pecuniary injury. Plaintiff never lost the use of any money by, for example, paying the amounts that were not due at that time.

As to an emotional or mental injury, plaintiff adequately establishes a causal connection between the per se deceptions and an emotional or mental injury with respect to the April 2005 suits and the October 2005 and June 2006 unit 105 suits.  These four suits all significantly overstated the amount of the common expenses that were "not paid when due" and were not "duly assessed" because they included the legal fees for filing the complaints.  In contrast, the subsequent suits did not significantly overstate the amount of common expenses in relation to the actual amount of common expenses and, by that time, this court finds that plaintiff fully expected the inclusions.

Turning to the amount of damages plaintiff suffered vis-à-vis these first four suits, plaintiff was in a vulnerable state as a result of the recent deaths of his parents.  On the other hand, he received the March 23 and 31, 2005 letters and therefore experienced less of a shock or surprise by virtue of the common expenses figure in the two April 2005 suits.  With respect to all four suits, plaintiff knew he was responsible for the legal fees even though such fees had not been duly assessed or not paid when due at the time MEEB filed these suits.  On balance, this court finds that the per se deceptions caused an emotional and mental injury in the amount of $4,500.00.

The next per se chapter 93A violation based on the FDCPA consists of the false representations of the amount of the debt in the May 2, 2005 letter in violation of section 1692e(2)(A).  MEEB overstated the amount of the legal fees for unit 104 by $195.00 and for unit 105 by $167.00.  Again, there is insufficient evidence of a monetary injury or property loss.  The evidence fails to establish that Bayview's May 2005 payment included the overstated $167.00 amount for unit 105 and, hence, that Bayview added the $167.00 to plaintiff's mortgage.  There is also insufficient evidence that MEEB received the additional amounts of $195.00 and $167.00 in the form of legal fees.  The facts demonstrate that these fees are not contained in MEEB's invoices for March, April and May of 2005.  Ledgers reflecting the Bayview

183

183

payment for unit 105 show the same amounts of legal fees in MEEB's invoices for March, April and May 2, 2005.  Accordingly, plaintiff fails to demonstrate that these per se violations caused him a financial loss.  They did not cause him a property loss.

Plaintiff nonetheless was emotionally and mentally impacted by the May 2, 2005 letter.  Shortly after receiving it, he telephoned MEEB and asked to speak with Brooks.  See generally Sweetland v. Stevens & James, Inc., 563 F.Supp.2d at 303 (noting that the plaintiff contacted her attorney after debt collector's telephone threatening calls as support for finding emotional distress damages, albeit under section 1692k, resulting from violation and awarding $2,500.00 in actual damages).  Plaintiff was concerned because the letter stated that he owed several thousand dollars.  Because of the overstated and false representations of the amount of the legal fees for each unit, plaintiff actually owed less money than the stated amount.  Specifically, plaintiff actually owed $195.00 less than the $1,389.00 amount of legal fees for unit 104 and $167.00 less than the $1,772.00 amount of legal fees for unit 105.  Taking into account plaintiff's relatively unconvincing demeanor and other circumstances, including his depression, this court finds that plaintiff experienced emotional distress damages in the amount of $500.00.

Turning to the first May 17, 2005 letter, MEEB incorrectly

184

stated the amount of the debt by including two, duplicate legal fees for March 2005. The letter added the attorney's fees for unit 104 ($348.00) and unit 105 ($536.00) twice to the balance as of May 17, 2005. (Ex. 22). MEEB therefore made two false representations of the amount of the debt in violation of section 1692e(2)(A). Plaintiff knew he was responsible for the legal fees and the duplication had no effect on plaintiff's emotional state. MEEB also promptly corrected the errors in the second May 17, 2005 letter. (Ex. 24). On balance, this court finds that plaintiff did not experience any mental or emotional injury. He also did not experience a loss of money or property. In short, he failed in his burden to demonstrate the necessary causal connection between MEEB's false representation and a loss. Likewise, he failed in his burden to show the necessary causal connection to an injury with respect to the understated legal fees "THROUGH 5/17/05" in the May 17, 2005 letter.

The May 17, 2005 letter also included a dismissal fee of $150.00 in the ledger for each unit that was a false representation of the amount of the debt. See 15 U.S.C. § 1692e(2)(A). Brooks changed the dismissal fee to the correct amount ($75.00) on May 27, 2005, for unit 105. MEEB did not include the $150.00 dismissal fee on its invoices and Bayview did not pay the fee or add it to plaintiff's mortgage. MEEB charged $75.00 for the dismissal which Bayview paid and added to

plaintiff's mortgage.  The mortgage for unit 105, which included
the condominium rider, allowed Bayview to add the dismissal fee to
the debt secured by the security agreement.  Hence, MEEB's
violation of section 1692e(2)(A) by stating the false amount of
the dismissal fee as $150.00 as opposed to $75.00 in the unit 105
ledger attached to the letter did not result in any monetary or
property loss to plaintiff.  Based on the evidence, this court
also finds that the violation did not cause any emotional or
mental loss to plaintiff.  With respect to this violation,
plaintiff's emotional distress and depression at this time
resulted solely from the loss of his parents.

As to the inclusion of the $150.00 dismissal fee in the
attached unit 104 ledger, plaintiff did not suffer a pecuniary
loss because the dismissal fee eventually paid ($275.00)[158] was
greater than the $150.00 fee.  MERS paid the $275.00 fee as part
of the July 31, 2008 payment of $34,813.40.  In accordance with
the terms of the mortgage, including the condominium rider, MERS
added the amount to the debt under the security agreement.  In
light of plaintiff's demeanor on cross examination and his failure
to testify about the dismissal fee as causing an emotional loss,
MEEB's per se deception did not cause any emotional or mental loss
to plaintiff.  As noted above, plaintiff's emotional distress and

---

[158]  See footnote 80 and related text.  Plaintiff does not
discuss, let alone raise an argument, that the $275.00 dismissal
fee violated section 1692e(2)(A).  See fn. 81 & 113.

depression at this time resulted from the loss of his parents,
including the loss of his mother five months earlier.

The next FDCPA violation occurred in the two, October 4, 2005
letters.  Both letters, one a 60 day letter and the other a notice
of intent to collect rent letter, included the false
representation of the amount of the debt "incurred though the date
of this letter."  (Ex. 25 & 26).  The stated amount in each letter
was $1,098.14.  MEEB violated section 1692e(2)(A) because the
letters stated the debt as $1,098.14 when in fact the debt was
actually $1,380.14 as of October 4, 2005.  The fact that MEEB
understated as opposed to overstated the amount of the debt
evidences a lack of any financial or emotional loss.  Moreover,
plaintiff did not testify that these letters or MEEB's misconduct
of understating the amounts caused him to experience any emotional
or mental harm.  He did not visit any medical professional at or
around this time.  He took antidepressant medication prior to this
violation as well as prior to all the other FDCPA violations
committed by MEEB.  Given the absence of a causal connection to a
loss, plaintiff is not entitled to a chapter 93A damages award
based on these per se deceptions in the two October 4, 2005
letters.[159]

---

[159]   The absence of the necessary causal connection here and
elsewhere also precludes a damages award in the amount of $25.00
under section 9(3) of chapter 93A.  See Hershenow v. Enterprise
Rent-A-Car Company of Boston, Inc., 840 N.E.2d at 533 n.18.

The next per se chapter 93A violation results from the section 1692c(b) violations based on MEEB's letters to Bayview, Aegis, M & T or MERS' attorney. (Ex. 38, 42, 45, 47, 55, 59, 60 & 68). The letters either respond to payoff requests or confirm a payment. Plaintiff asserts that the communications led to payments in excess of the priority amounts as well as payments of attorney's fees. (Docket Entry # 60, ¶ 16, pp. 13-14 & § 1(b)). With respect to four of the letters (Ex. 42, 47, 55 & 68), there is insufficient evidence that the letters caused any of the recipients to make a payment or caused any negative impact to plaintiff. These letters are not temporally tied to any payment on the part of the recipient.

The November 30, 2005 letter to Bayview identified the amount of outstanding unit 105 debt. (Ex. 38). Plaintiff did not receive the letter. Bayview paid the amount ($3,015.55) by check dated December 15, 2005, made payable to Pondview. (Ex. 41). Pondview credited the amount to plaintiff's unit 105 account and Bayview added the amount to the mortgage. Plaintiff was responsible for the entire amount, including the attorney's fees, by virtue of The Declaration of Trust and chapter 183A, section six. MEEB's per se deception, i.e., the communication to M & T in violation of section 1692c(b), therefore did not cause plaintiff a monetary loss or a loss of property. Plaintiff's unconvincing demeanor belies the existence of any emotional distress or mental

anguish caused by MEEB's communication to M & T in violation of section 1692c(b).

The same reasoning applies to the January 31, 2007 communication (Ex. 59) and the February 15, 2007 communication (Ex. 60) confirming the $2,226.83 payment (Ex. 60).  Plaintiff thus fails in his burden to demonstrate that these per se deceptions caused him a loss of money or property or an emotional or other injury within the meaning of section 9(1) of chapter 93A.

The August 18, 2006 letter communicated the amount of the unit 104 debt to M & T as $3,454.00.[160]  (Ex. 45).  Shortly thereafter, M & T paid $3,454.00 by check dated August 29, 2006, made payable to Pondview.  M & T added the amount to plaintiff's mortgage.[161]  Pondview credited the entire amount to the unit 104 account.  Again, by virtue of the Declaration of Trust and chapter 183A, plaintiff was responsible for the entire amount. Plaintiff's unconvincing demeanor belies the existence of any emotional distress or mental anguish.  Plaintiff thus fails in his burden to show that the per se deception of the communication caused a monetary, property or emotional loss.  See Hershenow v. Enterprise Rent-A-Car Company of Boston, Inc., 840 N.E.2d at 533

---

[160]  The factual background identifies the amounts included in this figure.

[161]  Plaintiff makes no argument and provides no evidence that he paid a greater amount due to any interest paid on the mortgage.  See fn. 81 & 113.

("a plaintiff . . . must demonstrate that even a per se deception caused a loss").

Turning to the next per se violation, MEEB filed the multiple unit 105 suits in June 2007 and October 2007 seeking significant amounts of duplicate legal fees in violation of section 1692d. The misconduct caused plaintiff emotional distress. See generally Gathuru v. Credit Control Services, Inc., 623 F.Supp.2d at 123-124. Again, however, plaintiff did not seek medical attention as a result of this misconduct. He took antidepressant medication years before these violations. On the other hand, the amount of duplicate legal fees sought was significant. Plaintiff was in an emotionally vulnerable state in light of his parents' deaths, the pending foreclosure of unit 105 and the actual foreclosure of unit 105 in September 2007. On balance and given the discrepancies in plaintiff's testimony, this court finds an award of $5,000.00 in mental anguish and emotional distress damages causally connected to these per se violations.[162]

Plaintiff also testified to incurring several thousand dollars in copying costs as a result of the ongoing litigation over the condominium assessments. These costs foreseeably flow from MEEB filing the nine lawsuits. See Haddad v. Gonzalez, 576

---

[162]  In making this chapter 93A damages award here and elsewhere, this court has considered MEEB's argument relative to third party fees. (Docket Entry # 61, ¶ 51, p. 22). The argument is moot inasmuch as this court did not award any such fees paid to MEEB.

N.E.2d at 665 ("actual damages in this context consist of all damages foreseeably flowing from an unfair or deceptive act or practice"). Two of those lawsuits included the proscribed harassing and abusive conduct of seeking duplicate legal fees in a significant amount in violation of section 1692d. Out of pocket costs are compensable under chapter 93A. <u>See</u> <u>Wendt v. Barnum</u>, 2007 WL 1783870, at *2 (Mass.App.Div. June 18, 2007) (actual damages under chapter 93A allow "the court to consider out-of-pocket expenses"). Recognizing that certain suits generated greater activity and that the violation involves two of the nine lawsuits, an award of $400.00 is appropriate.

Except for these out of pocket copying costs, there was no causal connection between the per se unfair or deceptive conduct and a monetary loss or loss of property. It is true that the May 2007 foreclosure notice provided an impetus to MEEB's decision to file the June 2007 unit 105 suit because of its perceived need to protect a six month priority lien.[163] Plaintiff, however, failed in his burden to show that the inclusion of the multiple legal fees in the June 2007 unit 105 suit caused the September 2007 foreclosure and loss of property. <u>See</u> <u>Hershenow v. Enterprise Rent-A-Car Company of Boston, Inc.</u>, 840 N.E.2d at 533 ("a plaintiff seeking a remedy under G.L. c. 93A, § 9, must

---

[163] As previously indicated, although the decision was reasonable and made in good faith it was not legally correct.

demonstrate that even a per se deception caused a loss"); <u>Haddad v. Gonzalez</u>, 576 N.E.2d at 665 (actual damages consist of damages "foreseeably flowing" from the "unfair or deceptive act or practice"). Rather, this court draws the reasonable inference and the factual finding that the September 2007 foreclosure arose solely because of the lender's decision and plaintiff's failure to pay the mortgage debt. MEEB's per se deception did not cause plaintiff's failure to pay his mortgage debt or contribute to the foreclosure decision.

Turning to the next per se chapter 93A violation, MEEB violated section 1692c(a)(2) by sending plaintiff, as opposed to his attorney, the 60 day delinquency letters on October 10, 2007, and June 30 and September 16, 2008. For reasons previously explained, these three per se unfair or deceptive practices did not cause plaintiff a loss. <u>See</u> <u>Hershenow v. Enterprise Rent-A-Car Company Of Boston, Inc.</u>, 840 N.E.2d at 533.

As a final matter, plaintiff seeks a disgorgement of MEEB's profits as the measure of his economic damages under an unjust enrichment theory of recovery. MEEB asserts that unjust enrichment or disgorgement of profits does not apply given the absence of a special or fiduciary relationship or an intentional interference with contractual relations.

In Massachusetts, "An accounting of profits-an approximation of the defendant's 'unjust enrichment'-often joined with an

injunction, has been a well understood feature of actions for 'business torts' such as unfair competition (passing off), and trade name, trademark, and copyright infringement." <u>National Merchandising Corp. v. Leyden</u>, 348 N.E.2d 771, 775 (Mass. 1976) (interference with contractual relations); <u>see</u>, <u>e.g.</u>, <u>Melo-Tone Vending, Inc. v. Sherry, Inc.</u>, 656 N.E.2d 312, 315 (Mass.App.Ct. 1995) ("tainted profits" resulting from intentional interference with contract were appropriate measure of damages and doubled under chapter 93A based on willful conduct).  The measure of damages for business torts "such as the misappropriation of trade secrets entitles a plaintiff to recover full compensation for his lost profits and requires a defendant to surrender the profits which he realized from his tortious conduct." <u>Jet Spray Cooler, Inc. v. Crampton</u>, 385 N.E.2d 1349, 1356 (Mass. 1979).  As explained by the SJC in <u>Jet Spray</u>, "'Public policy requires that unfair competitors must not be allowed to profit by their wrongful methods and that those who have been injured by them should receive adequate compensation for the loss or injury they have suffered.'" <u>Id.</u>

Disgorgement of profits is also an appropriate measure of damages for a willful breach of fiduciary.  <u>See</u> <u>Berish v. Bornstein</u>, 770 N.E.2d at 978 ("measure of recovery for a wilful breach of fiduciary duty that results in personal financial gain to the trustee may include disgorgement of the amount of the

gain"). Similarly, an employee who breaches a fiduciary duty of loyalty may also be required to forfeit his compensation. See Boston Children's Heart Foundation, Inc. v. Nadal-Ginard, 73 F.3d 429, 435 (1st Cir. 1996); Chelsea Industries, Inc. v. Gaffney, 449 N.E.2d 320, 326-327 (Mass. 1983). Likewise, when "a corporate fiduciary obtains a gain or advantage through a violation of his duty of loyalty, a court may properly order restitution of the gain, so as to deny any profit to the wrongdoer and prevent his unjust enrichment." Demoulas v. Demoulas Super Markets, Inc., 677 N.E.2d 159, 195 (Mass. 1997).

Here, plaintiff suffered only a minimal economic injury causally connected to the FDCPA violations. The damages sought by plaintiff in the form of all of MEEB's attorney's fees is not appropriate under the facts. Furthermore, there was no fiduciary relationship between Pondview and plaintiff let alone between MEEB and plaintiff. See Office One, Inc., v. Lopez, 769 N.E.2d. at 759 ("members of a governing board of a condominium association, in the capacity of the trustees here, owe no fiduciary duty to individual condominium unit owners"). Although plaintiff asserts that MEEB tortuously interfered with plaintiff's relationship with Pondview (Docket Entry # 60, p. 33), plaintiff never pled an interference with contractual relations claim. Disgorgement of profits is not a proper measure of damages under the

194

circumstances.[164]

C.   Independent Violations of Chapter 93A

     As previously discussed, the post trial brief argues that the FDCPA violations are unfair and deceptive acts in violation of chapter 93A.  It does not identify an independent chapter 93A violation.  Without elucidating the independent chapter 93A violation, the complaint alleges that MEEB's actions are unfair and deceptive acts under chapter 93A "independent" and "irrespective of" the FDCPA violations.  (Docket Entry # 1, ¶ 75).  The chapter 93A demand letter focuses on the FDCPA violations as unfair and deceptive acts under chapter 93A, section two.  (Ex. 79).

     Plaintiff nevertheless repeatedly argues that MEEB acted in bad faith.  According to plaintiff, MEEB engaged in intentional and deliberate conduct all designed to escalate its legal fees.  (Docket Entry # 60).  The facts do not support an egregious or intentional escalation of legal fees.  Although the relationship between MEEB and plaintiff extended a number for years, the section two violations were not as extensive.  As a means to establish a willful or knowing violation under section 9(3) of chapter 93A, it is unsuccessful.  Under the facts, MEEB's per se chapter 93A violations were neither willful nor knowing violations

---

    [164]  It is therefore not necessary to address MEEB's alternative argument that plaintiff's adequate remedy at law precludes this measure of damages.

of section two.  See generally Heller v. Silverbranch Construction

Corp., 382 N.E.2d 1065, 1070 (Mass. 1978) (willful or knowing "is

directed against callous and intentional violations of the law and

permits" multiple damages where "the defendant wilfully or

knowingly employed an unfair or deceptive practice"); Smith v.

Jenkins, 818 F.Supp.2d 336, 345 (D.Mass. 2011) ("[w]illful and

knowing means that one not only knows in fact that what was

represented was not true, but knew that he did not know whether

such a representation was true before making it").  Out of an

abundance of caution, this court turns to whether these

allegations create a viable independent chapter 93A claim.

Substantive liability under chapter 93A "requires a showing

of conduct that (1) falls within the penumbra of some common-law,

statutory, or other established concept of unfairness; (2) is

immoral, unethical, oppressive, or unscrupulous; and (3) causes

substantial injury to consumers or other business persons."  Jasty

v. Wright Medical Technology, Inc., 528 F.3d 28, 37 (1st Cir.

2008) (internal quotations marks, brackets and citations omitted);

accord Rodi v. Southern New England School of Law, 532 F.3d 11, 19

(1st Cir. 2008).  For example, "making a loan that the lender

knows cannot be paid back may be an 'unfair or deceptive act or

practice'" under section 2(a) thereby "giving the borrower a cause

of action."  Frappier v. Countrywide Home Loans, Inc., 645 F.3d 51,

56 (1st Cir. 2011) (discussing Commonwealth v. Fremont Investment

& Loan, 897 N.E.2d 548 (Mass. 2008)).

Under the facts, MEEB's conduct was neither unfair nor deceptive.  Its communications with plaintiff's mortgagees seeking to enforce the rights of its client, Pondview, falls significantly short of this threshold.

MEEB did not engage in filing frivolous, baseless or meritless suits for an ulterior motive.  See Northeast Data Systems, Inc. v. McDonnell Douglas Computer Systems Co., 986 F.2d 607, 611 (1st Cir. 1993) (abuse of process claim "with nothing more does not state a violation of Chapter 93A"); Quaker State Oil Refining Corp. v. Garrity Oil Co., Inc., 884 F.2d 1510, 1514 (1st Cir. 1989).  MEEB's conduct was not threatening, oppressive or coercive or otherwise unethical or unscrupulous.  See generally Abraham v. American Home Mortgage Servicing, Inc., 2012 WL 4482236, at *4 (D.Mass. Sept. 27, 2012) ("[b]ecause Deutsche Bank was entitled to foreclose on Abraham's home, its conduct cannot subject it to liability under Chapter 93A").  The Declaration of Trust and chapter 183A allowed MEEB to collect the legal fees and other overdue condominium charges.  Although MEEB misread the reach of the priority lien under chapter 183A, section 6(c), its conduct constituted no more than a good faith dispute that the priority lien was owed by plaintiff's mortgagees.  See Duclersaint v. Federal National Mortgage Association, 696 N.E.2d 536, 540 (Mass. 1998) (noting that "a good faith dispute as to whether

money is owed, or performance of some kind is due, is not the stuff of which a c. 93A claim is made"). In short, any alleged independent chapter 93A violation based upon MEEB's alleged bad faith conduct of escalating its legal fees is not supported by the facts and lacks merit.[165]

Plaintiff additionally requests up to three but not less than two times the amount of actual damages because of MEEB's refusal to tender any relief in response to the chapter 93A demand letter. The December 11, 2008 demand letter stated that plaintiff's damages exceeded $200,000.00 and warned MEEB that, absent a reasonable written settlement offer within 30 days, plaintiff will be entitled to up to three times the amount of actual damages.

Section 9(3) in pertinent part states that:

> recovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of said section two or that the refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated said section two.

Mass. Gen. L. ch. 93A, § 9(3). The bad faith refusal to offer relief in response to a demand letter "is an attempt to promote prelitigation settlements by making it unprofitable for the defendant either to ignore the plaintiff's request for relief or to bargain with the plaintiff with respect to such relief in bad

---

[165] It is therefore not necessary to address whether the litigation privilege bars any independent chapter 93A claim.

faith." <u>Heller v. Silverbranch Construction Corp.</u>, 382 N.E.2d at 1070. "The standard is objective and requires the defendant to investigate the facts and consider the legal precedents." <u>Id.</u>

The eight page, single spaced response to the demand letter evidences that MEEB fully investigated the facts. MEEB did not ignore the demand letter. The letter details the facts and frames a number of reasonable, albeit unsuccessful, legal defenses to per se chapter 93A liability based upon the FDCPA violations. In light of such defenses, MEEB did not act in bad faith by failing to tender a settlement offer or enter into bargaining negotiations in response to the demand letter. MEEB's letter denies certain facts and elaborates upon other alleged facts which objectively justify the failure to offer a settlement amount.

As a final remaining issue, on September 29, 2011, this court denied as moot plaintiff's motion in limine seeking to preclude the entry into evidence of the "rulings, findings, or judgments"[166] in state court to prove claim or issue preclusion.[167] (Docket Entry # 30). The ruling stated that this court will address the preclusion issues including plaintiff's arguments, if necessary. To complete the record, this court turns to plaintiff's arguments

---

[166] The April 2005 unit 104 suit and the June 2006 unit 105 suit constitute the state court suits in which the courts issued findings in addition to judgments.

[167] As explained in the September 29, 2011 Order, defendant did not properly file its alleged motion in limine to preclude litigation on previously determined issues.

(Docket Entry # 30) in the context of defendant's opposition to the motion (Docket Entry # 37).[168]

Massachusetts law governs "the preclusive effect of a Massachusetts judgment."  Iantosca v. Step Plan Services, Inc., 604 F.3d 24, 30 (1st Cir. 2010).  Issue preclusion bars relitigation of the same "issues even in the context of a suit based on an entirely different claim."  In re Sonus Networks, Inc., Shareholder Derivative Litigation, 499 F.3d 47, 56 (1st Cir. 2007).  In order to apply the doctrine, Massachusetts law requires that:

> (1) there was a final judgment on the merits in the prior adjudication; (2) the party against whom preclusion is asserted was a party (or in privity with a party) to the prior adjudication; and (3) the issue in the prior adjudication was identical to the issue in the current adjudication.

Id.  In addition, "the issue decided in the prior adjudication must have been essential to the earlier judgment."  Id. Defendant, as the "party invoking the doctrine of issue preclusion[,] has the burden of demonstrating that the doctrine applies."  Day v. Kerkorian, 814 N.E.2d 745, 750 (Mass.App.Ct. 2004).

Defendant's 12 requests in the opposition are moot because

---

[168]  Defendant relies on issue preclusion as opposed to claim preclusion.  (Docket Entry # 37; Docket Entry # 21, p. 5).  It is therefore not necessary to address the latter doctrine.

this court independently made similar findings.[169]  Furthermore, a number of the requests include "issues" that were neither decided nor essential to the decisions.  Hence, defendant either fails in its burden to establish issue preclusion or the request on the particular issue is moot.  Correspondingly, it is therefore not necessary to address the arguments plaintiff raises in the motion in limine (Docket Entry # 30) seeking to bar the introduction of evidence for purposes of claim or issue preclusion.

III.  Prejudgment Interest

Plaintiff seeks prejudgment interest at a rate of 12%. (Docket Entry # 60, p. 37).  Defendant does not address the issue in the post trial brief.

"[P]rejudgment interest is a substantive remedy governed by state law when state-law claims are brought in federal court." Tobin v. Liberty Mutual Insurance Co., 553 F.3d 121, 146 (1st Cir. 2009).  Massachusetts General Laws chapter 231, section 6B ("section 6B"), imposes a 12% per annum prejudgment interest rate "for pecuniary damages for personal injuries."  Mass. Gen. L. ch. 231, § 6B.  An award of prejudgment interest on the chapter 93A compensatory award is therefore appropriate.  See Gore v. Arbella Mutual Insurance Co., 932 N.E.2d 837, 853 (Mass.App.Ct. 2010) (awarding prejudgment interest under section 6B on chapter 93A

---

[169]  Footnotes 57 and 73 contain explanations with respect to requests 11 and 12.

compensatory award).  Prejudgment interest under section 6B ordinarily runs "from the date of commencement of suit to the date on which judgment is entered."  <u>Tobin v. Liberty Mutual Insurance Co.</u>, 553 F.3d at 146.

With the exception of the statutory damages award ($800.00) under section 1692k, the damages award arises under the chapter 93A claim.  Prejudgment interest awarded under a "chapter 93A action may only be applied to the actual damages suffered, not to the multiple punitive damage award.'"  <u>Smith v. Jenkins</u>, 818 F.Supp.2d 336, 348 (D.Mass. 2011) (quoting <u>Trenwick America Reinsurance Corp. v. IRC, Inc.</u>, 2011 WL 2009919, at *1 (D.Mass. May 23, 2011)).  An award of prejudgment interest at the 12% per annum rate therefore applies to the $10,400.00 chapter 93A award accruing from the February 3, 2009 filing of the complaint. Excluding February 3, 2009, <u>see</u> Rule 6(a)(1), Fed. R. Civ. P., and including today, amounts to 1,360 days.  The applicable calculation is "the amount of single damages multiplied by the daily interest rate (annual rate ÷ 365) multiplied by the number of days from date interest began to run."  48 Jordan Shapiro, Marc Perlin & John Connors, <u>Massachusetts Practice Series</u> § 7:27 (2009).  The calculation ($10,400.00 x (12% ÷ 365 = .0003287) x 1,360) yields a prejudgment interest award of $4,649.

In sum, the final judgment will therefore include the $800.00 statutory damages award under section 1692k(a)(2), the $10,400.00

damages award under chapter 93A and the $4,649.00 prejudgment interest award.  This court will address the issues of a reasonable attorney's fee award, <u>see</u> Mass. Gen. L. ch. 93A, § 9(4), after entry of a final judgment.

<u>CONCLUSION</u>

In accordance with the foregoing discussion, plaintiff is entitled to $800.00 in damages under Count One and $10,400.00 in damages under Count Two including prejudgment interest in the amount of $4,649.00.  A final judgment will issue.  This court will conduct a status conference to set a briefing schedule for the attorney's fees issues on December 17, 2012, at 2:30 p.m.

       /s/ Marianne B. Bowler    
**MARIANNE B. BOWLER**
United States Magistrate Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WILLIAM M. MCDERMOTT,
    Plaintiff,

    v.                               CIVIL ACTION NO.
                                            09-10159-MBB

MARCUS, ERRICO, EMMER & BROOKS, P.C.,
    Defendant.

---

**FINAL JUDGMENT**

**November 20, 2012**

**BOWLER, U.S.M.J.**

    The issues having been duly tried before this court and decisions rendered,

    It is **ORDERED** and **ADJUDGED** that plaintiff William M. McDermott recover of defendant Marcus, Errico, Emmer & Brooks, P.C. the sum of $11,200.00 with prejudgment interest of $4,649.00 along with costs.


                                                 /s/ Marianne B. Bowler
                                          **MARIANNE B. BOWLER**
                                          United States Magistrate Judge

204

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WILLIAM M. MCDERMOTT,
        Plaintiff,

        v.                                          CIVIL ACTION NO.
                                                    09-10159-MBB

MARCUS, ERRICO, EMMER & BROOKS, P.C.,
        Defendant.


**MEMORANDUM AND ORDER RE:**
**PLAINTIFF'S MOTION UNDER RULE 59(E) TO AMEND THE**
**JUDGMENT RELATIVE TO THE FINDINGS AND RULINGS**
**CONCERNING THE PRE-SUIT NOTICES UNDER G.L.C.**
**183A, § 6(C) (DOCKET ENTRY # 66); MOTION OF**
**THE DEFENDANT, MARCUS, ERRICO, EMMER & BROOKS,**
**P.C., FOR RECONSIDERATION AND/OR TO**
**ALTER AND AMEND JUDGMENT**
**(DOCKET ENTRY # 68)**

**August 26, 2013**


**BOWLER, U.S.M.J.**

        After a six day non-jury trial, this court issued findings
and conclusions under Rule 52(a), Fed. R. Civ. P., (Docket Entry
# 63) and a final judgment (Docket Entry # 64).  Both parties
filed timely motions to alter or amend the judgment under Rule
59(e), Fed. R. Civ. P. ("Rule 59(e)").  (Docket Entry ## 66 &
68).  After conducting a hearing, this court took the motions
under advisement.

        The two count complaint sets out violations of the Fair Debt
Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 ("section

1692") in Count One and section nine of Massachusetts General Laws chapter 93A ("chapter 93A") in Count Two.  Although the multitude of alleged FDCPA violations required extensive findings and conclusions, plaintiff William M. McDermott ("plaintiff") eventually recovered $800.00 in statutory damages under Count One and $10,400.00 in damages under Count Two including prejudgment interest in the amount of $4,649.00.[1]

In seeking Rule 59(e) relief, defendant Marcus, Errico, Emmer & Brooks, P.C. ("MEEB") requests reconsideration of the chapter 93A "trade or commerce" determination.  It also argues that the untimely conduct under the FDCPA's one year limitations period cannot serve as a predicate for a per se violation of chapter 93A.  MEEB further seeks reconsideration of the determination that per se chapter 93A violations are not protected by the litigation privilege.  MEEB maintains that the litigation privilege is absolute and bars any liability under chapter 93A.  As to the FDCPA, MEEB challenges the determinations that it violated section 1692i by filing suit in the wrong venue and section 1692c(b) by sending letters (Ex. 38, 42, 45, 47, 55, 59, 60 & 68) to plaintiff as opposed to his attorney.  (Docket Entry # 74).

Plaintiff urges reconsideration of the finding that MEEB did not violate section 6(c) of Massachusetts General Laws chapter

---

[1]  The amount of attorneys' fees remains outstanding.

183A ("chapter 183A"), the state condominium statute, when it failed to send notice of its intent to file suit at least 30 days in advance of filing suit to plaintiff's mortgagees. (Docket Entry # 67). Plaintiff asserts that this court erroneously determined that MEEB's failure to provide the mortgagees with a letter 30 days before filing suit did not violate either section 1692f or section 1692d. Finally, plaintiff argues that he suffered actual damages in the form of increased attorneys' fees and costs as a result of MEEB's failure to notify the mortgagees 30 days in advance of filing suit.

<u>BACKGROUND</u>[2]

Plaintiff, a resident of the Pondview condominiums in Lynn, Massachusetts, filed this action alleging improper debt collection activities on two residential condominium units at the 19 unit complex against MEEB, a professional corporation of attorneys located in Braintree, Massachusetts. Plaintiff, plaintiff's brother and/or plaintiff's parents owned the units at various times and, except for a one year period, plaintiff resided in one of the units.[3] Throughout the relevant time

---

[2] Familiarity with the facts, detailed in the November 2012 Memorandum and Order (Docket Entry # 63, pp. 3-65), is presumed. For present purposes, this court highlights a few of the relevant findings.

[3] The units are unit 104 and unit 105. Plaintiff was the borrower in the March 2003 and April 2005 mortgages on the units.

period, MEEB represented the Pondview Condominium Trust ("Pondview") in its efforts to collect monies plaintiff owed for unpaid condominium assessments, loan payback charges,[4] collection costs, including MEEB's attorneys' fees, and late fees.

Created under a September 1986 Declaration of Trust (Ex. B), Pondview is the governing body of the Pondview condominiums and consists of a group of volunteer trustees. The Declaration of Trust states that the trustees must be unit owners. (Ex. B).

The Declaration of Trust gives the trustees the authority to determine the assessment for each fiscal year and the unit owners' "respective shares of such assessment, according to their percentages of interest in the common areas and facilities."[5] (Ex. B, Art. V, § 5.3(B)). The Declaration of Trust allows for monthly payment of the assessment and, "[i]f not paid when due, the amount . . . shall constitute a lien on the unit." (Ex. B, Art. V, § 5.3(B)).[6] The Master Deed likewise provides that:

---

[4] The loan payback charge was either part of a special assessment or a line item in Pondview's budget.

[5] Chapter 183A requires Pondview to assess the common expenses "against all units in accordance with their respective percentages of undivided interest in the common areas and facilities." Mass. Gen. L. ch. 183A, § 6(a)(i).

[6] Chapter 183A similarly allows Pondview to assess an unpaid expense incurred by Pondview because of a unit owner's failure to abide by the requirements of chapter 183A or a master deed or trust "against the unit owner and such assessment shall constitute a lien against the unit . . .." Mass. Gen. L. ch. 183A, § 6(a)(ii).

4

208

> The Trustees in their discretion may enforce collection of
> unpaid assessments for common expenses plus interest thereof
> by enforcing the lien by a court action or by other lawful
> means on account of which there shall be added to the amount
> due and payable the reasonable costs of such collection
> including reasonable attorney fees.

(Ex. B, Art. V, § 5.3(C)).

In addition, the Master Deed submitted Pondview to the

"provisions of Chapter 183A." (Ex. C, p. 1); see Mass. Gen. L.

ch. 183A, § 1 (defining "Master deed" as "the instrument by which

the condominium is submitted to the provisions of this chapter").

The Declaration of Trust similarly grants the trustees the power

"to exercise all of the powers of the 'organization of unit

owners' pursuant to Massachusetts General Laws, Chapter 183A."

(Ex. B, Art. III, § 3.6). Under section six of chapter 183A,

"The organization of unit owners may . . . assess any fees,

attorneys' fees [and] late charges . . . against the unit owner."

Mass. Gen. L. ch. 183A, § 6(a)(ii). In short, under chapter

183A, the Declaration of Trust and the Master Deed, Pondview had

the ability and the authority to assess condominium fees,

attorneys' fees, late charges and costs of collection against a

unit owner such as plaintiff. See Mass. Gen. L. ch. 183A, §

6(a)(ii) & 6(b); (Ex. B, Art. V, § 5.3(C)).

In July and August of 2004, plaintiff fell behind in paying

his assessments, late fees and loan payback charges for both

units. Pondview did not hire or engage MEEB as its attorney,

however, until March 2005. MEEB's efforts to collect the debts

209

plaintiff owed to Pondview continued through the fall of 2008.
Plaintiff's failure to pay legitimately imposed charges led MEEB,
on behalf of its client Pondview, to file two collection suits
against plaintiff, as a unit owner, on April 28, 2005, in the
Massachusetts District Court Department (Lynn Division) ("Lynn
District Court").  MEEB filed these and an additional seven
collection suits in Lynn District Court except for the last
collection suit filed in September 2008 ("September 2008 unit 104
suit") in the Massachusetts Superior Court Department (Essex
County) ("Essex Superior Court").[7]

Beginning in May 2005, MEEB also communicated with
plaintiff's mortgagees without obtaining plaintiff's consent.
Section six of chapter 183A imposes a requirement on a
condominium association, such as Pondview, to send a letter to
the owner of a unit when any portion of a unit owner's share of
common expenses is delinquent for at least 60 days ("60 day
letter").  Section six also requires Pondview to send the first
mortgagee a 60 day letter and a notice 30 days in advance of
filing suit of its intention to file suit ("30 day notice
letter") "provided that the first mortgagee has informed the
condominium association of its name and mailing address."  Mass.
Gen. L. ch. 183A, § 6(c).

---

[7]  The complaint in this action summarily asserts that the
filing of the suit "in Essex Superior Court violated 15 U.S.C. §§
1692i."  (Docket Entry # 1, ¶ 35).

6

210

Plaintiff filed this suit on February 3, 2009. The FDCPA has a one year statute of limitations. 15 U.S.C. § 1692k(d). The delay in filing suit sharply curtailed the timely FDCPA violations committed by MEEB. In addition to a May 13, 2008 letter that violated section 1692c(b), this court found the following FDCPA timely violations: (1) MEEB violated section 1692c(a)(2) by sending plaintiff, as opposed to his attorney, a 60 day letter dated June 30, 2008 (Ex. 50);[8] (2) MEEB violated section 1692c(a)(2) by sending plaintiff, as opposed to his attorney, a 60 day letter dated September 16, 2008 (Ex. 76);[9] and (3) MEEB violated section 1692i by filing the September 2008 unit 104 suit in Essex Superior Court.

This court also found that MEEB committed a number of FDCPA violations outside the one year limitations period. These untimely FDCPA violations served as a basis for per se liability under chapter 93A. Examining MEEB's conduct independent of per se liability, this court additionally determined that such

_____

[8] MEEB does not seek reconsideration of this finding. The Rule 59(e) motion cites section 1692c(b), as opposed to section 1692c(a)(1), and it does not refer to or identify exhibit 50. Instead, the motion refers to the letters in "Exhibits 38, 42, 45, 47, 55, 59, 60, 68 and 69" and argues that these letters did not unlawfully disclose the debt to third parties in violation of section 1692c(b). (Docket Entry # 69, § V).

[9] For reasons stated in the previous footnote, MEEB does not seek reconsideration of this finding. These two letters (Ex. 50 & 76) provided a basis for the statutory award of damages in the amount of $800.00.

211

conduct was neither unfair nor deceptive under chapter 93A.

## DISCUSSION

Both parties seek relief under Rule 59(e).  "[T]o prevail on a Rule 59(e) motion, the moving party 'must either clearly establish a manifest error of law or must present newly discovered evidence.'"  <u>Markel American Ins. Co. v. Diaz-Santiago</u>, 674 F.3d 21, 32 (1st Cir. 2012); <u>see Prescott v. Higgins</u>, 538 F.3d 32, 45 (1st Cir. 2008) (same); <u>Kansky v. Coca-Cola Bottling Co. of New England</u>, 492 F.3d 54, 60 (1st Cir. 2007) (same).  "[A]n 'intervening change' in the controlling law" also provides a basis for Rule 59(e) relief.  <u>Soto-Padro v. Public Bldgs. Authority</u>, 675 F.3d 1, 9 (1st Cir. 2012); <u>Moran Vega v. Cruz Burgos</u>, 537 F.3d 14, 18 (1st Cir. 2008).  When successful, Rule 59(e) allows a court to reverse as well as to amend a prior judgment.  <u>See</u> <u>National Metal Finishing Co., Inc. v. BarclaysAmerican/Commercial, Inc.</u>, 899 F.2d 119, 123-124 (1st Cir. 1990).

Rule 59(e) does not allow a party to raise an argument that could and should have been raised before a judgment issued. <u>Markel American Ins. Co. v. Diaz-Santiago</u>, 674 F.3d at 32 (Rule 59(e) does not permit litigant to present new arguments that "'could, and should, have been made before judgment issued'"); <u>Fernandez-Vargas ex rel. C.J.P.F. v. Pfizer</u>, 522 F.3d 55, 67 n.5 (1st Cir. 2008) (same); <u>ACA Financial Guaranty Corp. v. Advest,</u>

212

Inc., 512 F.3d 46, 55 (1ˢᵗ Cir. 2008) (same); cf.
Venegas-Hernandez v. Sonolux Records, 370 F.3d 183, 191 (1ˢᵗ Cir.
2004) (noting this "usual rule" but finding it did not apply to
default judgment).  Overall, whether to consider an argument
raised in a Rule 59(e) motion entails "balancing the need for
finality of judgments with the need to render a just decision."
Venegas-Hernandez v. Sonolux Records, 370 F.3d at 191.

I.  MEEB'S RULE 59(e) MOTION

     A.  Trade or Commerce

     MEEB seeks reconsideration of the entire chapter 93A award
because MEEB's relationship to plaintiff, as a litigation
opponent of MEEB's client, does not constitute "trade or
commerce" under section 2(a) of chapter 93A.  (Docket Entry #
69).  This court rejected the trade or commerce argument as well
as the litigation privilege argument.  (Docket Entry # 63, pp.
169-177).

     Section 2(a) prohibits "unfair or deceptive acts or
practices in the conduct of trade or commerce."  Mass. Gen. L.
ch. 93A, § 2(a).  Section 2(c) provides that, "The attorney
general may make rules and regulations interpreting the
provisions of subsection 2(a) of this chapter" and that, "Such
rules and regulations shall not be inconsistent with the rules,
regulations and decisions of the Federal Trade Commission . . .
as from time to time amended."  Mass. Gen. L. ch. 93A, § 2(c).

213

Exercising the power conferred in section 2(c), the Attorney
General of the Commonwealth enacted 940 C.M.R. § 3.16
("regulation 3.16").  The regulation broadly declares that:

> . . . an act or practice is a violation of M.G.L. c.93A, § 2
> if:
>
> (1) It is oppressive or otherwise unconscionable in any
> respect; or
>
> (2) Any person or other legal entity subject to this act
> fails to disclose to a buyer or prospective buyer any fact,
> the disclosure of which may have influenced the buyer or
> prospective buyer not to enter into the transaction; or
>
> (3) It fails to comply with existing statutes, rules,
> regulations or laws, meant for the protection of the
> public's health, safety, or welfare promulgated by the
> Commonwealth or any political subdivision thereof intended
> to provide the consumers of this Commonwealth protection; or
>
> (4) It violates the Federal Trade Commission Act, the
> Federal Consumer Credit Protection Act or other Federal
> consumer protection statutes within the purview of M.G.L. c.
> 93A, § 2.

940 C.M.R. 3.16 (emphasis added).

Because of the breadth and reach of the language in
regulation 3.16, this court rejected MEEB's argument that it was
not engaged in trade or commerce.  (Docket Entry # 63, pp. 169-
174).  This court reasoned that if an act violates regulation
3.16(4) by violating the FDCPA, see In re Pharmaceutical Industry
Average Wholesale Price Litigation, 491 F.Supp.2d 20, 84 (D.Mass.
2007) ("[t]he types of federal statutes that courts have found to
be consumer protection statutes under section 3.16(4) include"
the FDCPA), the act automatically constitutes "unfair or

10

deceptive acts or practices in the conduct of trade or commerce."
Mass. Gen. L. ch. 93A, § 2(a).  Thus, because the regulation did
not require a "trade or commerce" showing and it globally
declared that the act was a violation of section two, a showing
of "trade or commerce" was not required.

After the Memorandum and Order issued and after the parties
filed the Rule 59(e) motions, the Massachusetts Supreme Judicial
Court issued an opinion rejecting this view.  <u>Klairmont v.</u>
<u>Gainsboro Restaurant, Inc.</u>, 987 N.E.2d 1247, 1255 (Mass. 2013).
The May 16, 2013 decision held that regulation 3.16(3), which has
language similar to regulation 3.16(4) except that the violation
is based on Massachusetts as opposed to federal consumer
protection law, is subject to a trade or commerce determination.
<u>Id.</u> (violation of state building code was not a per se violation
of chapter 93A unless "the conduct leading to the violation is
both unfair or deceptive and occurs in trade or commerce").  The
decision reads, in pertinent part, as follows:

> Section 2 (a) of c. 93A proscribes "unfair or deceptive acts
> or practices in the conduct of trade or commerce."  Although
> the language of 940 Code Mass. Regs. § 3.16(3) is
> unquestionably broad, by its terms it imposes the
> substantive limitation that the law or regulation at issue
> must be intended to protect consumers, and we further read
> the regulation as being bound by the scope of c. 93A, § 2
> (a).  In other words, under 940 Code Mass. Regs. § 3.16(3) a
> violation of a law or regulation, including a violation of
> the building code, will be a violation of c. 93A, § 2 (a),
> *only if the conduct leading to the violation is both unfair
> or deceptive and occurs in trade or commerce.*

11

215

Id. (emphasis added).[10]  This intervening change in the
controlling law provides a basis for Rule 59(e) relief.
Alternatively, it was a manifest error of law under Rule 59(e) to
find that the untimely FDCPA violations were per se violations of
chapter 93A without regard to whether MEEB was engaged in trade
or commerce under section 2(a).

It is therefore necessary to examine whether the conduct by
MEEB that led to the untimely FDCPA violations and per se chapter
93A liability took place in "trade or commerce."[11]  Ordinarily,
"the proper party to assert a c. 93A claim against an attorney is
a client or someone acting on a client's behalf."  Tetrault v.
Mahoney, Hawkes & Goldings, 681 N.E.2d 1189, 1195 (Mass. 1997)
(citing case law indicating that the client is the proper party).
Where, as here, the client (Pondview) is not asserting the

_____

[10]  To the extent the Andrews decision concludes otherwise,
see Andrews v. South Coast Legal Services, Inc., 582 F.Supp.2d
82, 89-90 (D.Mass. 2008), a decision by the Massachusetts Supreme
Court takes precedence over a decision by a federal district
court in deciding issues of state substantive law.  See Dykes v.
DePuy, Inc., 140 F.3d 31, 39 (1st Cir. 1998).  The federal
district court cases cited by plaintiff (Docket Entry # 73, p. 5)
are distinguishable on this basis.  They all involve violations
of the FDCPA as creating per se chapter 93A liability without
regard to a trade or commerce determination.  Klairmont teaches
otherwise.  Klairmont v. Gainsboro Restaurant, Inc., 987 N.E.2d
at 1255.

[11]  As set out in the Memorandum and Order, there was no
unfair or deceptive conduct with respect to the timely FDCPA
conduct or an independent violation of chapter 93A outside the
context of the per se liability based on the untimely FDCPA
violations.

chapter 93A claim, the attorney "must have been acting in a business context." Id. (citing First Enterprises, Ltd. v. Cooper, 680 N.E.2d 1163, 1165-1166 (Mass. 1997)); Miller v. Mooney, 725 N.E.2d 545, 551 (Mass. 2000) ("[a]s nonclients [the plaintiffs] must show the defendant was acting in a business context"); Akar v. Federal National Mortgage Association, 843 F.Supp.2d 154, 170 (D.Mass. 2012) ("'[c]hapter 93A claims can be brought against an attorney or a law firm,' but only when the attorney or law firm is 'acting in a business context vis-a-vis the plaintiffs'").

Section one of chapter 93A defines "trade" and "commerce" to "include the advertising, the offering for sale, rent or lease, the sale, rent, lease or distribution of any services and any property, tangible or intangible, real, personal or mixed" as well as any "contract of sale of a commodity for future delivery, and any other article, commodity, or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this commonwealth." Mass. Gen. L. ch. 93A, § 1(b); see also Riseman v. Orion Research Inc., 475 N.E.2d 398, 399 (Mass. 1985) ("definition of 'trade' and 'commerce' . . . is open-ended to a considerable degree because, although it states certain activities that are included, it does not exclude other activities"). "[U]se of the words 'distribution of any services' in conjunction with words such as

'sale' and 'lease' indicates an intent that the services be distributed in exchange for some consideration or that there must be other strong indications that the services are distributed in a business context." <u>Planned Parenthood Federation of America, Inc. v. Problem Pregnancy of Worcester, Inc.</u>, 498 N.E.2d 1044, 1051-1052 (Mass. 1986).

Interpreting section two and whether a party is engaging in trade or commerce by acting in a business context "depends on a number of factors including:  'the nature of the transaction, the character of the parties involved, and [their] activities . . . and whether the transaction [was] motivated by business or personal reasons.'" <u>Peabody N.E., Inc. v. Town of Marshfield</u>, 689 N.E.2d 774, 778 & n.6 (Mass. 1998) (interpreting section 2(a)).  The inquiry also entails factual determinations on the part of this court as the finder of fact.  <u>See</u> <u>Feeney v. Dell Inc.</u>, 908 N.E.2d 753, 770 (Mass. 2009) ("'[t]rade or commerce' refers to transactions in a 'business context,' which, in turn, is 'determined by the facts of each case'").

The underlying dispute in the case at bar is a private dispute between volunteer members of a condominium association and a condominium owner who failed to pay assessments and related charges.  <u>See</u> <u>Berish v. Bornstein</u>, 770 N.E.2d 961, 979 (Mass. 2002) (statute "is inapplicable to a private dispute between a condominium unit owners' association and a member of that

218

association for failure to pay condominium fees"); <u>Office One,
Inc. v. Lopez</u>, 769 N.E.2d 749, 759 (Mass. 2002).[12]
Pondview then hired MEEB to enforce this purely private
transaction.

Although the scale of MEEB's representation of condominium
associations is large, it did not inject itself into the external
marketplace in the course of its efforts to collect monies owed
to its client, Pondview.  <u>See</u> <u>First Enterprises, Ltd. v. Cooper</u>,
680 N.E.2d at 1165.  Throughout, MEEB's statements to plaintiff
and others were made to serve the interests of its client,
Pondview.[13]  <u>See</u> <u>First Enterprises, Ltd. v. Cooper</u>, 680 N.E.2d at
1165-1166 (attorney's "statements were not made to influence an
external marketplace but rather to secure for his client a
lump-sum payment for his client's shares in the plaintiffs'
business").  The nature of the relationship between MEEB and
plaintiff is that of adversaries on opposite sides of a dispute
that lead to multiple lawsuits.  <u>See</u> <u>Akar v. Federal National
Mortgage Association</u>, 843 F.Supp.2d at 171 (finding no trade or
commerce because "'only contact between the parties was on

---

[12]  This court previously distinguished <u>Berish</u> and <u>Office
One</u> because they did not involve per se chapter 93A violations
based on the FDCPA.  (Docket Entry # 63, p. 170).  In light of
<u>Klairmont</u>, this reasoning no longer applies.

[13]  This court disagrees with plaintiff's assessments of the
facts in terms of MEEB's motives and desires to act on behalf of
its client.

opposing sides of a dispute' involving the foreclosure of Akar's
property by Harmon's client, Wells Fargo"); <u>Altschuler v. Lamond</u>,
2006 WL 2588148, *2 (Mass.App.Div. Sept. 6, 2006) (when conduct
"occurs among adversaries embroiled in litigation, it is not
generally deemed to have been perpetrated in a business context"
and person is thereby not engaged in trade or commerce).
Moreover, "'The mere filing of litigation does not of itself
constitute "trade or commerce."'" <u>Milliken & Co. v. Duro</u>
<u>Textiles, LLC</u>, 887 N.E.2d 244, 260 (Mass. 2008); <u>see also</u> <u>Kurker</u>
<u>v. Hill</u>, 689 N.E.2d 833, 838 (Mass.App.Ct. 1998) (minority
shareholders claim against majority shareholders' attorneys
properly dismissed because it was not "the conduct of any trade
or commerce" under chapter 93A, section 11).

Here, MEEB filed the lawsuits to collect monies owed to and
incurred by Pondview as a result of plaintiff's delinquencies.
MEEB's motives were not unduly influenced by the desire to
increase its profits.  Contrary to plaintiff's view of the facts,
this court finds that MEEB was not being deceitful, purposefully
concealing its legal fees or its interactions with plaintiff's
mortgagees or unduly or improperly focusing on the collection of
its attorneys' fees to the exclusion of the interests of its
client.  MEEB's motives were based on a desire to represent its
client to the fullest extent possible in a vigorous and
aggressive manner.  <u>See also</u> <u>St. Paul Fire and Marine Insurance</u>

Co. v. Ellis & Ellis, 262 F.3d 53, 67 (1st Cir. 2001)
(distinguishing between "vigorous advocacy in pursuit of" the
client's legal claim and the use of litigation to add a veneer of
legitimacy to a fraudulent scheme that affects trade or
commerce).

Under the facts, MEEB's acts and practices in violation of
the FDCPA were not made "in the conduct of any trade or commerce"
under section 2(a).  The 1986 amendment to the FDCPA repealing
the exemption for attorneys from the definition of a "debt
collector" does not alter this factual finding.  In reaching the
above conclusion, this court is not applying the litigation
privilege.[14]  Rather, it is applying the definition of trade or
commerce to the facts of this case.  Correcting the
aforementioned manifest error of law and in light of the
intervening change in the controlling law, MEEB is not liable
under chapter 93A given the absence of the required trade or
commerce under section 2(a).[15]  See generally Coons v. Industrial
Knife Co., Inc., 620 F.3d 38, 41 (1st Cir. 2010) ("'the entry of a
judgment against the party that was entitled to judgment as a

---

[14]   The Memorandum and Order addresses the litigation
privilege and the FDCPA's application to litigation activity.
(Docket Entry # 63, pp. 174-176).

[15]   It is therefore not necessary to address MEEB's
alternative challenges under Roman numerals II and III in the
supporting memorandum (Docket Entry # 69) to its liability under
chapter 93A.

matter of law—the predicate for granting a motion for judgment notwithstanding the verdict—could easily be thought a manifest error' that would justify amendment of the judgment under Rule 59(e)").

B.  <u>FDCPA</u>

MEEB's challenges to the FDCPA violations found by this court are twofold.  First, on the basis of two arguments, it seeks reconsideration of the finding that MEEB violated section 1692i by filing the September 2008 unit 104 suit in Essex Superior Court.  (Docket Entry # 69, § IV).  Second, MEEB maintains that it did not unlawfully disclose the debt to third parties, i.e., plaintiff's mortgagees, in violation of section 1692c(b) because the debt was in the public record or previously disclosed by lawful means.  (Docket Entry # 69, § V).

1.  <u>Section 1692i</u>

As noted, MEEB moves for reconsideration of the determination that it violated section 1692i by filing the September 2008 unit 104 suit in Essex Superior Court as opposed to Lynn District Court.  This court determined that MEEB violated section 1692i by not filing suit in Lynn District Court because Essex Superior Court was not located in the correct "judicial district or similar legal entity" within the meaning of section 1692i.  (Docket Entry # 63, pp. 164-167).

MEEB proffers two arguments in the Rule 59(e) motion.

18

222

First, it contends that plaintiff waived the issue of its liability under section 1692i.  Second, MEEB asserts this court erred by finding it liable.  Plaintiff does not address the waiver argument.

Turning to the waiver argument, the "usual rule" is "that parties cannot use Rule 59(e) motions to raise new arguments that could have been made before judgment issued or to undo their own procedural failures." Venegas-Hernandez v. Sonolux Records, 370 F.3d at 190; accord ACA Financial Guaranty Corp. v. Advest, Inc., 512 F.3d at 55; Fernandez-Vargas ex rel. C.J.P.F. v. Pfizer, 522 F.3d at 67 n.5.  MEEB did not raise the waiver argument in its post trial brief (Docket Entry # 61).  The issue therefore arises whether to consider the argument at this point in a Rule 59(e) motion.  A number of reasons favor such consideration.

As explained by the First Circuit in Venegas-Hernandez, in considering a Rule 59(e) motion, it is appropriate to balance the need for the "finality of judgments with the need to render a just decision." Venegas-Hernandez v. Sonolux Records, 370 F.3d at 190.  The court in Venegas-Hernandez allowed a Rule 59(e) challenge to a default judgment by the defaulted party partly because otherwise "a party in default would never be able, by motion in the district court, to bring to that court's attention an error of law in the default judgment." Venegas-Hernandez v. Sonolux Records, 370 F.3d at 189.  Here too, MEEB had no reason

19

223

to raise the waiver argument in the post trial brief.  Plaintiff
only briefly mentioned the section 1692i liability in a sentence
in paragraph 35 of the 80 paragraph complaint.[16]  Thereafter, in
response to MEEB's proposed jury instruction on its section 1692i
liability,[17] plaintiff unequivocally stated that the instruction
was "*irrelevant*" and that, "*The plaintiff makes no claim that the
defendant initiated a suit in the wrong court*."  (Docket Entry #
22-2, Proposed Instruction No. 24) (emphasis added).  During
trial, plaintiff did not raise the issue of the filing in Essex
Superior Court as opposed to Lynn District Court.  Without any
discussion, the parties agreed to admit the September 2008
complaint filed in Essex Superior Court along with 29 other
exhibits.  Plaintiff did not raise or address section 1692i
liability in the post trial brief.  It was only after this court
sua sponte raised the issue of MEEB's section 1692i liability in

---

[16]  Paragraph 35 reads:

35. From that time until September 19, 2008, Marcus, Errico,
prepared, mailed and filed in Lynn District Court and Essex
County Superior Court; mailed and recorded in the Essex
County South Registry of Deeds in Salem, Massachusetts; and
mailed to McDermott's mortgagees, eight additional
Complaints and Statements and one Amended Complaint which
contain the same or similar violations of 15 U.S.C. §§
1692d, 1692e, and 1692f.  The Complaint in Essex Superior
Court violated 15 U.S.C. §§ 1692i as well.

(Docket Entry # 1, ¶ 35).

[17]  The parties filed proposed instructions on the FDCPA
claims in anticipation of a jury trial.  They agreed to waive a
jury trial at a January 24, 2011 hearing.

the Memorandum and Order (Docket Entry # 63, pp. 164-167) that
MEEB could reasonably foresee the need to address plaintiff's
waiver of any such liability.  The customary circumstance in
which a judge reviews a judgment under Rule 59(e) after both
parties previously argued the points at issue does not apply.
See id. at 191.  Similar to the defaulting party in Venegas-
Hernandez, the Rule 59(e) motion here was the first meaningful
and logical opportunity MEEB had to raise the waiver issue and
this court's error of not finding a waiver.  Under the
circumstances, MEEB could not and should not have raised the
waiver issue prior to this court's sua sponte consideration and
resurrection of MEEB's section 1692i liability in the Memorandum
and Order.

Second, addressing the waiver error at this point is more
efficient than having MEEB appeal.  See id.  Thus, where, as
here, the trial court is readily available to correct its own
error, "no good purpose is served by requiring" MEEB to appeal to
a higher court to be heard on the issue of plaintiff's waiver.
See id. (quoting Schildhaus v. Moe, 335 F.2d 529, 531 (2nd Cir.
1964), in parenthetical that, "'[T]here is indeed good sense in
permitting the trial court to correct its own error and, if it
refuses, in allowing a timely appeal from the refusal; no good
purpose is served by requiring the parties to appeal to a higher
court'").  The First Circuit in Venegas-Hernandez relied in part

21

on this reasoning to conclude that Rule 59(e) was available to challenge a default judgment based on a new argument not previously made.  The reasoning applies to the case at bar.

Third, like the plaintiff in <u>Venegas-Hernandez</u>, plaintiff waived the issue of the availability of Rule 59(e) as a means for MEEB to raise plaintiff's waiver of section 1692i liability for the first time.  <u>See</u> <u>id.</u> (proceeding to address Rule 59(e) error in part because the "plaintiffs have waived the issue of the availability of the Rule 59(e) motion to defendant").  Plaintiff did not address the waiver argument in opposing MEEB's Rule 59(e) motion.

Finally, the need for finality in judgments is not well served by avoiding and bypassing the issue of plaintiff's waiver.  Instead, addressing the waiver issue serves to render a just decision by allowing MEEB the opportunity to be heard in light of the sua sponte and unforeseen consideration of section 1692i liability by this court.  <u>See</u> <u>id.</u> at 190 (noting trial court's discretion in deciding Rule 59(e) motions requires balancing "need for finality of judgments with the need to render a just decision").  Accordingly, this court turns to the existence of Rule 59(e) relief based on plaintiff's waiver of section 1692i liability and this court's error in considering such liability sua sponte without addressing or finding the section 1692i liability issue waived.

It is well settled that, "Simply mentioning a possible defense in an initial pleading, without further development in subsequent stages of the proceedings, does not preserve it for post-trial review." Bennett v. City of Holyoke, 362 F.3d 1, 6 (1st Cir. 2004); see Violette v. Smith & Nephew Dyonics, Inc., 62 F.3d 8, 11 (1st Cir. 1995) ("[m]erely mentioning an issue in a pleading is insufficient to carry a party's burden actually to present a claim or defense to the district court before arguing the matter on appeal"). As explained in Bennett in deeming a notice defense waived:

> [T]he City did not rely upon this notice defense in the pretrial proceedings, at the trial itself, during the charge conference, or in its motion for judgment as a matter of law. When a party persistently sleeps upon its rights, waiver *almost inevitably results* . . . By the time that the City advanced the defense for the first time in a post-trial motion for relief from judgment, it was too late.

Bennett v. City of Holyoke, 362 F.3d at 6 (flatly rejecting argument that reference to the notice defense in answer was sufficient) (citations omitted and emphasis supplied); see also Rodriguez-Garcia v. Miranda-Marin, 610 F.3d 756, 775 (1st Cir. 2010) (affirming trial court's finding waiver of claim due to failure to assert it in pretrial order notwithstanding a liability finding and damages award on the claim initially).

Here, plaintiff mentioned section 1962i liability in a single, short sentence in the complaint.[18]  Plaintiff expressly

---

[18]  See fn. 16.

disavowed such liability in the proposed jury instructions.  In no uncertain terms, plaintiff represented that he was not making a claim that MEEB filed suit in the wrong court and that MEEB's proposed instruction about what constitutes a "judicial district" within the meaning of section 1692i was "irrelevant."  (Docket Entry # 22-2, Proposed Instruction No. 24).  Plaintiff did not raise the issue of section 1692i liability and the filing of suit in the wrong "judicial district," i.e., Essex Superior Court, at trial or in the post trial brief.  The circumstances therefore inevitably and unerringly point to the existence of plaintiff's waiver.  Sua sponte consideration of this waived claim was not only an error, it was a manifest error of waiver law on the part of this court.[19]

### 2.  Section 1692c(b)

MEEB next seeks reconsideration of the finding that it violated section 1692c(b) and therefore chapter 93A by disclosing the debt to third parties by sending plaintiff, as opposed to his attorney, letters to plaintiff's mortgagees (Ex. 38, 42, 45, 47, 55, 59, 60, 68 & 69).  (Docket Entry # 74).  Plaintiff originally cited 17 exhibits (Ex. 17, 38, 41, 42, 45, 46, 47, 48, 53, 54, 55, 59, 60, 68, 69, 71 & 77) to support MEEB's liability under

---

[19] This court did not find that the section 1692i violation caused plaintiff any actual damages.  In this court's discretion, the $800.00 award of statutory damages remains appropriate even without the added section 1692i liability.

section 1692c(b).  (Docket Entry # 60, § 1(b)).

    The Memorandum and Order addresses these alleged section 1692c(b) violations on pages 122 through 132.  (Docket Entry # 63).  This court found one timely section 1692c(b) violation in the form of a May 13, 2008 letter (Ex. 69) from MEEB to Neil Heiger, Esq. ("Heiger"), an attorney representing a mortgagee of an April 2005 mortgage for unit 104.  The letter represented a lien amount against the unit as $31,309.09.  The remaining letters were untimely under the FDCPA, 15 U.S.C. § 1692k(d), and therefore did not provide a basis for liability under the FDCPA.  This court found that the untimely letters, however, could provide a basis for per se chapter 93A liability.  MEEB seeks reconsideration of the FDCPA ruling and the chapter 93A ruling with respect to all of the letters (Ex. 38, 42, 45, 47, 55, 59, 60, 68 & 69).  (Docket Entry # 69, p. 16).

    As explained above, the untimely FDCPA violations do not provide a basis for chapter 93A liability because of the absence of acts or practices by MEEB in the conduct of trade or commerce.  That finding moots the present challenge to the untimely FDCPA letters (Ex. 38, 42, 45, 47, 55, 59, 60 & 68) as creating per se chapter 93A liability.  MEEB's argument therefore reduces to seeking reconsideration of the determination that the May 13,

2008 letter to Heiger (Ex. 69) violated section 1962c(b).[20]

MEEB's policy argument that section 1692c(b) is designed to combat embarrassing communications to a debtor's friends, neighbors and employer or invade a debtor's privacy does not survive the statutory text.  See Muzuco v. Re$ubmitIt, LLC, 2012 WL 3242013, *4 (S.D.Fla. Aug. 7, 2012) (rejecting similar policy argument as basis to avoid section 1692c(b) liability given the plain language of section 1692c(b)).  Interpreting the words in section 1692c(b) guided by the statutory framework and the purpose of the statute leads to the same conclusion reached in the Memorandum and Order.  See Dolan v. U.S. Postal Service, 546 U.S. 481, 486 (2006) ("[i]nterpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute" and "precedents or authorities that inform the analysis"); Lawson v. FMR LLC, 670 F.3d 61, 68 (1st Cir. 2012) (circuit "and Supreme Court precedent require" examining "broader statutory framework, including particularly the nearby language and the title and caption").  Heiger or Aegis are not among the excepted categories of individuals or entities in section 1692c(b).  As explained in the Memorandum and Order, the plain language of section 1962c(b) proscribes the May 13, 2008 communication.  Hence, it was not an

---

[20]   The Memorandum and Order did not find an independent violation of chapter 93A based on the May 13, 2008 letter.

error of law, let alone a manifest error of law.  This court
stands by that analysis.  (Docket Entry # 63, pp. 123-130).

II.  <u>PLAINTIFF'S RULE 59(e) MOTION</u>

Plaintiff initially moves for reconsideration of the
following two factual findings.  First, based on the entire
record, this court made the factual finding that, "Plaintiff's
first mortgagees had not informed Pondview of their names and
addresses."  (Docket Entry # 63, p. 35).  Second, this court
found that, "Under the facts, plaintiff's first mortgagees did
not apprise Pondview of their names and mailing addresses."
(Docket Entry # 63, p. 139).  The testimony of Richard E. Brooks,
Esq. ("Brooks"), a principal of MEEB, provides adequate support
for these findings.

This court declines to alter or amend them.  Thus, although
a manifest error of fact may provide a basis to allow a Rule
59(e) motion, <u>see</u> <u>Markel American Insurance Co. v. Diaz-Santiago</u>,
674 F.3d at 32 (quoting <u>Marie v. Allied Home Mortg. Corp.</u>, 402
F.3d 1, 7 n.2 (1st Cir. 2005), in parenthetical, as "acknowledging
four grounds" to grant Rule 59(e) motion including "'manifest
errors of law or fact'"), Brooks' testimony and the record as a
whole do not establish such an error relative to the above two
findings.

Plaintiff also moves to amend the judgment regarding the
failure to send the mortgagees the 30 day notice letters at least

27

30 days in advance of filing suit as not violating section 1692d. (Docket Entry # 66, ¶ 2). Section 1692d proscribes "conduct the natural consequence of which is to harass, oppress or abuse any person in connection with the collection of a debt." 15 U.S.C. § 1692d. In finding no section 1692d liability based on the 30 day notice letters, this court explained that, "MEEB's failure to send the letters earlier does not have the natural consequence of embarrassing plaintiff or oppressing or abusing him even if the failure increased the litigation costs."[21] (Docket Entry # 63, p. 142). Plaintiff moves to amend this finding and the judgment finding no section 1692d violation.

With respect to section 1692f liability, plaintiff objects to the finding that the 30 day notice letters did not violate "'section 1692f's prohibition of unfair and unconscionable collection methods.'" (Docket Entry # 66) (quoting Docket Entry # 63, p. 144). As stated in the Memorandum and Order, "[I]t was neither unfair nor unconscionable to send the mortgagees the letters at or around the time MEEB filed suit." (Docket Entry #

---

[21] As previously noted under state law, section 6(c) of chapter 183A requires MEEB to send the 30 day notice letter to the first mortgagee at least 30 days before filing suit "provided that the first mortgagee has informed the condominium association of its name and mailing address." Mass. Gen. L. ch. 183A, § 6(c). This court did not explicitly find that the failure to send the mortgagees the 30 day notice letters at least 30 days before filing suit violated section 6(c) of chapter 183A. Rather, this court found that MEEB's failure to send the mortgagees the 30 day notice letters earlier did not violate section 1692d or section 1692f.

63, p. 144).  The Memorandum and Order held that, "MEEB did not violate section 1692f by not sending or by delaying sending the mortgagees the 30 day notice 30 days before fling suit."  (Docket Entry # 63, p. 145).  As a final matter, plaintiff seeks to amend the judgment to include a finding that he incurred actual damages in the form of liability for substantial attorneys' fees and costs as the result of MEEB's failure to comply with the 30 day notice provision of section 6(c) of chapter 183A.  (Docket Entry ## 66 & 67).

For present purposes, this court will assume arguendo that MEEB violated section 6(c) by not sending the letters at least 30 days in advance of filing suit.  This failure to adhere to the state statutory procedure, however, is not dispositive of the section 1692d, the section 1692f or the per se or independent chapter 93A violations.[22]  For reasons fully explained in the

---

[22]  Citing a number of cases, the Memorandum and Order explains that, "Even if MEEB did not comply with section 6(c) by sending the first mortgagees notice 30 days before filing suit, its failure does not necessarily establish a violation of the FDCPA."  (Docket Entry # 63, p. 139).  Elsewhere, the opinion states that any noncompliance with section 6(c) did not violate section 1692f.  (Docket Entry # 63, pp. 143-144).  Side stepping the issue of whether the first mortgagees "informed" Pondview "of its name and mailing address" within the meaning of section 6(c), the Memorandum and Order found that MEEB's failure to notify the mortgagees at least 30 days in advance of filing suit was not unfair and unconscionable under section 1692f, was not harassing, abusive or oppressive under section 1692d and did not independently constitute a violation of chapter 93A.  (Docket Entry # 63, pp. 138-145).  It was only in the context of the independent chapter 93A claim that this court found that Brooks and other MEEB attorneys held an honest and good faith belief

Memorandum and Order (Docket Entry # 63, pp. 138-145) as well as partially reiterated by MEEB (Docket Entry # 74, § II), MEEB's conduct did not violate section 1692d or section 1692f. Plaintiff's argument that MEEB's failure to adhere to the statutory procedure in section 6(c) and avoid costs eventually passed to plaintiff by the first mortgagee (Docket Entry # 67, § 2) is unconvincing.  Because this court finds no manifest error of law or fact to alter or amend the no liability findings under section 1692d, section 1692f or chapter 93A based on the delay in sending the 30 day notice letters, plaintiff's argument about damages (Docket Entry # 67, § 3) is moot.

CONCLUSION

MEEB's Rule 59(e) motion (Docket Entry # 68) is **ALLOWED** in part and **DENIED** in part.  MEEB is not liable under chapter 93A or section 1692i.  Plaintiff remains entitled to $800.00 in statutory damages under Count One but is not entitled to relief under Count Two.  The judgment is amended to eliminate the $10,400.00 in damages under Count Two including prejudgment interest in the amount of $4,649.00.  Plaintiff's Rule 59(e) motion (Docket Entry # 66) is **DENIED.**  This court will conduct a status conference to set a briefing schedule for the attorney's

---

that sending the 30 day notice letters around the time MEEB filed suit was based on a reading of section 6(c) that the language supports.  MEEB's intent is not and was not relevant to its liability under sections 1692d and 1692f.  (Docket Entry # 63, p. 140).

fees issues on September 16, 2013, at 2:30 p.m.


                                    /s/ Marianne B. Bowler
                                   **MARIANNE B. BOWLER**
                                   United States Magistrate Judge

235

"Antitrust Acts'' means the Act entitled "An Act to protect trade and commerce against unlawful restraints and monopolies'', approved July 2, 1890; also sections 73 to 76, inclusive, of an Act entitled "An Act to reduce taxation, to provide revenue for the Government, and for other purposes'', approved August 27, 1894; also the Act entitled "An Act to amend sections 73 and 76 of the Act of August 27, 1894, entitled 'An Act to reduce taxation, to provide revenue for the Government, and for other purposes''', approved February 12, 1913; and also the Act entitled "An Act to supplement existing laws against unlawful restraints and monopolies, and for other purposes'', approved October 15, 1914.

"Banks'' means the types of banks and other financial institutions referred to in section 57a(f)(2) of this title.

"Foreign law enforcement agency'' means—

(1) any agency or judicial authority of a foreign government, including a foreign state, a political subdivision of a foreign state, or a multinational organization constituted by and comprised of foreign states, that is vested with law enforcement or investigative authority in civil, criminal, or administrative matters; and

(2) any multinational organization, to the extent that it is acting on behalf of an entity described in paragraph (1).

(Sept. 26, 1914, ch. 311, § 4, 38 Stat. 719; Mar. 21, 1938, ch. 49, § 2, 52 Stat. 111; Pub. L. 102–242, title II, § 212(g)(1), Dec. 19, 1991, 105 Stat. 2302; Pub. L. 107–273, div. C, title IV, § 14102(c)(2)(B), Nov. 2, 2002, 116 Stat. 1921; Pub. L. 109–455, §§ 2, 13, Dec. 22, 2006, 120 Stat. 3372, 3382; Pub. L. 112–203, § 1, Dec. 4, 2012, 126 Stat. 1484.)

#### Amendment of Section

*For repeal of amendment by section 13 of Pub. L. 109–455, see Termination Date of 2006 Amendment note below.*

#### References in Text

The Communications Act of 1934, referred to in text, is act June 19, 1934, ch. 652, 48 Stat. 1064, as amended, which is classified principally to chapter 5 (§ 151 et seq.) of Title 47, Telecommunications. For complete classification of this Act to the Code, see section 609 of Title 47 and Tables.

The Act entitled "An Act to protect trade and commerce against unlawful restraints and monopolies,'' approved July 2, 1890, referred to in the text, is known as the Sherman Act, and is classified to sections 1 to 7 of this title.

Sections 73 to 76, inclusive, of an Act entitled "An Act to reduce taxation, to provide revenue for the Government, and for other purposes'', approved August 27, 1894, referred to in text, are known as the Wilson Tariff Act. Sections 73 to 76 are classified to sections 8 to 11 of this title.

Act February 12, 1913, is set out as amendments to sections 8 and 11 of this title.

The Act entitled "An Act to supplement existing laws against unlawful restraints and monopolies, and for other purposes'', approved October 15, 1914, referred to in text, is the Clayton Act. For classification of the Act to the Code, see References in Text note set out under section 12 of this title.

#### Codification

"Subtitle IV of title 49'' substituted in text for "the Act entitled 'An Act to regulate commerce', approved February 14, 1887, and all Acts amendatory thereof and supplementary thereto'' on authority of Pub. L. 95–473, § 3(b), Oct. 17, 1978, 92 Stat. 1466, the first section of which enacted subtitle IV of Title 49, Transportation.

#### Amendments

2012—Pub. L. 112–203, § 1, amended Pub. L. 109–455, § 13. See 2006 Amendment note below.

2006—Pub. L. 109–455, § 2, which added par. defining "Foreign law enforcement agency'', was repealed by Pub. L. 109–455, § 13, as amended by Pub. L. 112–203, § 1. See Termination Date of 2006 Amendment note below.

2002—Pub. L. 107–273 substituted "73 to 76'' for "73 to 77'' in par. defining "Antitrust Acts''.

1991—Pub. L. 102–242 added par. defining "Banks''.

1938—Act Mar. 21, 1938, amended section generally.

#### Termination Date of 2006 Amendment

Pub. L. 109–455, § 13, Dec. 22, 2006, 120 Stat. 3382, as amended by Pub. L. 112–203, § 1, Dec. 4, 2012, 126 Stat. 1484, provided that: "Effective September 30, 2020, this Act [enacting sections 57b–2a, 57b–2b, 57c–1, and 57c–2 of this title, amending this section, sections 45, 46, 56, 57b–2, and 58 of this title, and section 3412 of Title 12, Banks and Banking, and enacting provisions set out as notes under this section and section 58 of this title], and the amendments made by this Act, are repealed, and any provision of law amended by this Act shall be amended to read as if this Act had not been enacted into law.''

#### Effective Date of 2002 Amendment

Amendment by Pub. L. 107–273 effective Nov. 2, 2002, and applicable only with respect to cases commenced on or after Nov. 2, 2002, see section 14103 of Pub. L. 107–273, set out as a note under section 3 of this title.

#### Preservation of Existing Authority

Pub. L. 109–455, § 12, Dec. 22, 2006, 120 Stat. 3382, provided that: "The authority provided by this Act [see Termination Date of 2006 Amendment note above], and by the Federal Trade Commission Act (15 U.S.C. 41 et seq.) and the Right to Financial Privacy Act [of 1978] (12 U.S.C. 3401 et seq.), as such Acts are amended by this Act, is in addition to, and not in lieu of, any other authority vested in the Federal Trade Commission or any other officer of the United States.''

[Section 12 of Pub. L. 109–455, set out above, repealed effective Sept. 30, 2020, see section 13 of Pub. L. 109–455, as amended by section 1 of Pub. L. 112–203, set out as a Termination Date of 2006 Amendment note above.]

## § 45. Unfair methods of competition unlawful; prevention by Commission

### (a) Declaration of unlawfulness; power to prohibit unfair practices; inapplicability to foreign trade

(1) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.

(2) The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations, except banks, savings and loan institutions described in section 57a(f)(3) of this title, Federal credit unions described in section 57a(f)(4) of this title, common carriers subject to the Acts to regulate commerce, air carriers and foreign air carriers subject to part A of subtitle VII of title 49, and persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act, 1921, as amended [7 U.S.C. 181 et seq.], except as provided in section 406(b) of said Act [7 U.S.C. 227(b)], from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce.

(3) This subsection shall not apply to unfair methods of competition involving commerce with foreign nations (other than import commerce) unless—

(A) such methods of competition have a direct, substantial, and reasonably foreseeable effect—

(i) on commerce which is not commerce with foreign nations, or on import commerce with foreign nations; or

(ii) on export commerce with foreign nations, of a person engaged in such commerce in the United States; and

(B) such effect gives rise to a claim under the provisions of this subsection, other than this paragraph.

If this subsection applies to such methods of competition only because of the operation of subparagraph (A)(ii), this subsection shall apply to such conduct only for injury to export business in the United States.

(4)(A) For purposes of subsection (a), the term ''unfair or deceptive acts or practices'' includes such acts or practices involving foreign commerce that—

(i) cause or are likely to cause reasonably foreseeable injury within the United States; or

(ii) involve material conduct occurring within the United States.

(B) All remedies available to the Commission with respect to unfair and deceptive acts or practices shall be available for acts and practices described in this paragraph, including restitution to domestic or foreign victims.

**(b) Proceeding by Commission; modifying and setting aside orders**

Whenever the Commission shall have reason to believe that any such person, partnership, or corporation has been or is using any unfair method of competition or unfair or deceptive act or practice in or affecting commerce, and if it shall appear to the Commission that a proceeding by it in respect thereof would be to the interest of the public, it shall issue and serve upon such person, partnership, or corporation a complaint stating its charges in that respect and containing a notice of a hearing upon a day and at a place therein fixed at least thirty days after the service of said complaint. The person, partnership, or corporation so complained of shall have the right to appear at the place and time so fixed and show cause why an order should not be entered by the Commission requiring such person, partnership, or corporation to cease and desist from the violation of the law so charged in said complaint. Any person, partnership, or corporation may make application, and upon good cause shown may be allowed by the Commission to intervene and appear in said proceeding by counsel or in person. The testimony in any such proceeding shall be reduced to writing and filed in the office of the Commission. If upon such hearing the Commission shall be of the opinion that the method of competition or the act or practice in question is prohibited by this subchapter, it shall make a report in writing in which it shall state its findings as to the facts and shall issue and cause to be served on such person, partnership, or corporation an order requiring such person, partnership, or corporation to cease and desist from using such method of competition or such act or practice. Until the expiration of the time allowed for filing a petition for review, if no such petition has been duly filed within such time, or, if a petition for review has been filed within such time then until the record in the proceeding has been filed in a court of appeals of the United States, as hereinafter provided, the Commission may at any time, upon such notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any report or any order made or issued by it under this section. After the expiration of the time allowed for filing a petition for review, if no such petition has been duly filed within such time, the Commission may at any time, after notice and opportunity for hearing, reopen and alter, modify, or set aside, in whole or in part any report or order made or issued by it under this section, whenever in the opinion of the Commission conditions of fact or of law have so changed as to require such action or if the public interest shall so require, except that (1) the said person, partnership, or corporation may, within sixty days after service upon him or it of said report or order entered after such a reopening, obtain a review thereof in the appropriate court of appeals of the United States, in the manner provided in subsection (c) of this section; and (2) in the case of an order, the Commission shall reopen any such order to consider whether such order (including any affirmative relief provision contained in such order) should be altered, modified, or set aside, in whole or in part, if the person, partnership, or corporation involved files a request with the Commission which makes a satisfactory showing that changed conditions of law or fact require such order to be altered, modified, or set aside, in whole or in part. The Commission shall determine whether to alter, modify, or set aside any order of the Commission in response to a request made by a person, partnership, or corporation under paragraph[1] (2) not later than 120 days after the date of the filing of such request.

**(c) Review of order; rehearing**

Any person, partnership, or corporation required by an order of the Commission to cease and desist from using any method of competition or act or practice may obtain a review of such order in the court of appeals of the United States, within any circuit where the method of competition or the act or practice in question was used or where such person, partnership, or corporation resides or carries on business, by filing in the court, within sixty days from the date of the service of such order, a written petition praying that the order of the Commission be set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Commission, and thereupon the Commission shall file in the court the record in the proceeding, as provided in section 2112 of title 28. Upon such filing of the petition the court shall have jurisdiction of the proceeding and of the question determined therein concurrently with the Commission until the filing of the record and

---

[1] So in original. Probably should be ''clause''.

shall have power to make and enter a decree affirming, modifying, or setting aside the order of the Commission, and enforcing the same to the extent that such order is affirmed and to issue such writs as are ancillary to its jurisdiction or are necessary in its judgement to prevent injury to the public or to competitors pendente lite. The findings of the Commission as to the facts, if supported by evidence, shall be conclusive. To the extent that the order of the Commission is affirmed, the court shall thereupon issue its own order commanding obedience to the terms of such order of the Commission. If either party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts, or make new findings, by reason of the additional evidence so taken, and it shall file such modified or new findings, which, if supported by evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of its original order, with the return of such additional evidence. The judgment and decree of the court shall be final, except that the same shall be subject to review by the Supreme Court upon certiorari, as provided in section 1254 of title 28.

**(d) Jurisdiction of court**

Upon the filing of the record with it the jurisdiction of the court of appeals of the United States to affirm, enforce, modify, or set aside orders of the Commission shall be exclusive.

**(e) Exemption from liability**

No order of the Commission or judgement of court to enforce the same shall in anywise relieve or absolve any person, partnership, or corporation from any liability under the Antitrust Acts.

**(f) Service of complaints, orders and other processes; return**

Complaints, orders, and other processes of the Commission under this section may be served by anyone duly authorized by the Commission, either (a) by delivering a copy thereof to the person to be served, or to a member of the partnership to be served, or the president, secretary, or other executive officer or a director of the corporation to be served; or (b) by leaving a copy thereof at the residence or the principal office or place of business of such person, partnership, or corporation; or (c) by mailing a copy thereof by registered mail or by certified mail addressed to such person, partnership, or corporation at his or its residence or principal office or place of business. The verified return by the person so serving said complaint, order, or other process setting forth the manner of said service shall be proof of the same, and the return post office receipt for said complaint, order, or other process mailed by registered mail or by certified mail as aforesaid shall be proof of the service of the same.

**(g) Finality of order**

An order of the Commission to cease and desist shall become final—

(1) Upon the expiration of the time allowed for filing a petition for review, if no such petition has been duly filed within such time; but the Commission may thereafter modify or set aside its order to the extent provided in the last sentence of subsection (b).

(2) Except as to any order provision subject to paragraph (4), upon the sixtieth day after such order is served, if a petition for review has been duly filed; except that any such order may be stayed, in whole or in part and subject to such conditions as may be appropriate, by—

(A) the Commission;

(B) an appropriate court of appeals of the United States, if (i) a petition for review of such order is pending in such court, and (ii) an application for such a stay was previously submitted to the Commission and the Commission, within the 30-day period beginning on the date the application was received by the Commission, either denied the application or did not grant or deny the application; or

(C) the Supreme Court, if an applicable petition for certiorari is pending.

(3) For purposes of subsection (m)(1)(B) of this section and of section 57b(a)(2) of this title, if a petition for review of the order of the Commission has been filed—

(A) upon the expiration of the time allowed for filing a petition for certiorari, if the order of the Commission has been affirmed or the petition for review has been dismissed by the court of appeals and no petition for certiorari has been duly filed;

(B) upon the denial of a petition for certiorari, if the order of the Commission has been affirmed or the petition for review has been dismissed by the court of appeals; or

(C) upon the expiration of 30 days from the date of issuance of a mandate of the Supreme Court directing that the order of the Commission be affirmed or the petition for review be dismissed.

(4) In the case of an order provision requiring a person, partnership, or corporation to divest itself of stock, other share capital, or assets, if a petition for review of such order of the Commission has been filed—

(A) upon the expiration of the time allowed for filing a petition for certiorari, if the order of the Commission has been affirmed or the petition for review has been dismissed by the court of appeals and no petition for certiorari has been duly filed;

(B) upon the denial of a petition for certiorari, if the order of the Commission has been affirmed or the petition for review has been dismissed by the court of appeals; or

(C) upon the expiration of 30 days from the date of issuance of a mandate of the Supreme Court directing that the order of the Commission be affirmed or the petition for review be dismissed.

**(h) Modification or setting aside of order by Supreme Court**

If the Supreme Court directs that the order of the Commission be modified or set aside, the

order of the Commission rendered in accordance with the mandate of the Supreme Court shall become final upon the expiration of thirty days from the time it was rendered, unless within such thirty days either party has instituted proceedings to have such order corrected to accord with the mandate, in which event the order of the Commission shall become final when so corrected.

**(i) Modification or setting aside of order by Court of Appeals**

If the order of the Commission is modified or set aside by the court of appeals, and if (1) the time allowed for filing a petition for certiorari has expired and no such petition has been duly filed, or (2) the petition for certiorari has been denied, or (3) the decision of the court has been affirmed by the Supreme Court, then the order of the Commission rendered in accordance with the mandate of the court of appeals shall become final on the expiration of thirty days from the time such order of the Commission was rendered, unless within such thirty days either party has instituted proceedings to have such order corrected so that it will accord with the mandate, in which event the order of the Commission shall become final when so corrected.

**(j) Rehearing upon order or remand**

If the Supreme Court orders a rehearing; or if the case is remanded by the court of appeals to the Commission for a rehearing, and if (1) the time allowed for filing a petition for certiorari has expired, and no such petition has been duly filed, or (2) the petition for certiorari has been denied, or (3) the decision of the Supreme Court, then the order of the Commission rendered upon such rehearing shall become final in the same manner as though no prior order of the Commission had been rendered.

**(k) "Mandate" defined**

As used in this section the term "mandate", in case a mandate has been recalled prior to the expiration of thirty days from the date of issuance thereof, means the final mandate.

**(l) Penalty for violation of order; injunctions and other appropriate equitable relief**

Any person, partnership, or corporation who violates an order of the Commission after it has become final, and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than $10,000 for each violation, which shall accrue to the United States and may be recovered in a civil action brought by the Attorney General of the United States. Each separate violation of such an order shall be a separate offense, except that in a case of a violation through continuing failure to obey or neglect to obey a final order of the Commission, each day of continuance of such failure or neglect shall be deemed a separate offense. In such actions, the United States district courts are empowered to grant mandatory injunctions and such other and further equitable relief as they deem appropriate in the enforcement of such final orders of the Commission.

**(m) Civil actions for recovery of penalties for knowing violations of rules and cease and desist orders respecting unfair or deceptive acts or practices; jurisdiction; maximum amount of penalties; continuing violations; de novo determinations; compromise or settlement procedure**

(1)(A) The Commission may commence a civil action to recover a civil penalty in a district court of the United States against any person, partnership, or corporation which violates any rule under this subchapter respecting unfair or deceptive acts or practices (other than an interpretive rule or a rule violation of which the Commission has provided is not an unfair or deceptive act or practice in violation of subsection (a)(1) of this section) with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule. In such action, such person, partnership, or corporation shall be liable for a civil penalty of not more than $10,000 for each violation.

(B) If the Commission determines in a proceeding under subsection (b) of this section that any act or practice is unfair or deceptive, and issues a final cease and desist order, other than a consent order, with respect to such act or practice, then the Commission may commence a civil action to obtain a civil penalty in a district court of the United States against any person, partnership, or corporation which engages in such act or practice—

(1) after such cease and desist order becomes final (whether or not such person, partnership, or corporation was subject to such cease and desist order), and

(2) with actual knowledge that such act or practice is unfair or deceptive and is unlawful under subsection (a)(1) of this section.

In such action, such person, partnership, or corporation shall be liable for a civil penalty of not more than $10,000 for each violation.

(C) In the case of a violation through continuing failure to comply with a rule or with subsection (a)(1) of this section, each day of continuance of such failure shall be treated as a separate violation, for purposes of subparagraphs (A) and (B). In determining the amount of such a civil penalty, the court shall take into account the degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require.

(2) If the cease and desist order establishing that the act or practice is unfair or deceptive was not issued against the defendant in a civil penalty action under paragraph (1)(B) the issues of fact in such action against such defendant shall be tried de novo. Upon request of any party to such an action against such defendant, the court shall also review the determination of law made by the Commission in the proceeding under subsection (b) of this section that the act or practice which was the subject of such proceeding constituted an unfair or deceptive act or practice in violation of subsection (a) of this section.

(3) The Commission may compromise or settle any action for a civil penalty if such com-

promise or settlement is accompanied by a public statement of its reasons and is approved by the court.

**(n) Standard of proof; public policy considerations**

The Commission shall have no authority under this section or section 57a of this title to declare unlawful an act or practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition. In determining whether an act or practice is unfair, the Commission may consider established public policies as evidence to be considered with all other evidence. Such public policy considerations may not serve as a primary basis for such determination.

(Sept. 26, 1914, ch. 311, §5, 38 Stat. 719; Mar. 21, 1938, ch. 49, §3, 52 Stat. 111; June 23, 1938, ch. 601, title XI, §1107(f), 52 Stat. 1028; June 25, 1948, ch. 646, §32(a), 62 Stat. 991; May 24, 1949, ch. 139, §127, 63 Stat. 107; Mar. 16, 1950, ch. 61, §4(c), 64 Stat. 21; July 14, 1952, ch. 745, §2, 66 Stat. 632; Pub. L. 85–726, title XIV, §§1401(b), 1411, Aug. 23, 1958, 72 Stat. 806, 809; Pub. L. 85–791, §3, Aug. 28, 1958, 72 Stat. 942; Pub. L. 85–909, §3, Sept. 2, 1958, 72 Stat. 1750; Pub. L. 86–507, §1(13), June 11, 1960, 74 Stat. 200; Pub. L. 93–153, title IV, §408(c), (d), Nov. 16, 1973, 87 Stat. 591, 592; Pub. L. 93–637, title II, §§201(a), 204(b), 205(a), Jan. 4, 1975, 88 Stat. 2193, 2200; Pub. L. 94–145, §3, Dec. 12, 1975, 89 Stat. 801; Pub. L. 96–37, §1(a), July 23, 1979, 93 Stat. 95; Pub. L. 96–252, §2, May 28, 1980, 94 Stat. 374; Pub. L. 97–290, title IV, §403, Oct. 8, 1982, 96 Stat. 1246; Pub. L. 98–620, title IV, §402(12), Nov. 8, 1984, 98 Stat. 3358; Pub. L. 100–86, title VII, §715(a)(1), Aug. 10, 1987, 101 Stat. 655; Pub. L. 103–312, §§4, 6, 9, Aug. 26, 1994, 108 Stat. 1691, 1692, 1695; Pub. L. 109–455, §§3, 13, Dec. 22, 2006, 120 Stat. 3372, 3382; Pub. L. 112–203, §1, Dec. 4, 2012, 126 Stat. 1484.)

AMENDMENT OF SECTION

*For repeal of amendment by section 13 of Pub. L. 109–455, see Termination Date of 2006 Amendment note below.*

REFERENCES IN TEXT

The Packers and Stockyards Act, 1921, as amended, referred to in subsec. (a)(2), is act Aug. 15, 1921, ch. 64, 42 Stat. 159, as amended, which is classified to chapter 9 (§181 et seq.) of Title 7, Agriculture. For complete classification of this Act to the Code, see section 181 of Title 7 and Tables.

CODIFICATION

In subsec. (a)(2), "part A of subtitle VII of title 49" substituted for "the Federal Aviation Act of 1958 [49 App. U.S.C. 1301 et seq.]" on authority of Pub. L. 103–272, §6(b), July 5, 1994, 108 Stat. 1378, the first section of which enacted subtitles II, III, and V to X of Title 49, Transportation.

In subsec. (c), "section 1254 of title 28" substituted for "section 240 of the Judicial Code [28 U.S.C. 347]" on authority of act June 25, 1948, ch. 646, 62 Stat. 869, the first section of which enacted Title 28, Judiciary and Judicial Procedure.

AMENDMENTS

2012—Subsec. (a)(4). Pub. L. 112–203, §1, amended Pub. L. 109–455, §13. See 2006 Amendment note below.

2006—Subsec. (a)(4). Pub. L. 109–455, §3, which added par. (4) extending the definition of unfair or deceptive acts or practices to include certain ones involving foreign commerce, was repealed by Pub. L. 109–455, §13, as amended by Pub. L. 112–203, §1. See Termination Date of 2006 Amendment note below.

1994—Subsec. (g)(1). Pub. L. 103–312, §6(d), substituted a period for ''; or'' at end.

Subsec. (g)(2). Pub. L. 103–312, §6(a), amended par. (2) generally. Prior to amendment, par. (2) read as follows: "Upon the expiration of the time allowed for filing a petition for certiorari, if the order of the Commission has been affirmed, or the petition for review dismissed by the court of appeals, and no petition for certiorari has been duly filed; or".

Subsec. (g)(3). Pub. L. 103–312, §6(b), amended par. (3) generally. Prior to amendment, par. (3) read as follows: "Upon the denial of a petition for certiorari, if the order of the Commission has been affirmed or the petition for review dismissed by the court of appeals; or".

Subsec. (g)(4). Pub. L. 103–312, §6(c), amended par. (4) generally. Prior to amendment, par. (4) read as follows: "Upon the expiration of thirty days from the date of issuance of the mandate of the Supreme Court, if such Court directs that the order of the Commission be affirmed or the petition for review dismissed."

Subsec. (m)(1)(B). Pub. L. 103–312, §4(a), inserted '', other than a consent order,'' after ''a final cease and desist order'' in introductory provisions.

Subsec. (n)(2). Pub. L. 103–312, §4(b), inserted at end "Upon request of any party to such an action against such defendant, the court shall also review the determination of law made by the Commission in the proceeding under subsection (b) of this section that the act or practice which was the subject of such proceeding constituted an unfair or deceptive act or practice in violation of subsection (a) of this section."

Subsec. (n). Pub. L. 103–312, §9, added subsec. (n).

1987—Subsec. (a)(2). Pub. L. 100–86 inserted "Federal credit unions described in section 57a(f)(4) of this title," after "section 57a(f)(3) of this title,".

1984—Subsec. (e). Pub. L. 98–620 struck out provision that such proceedings in the court of appeals had to be given precedence over other cases pending therein, and had to be in every way expedited.

1982—Subsec. (a)(3). Pub. L. 97–290 added par. (3).

1980—Subsec. (b). Pub. L. 96–252 added cl. (2) and provision following cl. (2) requiring that the Commission determine whether to alter, modify, or set aside any order of the Commission in response to a request made by a person, partnership, or corporation under paragraph (2) not later than 120 days after the date of the filing of such request.

1979—Subsec. (a)(2). Pub. L. 96–37 added savings and loan institutions described in section 57a(f)(3) of this title to the enumeration of entities exempted from the Commission's power to prevent the use of unfair methods of competition and unfair or deceptive acts or practices.

1975—Pub. L. 93–637, §201(a), substituted "in or affecting commerce" for "in commerce" wherever appearing.

Subsec. (a). Pub. L. 94–145 struck out pars. (2) to (5) which permitted fair trade pricing of articles for retail sale and State enactment of nonsigner provisions, and redesignated par. (6) as (2).

Subsec. (m). Pub. L. 93–637, §§204(b), 205(a), added subsec. (m). Former subsec. (m), relating to the election by the Commission to appear in its own name after notifying and consulting with and giving the Attorney General 10 days to take the action proposed by the Commission, was struck out.

1973—Subsec. (l). Pub. L. 93–153, §408(c), raised the maximum civil penalty for each violation to $10,000 and inserted provisions empowering the United States District Courts to grant mandatory injunctions and such other and further equitable relief as they might deem appropriate for the enforcement of final Commission orders.

Subsec. (m). Pub. L. 93–153, §408(d), added subsec. (m).

1960—Subsec. (f). Pub. L. 86–507 substituted "mailing a copy thereof by registered mail or by certified mail"

for "registering and mailing a copy thereof", and "mailed by registered mail or by certified mail" for "registered mail or by certified mail".

1958—Subsec. (a)(6). Pub. L. 85–909 substituted "persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act, 1921, as amended," for "persons, partnerships or corporations subject to the Packers and Stockyards Act, 1921,".

Pub. L. 85–726, §1411, substituted "Federal Aviation Act of 1958" for "Civil Aeronautics Act of 1938".

Subsec. (b). Pub. L. 85–791, §3(a), struck out "the transcript of" before "the record in the proceeding" in sixth sentence.

Subsec. (c). Pub. L. 85–791, §3(b), in second sentence, substituted "transmitted by the clerk of the court to" for "served upon", and "Commission shall file in the court the record in the proceeding, as provided in section 2112 of title 28" for "Commission forthwith shall certify and file in the court a transcript of the entire record in the proceeding, including all the evidence taken and the report and order of the Commission", and which, in third sentence struck out "and transcript" after "petition", inserted "concurrently with the Commission until the filing of the record" and struck out "upon the pleadings, evidence, and proceedings set forth in such transcript" before "a decree affirming".

Subsec. (d). Pub. L. 85–791, §3(c), substituted "Upon the filing of the record with it the" for "The".

1952—Subsec. (a). Act July 14, 1952, amended subsec. (a) generally to permit fair trade pricing of articles for retail sale.

1950—Subsec. (l). Act Mar. 16, 1950, inserted last sentence to make each separate violation of a cease and desist order as a separate offense, except that each day of a continuing failure to obey a final order shall be a separate offense.

1938—Subsec. (a). Act June 23, 1938, inserted "air carriers and foreign air carriers subject to chapter 9 of title 49" in second par.

Act Mar. 21, 1938, amended section generally.

<sub>Change of Name</sub>

Act June 25, 1948, eff. Sept. 1, 1948, as amended by act May 24, 1949, substituted "court of appeals" for "circuit court of appeals".

<sub>Termination Date of 2006 Amendment</sub>

Amendment by section 3 of Pub. L. 109–455 repealed effective Sept. 30, 2020, and provisions amended by Pub. L. 109–455 to be amended to read as if Pub. L. 109–455 had not been enacted, see section 13 of Pub. L. 109–455, set out as a note under section 44 of this title.

<sub>Effective Date of 1994 Amendment</sub>

Pub. L. 103–312, §15, Aug. 26, 1994, 108 Stat. 1697, provided that:

"(a) In General.—Except as provided in subsections (b), (c), (d), and (e), the provisions of this Act [enacting section 57b–5 of this title, amending this section and sections 53, 57a, 57b–1, 57b–2, 57c, and 58 of this title, and enacting provisions set out as notes under sections 57c and 58 of this title] shall take effect on the date of enactment of this Act [Aug. 26, 1994].

"(b) Applicability of Section 5.—The amendment made by section 5 of this Act [amending section 57a of this title] shall apply only to rulemaking proceedings initiated after the date of enactment of this Act. Such amendment shall not be construed to affect in any manner a rulemaking proceeding which was initiated before the date of enactment of this Act [Aug. 26, 1994].

"(c) Applicability of Section 6.—The amendments made by section 6 of this Act [amending this section] shall apply only with respect to cease and desist orders issued under section 5 of the Federal Trade Commission Act (15 U.S.C. 45) after the date of enactment of this Act [Aug. 26, 1994]. These amendments shall not be construed to affect in any manner a cease and desist order which was issued before the date of enactment of this Act.

"(d) Applicability of Sections 7 and 8.—The amendments made by sections 7 and 8 of this Act [amending sections 57b–1 and 57b–2 of this title] shall apply only with respect to compulsory process issued after the date of enactment of this Act [Aug. 26, 1994].

"(e) Applicability of Section 9.—The amendments made by section 9 of this Act [amending this section] shall apply only with respect to cease and desist orders issued under section 5 of the Federal Trade Commission Act (15 U.S.C. 45), or to rules promulgated under section 18 of the Federal Trade Commission Act (15 U.S.C. 57a) after the date of enactment of this Act [Aug. 26, 1994]. These amendments shall not be construed to affect in any manner a cease and desist order which was issued, or a rule which was promulgated, before the date of enactment of this Act. These amendments shall not be construed to affect in any manner a cease and desist order issued after the date of enactment of this Act, if such order was issued pursuant to remand from a court of appeals or the Supreme Court of an order issued by the Federal Trade Commission before the date of enactment of this Act."

<sub>Effective Date of 1984 Amendment</sub>

Amendment by Pub. L. 98–620 not applicable to cases pending on Nov. 8, 1984, see section 403 of Pub. L. 98–620, set out as an Effective Date note under section 1657 of Title 28, Judiciary and Judicial Procedure.

<sub>Effective Date of 1980 Amendment</sub>

Pub. L. 96–252, §23, May 28, 1980, 94 Stat. 397, provided that: "The provisions of this Act [enacting sections 57a–1 and 57b–1 to 57b–4 of this title, amending this section and sections 46, 50, 57a, 57c, and 58 of this title, and enacting provisions set out as notes under sections 46, 57a, 57a–1, 57c, and 58 of this title], and the amendments made by this Act, shall take effect on the date of the enactment of this Act [May 28, 1980]."

<sub>Effective Date of 1975 Amendments</sub>

Amendment by Pub. L. 94–145 effective upon expiration of ninety-day period beginning on Dec. 12, 1975, see section 4 of Pub. L. 94–145, set out as a note under section 1 of this title.

Amendment by section 204(b) of Pub. L. 93–637 not applicable to any civil action commenced before Jan. 4, 1975, see section 204(c) of Pub. L. 93–637, set out as a note under section 56 of this title.

Pub. L. 93–637, §205(b), Jan. 4, 1975, 88 Stat. 2201, provided that: "The amendment made by subsection (a) of this section [amending this section] shall not apply to any violation, act, or practice to the extent that such violation, act, or practice occurred before the date of enactment of this Act [Jan. 4, 1975]."

<sub>Effective Date of 1958 Amendment</sub>

Amendment by Pub. L. 85–726 effective on 60th day following the date on which the Administrator of the Federal Aviation Agency first appointed under Pub. L. 85–726 qualifies and takes office, see section 1505(2) of Pub. L. 85–726. The Administrator was appointed, qualified, and took office on Oct. 31, 1958.

<sub>Effective Date of 1950 Amendment</sub>

Amendment by act Mar. 16, 1950, effective July 1, 1950, see note set out under section 347 of Title 21, Food and Drugs.

<sub>Transfer of Functions</sub>

For transfer of functions of Federal Trade Commission, with certain exceptions, to Chairman of such Commission, see Reorg. Plan No. 8 of 1950, §1, eff. May 24, 1950, 15 F.R. 3175, 64 Stat. 1264, set out under section 41 of this title.

<sub>Congressional Findings and Declaration of Purpose Covering Grant of District Subpena Enforcement Authority and Authority To Grant Preliminary Injunctive Relief</sub>

Pub. L. 93–153, §408(a), (b), Nov. 16, 1973, 87 Stat. 591, provided that:

Case: 13-2181    Document: 00116612444    Page: 306    Date Filed: 11/18/2013    Entry ID: 5780656

"(a)(1) The Congress hereby finds that the investigative and law enforcement responsibilities of the Federal Trade Commission have been restricted and hampered because of inadequate legal authority to enforce subpenas and to seek preliminary injunctive relief to avoid unfair competitive practices.

"(2) The Congress further finds that as a direct result of this inadequate legal authority significant delays have occurred in a major investigation into the legality of the structure, conduct, and activities of the petroleum industry, as well as in other major investigations designed to protect the public interest.

"(b) It is the purpose of this Act [amending this section and sections 46, 53, and 56 of this title] to grant the Federal Trade Commission the requisite authority to insure prompt enforcement of the laws the Commission administers by granting statutory authority to directly enforce subpenas issued by the Commission and to seek preliminary injunctive relief to avoid unfair competitive practices."

PURPOSE OF ACT JULY 14, 1952

Act July 14, 1952, ch. 745, § 1, 66 Stat. 631, provided: "That it is the purpose of this Act [amending this section] to protect the rights of States under the United States Constitution to regulate their internal affairs and more particularly to enact statutes and laws, and to adopt policies, which authorize contracts and agreements prescribing minimum or stipulated prices for the resale of commodities and to extend the minimum or stipulated prices prescribed by such contracts and agreements to persons who are not parties thereto. It is the further purpose of this Act to permit such statutes, laws, and public policies to apply to commodities, contracts, agreements, and activities in or affecting interstate or foreign commerce."

## § 45a. Labels on products

To the extent any person introduces, delivers for introduction, sells, advertises, or offers for sale in commerce a product with a "Made in the U.S.A." or "Made in America" label, or the equivalent thereof, in order to represent that such product was in whole or substantial part of domestic origin, such label shall be consistent with decisions and orders of the Federal Trade Commission issued pursuant to section 45 of this title. This section only applies to such labels. Nothing in this section shall preclude the application of other provisions of law relating to labeling. The Commission may periodically consider an appropriate percentage of imported components which may be included in the product and still be reasonably consistent with such decisions and orders. Nothing in this section shall preclude use of such labels for products that contain imported components under the label when the label also discloses such information in a clear and conspicuous manner. The Commission shall administer this section pursuant to section 45 of this title and may from time to time issue rules pursuant to section 553 of title 5 for such purpose. If a rule is issued, such violation shall be treated by the Commission as a violation of a rule under section 57a of this title regarding unfair or deceptive acts or practices. This section shall be effective upon publication in the Federal Register of a Notice of the provisions of this section. The Commission shall publish such notice within six months after September 13, 1994.

(Pub. L. 103–322, title XXXII, § 320933, Sept. 13, 1994, 108 Stat. 2135.)

CODIFICATION

Section was enacted as part of the Violent Crime Control and Law Enforcement Act of 1994, and not as part of the Federal Trade Commission Act which comprises this subchapter.

## § 46. Additional powers of Commission

The Commission shall also have power—

### (a) Investigation of persons, partnerships, or corporations

To gather and compile information concerning, and to investigate from time to time the organization, business, conduct, practices, and management of any person, partnership, or corporation engaged in or whose business affects commerce, excepting banks, savings and loan institutions described in section 57a(f)(3) of this title, Federal credit unions described in section 57a(f)(4) of this title, and common carriers subject to the Act to regulate commerce, and its relation to other persons, partnerships, and corporations.

### (b) Reports of persons, partnerships, and corporations

To require, by general or special orders, persons, partnerships, and corporations, engaged in or whose business affects commerce, excepting banks, savings and loan institutions described in section 57a(f)(3) of this title, Federal credit unions described in section 57a(f)(4) of this title, and common carriers subject to the Act to regulate commerce, or any class of them, or any of them, respectively, to file with the Commission in such form as the Commission may prescribe annual or special, or both annual and special, reports or answers in writing to specific questions, furnishing to the Commission such information as it may require as to the organization, business, conduct, practices, management, and relation to other corporations, partnerships, and individuals of the respective persons, partnerships, and corporations filing such reports or answers in writing. Such reports and answers shall be made under oath, or otherwise, as the Commission may prescribe, and shall be filed with the Commission within such reasonable period as the Commission may prescribe, unless additional time be granted in any case by the Commission.

### (c) Investigation of compliance with antitrust decrees

Whenever a final decree has been entered against any defendant corporation in any suit brought by the United States to prevent and restrain any violation of the antitrust Acts, to make investigation, upon its own initiative, of the manner in which the decree has been or is being carried out, and upon the application of the Attorney General it shall be its duty to make such investigation. It shall transmit to the Attorney General a report embodying its findings and recommendations as a result of any such investigation, and the report shall be made public in the discretion of the Commission.

### (d) Investigations of violations of antitrust statutes

Upon the direction of the President or either House of Congress to investigate and report the

the enforcement actions taken by each of the agencies assigned administrative enforcement responsibilities under section 1691c of this title.

(Pub. L. 90–321, title VII, §707, as added Pub. L. 94–239, §7, Mar. 23, 1976, 90 Stat. 255; amended Pub. L. 96–221, title VI, §610(c), Mar. 31, 1980, 94 Stat. 174; Pub. L. 111–203, title X, §1085(1), July 21, 2010, 124 Stat. 2083.)

AMENDMENTS

2010—Pub. L. 111–203 substituted "Bureau" for "Board" wherever appearing.

1980—Pub. L. 96–221 substituted "Each year" for "Not later than February 1 of each year after 1976".

EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

EFFECTIVE DATE OF 1980 AMENDMENT

Amendment by Pub. L. 96–221 effective on expiration of two years and six months after Mar. 31, 1980, with all regulations, forms, and clauses required to be prescribed to be promulgated at least one year prior to such effective date, and allowing any creditor to comply with any amendments, in accordance with the regulations, forms, and clauses prescribed by the Board prior to such effective date, see section 625 of Pub. L. 96–221, set out as a note under section 1602 of this title.

EFFECTIVE DATE

Section effective Mar. 23, 1976, see section 708 of Pub. L. 90–321, set out as a note under section 1691 of this title.

SUBCHAPTER V—DEBT COLLECTION PRACTICES

## § 1692. Congressional findings and declaration of purpose

### (a) Abusive practices

There is abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors. Abusive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy.

### (b) Inadequacy of laws

Existing laws and procedures for redressing these injuries are inadequate to protect consumers.

### (c) Available non-abusive collection methods

Means other than misrepresentation or other abusive debt collection practices are available for the effective collection of debts.

### (d) Interstate commerce

Abusive debt collection practices are carried on to a substantial extent in interstate commerce and through means and instrumentalities of such commerce. Even where abusive debt collection practices are purely intrastate in character, they nevertheless directly affect interstate commerce.

### (e) Purposes

It is the purpose of this subchapter to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors

who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses.

(Pub. L. 90–321, title VIII, §802, as added Pub. L. 95–109, Sept. 20, 1977, 91 Stat. 874.)

EFFECTIVE DATE

Pub. L. 90–321, title VIII, §819, formerly §818, as added Pub. L. 95–109, Sept. 20, 1977, 91 Stat. 883, §818; renumbered §819, Pub. L. 109–351, title VIII, §801(a)(1), Oct. 13, 2006, 120 Stat. 2004, provided that: "This title [enacting this subchapter] takes effect upon the expiration of six months after the date of its enactment [Sept. 20, 1977], but section 809 [section 1692g of this title] shall apply only with respect to debts for which the initial attempt to collect occurs after such effective date."

SHORT TITLE

This subchapter known as the "Fair Debt Collection Practices Act", see Short Title note set out under section 1601 of this title.

## § 1692a. Definitions

As used in this subchapter—

(1) The term "Bureau" means the Bureau of Consumer Financial Protection.

(2) The term "communication" means the conveying of information regarding a debt directly or indirectly to any person through any medium.

(3) The term "consumer" means any natural person obligated or allegedly obligated to pay any debt.

(4) The term "creditor" means any person who offers or extends credit creating a debt or to whom a debt is owed, but such term does not include any person to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another.

(5) The term "debt" means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

(6) The term "debt collector" means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. Notwithstanding the exclusion provided by clause (F) of the last sentence of this paragraph, the term includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts. For the purpose of section 1692f(6) of this title, such term also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests. The term does not include—

(A) any officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor;

(B) any person while acting as a debt collector for another person, both of whom are related by common ownership or affiliated by corporate control, if the person acting as a debt collector does so only for persons to whom it is so related or affiliated and if the principal business of such person is not the collection of debts;

(C) any officer or employee of the United States or any State to the extent that collecting or attempting to collect any debt is in the performance of his official duties;

(D) any person while serving or attempting to serve legal process on any other person in connection with the judicial enforcement of any debt;

(E) any nonprofit organization which, at the request of consumers, performs bona fide consumer credit counseling and assists consumers in the liquidation of their debts by receiving payments from such consumers and distributing such amounts to creditors; and

(F) any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity (i) is incidental to a bona fide fiduciary obligation or a bona fide escrow arrangement; (ii) concerns a debt which was originated by such person; (iii) concerns a debt which was not in default at the time it was obtained by such person; or (iv) concerns a debt obtained by such person as a secured party in a commercial credit transaction involving the creditor.

(7) The term "location information" means a consumer's place of abode and his telephone number at such place, or his place of employment.

(8) The term "State" means any State, territory, or possession of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or any political subdivision of any of the foregoing.

(Pub. L. 90–321, title VIII, §803, as added Pub. L. 95–109, Sept. 20, 1977, 91 Stat. 875; amended Pub. L. 99–361, July 9, 1986, 100 Stat. 768; Pub. L. 111–203, title X, §1089(2), July 21, 2010, 124 Stat. 2092.)

AMENDMENTS

2010—Par. (1). Pub. L. 111–203 added par. (1) and struck out former par. (1) which read as follows: "The term 'Commission' means the Federal Trade Commission."

1986—Par. (6). Pub. L. 99–361 in provision preceding cl. (A) substituted "clause (F)" for "clause (G)", struck out cl. (F) which excluded any attorney-at-law collecting a debt as an attorney on behalf of and in the name of a client from term "debt collector", and redesignated cl. (G) as (F).

EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

### § 1692b. Acquisition of location information

Any debt collector communicating with any person other than the consumer for the purpose of acquiring location information about the consumer shall—

(1) identify himself, state that he is confirming or correcting location information concerning the consumer, and, only if expressly requested, identify his employer;

(2) not state that such consumer owes any debt;

(3) not communicate with any such person more than once unless requested to do so by such person or unless the debt collector reasonably believes that the earlier response of such person is erroneous or incomplete and that such person now has correct or complete location information;

(4) not communicate by post card;

(5) not use any language or symbol on any envelope or in the contents of any communication effected by the mails or telegram that indicates that the debt collector is in the debt collection business or that the communication relates to the collection of a debt; and

(6) after the debt collector knows the consumer is represented by an attorney with regard to the subject debt and has knowledge of, or can readily ascertain, such attorney's name and address, not communicate with any person other than that attorney, unless the attorney fails to respond within a reasonable period of time to communication from the debt collector.

(Pub. L. 90–321, title VIII, §804, as added Pub. L. 95–109, Sept. 20, 1977, 91 Stat. 876.)

### § 1692c. Communication in connection with debt collection

#### (a) Communication with the consumer generally

Without the prior consent of the consumer given directly to the debt collector or the express permission of a court of competent jurisdiction, a debt collector may not communicate with a consumer in connection with the collection of any debt—

(1) at any unusual time or place or a time or place known or which should be known to be inconvenient to the consumer. In the absence of knowledge of circumstances to the contrary, a debt collector shall assume that the convenient time for communicating with a consumer is after 8 o'clock antemeridian and before 9 o'clock postmeridian, local time at the consumer's location;

(2) if the debt collector knows the consumer is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address, unless the attorney fails to respond within a reasonable period of time to a communication from the debt collector or unless the attorney consents to direct communication with the consumer; or

(3) at the consumer's place of employment if the debt collector knows or has reason to know that the consumer's employer prohibits the consumer from receiving such communication.

#### (b) Communication with third parties

Except as provided in section 1692b of this title, without the prior consent of the consumer given directly to the debt collector, or the express permission of a court of competent juris-

diction, or as reasonably necessary to effectuate a postjudgment judicial remedy, a debt collector may not communicate, in connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector.

**(c) Ceasing communication**

If a consumer notifies a debt collector in writing that the consumer refuses to pay a debt or that the consumer wishes the debt collector to cease further communication with the consumer, the debt collector shall not communicate further with the consumer with respect to such debt, except—

(1) to advise the consumer that the debt collector's further efforts are being terminated;

(2) to notify the consumer that the debt collector or creditor may invoke specified remedies which are ordinarily invoked by such debt collector or creditor; or

(3) where applicable, to notify the consumer that the debt collector or creditor intends to invoke a specified remedy.

If such notice from the consumer is made by mail, notification shall be complete upon receipt.

**(d) "Consumer" defined**

For the purpose of this section, the term "consumer" includes the consumer's spouse, parent (if the consumer is a minor), guardian, executor, or administrator.

(Pub. L. 90–321, title VIII, §805, as added Pub. L. 95–109, Sept. 20, 1977, 91 Stat. 876.)

**§ 1692d. Harassment or abuse**

A debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(1) The use or threat of use of violence or other criminal means to harm the physical person, reputation, or property of any person.

(2) The use of obscene or profane language or language the natural consequence of which is to abuse the hearer or reader.

(3) The publication of a list of consumers who allegedly refuse to pay debts, except to a consumer reporting agency or to persons meeting the requirements of section 1681a(f) or 1681b(3)[1] of this title.

(4) The advertisement for sale of any debt to coerce payment of the debt.

(5) Causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number.

(6) Except as provided in section 1692b of this title, the placement of telephone calls without meaningful disclosure of the caller's identity.

(Pub. L. 90–321, title VIII, §806, as added Pub. L. 95–109, Sept. 20, 1977, 91 Stat. 877.)

[1] See References in Text note below.

REFERENCES IN TEXT

Section 1681b(3) of this title, referred to in par. (3), was redesignated section 1681b(a)(3) of this title by Pub. L. 104–208, div. A, title II, §2403(a)(1), Sept. 30, 1996, 110 Stat. 3009–430.

**§ 1692e. False or misleading representations**

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(1) The false representation or implication that the debt collector is vouched for, bonded by, or affiliated with the United States or any State, including the use of any badge, uniform, or facsimile thereof.

(2) The false representation of—

(A) the character, amount, or legal status of any debt; or

(B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.

(3) The false representation or implication that any individual is an attorney or that any communication is from an attorney.

(4) The representation or implication that nonpayment of any debt will result in the arrest or imprisonment of any person or the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and the debt collector or creditor intends to take such action.

(5) The threat to take any action that cannot legally be taken or that is not intended to be taken.

(6) The false representation or implication that a sale, referral, or other transfer of any interest in a debt shall cause the consumer to—

(A) lose any claim or defense to payment of the debt; or

(B) become subject to any practice prohibited by this subchapter.

(7) The false representation or implication that the consumer committed any crime or other conduct in order to disgrace the consumer.

(8) Communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed.

(9) The use or distribution of any written communication which simulates or is falsely represented to be a document authorized, issued, or approved by any court, official, or agency of the United States or any State, or which creates a false impression as to its source, authorization, or approval.

(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

(11) The failure to disclose in the initial written communication with the consumer and, in addition, if the initial communication with the consumer is oral, in that initial oral communication, that the debt collector is at-

tempting to collect a debt and that any information obtained will be used for that purpose, and the failure to disclose in subsequent communications that the communication is from a debt collector, except that this paragraph shall not apply to a formal pleading made in connection with a legal action.

(12) The false representation or implication that accounts have been turned over to innocent purchasers for value.

(13) The false representation or implication that documents are legal process.

(14) The use of any business, company, or organization name other than the true name of the debt collector's business, company, or organization.

(15) The false representation or implication that documents are not legal process forms or do not require action by the consumer.

(16) The false representation or implication that a debt collector operates or is employed by a consumer reporting agency as defined by section 1681a(f) of this title.

(Pub. L. 90–321, title VIII, §807, as added Pub. L. 95–109, Sept. 20, 1977, 91 Stat. 877; amended Pub. L. 104–208, div. A, title II, §2305(a), Sept. 30, 1996, 110 Stat. 3009–425.)

AMENDMENTS

1996—Par. (11). Pub. L. 104–208 amended par. (11) generally. Prior to amendment, par. (11) read as follows: "Except as otherwise provided for communications to acquire location information under section 1692b of this title, the failure to disclose clearly in all communications made to collect a debt or to obtain information about a consumer, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose."

EFFECTIVE DATE OF 1996 AMENDMENT

Pub. L. 104–208, div. A, title II, §2305(b), Sept. 30, 1996, 110 Stat. 3009–425, provided that: "The amendment made by subsection (a) [amending this section] shall take effect 90 days after the date of enactment of this Act [Sept. 30, 1996] and shall apply to all communications made after that date of enactment."

§ 1692f. Unfair practices

A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

(2) The acceptance by a debt collector from any person of a check or other payment instrument postdated by more than five days unless such person is notified in writing of the debt collector's intent to deposit such check or instrument not more than ten nor less than three business days prior to such deposit.

(3) The solicitation by a debt collector of any postdated check or other postdated payment instrument for the purpose of threatening or instituting criminal prosecution.

(4) Depositing or threatening to deposit any postdated check or other postdated payment instrument prior to the date on such check or instrument.

(5) Causing charges to be made to any person for communications by concealment of the true purpose of the communication. Such charges include, but are not limited to, collect telephone calls and telegram fees.

(6) Taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if—

(A) there is no present right to possession of the property claimed as collateral through an enforceable security interest;

(B) there is no present intention to take possession of the property; or

(C) the property is exempt by law from such dispossession or disablement.

(7) Communicating with a consumer regarding a debt by post card.

(8) Using any language or symbol, other than the debt collector's address, on any envelope when communicating with a consumer by use of the mails or by telegram, except that a debt collector may use his business name if such name does not indicate that he is in the debt collection business.

(Pub. L. 90–321, title VIII, §808, as added Pub. L. 95–109, Sept. 20, 1977, 91 Stat. 879.)

§ 1692g. Validation of debts

(a) Notice of debt; contents

Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing—

(1) the amount of the debt;

(2) the name of the creditor to whom the debt is owed;

(3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

(4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and

(5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

(b) Disputed debts

If the consumer notifies the debt collector in writing within the thirty-day period described in subsection (a) of this section that the debt, or any portion thereof, is disputed, or that the consumer requests the name and address of the original creditor, the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name

and address of the original creditor, is mailed to the consumer by the debt collector. Collection activities and communications that do not otherwise violate this subchapter may continue during the 30-day period referred to in subsection (a) unless the consumer has notified the debt collector in writing that the debt, or any portion of the debt, is disputed or that the consumer requests the name and address of the original creditor. Any collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt or request the name and address of the original creditor.

**(c) Admission of liability**

The failure of a consumer to dispute the validity of a debt under this section may not be construed by any court as an admission of liability by the consumer.

**(d) Legal pleadings**

A communication in the form of a formal pleading in a civil action shall not be treated as an initial communication for purposes of subsection (a).

**(e) Notice provisions**

The sending or delivery of any form or notice which does not relate to the collection of a debt and is expressly required by title 26, title V of Gramm-Leach-Bliley Act [15 U.S.C. 6801 et seq.], or any provision of Federal or State law relating to notice of data security breach or privacy, or any regulation prescribed under any such provision of law, shall not be treated as an initial communication in connection with debt collection for purposes of this section.

(Pub. L. 90–321, title VIII, §809, as added Pub. L. 95–109, Sept. 20, 1977, 91 Stat. 879; amended Pub. L. 109–351, title VIII, §802, Oct. 13, 2006, 120 Stat. 2006.)

REFERENCES IN TEXT

The Gramm-Leach-Bliley Act, referred to in subsec. (e), is Pub. L. 106–102, Nov. 12, 1999, 113 Stat. 1338. Title V of the Act is classified principally to chapter 94 (§ 6801 et seq.) of this title. For complete classification of this Act to the Code, see Short Title of 1999 Amendment note set out under section 1811 of Title 12, Banks and Banking, and Tables.

AMENDMENTS

2006—Subsec. (b). Pub. L. 109–351, §802(c), inserted at end "Collection activities and communications that do not otherwise violate this subchapter may continue during the 30-day period referred to in subsection (a) unless the consumer has notified the debt collector in writing that the debt, or any portion of the debt, is disputed or that the consumer requests the name and address of the original creditor. Any collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt or request the name and address of the original creditor."

Subsec. (d). Pub. L. 109–351, §802(a), added subsec. (d).
Subsec. (e). Pub. L. 109–351, §802(b), added subsec. (e).

EFFECTIVE DATE

Section applicable only with respect to debts for which the initial attempt to collect occurs after the effective date of this subchapter, which takes effect upon the expiration of six months after Sept. 20, 1977, see

section 819 of Pub. L. 90–321, set out as a note under section 1692 of this title.

**§ 1692h. Multiple debts**

If any consumer owes multiple debts and makes any single payment to any debt collector with respect to such debts, such debt collector may not apply such payment to any debt which is disputed by the consumer and, where applicable, shall apply such payment in accordance with the consumer's directions.

(Pub. L. 90–321, title VIII, §810, as added Pub. L. 95–109, Sept. 20, 1977, 91 Stat. 880.)

**§ 1692i. Legal actions by debt collectors**

**(a) Venue**

Any debt collector who brings any legal action on a debt against any consumer shall—

(1) in the case of an action to enforce an interest in real property securing the consumer's obligation, bring such action only in a judicial district or similar legal entity in which such real property is located; or

(2) in the case of an action not described in paragraph (1), bring such action only in the judicial district or similar legal entity—

(A) in which such consumer signed the contract sued upon; or

(B) in which such consumer resides at the commencement of the action.

**(b) Authorization of actions**

Nothing in this subchapter shall be construed to authorize the bringing of legal actions by debt collectors.

(Pub. L. 90–321, title VIII, §811, as added Pub. L. 95–109, Sept. 20, 1977, 91 Stat. 880.)

**§ 1692j. Furnishing certain deceptive forms**

(a) It is unlawful to design, compile, and furnish any form knowing that such form would be used to create the false belief in a consumer that a person other than the creditor of such consumer is participating in the collection of or in an attempt to collect a debt such consumer allegedly owes such creditor, when in fact such person is not so participating.

(b) Any person who violates this section shall be liable to the same extent and in the same manner as a debt collector is liable under section 1692k of this title for failure to comply with a provision of this subchapter.

(Pub. L. 90–321, title VIII, §812, as added Pub. L. 95–109, Sept. 20, 1977, 91 Stat. 880.)

**§ 1692k. Civil liability**

**(a) Amount of damages**

Except as otherwise provided by this section, any debt collector who fails to comply with any provision of this subchapter with respect to any person is liable to such person in an amount equal to the sum of—

(1) any actual damage sustained by such person as a result of such failure;

(2)(A) in the case of any action by an individual, such additional damages as the court may allow, but not exceeding $1,000; or

(B) in the case of a class action, (i) such amount for each named plaintiff as could be

recovered under subparagraph (A), and (ii) such amount as the court may allow for all other class members, without regard to a minimum individual recovery, not to exceed the lesser of $500,000 or 1 per centum of the net worth of the debt collector; and

(3) in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court. On a finding by the court that an action under this section was brought in bad faith and for the purpose of harassment, the court may award to the defendant attorney's fees reasonable in relation to the work expended and costs.

**(b) Factors considered by court**

In determining the amount of liability in any action under subsection (a) of this section, the court shall consider, among other relevant factors—

(1) in any individual action under subsection (a)(2)(A) of this section, the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional; or

(2) in any class action under subsection (a)(2)(B) of this section, the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, the resources of the debt collector, the number of persons adversely affected, and the extent to which the debt collector's noncompliance was intentional.

**(c) Intent**

A debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

**(d) Jurisdiction**

An action to enforce any liability created by this subchapter may be brought in any appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction, within one year from the date on which the violation occurs.

**(e) Advisory opinions of Bureau**

No provision of this section imposing any liability shall apply to any act done or omitted in good faith in conformity with any advisory opinion of the Bureau, notwithstanding that after such act or omission has occurred, such opinion is amended, rescinded, or determined by judicial or other authority to be invalid for any reason.

(Pub. L. 90–321, title VIII, §813, as added Pub. L. 95–109, Sept. 20, 1977, 91 Stat. 881; amended Pub. L. 111–203, title X, §1089(1), July 21, 2010, 124 Stat. 2092.)

AMENDMENTS

2010—Subsec. (e). Pub. L. 111–203 substituted ''Bureau'' for ''Commission''.

EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

## §1692*l*. Administrative enforcement

**(a) Federal Trade Commission**

The Federal Trade Commission shall be authorized to enforce compliance with this subchapter, except to the extent that enforcement of the requirements imposed under this subchapter is specifically committed to another Government agency under any of paragraphs (1) through (5) of subsection (b), subject to subtitle B of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5511 et seq.]. For purpose of the exercise by the Federal Trade Commission of its functions and powers under the Federal Trade Commission Act (15 U.S.C. 41 et seq.), a violation of this subchapter shall be deemed an unfair or deceptive act or practice in violation of that Act. All of the functions and powers of the Federal Trade Commission under the Federal Trade Commission Act are available to the Federal Trade Commission to enforce compliance by any person with this subchapter, irrespective of whether that person is engaged in commerce or meets any other jurisdictional tests under the Federal Trade Commission Act, including the power to enforce the provisions of this subchapter, in the same manner as if the violation had been a violation of a Federal Trade Commission trade regulation rule.

**(b) Applicable provisions of law**

Subject to subtitle B of the Consumer Financial Protection Act of 2010, compliance with any requirements imposed under this subchapter shall be enforced under—

(1) section 8 of the Federal Deposit Insurance Act [12 U.S.C. 1818], by the appropriate Federal banking agency, as defined in section 3(q) of the Federal Deposit Insurance Act (12 U.S.C. 1813(q)), with respect to—

(A) national banks, Federal savings associations, and Federal branches and Federal agencies of foreign banks;

(B) member banks of the Federal Reserve System (other than national banks), branches and agencies of foreign banks (other than Federal branches, Federal agencies, and insured State branches of foreign banks), commercial lending companies owned or controlled by foreign banks, and organizations operating under section 25 or 25A of the Federal Reserve Act [12 U.S.C. 601 et seq., 611 et seq.]; and

(C) banks and State savings associations insured by the Federal Deposit Insurance Corporation (other than members of the Federal Reserve System), and insured State branches of foreign banks;

(2) the Federal Credit Union Act [12 U.S.C. 1751 et seq.], by the Administrator of the National Credit Union Administration with respect to any Federal credit union;

(3) subtitle IV of title 49, by the Secretary of Transportation, with respect to all carriers subject to the jurisdiction of the Surface Transportation Board;

(4) part A of subtitle VII of title 49, by the Secretary of Transportation with respect to

any air carrier or any foreign air carrier subject to that part;

(5) the Packers and Stockyards Act, 1921 [7 U.S.C. 181 et seq.] (except as provided in section 406 of that Act [7 U.S.C. 226, 227]), by the Secretary of Agriculture with respect to any activities subject to that Act; and

(6) subtitle E of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5561 et seq.], by the Bureau, with respect to any person subject to this subchapter.

The terms used in paragraph (1) that are not defined in this subchapter or otherwise defined in section 3(s) of the Federal Deposit Insurance Act (12 U.S.C. 1813(s)) shall have the meaning given to them in section 1(b) of the International Banking Act of 1978 (12 U.S.C. 3101).

**(c) Agency powers**

For the purpose of the exercise by any agency referred to in subsection (b) of this section of its powers under any Act referred to in that subsection, a violation of any requirement imposed under this subchapter shall be deemed to be a violation of a requirement imposed under that Act. In addition to its powers under any provision of law specifically referred to in subsection (b) of this section, each of the agencies referred to in that subsection may exercise, for the purpose of enforcing compliance with any requirement imposed under this subchapter any other authority conferred on it by law, except as provided in subsection (d) of this section.

**(d) Rules and regulations**

Except as provided in section 1029(a) of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5519(a)], the Bureau may prescribe rules with respect to the collection of debts by debt collectors, as defined in this subchapter.

(Pub. L. 90–321, title VIII, §814, as added Pub. L. 95–109, Sept. 20, 1977, 91 Stat. 881; amended Pub. L. 98–443, §9(n), Oct. 4, 1984, 98 Stat. 1708; Pub. L. 101–73, title VII, §744(n), Aug. 9, 1989, 103 Stat. 440; Pub. L. 102–242, title II, §212(e), Dec. 19, 1991, 105 Stat. 2301; Pub. L. 102–550, title XVI, §1604(a)(8), Oct. 28, 1992, 106 Stat. 4082; Pub. L. 104–88, title III, §316, Dec. 29, 1995, 109 Stat. 949; Pub. L. 111–203, title X, §1089(3), (4), July 21, 2010, 124 Stat. 2092, 2093.)

REFERENCES IN TEXT

The Consumer Financial Protection Act of 2010, referred to in subsecs. (a) and (b), is title X of Pub. L. 111–203, July 21, 2010, 124 Stat. 1955. Subtitles B (§§1021–1029A) and E (§§1051–1058) of the Act are classified generally to parts B (§5511 et seq.) and E (§5561 et seq.), respectively, of subchapter V of chapter 53 of Title 12, Banks and Banking. For complete classification of subtitles B and E to the Code, see Tables.

The Federal Trade Commission Act, referred to in subsec. (a), is act Sept. 26, 1914, ch. 311, 38 Stat. 717, which is classified generally to subchapter I (§41 et seq.) of chapter 2 of this title. For complete classification of this Act to the Code, see section 58 of this title and Tables.

Sections 25 and 25A of the Federal Reserve Act, referred to in subsec. (b)(1)(B), are classified to subchapters I (§601 et seq.) and II (§611 et seq.), respectively, of chapter 6 of Title 12, Banks and Banking.

The Federal Credit Union Act, referred to in subsec. (b)(2), is act June 26, 1934, ch. 750, 48 Stat. 1216, which is classified generally to chapter 14 (§1751 et seq.) of

Title 12. For complete classification of this Act to the Code, see section 1751 of Title 12 and Tables.

The Packers and Stockyards Act, 1921, referred to in subsec. (b)(5), is act Aug. 15, 1921, ch. 64, 42 Stat. 159, which is classified generally to chapter 9 (§181 et seq.) of Title 7, Agriculture. For complete classification of this Act to the Code, see section 181 of Title 7 and Tables.

CODIFICATION

In subsec. (b)(3), "subtitle IV of title 49" substituted for "the Acts to regulate commerce" on authority of Pub. L. 95–473, §3(b), Oct. 17, 1978, 92 Stat. 1466, the first section of which enacted subtitle IV of Title 49, Transportation.

In subsec. (b)(4), "part A of subtitle VII of title 49 [App. U.S.C. 1301 et seq.]" and "that part" substituted for "the Federal Aviation Act of 1958 [49 App. U.S.C. 1301 et seq.]" and "that Act" on authority of Pub. L. 103–272, §6(b), July 5, 1994, 108 Stat. 1378, the first section of which enacted subtitles II, III, and V to X of Title 49.

Section 1089(4) of Pub. L. 111–203, which directed amendment "in subsection (d)" of the Fair Debt Collection Practices Act, was executed in subsec. (d) of this section, which is section 814 of the Act, to reflect the probable intent of Congress. See 2010 Amendment note below.

AMENDMENTS

2010—Subsec. (a). Pub. L. 111–203, §1089(3)(A), added subsec. (a) and struck out former subsec. (a). Prior to amendment, text read as follows: "Compliance with this subchapter shall be enforced by the Commission, except to the extent that enforcement of the requirements imposed under this subchapter is specifically committed to another agency under subsection (b) of this section. For purpose of the exercise by the Commission of its functions and powers under the Federal Trade Commission Act, a violation of this subchapter shall be deemed an unfair or deceptive act or practice in violation of that Act. All of the functions and powers of the Commission under the Federal Trade Commission Act are available to the Commission to enforce compliance by any person with this subchapter, irrespective of whether that person is engaged in commerce or meets any other jurisdictional tests in the Federal Trade Commission Act, including the power to enforce the provisions of this subchapter in the same manner as if the violation had been a violation of a Federal Trade Commission trade regulation rule."

Subsec. (b). Pub. L. 111–203, §1089(3)(B)(i), substituted "Subject to subtitle B of the Consumer Financial Protection Act of 2010, compliance" for "Compliance" in introductory provisions.

Subsec. (b)(1). Pub. L. 111–203, §1089(3)(B)(ii), added par. (1) and struck out former par. (1) which read as follows: "section 8 of the Federal Deposit Insurance Act, in the case of—

"(A) national banks, and Federal branches and Federal agencies of foreign banks, by the Office of the Comptroller of the Currency;

"(B) member banks of the Federal Reserve System (other than national banks), branches and agencies of foreign banks (other than Federal branches, Federal agencies, and insured State branches of foreign banks), commercial lending companies owned or controlled by foreign banks, and organizations operating under section 25 or 25(a) of the Federal Reserve Act, by the Board of Governors of the Federal Reserve System; and

"(C) banks insured by the Federal Deposit Insurance Corporation (other than members of the Federal Reserve System) and insured State branches of foreign banks, by the Board of Directors of the Federal Deposit Insurance Corporation;".

Subsec. (b)(2) to (6). Pub. L. 111–203, §1089(3)(B)(ii)–(vi), added par. (6), redesignated former pars. (3) to (6) as (2) to (5), respectively, and struck out former par. (2) which read as follows: "section 8 of the

Federal Deposit Insurance Act, by the Director of the Office of Thrift Supervision, in the case of a savings association the deposits of which are insured by the Federal Deposit Insurance Corporation;''.

Subsec. (d). Pub. L. 111–203, §1089(4), substituted ''Except as provided in section 1029(a) of the Consumer Financial Protection Act of 2010, the Bureau may prescribe rules with respect to the collection of debts by debt collectors, as defined in this subchapter'' for ''Neither the Commission nor any other agency referred to in subsection (b) of this section may promulgate trade regulation rules or other regulations with respect to the collection of debts by debt collectors as defined in this subchapter''. See Codification note above.

1995—Subsec. (b)(4). Pub. L. 104–88 substituted ''Secretary of Transportation, with respect to all carriers subject to the jurisdiction of the Surface Transportation Board'' for ''Interstate Commerce Commission with respect to any common carrier subject to those Acts''.

1992—Subsec. (b)(1)(C). Pub. L. 102–550 substituted semicolon for period at end.

1991—Subsec. (b). Pub. L. 102–242, §212(e)(2), inserted at end ''The terms used in paragraph (1) that are not defined in this subchapter or otherwise defined in section 3(s) of the Federal Deposit Insurance Act (12 U.S.C. 1813(s)) shall have the meaning given to them in section 1(b) of the International Banking Act of 1978 (12 U.S.C. 3101).''

Pub. L. 102–242, §212(e)(1), added par. (1) and struck out former par. (1) which read as follows: ''section 8 of Federal Deposit Insurance Act, in the case of—

''(A) national banks, by the Comptroller of the Currency;

''(B) member banks of the Federal Reserve System (other than national banks), by the Federal Reserve Board; and

''(C) banks the deposits or accounts of which are insured by the Federal Deposit Insurance Corporation (other than members of the Federal Reserve System), by the Board of Directors of the Federal Deposit Insurance Corporation;''.

1989—Subsec. (b)(2). Pub. L. 101–73 amended par. (2) generally. Prior to amendment, par. (2) read as follows: ''section 5(d) of the Home Owners Loan Act of 1933, section 407 of the National Housing Act, and sections 6(i) and 17 of the Federal Home Loan Bank Act, by the Federal Home Loan Bank Board (acting directly or through the Federal Savings and Loan Insurance Corporation), in the case of any institution subject to any of those provisions;''.

1984—Subsec. (b)(5). Pub. L. 98–443 substituted ''Secretary of Transportation'' for ''Civil Aeronautics Board''.

EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

EFFECTIVE DATE OF 1995 AMENDMENT

Amendment by Pub. L. 104–88 effective Jan. 1, 1996, see section 2 of Pub. L. 104–88, set out as an Effective Date note under section 701 of Title 49, Transportation.

EFFECTIVE DATE OF 1992 AMENDMENT

Amendment by Pub. L. 102–550 effective as if included in the Federal Deposit Insurance Corporation Improvement Act of 1991, Pub. L. 102–242, as of Dec. 19, 1991, see section 1609(a) of Pub. L. 102–550, set out as a note under section 191 of Title 12, Banks and Banking.

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–443 effective Jan. 1, 1985, see section 9(v) of Pub. L. 98–443, set out as a note under section 5314 of Title 5, Government Organization and Employees.

TRANSFER OF FUNCTIONS

Functions vested in Administrator of National Credit Union Administration transferred and vested in Na-

tional Credit Union Administration Board pursuant to section 1752a of Title 12, Banks and Banking.

§ 1692m. Reports to Congress by the Bureau; views of other Federal agencies

(a) Not later than one year after the effective date of this subchapter and at one-year intervals thereafter, the Bureau shall make reports to the Congress concerning the administration of its functions under this subchapter, including such recommendations as the Bureau deems necessary or appropriate. In addition, each report of the Bureau shall include its assessment of the extent to which compliance with this subchapter is being achieved and a summary of the enforcement actions taken by the Bureau under section 1692*l* of this title.

(b) In the exercise of its functions under this subchapter, the Bureau may obtain upon request the views of any other Federal agency which exercises enforcement functions under section 1692*l* of this title.

(Pub. L. 90–321, title VIII, §815, as added Pub. L. 95–109, Sept. 20, 1977, 91 Stat. 882; amended Pub. L. 111–203, title X, §1089(1), July 21, 2010, 124 Stat. 2092.)

REFERENCES IN TEXT

The effective date of this subchapter, referred to in subsec. (a), is the date occurring on expiration of six months after Sept. 20, 1977. See section 819 of Pub. L. 90–321, set out as an Effective Date note under section 1692 of this title.

AMENDMENTS

2010—Pub. L. 111–203 substituted ''Bureau'' for ''Commission'' wherever appearing.

EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

§ 1692n. Relation to State laws

This subchapter does not annul, alter, or affect, or exempt any person subject to the provisions of this subchapter from complying with the laws of any State with respect to debt collection practices, except to the extent that those laws are inconsistent with any provision of this subchapter, and then only to the extent of the inconsistency. For purposes of this section, a State law is not inconsistent with this subchapter if the protection such law affords any consumer is greater than the protection provided by this subchapter.

(Pub. L. 90–321, title VIII, §816, as added Pub. L. 95–109, Sept. 20, 1977, 91 Stat. 883.)

§ 1692o. Exemption for State regulation

The Bureau shall by regulation exempt from the requirements of this subchapter any class of debt collection practices within any State if the Bureau determines that under the law of that State that class of debt collection practices is subject to requirements substantially similar to those imposed by this subchapter, and that there is adequate provision for enforcement.

(Pub. L. 90–321, title VIII, §817, as added Pub. L. 95–109, Sept. 20, 1977, 91 Stat. 883; amended Pub.

250

L. 111–203, title X, § 1089(1), July 21, 2010, 124 Stat. 2092.)

AMENDMENTS

2010—Pub. L. 111–203 substituted ''Bureau'' for ''Commission'' in two places.

EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

### § 1692p. Exception for certain bad check enforcement programs operated by private entities

#### (a) In general

**(1) Treatment of certain private entities**

Subject to paragraph (2), a private entity shall be excluded from the definition of a debt collector, pursuant to the exception provided in section 1692a(6) of this title, with respect to the operation by the entity of a program described in paragraph (2)(A) under a contract described in paragraph (2)(B).

**(2) Conditions of applicability**

Paragraph (1) shall apply if—

(A) a State or district attorney establishes, within the jurisdiction of such State or district attorney and with respect to alleged bad check violations that do not involve a check described in subsection (b), a pretrial diversion program for alleged bad check offenders who agree to participate voluntarily in such program to avoid criminal prosecution;

(B) a private entity, that is subject to an administrative support services contract with a State or district attorney and operates under the direction, supervision, and control of such State or district attorney, operates the pretrial diversion program described in subparagraph (A); and

(C) in the course of performing duties delegated to it by a State or district attorney under the contract, the private entity referred to in subparagraph (B)—

(i) complies with the penal laws of the State;

(ii) conforms with the terms of the contract and directives of the State or district attorney;

(iii) does not exercise independent prosecutorial discretion;

(iv) contacts any alleged offender referred to in subparagraph (A) for purposes of participating in a program referred to in such paragraph—

(I) only as a result of any determination by the State or district attorney that probable cause of a bad check violation under State penal law exists, and that contact with the alleged offender for purposes of participation in the program is appropriate; and

(II) the alleged offender has failed to pay the bad check after demand for payment, pursuant to State law, is made for payment of the check amount;

(v) includes as part of an initial written communication with an alleged offender a clear and conspicuous statement that—

(I) the alleged offender may dispute the validity of any alleged bad check violation;

(II) where the alleged offender knows, or has reasonable cause to believe, that the alleged bad check violation is the result of theft or forgery of the check, identity theft, or other fraud that is not the result of the conduct of the alleged offender, the alleged offender may file a crime report with the appropriate law enforcement agency; and

(III) if the alleged offender notifies the private entity or the district attorney in writing, not later than 30 days after being contacted for the first time pursuant to clause (iv), that there is a dispute pursuant to this subsection, before further restitution efforts are pursued, the district attorney or an employee of the district attorney authorized to make such a determination makes a determination that there is probable cause to believe that a crime has been committed; and

(vi) charges only fees in connection with services under the contract that have been authorized by the contract with the State or district attorney.

#### (b) Certain checks excluded

A check is described in this subsection if the check involves, or is subsequently found to involve—

(1) a postdated check presented in connection with a payday loan, or other similar transaction, where the payee of the check knew that the issuer had insufficient funds at the time the check was made, drawn, or delivered;

(2) a stop payment order where the issuer acted in good faith and with reasonable cause in stopping payment on the check;

(3) a check dishonored because of an adjustment to the issuer's account by the financial institution holding such account without providing notice to the person at the time the check was made, drawn, or delivered;

(4) a check for partial payment of a debt where the payee had previously accepted partial payment for such debt;

(5) a check issued by a person who was not competent, or was not of legal age, to enter into a legal contractual obligation at the time the check was made, drawn, or delivered; or

(6) a check issued to pay an obligation arising from a transaction that was illegal in the jurisdiction of the State or district attorney at the time the check was made, drawn, or delivered.

#### (c) Definitions

For purposes of this section, the following definitions shall apply:

**(1) State or district attorney**

The term ''State or district attorney'' means the chief elected or appointed prosecuting attorney in a district, county (as defined in section 2 of title 1), municipality, or comparable jurisdiction, including State attorneys general who act as chief elected or appointed prosecut-

251

ing attorneys in a district, county (as so defined), municipality or comparable jurisdiction, who may be referred to by a variety of titles such as district attorneys, prosecuting attorneys, commonwealth's attorneys, solicitors, county attorneys, and state's attorneys, and who are responsible for the prosecution of State crimes and violations of jurisdiction-specific local ordinances.

**(2) Check**

The term "check" has the same meaning as in section 5002(6) of title 12.

**(3) Bad check violation**

The term "bad check violation" means a violation of the applicable State criminal law relating to the writing of dishonored checks.

(Pub. L. 90–321, title VIII, §818, as added Pub. L. 109–351, title VIII, §801(a)(2), Oct. 13, 2006, 120 Stat. 2004.)

## SUBCHAPTER VI—ELECTRONIC FUND TRANSFERS

### § 1693. Congressional findings and declaration of purpose

**(a) Rights and liabilities undefined**

The Congress finds that the use of electronic systems to transfer funds provides the potential for substantial benefits to consumers. However, due to the unique characteristics of such systems, the application of existing consumer protection legislation is unclear, leaving the rights and liabilities of consumers, financial institutions, and intermediaries in electronic fund transfers undefined.

**(b) Purposes**

It is the purpose of this subchapter to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems. The primary objective of this subchapter, however, is the provision of individual consumer rights.

(Pub. L. 90–321, title IX, §902, as added Pub. L. 95–630, title XX, §2001, Nov. 10, 1978, 92 Stat. 3728; amended Pub. L. 111–203, title X, §1073(a)(1), July 21, 2010, 124 Stat. 2060.)

AMENDMENTS

2010—Subsec. (b). Pub. L. 111–203 inserted "and remittance" after "electronic fund".

EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective 1 day after July 21, 2010, except as otherwise provided, see section 4 of Pub. L. 111–203, set out as an Effective Date note under section 5301 of Title 12, Banks and Banking.

EFFECTIVE DATE

Pub. L. 90–321, title IX, §923, formerly §921, as added by Pub. L. 95–630, title XX, §2001, Nov. 10, 1978, 92 Stat. 3741, renumbered §922, Pub. L. 111–24, title IV, §401(1), May 22, 2009, 123 Stat. 1751; renumbered §923, Pub. L. 111–203, title X, §1073(a)(3), July 21, 2010, 124 Stat. 2060, provided that: "This title [enacting this subchapter] takes effect upon the expiration of eighteen months from the date of its enactment [Nov. 10, 1978], except that sections 909 and 911 [sections 1693g, 1693i of this title] take effect upon the expiration of ninety days after the date of enactment.''

[Pub. L. 111–203, §1073(a)(3), which directed renumbering of section 922 of Pub. L. 90–321 as section 923 effective 1 day after July 21, 2010, was executed after the renumbering of section 921 of Pub. L. 90–321 as section 922 by Pub. L. 111–24, §401(1), effective 15 months after May 22, 2009, to reflect the probable intent of Congress.]

SHORT TITLE

This subchapter known as the ''Electronic Fund Transfer Act'', see Short Title note set out under section 1601 of this title.

### § 1693a. Definitions

As used in this subchapter—

(1) the term "accepted card or other means of access" means a card, code, or other means of access to a consumer's account for the purpose of initiating electronic fund transfers when the person to whom such card or other means of access was issued has requested and received or has signed or has used, or authorized another to use, such card or other means of access for the purpose of transferring money between accounts or obtaining money, property, labor, or services;

(2) the term "account" means a demand deposit, savings deposit, or other asset account (other than an occasional or incidental credit balance in an open end credit plan as defined in section 1602(i)[1] of this title), as described in regulations of the Bureau, established primarily for personal, family, or household purposes, but such term does not include an account held by a financial institution pursuant to a bona fide trust agreement;

(4)[2] the term "Board" means the Board of Governors of the Federal Reserve System;

(4)[2] the term "Bureau" means the Bureau of Consumer Financial Protection;

(5) the term "business day" means any day on which the offices of the consumer's financial institution involved in an electronic fund transfer are open to the public for carrying on substantially all of its business functions;

(6) the term "consumer" means a natural person;

(7) the term "electronic fund transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, direct deposits or withdrawals of funds, and transfers initiated by telephone. Such term does not include—

(A) any check guarantee or authorization service which does not directly result in a debit or credit to a consumer's account:[3]

(B) any transfer of funds, other than those processed by automated clearinghouse, made by a financial institution on behalf of a consumer by means of a service that transfers funds held at either Federal Reserve banks

[1] See References in Text note below.

[2] So in original. There are two pars. designated ''(4)'' and no par. (3).

[3] So in original. The colon probably should be a semicolon.

1984—Pub. L. 98–620, title IV, §402(29)(C), Nov. 8, 1984, 98 Stat. 3359, struck out item 1296 "Precedence of cases in the United States Court of Appeals for the Federal Circuit".

1982—Pub. L. 97–164, title I, §127(b), Apr. 2, 1982, 96 Stat. 39, added items 1295 and 1296.

1978—Pub. L. 95–598, title II, §236(b), Nov. 6, 1978, 92 Stat. 2667, directed the addition of item 1293, "Bankruptcy appeals", which amendment did not become effective pursuant to section 402(b) of Pub. L. 95–598, as amended, set out as an Effective Date note preceding section 101 of Title 11, Bankruptcy.

1961—Pub. L. 87–189, §4, Aug. 30, 1961, 75 Stat. 417, struck out item 1293 "Final decisions of Puerto Rico and Hawaii Supreme Courts".

## § 1291. Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

(June 25, 1948, ch. 646, 62 Stat. 929; Oct. 31, 1951, ch. 655, §48, 65 Stat. 726; Pub. L. 85–508, §12(e), July 7, 1958, 72 Stat. 348; Pub. L. 97–164, title I, §124, Apr. 2, 1982, 96 Stat. 36.)

### HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., §§225(a), 933(a)(1), and section 1356 of title 48, U.S.C., 1940 ed., Territories and Insular Possessions, and sections 61 and 62 of title 7 of the Canal Zone Code (Mar. 3, 1911, ch. 231, §128, 36 Stat. 1133; Aug. 24, 1912, ch. 390, §9, 37 Stat. 566; Jan. 28, 1915, ch. 22, §2, 38 Stat. 804; Feb. 7, 1925, ch. 150, 43 Stat. 813; Sept. 21, 1922, ch. 370, §3, 42 Stat. 1006; Feb. 13, 1925, ch. 229, §1, 43 Stat. 936; Jan. 31, 1928, ch. 14, §1, 45 Stat. 54; May 17, 1932, ch. 190, 47 Stat. 158; Feb. 16, 1933, ch. 91, §3, 47 Stat. 817; May 31, 1935, ch. 160, 49 Stat. 313; June 20, 1938, ch. 526, 52 Stat. 779; Aug. 2, 1946, ch. 753, §412(a)(1), 60 Stat. 844).

This section rephrases and simplifies paragraphs "First", "Second", and "Third" of section 225(a) of title 28, U.S.C., 1940 ed., which referred to each Territory and Possession separately, and to sections 61 and 62 of the Canal Zone Code, section 933(a)(1) of said title relating to jurisdiction of appeals in tort claims cases, and the provisions of section 1356 of title 48, U.S.C., 1940 ed., relating to jurisdiction of appeals from final judgments of the district court for the Canal Zone.

The district courts for the districts of Hawaii and Puerto Rico are embraced in the term "district courts of the United States." (See definitive section 451 of this title.)

Paragraph "Fourth" of section 225(a) of title 28, U.S.C., 1940 ed., is incorporated in section 1293 of this title.

Words "Fifth. In the United States Court for China, in all cases" in said section 225(a) were omitted. (See reviser's note under section 411 of this title.)

Venue provisions of section 1356 of title 48, U.S.C., 1940 ed., are incorporated in section 1295 of this title.

Section 61 of title 7 of the Canal Zone Code is also incorporated in sections 1291 and 1295 of this title.

In addition to the jurisdiction conferred by this chapter, the courts of appeals also have appellate jurisdiction in proceedings under Title 11, Bankruptcy, and jurisdiction to review:

(1) Orders of the Secretary of the Treasury denying an application for, suspending, revoking, or annulling a basic permit under chapter 8 of title 27;

(2) Orders of the Interstate Commerce Commission, the Federal Communications Commission, the Civil Aeronautics Board, the Board of Governors of the Federal Reserve System and the Federal Trade Commission, based on violations of the antitrust laws or unfair or deceptive acts, methods, or practices in commerce;

(3) Orders of the Secretary of the Army under sections 504, 505 and 516 of title 33, U.S.C., 1940 ed., Navigation and Navigable Waters;

(4) Orders of the Civil Aeronautics Board under chapter 9 of title 49, except orders as to foreign air carriers which are subject to the President's approval;

(5) Orders under chapter 1 of title 7, refusing to designate boards of trade as contract markets or suspending or revoking such designations, or excluding persons from trading in contract markets;

(6) Orders of the Federal Power Commission under chapter 12 of title 16;

(7) Orders of the Federal Security Administrator under section 371(e) of title 21, in a case of actual controversy as to the validity of any such order, by any person adversely affected thereby;

(8) Orders of the Federal Power Commission under chapter 15B of title 15;

(9) Final orders of the National Labor Relations Board;

(10) Cease and desist orders under section 193 of title 7;

(11) Orders of the Securities and Exchange Commission;

(12) Orders to cease and desist from violating section 1599 of title 7;

(13) Wage orders of the Administrator of the Wage and Hour Division of the Department of Labor under section 208 of title 29;

(14) Orders under sections 81r and 1641 of title 19, U.S.C., 1940 ed., Customs Duties.

The courts of appeals also have jurisdiction to enforce:

(1) Orders of the Interstate Commerce Commission, the Federal Communications Commission, the Civil Aeronautics Board, the Board of Governors of the Federal Reserve System, and the Federal Trade Commission, based on violations of the antitrust laws or unfair or deceptive acts, methods, or practices in commerce;

(2) Final orders of the National Labor Relations Board;

(3) Orders to cease and desist from violating section 1599 of title 7.

The Court of Appeals for the District of Columbia also has jurisdiction to review orders of the Post Office Department under section 576 of title 39 relating to discriminations in sending second-class publications by freight; Maritime Commission orders denying transfer to foreign registry of vessels under subsidy contract; sugar allotment orders; decisions of the Federal Communications Commission granting or refusing applications for construction permits for radio stations, or for radio station licenses, or for renewal or modification of radio station licenses, or suspending any radio operator's license.

Changes were made in phraseology.

### AMENDMENTS

1982—Pub. L. 97–164, §124, inserted "(other than the United States Court of Appeals for the Federal Circuit)" after "The court of appeals" and inserted provision that the jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

1958—Pub. L. 85–508 struck out provisions which gave courts of appeals jurisdiction of appeals from District Court for Territory of Alaska. See section 81A of this title which establishes a United States District Court for the State of Alaska.

1951—Act Oct. 31, 1951, inserted reference to District Court of Guam.

Amendment by Pub. L. 97–164 effective Oct. 1, 1982, see section 402 of Pub. L. 97–164, set out as a note under section 171 of this title.

Amendment by Pub. L. 85–508 effective Jan. 3, 1959, on admission of Alaska into the Union pursuant to Proc. No. 3269, Jan. 3, 1959, 24 F.R. 81, 73 Stat. c.16 as required by sections 1 and 8(c) of Pub. L. 85–508, see notes set out under section 81A of this title and preceding section 21 of Title 48, Territories and Insular Possessions.

For termination of the United States District Court for the District of the Canal Zone at end of the "transition period", being the 30-month period beginning Oct. 1, 1979, and ending midnight Mar. 31, 1982, see Paragraph 5 of Article XI of the Panama Canal Treaty of 1977 and sections 2101 and 2201 to 2203 of Pub. L. 96–70, title II, Sept. 27, 1979, 93 Stat. 493, formerly classified to sections 3831 and 3841 to 3843, respectively, of Title 22, Foreign Relations and Intercourse.

## § 1292. Interlocutory decisions

(a) Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

(1) Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court;

(2) Interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property;

(3) Interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed.

(b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

(c) The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction—

(1) of an appeal from an interlocutory order or decree described in subsection (a) or (b) of this section in any case over which the court would have jurisdiction of an appeal under section 1295 of this title; and

(2) of an appeal from a judgment in a civil action for patent infringement which would otherwise be appealable to the United States Court of Appeals for the Federal Circuit and is final except for an accounting.

(d)(1) When the chief judge of the Court of International Trade issues an order under the provisions of section 256(b) of this title, or when any judge of the Court of International Trade, in issuing any other interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit may, in its discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

(2) When the chief judge of the United States Court of Federal Claims issues an order under section 798(b) of this title, or when any judge of the United States Court of Federal Claims, in issuing an interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit may, in its discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

(3) Neither the application for nor the granting of an appeal under this subsection shall stay proceedings in the Court of International Trade or in the Court of Federal Claims, as the case may be, unless a stay is ordered by a judge of the Court of International Trade or of the Court of Federal Claims or by the United States Court of Appeals for the Federal Circuit or a judge of that court.

(4)(A) The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction of an appeal from an interlocutory order of a district court of the United States, the District Court of Guam, the District Court of the Virgin Islands, or the District Court for the Northern Mariana Islands, granting or denying, in whole or in part, a motion to transfer an action to the United States Court of Federal Claims under section 1631 of this title.

(B) When a motion to transfer an action to the Court of Federal Claims is filed in a district court, no further proceedings shall be taken in the district court until 60 days after the court has ruled upon the motion. If an appeal is taken from the district court's grant or denial of the motion, proceedings shall be further stayed until the appeal has been decided by the Court of Appeals for the Federal Circuit. The stay of proceedings in the district court shall not bar the granting of preliminary or injunctive relief, where appropriate and where expedition is reasonably necessary. However, during the period in which proceedings are stayed as provided in

Sec.
1345.    United States as plaintiff.
1346.    United States as defendant.
1347.    Partition action where United States is joint tenant.
1348.    Banking association as party.
1349.    Corporation organized under federal law as party.
1350.    Alien's action for tort.
1351.    Consuls, vice consuls, and members of a diplomatic mission as defendant.
1352.    Bonds executed under federal law.
1353.    Indian allotments.
1354.    Land grants from different states.
1355.    Fine, penalty or forfeiture.
1356.    Seizures not within admiralty and maritime jurisdiction.
1357.    Injuries under Federal laws.
1358.    Eminent domain.
1359.    Parties collusively joined or made.
1360.    State civil jurisdiction in actions to which Indians are parties.
1361.    Action to compel an officer of the United States to perform his duty.
1362.    Indian tribes.
1363.    Jurors' employment rights.
1364.    Direct actions against insurers of members of diplomatic missions and their families.
1365.    Senate actions.
1366.    Construction of references to laws of the United States or Acts of Congress.
1367.    Supplemental jurisdiction.
1368.    Counterclaims in unfair practices in international trade.
1369.    Multiparty, multiforum jurisdiction.

### AMENDMENTS

2002—Pub. L. 107–273, div. C, title I, §11020(b)(1)(B), Nov. 2, 2002, 116 Stat. 1827, added item 1369.

1999—Pub. L. 106–113, div. B, §1000(a)(9) [title III, §3009(2)], Nov. 29, 1999, 113 Stat. 1536, 1501A–552, substituted "trademarks" for "trade-marks" in item 1368.

1998—Pub. L. 105–304, title V, §503(b)(2)(B), Oct. 28, 1998, 112 Stat. 2917, inserted "designs," after "mask works," in item 1338.

1995—Pub. L. 104–88, title III, §305(a)(4), Dec. 29, 1995, 109 Stat. 944, substituted "Surface Transportation Board's" for "Interstate Commerce Commission's" in item 1336.

1994—Pub. L. 103–465, title III, §321(b)(3)(B), Dec. 8, 1994, 108 Stat. 4947, added item 1368.

1990—Pub. L. 101–650, title III, §310(b), Dec. 1, 1990, 104 Stat. 5114, added item 1367.

1988—Pub. L. 100–702, title X, §1020(a)(7), Nov. 19, 1988, 102 Stat. 4672, substituted "Actions" for "Action" in item 1330, inserted a period after "question" in item 1331, substituted "plant variety protection, copyrights, mask works, trade-marks," for "copyrights, and trade-marks" in item 1338, and inserted "and elective franchise" in item 1343.

1986—Pub. L. 99–336, §6(a)(1)(A), June 19, 1986, 100 Stat. 638, renumbered item 1364 "Senate actions" and item 1364 "Construction of references to laws of the United States or Acts of Congress" as items 1365 and 1366, respectively.

1984—Pub. L. 98–353, title I, §101(b), July 10, 1984, 98 Stat. 333, substituted "cases" for "matters" in item 1334.

1980—Pub. L. 96–486, §2(b), Dec. 1, 1980, 94 Stat. 2369, struck out "; amount in controversy; costs." after "question" in item 1331.

1978—Pub. L. 95–598, title II, §238(b), Nov. 6, 1978, 92 Stat. 2668, directed the substitution of "Bankruptcy appeals" for "Bankruptcy matters and proceedings" in item 1334, which amendment did not become effective pursuant to section 402(b) of Pub. L. 95–598, as amended, set out as an Effective Date note preceding section 101 of Title 11, Bankruptcy.

Pub. L. 95–572, §6(b)(2), Nov. 2, 1978, 92 Stat. 2457, added item 1363 and redesignated former item 1363 "Construction of references to laws of the United States or Acts of Congress", as 1364.

Pub. L. 95–521, title VII, §705(f)(2), Oct. 26, 1978, 92 Stat. 1880, added item 1364 "Senate actions".

Pub. L. 95–486, §9(c), Oct. 20, 1978, 92 Stat. 1634, substituted "Commerce and antitrust regulations; amount in controversy, costs" for "Commerce and antitrust regulations" in item 1337.

Pub. L. 95–393, §§7(b), 8(a)(2), Sept. 30, 1978, 92 Stat. 810, substituted "Consuls, vice consuls, and members of a diplomatic mission as defendant" for "Consuls and vice consuls as defendants" in item 1351 and added item 1364 "Direct actions against insurers of members of diplomatic missions and their families".

1976—Pub. L. 94–583, §2(b), Oct. 21, 1976, 90 Stat. 2891, added item 1330.

1970—Pub. L. 91–358, title I, §172(c)(2), July 29, 1970, 84 Stat. 591, added item 1363.

1966—Pub. L. 89–635, §2, Oct. 10, 1966, 80 Stat. 880, added item 1362.

1962—Pub. L. 87–748, §1(b), Oct. 5, 1962, 76 Stat. 744, added item 1361.

1958—Pub. L. 85–554, §4, July 25, 1958, 72 Stat. 415, inserted "costs" in items 1331 and 1332.

1953—Act Aug. 15, 1953, ch. 505, §3, 67 Stat. 589, added item 1360.

## § 1330. Actions against foreign states

(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

(b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

(c) For purposes of subsection (b), an appearance by a foreign state does not confer personal jurisdiction with respect to any claim for relief not arising out of any transaction or occurrence enumerated in sections 1605–1607 of this title.

(Added Pub. L. 94–583, §2(a), Oct. 21, 1976, 90 Stat. 2891.)

### EFFECTIVE DATE

Section effective 90 days after Oct. 21, 1976, see section 8 of Pub. L. 94–583, set out as a note under section 1602 of this title.

## § 1331. Federal question

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

(June 25, 1948, ch. 646, 62 Stat. 930; Pub. L. 85–554, §1, July 25, 1958, 72 Stat. 415; Pub. L. 94–574, §2, Oct. 21, 1976, 90 Stat. 2721; Pub. L. 96–486, §2(a), Dec. 1, 1980, 94 Stat. 2369.)

### HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., §41(1) (Mar. 3, 1911, ch. 231, §24, par. 1, 36 Stat. 1091; May 14, 1934, ch. 283, §1, 48 Stat. 775; Aug. 21, 1937, ch. 726, §1, 50 Stat. 738; Apr. 20, 1940, ch. 117, 54 Stat. 143).

Jurisdiction of federal questions arising under other sections of this chapter is not dependent upon the amount in controversy. (See annotations under former section 41 of title 28, U.S.C.A., and 35 C.J.S., p. 833 et seq., §§30–43. See, also, reviser's note under section 1332 of this title.)

Words "wherein the matter in controversy exceeds the sum or value of $3,000, exclusive of interest and costs," were added to conform to rulings of the Supreme Court. See construction of provision relating to jurisdictional amount requirement in cases involving a Federal question in *United States v. Sayward*, 16 S.Ct. 371, 160 U.S. 493, 40 L.Ed. 508; *Fishback v. Western Union Tel. Co.*, 16 S.Ct. 506, 161 U.S. 96, 40 L.Ed. 630; and *Halt v. Indiana Manufacturing Co.*, 1900, 20 S.Ct. 272, 176 U.S. 68, 44 L.Ed. 374.

Words "all civil actions" were substituted for "all suits of a civil nature, at common law or in equity" to conform with Rule 2 of the Federal Rules of Civil Procedure.

Words "or treaties" were substituted for "or treaties made, or which shall be made under their authority," for purposes of brevity.

The remaining provisions of section 41(1) of title 28, U.S.C., 1940 ed., are incorporated in sections 1332, 1341, 1342, 1345, 1354, and 1359 of this title.

Changes were made in arrangement and phraseology.

### AMENDMENTS

1980—Pub. L. 96–486 struck out "; amount in controversy; costs" in section catchline, struck out minimum amount in controversy requirement of $10,000 for original jurisdiction in federal question cases which necessitated striking the exception to such required minimum amount that authorized original jurisdiction in actions brought against the United States, any agency thereof, or any officer or employee thereof in an official capacity, struck out provision authorizing the district court except where express provision therefore was made in a federal statute to deny costs to a plaintiff and in fact impose such costs upon such plaintiff where plaintiff was adjudged to be entitled to recover less than the required amount in controversy, computed without regard to set-off or counterclaim and exclusive of interests and costs, and struck out existing subsection designations.

1976—Subsec. (a). Pub. L. 94–574 struck out $10,000 jurisdictional amount where action is brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity.

1958—Pub. L. 85–554 included costs in section catchline, designated existing provisions as subsec. (a), substituted "$10,000" for "$3,000", and added subsec. (b).

### EFFECTIVE DATE OF 1980 AMENDMENT; APPLICABILITY

Section 4 of Pub. L. 96–486 provided: "This Act [amending this section and section 2072 of Title 15, Commerce and Trade, and enacting provisions set out as a note under section 1 of this title] shall apply to any civil action pending on the date of enactment of this Act [Dec. 1, 1980]."

### EFFECTIVE DATE OF 1958 AMENDMENT

Section 3 of Pub. L. 85–554 provided that: "This Act [amending this section and sections 1332 and 1345 of this title] shall apply only in the case of actions commenced after the date of the enactment of this Act [July 25, 1958]."

## § 1332. Diversity of citizenship; amount in controversy; costs

(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—

   (1) citizens of different States;

   (2) citizens of a State and citizens or subjects of a foreign state, except that the district courts shall not have original jurisdiction under this subsection of an action between citizens of a State and citizens or subjects of a foreign state who are lawfully admitted for permanent residence in the United States and are domiciled in the same State;

   (3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

   (4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

(b) Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff who files the case originally in the Federal courts is finally adjudged to be entitled to recover less than the sum or value of $75,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interest and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff.

(c) For the purposes of this section and section 1441 of this title—

   (1) a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business, except that in any direct action against the insurer of a policy or contract of liability insurance, whether incorporated or unincorporated, to which action the insured is not joined as a party-defendant, such insurer shall be deemed a citizen of—

     (A) every State and foreign state of which the insured is a citizen;

     (B) every State and foreign state by which the insurer has been incorporated; and

     (C) the State or foreign state where the insurer has its principal place of business; and

   (2) the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent, and the legal representative of an infant or incompetent shall be deemed to be a citizen only of the same State as the infant or incompetent.

(d)(1) In this subsection—

   (A) the term "class" means all of the class members in a class action;

   (B) the term "class action" means any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action;

   (C) the term "class certification order" means an order issued by a court approving the treatment of some or all aspects of a civil action as a class action; and

   (D) the term "class members" means the persons (named or unnamed) who fall within the definition of the proposed or certified class in a class action.

(2) The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which—

   (A) any member of a class of plaintiffs is a citizen of a State different from any defendant;

   (B) any member of a class of plaintiffs is a foreign state or a citizen or subject of a for-

(Added Pub. L. 91–358, title I, §172(c)(1), July 29, 1970, 84 Stat. 590, §1363; renumbered §1364, Pub. L. 95–572, §6(b)(1), Nov. 2, 1978, 92 Stat. 2456; renumbered §1366, Pub. L. 99–336, §6(a)(1)(C), June 19, 1986, 100 Stat. 639.)

### § 1367. Supplemental jurisdiction

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

(b) In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24 of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332.

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

(d) The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

(e) As used in this section, the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

(Added Pub. L. 101–650, title III, §310(a), Dec. 1, 1990, 104 Stat. 5113.)

REFERENCES IN TEXT

The Federal Rules of Civil Procedure, referred to in subsec. (b), are set out in the Appendix to this title.

EFFECTIVE DATE

Section 310(c) of Pub. L. 101–650 provided that: "The amendments made by this section [enacting this section] shall apply to civil actions commenced on or after the date of the enactment of this Act [Dec. 1, 1990]."

### § 1368. Counterclaims in unfair practices in international trade.

The district courts shall have original jurisdiction of any civil action based on a counterclaim raised pursuant to section 337(c) of the Tariff Act of 1930, to the extent that it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim in the proceeding under section 337(a) of that Act.

(Added Pub. L. 103–465, title III, §321(b)(3)(A), Dec. 8, 1994, 108 Stat. 4946.)

REFERENCES IN TEXT

Section 337 of the Tariff Act of 1930, referred to in text, is classified to section 1337 of Title 19, Customs Duties.

EFFECTIVE DATE

Section applicable with respect to complaints filed under section 1337 of Title 19, Customs Duties, on or after the date on which the World Trade Organization Agreement enters into force with respect to the United States [Jan. 1, 1995], or in cases under section 1337 of Title 19 in which no complaint is filed, with respect to investigations initiated under such section on or after such date, see section 322 of Pub. L. 103–465, set out as an Effective Date of 1994 Amendment note under section 1337 of Title 19.

### § 1369. Multiparty, multiforum jurisdiction

(a) IN GENERAL.—The district courts shall have original jurisdiction of any civil action involving minimal diversity between adverse parties that arises from a single accident, where at least 75 natural persons have died in the accident at a discrete location, if—

(1) a defendant resides in a State and a substantial part of the accident took place in another State or other location, regardless of whether that defendant is also a resident of the State where a substantial part of the accident took place;

(2) any two defendants reside in different States, regardless of whether such defendants are also residents of the same State or States; or

(3) substantial parts of the accident took place in different States.

(b) LIMITATION OF JURISDICTION OF DISTRICT COURTS.—The district court shall abstain from hearing any civil action described in subsection (a) in which—

(1) the substantial majority of all plaintiffs are citizens of a single State of which the primary defendants are also citizens; and

(2) the claims asserted will be governed primarily by the laws of that State.

(c) SPECIAL RULES AND DEFINITIONS.—For purposes of this section—

(1) minimal diversity exists between adverse parties if any party is a citizen of a State and any adverse party is a citizen of another State, a citizen or subject of a foreign state, or a foreign state as defined in section 1603(a) of this title;

(2) a corporation is deemed to be a citizen of any State, and a citizen or subject of any foreign state, in which it is incorporated or has its principal place of business, and is deemed to be a resident of any State in which it is in-

| |

nistrative Law And Procedure

uck dealership who brought
ck manufacturer, stemming
of business relationship, failed
t evidence that manufacturer
lieving that he was or would
as required to maintain claim
tts statute governing regula-
ractices for consumer protec-
r proffered legitimate reasons
r into business arrangement
C.A.1 (Mass.)2004, 369 F.3d
n ⇐ 871(2)

rademark infringement plain-
party to remove defendant's
insufficient, without more to
a, under Massachusetts law,
s practice; no facts concern-
nduct were alleged. Boxcar
neckjunk, LLC, D.Mass.2004,
. Trade Regulation ⇐ 862.1

under Massachusetts statute
methods of competition and
e trade practices, plaintiff
y separate, independent tort;
ute creates new substantive
to traditional tort remedies.
& Co., Inc. v. Zam-Cul Enter-
ass.1993, 830 F.Supp. 53.
⇐ 864

mortgage lender and its as-
agor incorrect billing state-
provide her with requested
supported claim under Mas-
er protection statutes. In re
Mass.2005, 336 B.R. 1. Con-
⇐ 10

nt against buyer, which al-
mployee and financing com-
ommitted fraud in order to
edit and allow it to purchase
greed to execute agreements
hase and refinance, and that
execute agreement and re-
ted to state cause of action
tive trade practices, as there
buyer knew of scheme be-
oyee and financing company
ent & Systems For Industry,
ows Const. Co., Inc. (2003)
9 Mass.App.Ct. 931. Trade

usivity provisions of anti-dis-
tenant's failure to name
int filed with Massachusetts
st Discrimination (MCAD)
maintaining claims against

landlord for unfair business practice and viola-
tion of consumer protection law, to the extent
those claims were based on landlord's alleged
discriminatory conduct. King v. First (1999)
705 N.E.2d 1172, 46 Mass.App.Ct. 372. Civil
Rights ⇐ 1716

**27. Jury trial**

There is no right to jury trial under Massa-
chusetts Consumer Protection Act. Refuse &
Environmental Systems, Inc. v. Industrial Ser-
vices of America, Inc., C.A.1 (Mass.)1991, 932
F.2d 37; Guity v. Commerce Ins. Co. (1994) 631
N.E.2d 75, 36 Mass.App.Ct. 339, review denied
636 N.E.2d 278, 418 Mass. 1102; Chamber-
layne School v. Banker (1991) 568 N.E.2d 642,
30 Mass.App.Ct. 346.

**28. Presumptions and burden of proof**

In action pursuant to Consumer Protection
Act, it is unnecessary for plaintiff to establish
that defendant knew his allegedly defective rep-
resentations were false or to prove his actual
reliance upon defendant's representation. In re
Leger, Bkrtcy.D.Mass.1983, 34 B.R. 873. Con-
sumer Protection ⇐ 34

**29. Questions of fact**

Genuine issue of material fact as to whether
commercial real estate companies engaged in
unfair and deceptive trade practices when deal-
ing with licensed real estate broker that alleged-
ly successfully solicited financing on behalf of
companies, including whether companies de-
ceived broker about the roles of various parties
in the financing transaction, precluded sum-
mary judgment for companies on broker's un-
fair or deceptive trade conduct claim. Meredith
& Grew, Inc. v. Worcester Lincoln, LLC (2005)

831 N.E.2d 940, 64 Mass.App.Ct. 142. Judg-
ment ⇐ 181(18)

Where plaintiffs have viable claims for fraud
and negligent misrepresentation, unfair busi-
ness practices act claims based on the same
misrepresentations and omissions withstand a
motion for summary judgment. Stolzoff v.
Waste Systems Intern., Inc. (2003) 792 N.E.2d
1031, 58 Mass.App.Ct. 747. Judgment ⇐
181(15.1)

Question of whether transaction occurs in
business context, so as to subject it to coverage
of Consumer Protection Act's proscription of
unfair or deceptive acts or practices, must be
determined by facts of each case. Poznik v.
Massachusetts Medical Professional Ins. Ass'n
(1994) 628 N.E.2d 1, 417 Mass. 48. Consumer
Protection ⇐ 4

Cause of action grounded on supposed viola-
tion of chapter governing regulation of business
practices for consumers' protection may be an
appropriate matter for summary judgment, pro-
vided that there is no genuine issue of material
fact, or if the opposing party has not been
adversely affected by a violation of statute gov-
erning unfair claim settlement practices. Chub
v. Electric Ins. Co. (1983) 455 N.E.2d 646, 17
Mass.App.Ct. 61. Judgment ⇐ 180

**30. Review**

Former trustee's appeal of removal was sub-
ject to dismissal, where trustee failed repeatedly
to comply with request of appeals clerk to assist
in assembling trial record. Spivey v. Neitlich
(2003) 797 N.E.2d 931, 59 Mass.App.Ct. 742,
review denied, review denied 801 N.E.2d 803,
440 Mass. 1110. Trusts ⇐ 167

## § 2.  Unfair practices; legislative intent; rules and regulations

(a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

(b) It is the intent of the legislature that in construing paragraph (a) of this section in actions brought under sections four, nine and eleven, the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended.

(c) The attorney general may make rules and regulations interpreting the provisions of subsection 2(a) of this chapter. Such rules and regulations shall not be inconsistent with the rules, regulations and decisions of the Federal Trade Commission and the Federal Courts interpreting the provisions of 15 U.S.C. 45(a)(1) (The Federal Trade Commission Act), as from time to time amended.

Added by St.1967, c. 813, § 1.  Amended by St.1978, c. 459, § 2.

257

**93A § 2**                                   **CONSUMER PROTECTION**

### Historical and Statutory Notes

St.1978, c. 459, § 2, in par. (b), inserted "in actions brought under sections four, nine and eleven".

St.1978, c. 459, was approved July 17, 1978. Emergency declaration by the Governor was filed August 10, 1978.

### Cross References

Collection agencies, unfair practices, penalties, see c. 93, § 28.

Consumer credit reporting, failure to comply with protective provisions as unfair trade practice under this section, see c. 93, § 68.

Dissemination of criminal offender record information to agencies employing or referring individuals to provide services to elderly or disabled persons, see c. 6 § 172C.

Free rider surcharges on non-providing employers, see c. 118G, § 18B.

Health maintenance organizations, deceptive practices under this section, see c. 176G, § 8.

Lead law and regulations, eviction or refusal to rent to families with children, see c. 111, § 199A.

Multi-level distribution companies, violation of requirements as unlawful method, act or practice under this section, see c. 93, § 69.

Personal service contracts between certain schools and students, failure to include termination notice required therein as an unfair and deceptive practice under this section, see c. 255, § 13K.

Sale or proposed sale of manufactured home located in licensed community, refusal of entrance to purchaser as an unfair and deceptive trade practice under this section, see c. 140, § 32M.

Travel services, surcharge on travel agent commissions for credit card sales, see c. 93 § 48B.

### Code of Massachusetts Regulations

Attorney general's office, consumer protection division,

Sales and distribution,

Cigars, see 940 CMR 22.01 et seq.

Cigarettes and smokeless tobacco, see 940 CMR 21.01 et seq.

General regulations, see 940 CMR 3.01 et seq.

Group health care insurers, termination of coverage, see 940 CMR 9.01 et seq.

Handgun sales, see 940 CMR 16.01 et seq.

Long term care facility, see 940 CMR 4.01 et seq.

Manufactured housing community regulations, see 940 CMR 10.01 et seq.

Mortgage brokers and mortgage lenders, see 940 CMR 8.01 et seq.

Motor vehicle regulations, see 940 CMR 5.01 et seq.

Regulations governing raffles, see 940 CMR 12.01 et seq.

Retail advertising, see 940 CMR 6.01 et seq.

Retail marketing and sale of electricity, see 940 CMR 19.01 et seq.

Sale of travel services, see 940 CMR 15.01 et seq.

Viatical settlements and viatical loans, see 940 CMR 18.01 et seq.

### Law Review and Journal Commentaries

Bad faith negotiations and unfair trade acts: New rules for corporate courtship. Gordon M. Jones, III, 37 Boston B.J. 15 (Jan.–Feb. 1993).

Consumer Protection Act. (1981) 16 New Eng.L.Rev. 449.

Consumer protection legislation and the assertion of tenant rights. (1979) 59 B.U.L.Rev. 483.

Contempt proceedings: Another dimension to consumer protection. Robert D. Cohan and Harry R. Hayes (1980) 14 Suffolk U.L.Rev. 1.

Defective products in Massachusetts. Raymond J. Kenney, Jr. (1984) 69 Mass.L.Rev. 108.

Delay in paying a meritorious insurance claim. James J. Moran, Jr., 30 Ann. Surv.Mass.L. 83 (1983).

Duty to defend. Michael Halley, 81 Mass. L.Rev. 51 (1996).

Engaging in "trade or commerce" under chapter 93A. Bertram E. Snyder and Susan F. Drogin, 39 Boston B. J. 20 (Jan.–Feb. 1995).

Excess liability of insurers for bad faith refusal to settle. (1984) 18 Suffolk U.L.Rev. 377.

FTC franchise disclosure rule and its impact on c. 93A. L. Seth Stadfeld (1980) 2 W.New Eng.L.Rev. 681.

Good faith in franchising. Harold Brown (1980) 24 Boston B.J. No. 8, p. 10.

HIV confidentiality and the right to warn–The Health care provider's dilemma. Bernard Friedland, 80 Mass.L.Rev. 3 (1995).

**CONSUMER PROTEC**

Legal Malpractice: Rec
David A. Barry, 78 Mass.L.R

Multiple Damages in
Against Insurers: Kapp v. A
ance Co. Michael Weinber
McNally, Jr., 43 Boston B.J.

Product liability in Massa
the millennium. Raymond
Mass.L.Rev. 110 (1995).

Remedies, enforcement
duality of consumer tran
David A. Rice (1968) 48 B.U

Consumer Protection ⚖1
Trade Regulation ⚖861,
Westlaw Topic Nos. 382, 9
C.J.S. Credit Reporting
Protection § 23.

**ALR Library**

199 ALR, Federal 169,
Law Under Carmack A
state Commerce Act, 4
and Predecessor Statut
Than Machinery, Livest
ages.

149 ALR, Federal 299, C
plication of § 105 Airl
(49 U.S.C.A. § 41713)
emption of Authority
and Services.

117 ALR 5th 155; Rig
Under State Consumer
conditions to Action.

71 ALR 5th 491, Liabili
ference With Prospect
tions Involving Sale o
Real Estate.

50 ALR 5th 417, Breach
Installation, Repair, I
of Septic or Sewage Di

19 ALR 5th 405, Landlo
ry or Death of Tenan
Paint Poisoning.

8 ALR 5th 312, Constr
Provision in Contract
Which Purchaser Agr
"As Is" or in Its Existi

77 ALR 4th 991, Co
Transactions Under St
tion Statutes.

35 ALR 4th 12, Award
Actions Under State
tice and Consumer Pr

18 ALR 4th 1340, Wh
tions Commences to
State Deceptive Trad
er Protection Acts.

Bob Brest Buick, Inc. (1977) 370 N.E.2d 449, 5 Mass.App.Ct. 717. Attorney General ⇐ 9

## § 8. Habitual violation of injunctions

Upon petition by the attorney general, the court may for habitual violation of injunctions issued pursuant to section four order the dissolution, or suspension or forfeiture of franchise of any corporation or the right of any individual or foreign corporation to do business in the commonwealth.
Added by St.1967, c. 813, § 1. Amended by St.1969, c. 814, § 4; St.1990, c. 363.

### Historical and Statutory Notes

St.1969, c. 814, § 4, approved Aug. 26, 1969, deleted "whenever said corporation violates the terms of an injunction issued under section four of this chapter" from the end.

St.1990, c. 363, approved Dec. 21, 1990, inserted "individual or".

### Cross References

Business practices between motor vehicle manufacturers, distributors and dealers, enforcement, see c. 93B, § 12.
Gasoline dealers' agreements, enforcement, see c. 93E, § 7A.
Violation of consumer protection provisions as violation of this chapter, see c. 140D, § 34.

### Law Review and Journal Commentaries

Contempt proceedings: Another dimension to consumer protection. Robert D. Cohan and Harry R. Hayes (1980) 14 Suffolk U.L.Rev. 1.
Remedies, enforcement procedures and the duality of consumer transaction problems. David A. Rice (1968) 48 B.U.L.Rev. 559.

State Farm: Refining the Constitutional Limitations on Punitive Damages Awards. David R. Gieger and Matthew C. Baltey. 48 Boston Bar Journal 6 (No. 1, 2004).

### Library References

Consumer Protection ⇐41.
Westlaw Topic No. 92H.

C.J.S. Credit Reporting Agencies; Consumer Protection §§ 95 to 96, 98 to 99, 104, 107, 114.

### Research References

**Treatises and Practice Aids**
31 Mass. Prac. Series § 457, Civil Remedies.
34 Mass. Prac. Series § 21:8, Enforcement.
35 Mass. Prac. Series § 2:4, Regulatory Scheme -- Role of Massachusetts Attorney General.
35 Mass. Prac. Series § 4:71, Authority of Attorney General.
36 Mass. Prac. Series § 20:20, Consumer Protection Act.

40 Mass. Prac. Series § 1795, Standard of Appellate Review.
14B Mass. Prac. Series § 18.102, Chapter 93a.
35A Mass. Prac. Series § 17:90, Action by Massachusetts Attorney General.
37A Mass. Prac. Series § 19.7, Role of Attorney General in Bringing Actions.

## § 9. Civil actions and remedies; class action; demand for relief; damages; costs; exhausting administrative remedies

(1) Any person, other than a person entitled to bring action under section eleven of this chapter, who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section

359

two or any rule or regulation issued thereunder or any person whose rights are affected by another person violating the provisions of clause (9) of section three of chapter one hundred and seventy-six D may bring an action in the superior court, or in the housing court as provided in section three of chapter one hundred and eighty-five C whether by way of original complaint, counterclaim, cross-claim or third party action, for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper.

(2) Any persons entitled to bring such action may, if the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated and if the court finds in a preliminary hearing that he adequately and fairly represents such other persons, bring the action on behalf of himself and such other similarly injured and situated persons; the court shall require that notice of such action be given to unnamed petitioners in the most effective practicable manner. Such action shall not be dismissed, settled or compromised without the approval of the court, and notice of any proposed dismissal, settlement or compromise shall be given to all members of the class of petitioners in such manner as the court directs.

(3) At least thirty days prior to the filing of any such action, a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be mailed or delivered to any prospective respondent. Any person receiving such a demand for relief who, within thirty days of the mailing or delivery of the demand for relief, makes a written tender of settlement which is rejected by the claimant may, in any subsequent action, file the written tender and an affidavit concerning its rejection and thereby limit any recovery to the relief tendered if the court finds that the relief tendered was reasonable in relation to the injury actually suffered by the petitioner. In all other cases, if the court finds for the petitioner, recovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of said section two or that the refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated said section two. For the purposes of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence, regardless of the existence or nonexistence of insurance coverage available in payment of the claim. In addition, the court shall award such other equitable relief, including an injunction, as it deems to be necessary and proper. The demand requirements of this paragraph shall not apply if the claim is asserted by way of counterclaim or cross-claim, or if the prospective respondent does not maintain a place of business or does not keep assets within the commonwealth, but such respondent may otherwise employ the provisions of this section by making a written offer of relief and paying the rejected tender into court as soon as practicable after receiving notice of an action commenced under this section. Notwithstanding any other provision to the contrary, if the court finds any method, act or practice unlawful with regard to any security or any contract of sale of a

360

commodity for future delive[...] for the petitioner, recovery s[...]

*[ Paragraph (3A) appli[...]*

(3A) A person may asser[...] whether by way of original [...] action, for money damages [...] damages, attorneys' fees an[...] ments and provision for ten[...] shall also be applicable und[...] relief shall be created und[...] claim hereunder be able to a[...] and situated persons as pro[...]

(4) If the court finds in an[...] a violation of section two,[...] provided for by this section[...] awarded reasonable attorne[...] action; provided, however,[...] costs which are incurred a[...] settlement made within thi[...] demand for relief required b[...]

*[ There is no paragra[...]*

(6) Any person entitled t[...] required to initiate, pursue[...] tion, administrative proced[...] common law in order to [...] injunctive relief or recover [...] provided in this section. F[...] be a defense to any proce[...] paragraph seven.

(7) The court may upon [...] answering and after a heari[...] to permit the respondent t[...] named a party before any [...] adjudicatory hearings to co[...] that:

(a) there is a substantial l[...] the petitioner would require[...] disrupt or be inconsistent w[...] actions or transactions com[...] istered under law by any s[...] under statutory authority c[...]

(b) that said regulatory b[...] ing said transactions or act[...] that the said regulatory boa[...]

commodity for future delivery as defined in section two, and if the court finds for the petitioner, recovery shall be in the amount of actual damages.

*[ Paragraph (3A) applicable as provided by 2004, 252, Sec. 23.]*

(3A) A person may assert a claim under this section in a district court, whether by way of original complaint, counterclaim, cross-claim or third-party action, for money damages only. Said damages may include double or treble damages, attorneys' fees and costs, as herein provided. The demand requirements and provision for tender of offer of settlement provided in paragraph (3) shall also be applicable under this paragraph, except that no rights to equitable relief shall be created under this paragraph, nor shall a person asserting a claim hereunder be able to assert any claim on behalf of other similarly injured and situated persons as provided in paragraph (2).

(4) If the court finds in any action commenced hereunder that there has been a violation of section two, the petitioner shall, in addition to other relief provided for by this section and irrespective of the amount in controversy, be awarded reasonable attorney's fees and costs incurred in connection with said action; provided, however, the court shall deny recovery of attorney's fees and costs which are incurred after the rejection of a reasonable written offer of settlement made within thirty days of the mailing or delivery of the written demand for relief required by this section.

*[ There is no paragraph (5).]*

(6) Any person entitled to bring an action under this section shall not be required to initiate, pursue or exhaust any remedy established by any regulation, administrative procedure, local, state or federal law or statute or the common law in order to bring an action under this section or to obtain injunctive relief or recover damages or attorney's fees or costs or other relief as provided in this section. Failure to exhaust administrative remedies shall not be a defense to any proceeding under this section, except as provided in paragraph seven.

(7) The court may upon motion by the respondent before the time for answering and after a hearing suspend proceedings brought under this section to permit the respondent to initiate action in which the petitioner shall be named a party before any appropriate regulatory board or officer providing adjudicatory hearings to complainants if the respondent's evidence indicates that:

(a) there is a substantial likelihood that final action by the court favorable to the petitioner would require of the respondent conduct or practices that would disrupt or be inconsistent with a regulatory scheme that regulates or covers the actions or transactions complained of by the petitioner established and administered under law by any state or federal regulatory board or officer acting under statutory authority of the commonwealth or of the United States; or

(b) that said regulatory board or officer has a substantial interest in reviewing said transactions or actions prior to judicial action under this chapter and that the said regulatory board or officer has the power to provide substantially

361

the relief sought by the petitioner and the class, if any, which the petitioner represents, under this section.

Upon suspending proceedings under this section the court may enter any interlocutory or temporary orders it deems necessary and proper pending final action by the regulatory board or officer and trial, if any, in the court, including issuance of injunctions, certification of a class, and orders concerning the presentation of the matter to the regulatory board or officer. The court shall issue appropriate interlocutory orders, decrees and injunctions to preserve the status quo between the parties pending final action by the regulatory board or officer and trial and shall stay all proceedings in any court or before any regulatory board or officer in which petitioner and respondent are necessarily involved. The court may issue further orders, injunctions or other relief while the matter is before the regulatory board or officer and shall terminate the suspension and bring the matter forward for trial if it finds (a) that proceedings before the regulatory board or officer are unreasonably delayed or otherwise unreasonably prejudicial to the interests of a party before the court, or (b) that the regulatory board or officer has not taken final action within six months of the beginning of the order suspending proceedings under this chapter.

(8) Except as provided in section ten, recovering or failing to recover an award of damages or other relief in any administrative or judicial proceeding, except proceedings authorized by this section, by any person entitled to bring an action under this section, shall not constitute a bar to, or limitation upon relief authorized by this section.

Added by St.1969, c. 690. Amended by St.1970, c. 736, §§ 1, 2; St.1971, c. 241; St.1973, c. 939; St.1978, c. 478, §§ 45, 46; St.1979, c. 72, § 1; St.1979, c. 406, §§ 1, 2; St.1986, c. 557, § 90; St.1987, c. 664, § 3; St.1989, c. 580, § 1; St.2004, c. 252, § 1, eff. Aug. 9, 2004.

### Historical and Statutory Notes

St.1969, c. 690, was approved Aug. 13, 1969.

St.1970, c. 736, § 1, approved Aug. 21, 1970, in par. (1), substituted "or" for "and" preceding "by any rule" and "paragraph (c) of said section two" for "said section three C".

Section 2 of St.1970, c. 736, added par. (5).

St.1971, c. 241, in par. (1), substituted ", services or property, real or personal" for "or services".

St.1971, c. 241, was approved April 29, 1971. Emergency declaration by the Governor was filed June 3, 1971.

St.1973, c. 939, approved Oct. 23, 1973, added pars. (6) to (8).

St.1978, c. 478, § 45, approved July 18, 1978, and by § 343 made effective as of July 1, 1978, in par. (1), substituted "whether by way of original complaint, counterclaim, cross-claim or third-party action" for "in equity".

Section 46 of St.1978, c. 478, inserted par. (3A).

St.1979, c. 72, § 1, approved April 6, 1979, and by § 4 made effective upon passage, in par. (1), inserted ", or in the housing court as provided in section three of chapter one hundred and eighty-five C,".

St.1979, c. 406, § 1, approved July 20, 1979, rewrote par. (1), which prior thereto read:

"Any person who purchases or leases goods, services or property, real or personal, primarily for personal, family or household purposes and thereby suffers any loss of money or property, real or personal, as a result of the use or employment by another person of an unfair or deceptive act or practice declared unlawful by section two or by any rule or regulation issued under paragraph (c) of said section two may, as hereinafter provided, bring an action in the superior court, or in the housing court as provided in section three of chapter one-hundred and eighty-five C, whether by way of original complaint, counterclaim, cross-claim or third-party action for damages and such equitable

relief, including an i deems to be necessary

Section 2 of St.1979, fifth sentence, inserted by way of countercla

St.1986, c. 557, § 9 proved Dec. 8, 1986, read:

"The provisions of c of section three shal brought pursuant to th

St.1987, c. 664, § 3, par. (3), added the sixt

St.1989, c. 580, § 1 in par. (3), inserted the

St.2004, c. 252, § 1 effective Aug. 9, 2004, which prior thereto sections ninety-five t inclusive, of chapter one, where applicable under this section, exc remand, removal and trolled by the amo claimed hereunder." by the Governor was fi

Section 23 of St.200

Class actions, see R.Civ Gasoline retail dealers, Violation of consumer

Attorneys' fees. Pa Gaudet, and Georg Surv.Mass.L. 421 (198

Bad faith refusal to assignment of insured an, Jr., 30 Ann.Surv.M

Balancing the insur the duty to settle thir McKittrick, 38 Boston

Bringing commerci back into the mains Knapp Shoes, Inc. v. S David E. Lurie and Ke ton B.J. 4 (Jan.–Feb.

Broadening the scop S. Savrin and Mary B.J. 6 (No. 5, Nov./Dec

Class actions. Lou L.Rev. 1.

Class actions in state 72 Mass.L.Rev. 10 (198

Consumer class a (1969) 49 B.U.L.Rev. 4

**183A § 3**                                   **CONDOMINIUMS**

### Historical and Statutory Notes

St.1970, c. 139, § 2, approved March 20, 1970, substituted "units in the condominium" for "apartments in the building".

St.1985, c. 788, § 4, an emergency act, approved Jan. 9, 1986, inserted ", whether or not such unit is built on owned or leased land".

### Library References

Condominium ⊃1.
Westlaw Topic No. 89A.
C.J.S. Estates §§ 193 to 195, 200, 203.

### Research References

**Treatises and Practice Aids**

14B Mass. Prac. Series § 17.60, Ownership Of Unit-Generally.
28 Mass. Prac. Series § 14.2, Theory.
28 Mass. Prac. Series § 14.9, Organization Of Unit Owners.
34 Mass. Prac. Series § 22:50, Master Deed Requirements.

34 Mass. Prac. Series § 22:55, Enforcement Of Rules, Regulations, Bylaws, And Restrictions Of Master Deed And Unit Deeds.
34 Mass. Prac. Series § 22:57, Condominiums And Landlord-Tenant Relationship.
34 Mass. Prac. Series § 22:58, Ownership And Possession Of Condominium Units.
34 Mass. Prac. Series § 22:68, Cooperatives.

### Notes of Decisions

Construction and application    1

**1. Construction and application**
Person's ownership of condominium unit includes exclusive fee interest in individual unit in

which possession and control is reserved to unit owner. 39 Joy Street Condominium Ass'n v. Board of Appeal of Boston (1998) 688 N.E.2d 1363, 426 Mass. 485.  Condominium ⊃ 13

## § 4.  Exclusive ownership and possession; restrictions

Each unit owner shall be entitled to the exclusive ownership and possession of his unit, subject to the provisions of this section and of sections seventeen, eighteen and nineteen; provided, however, that:—

(1) No unit shall be devoted to a use prohibited in the master deed or any lease which is submitted to the provisions of this chapter;

(2) The organization of unit owners, its agent or agents shall have access to each unit from time to time during reasonable hours for the maintenance, repair or replacement of any of the common areas and facilities therein or accessible therefrom or for making emergency repairs therein necessary to prevent damage to the common areas and facilities or to another unit or units; and

(3) Each unit owner shall comply with the by-laws and with any administrative rules and regulations adopted pursuant thereto, as either of the same may be amended from time to time, and with the lawful covenants, conditions and restrictions set forth in the master deed or in the deed to his unit and with each lease which is submitted to the provisions of this chapter.

(4) Each unit owner shall provide to the organization of unit owners and to each mortgagee holding a recorded mortgage upon the unit, within sixty days of the effective date of this subsection or at the time of acquisition of title to the unit, whichever comes later, written notice of the unit owner's name and

212

mailing address. Thereafter, the unit owner shall provide written notice to the organization and said mortgagees of any changes in the name or mailing address previously provided by the unit owner. The organization and mortgagees may rely in good faith upon the most recent notice of name and address for the purpose of providing notices to the unit owner under this chapter or under provisions of the loan documents or condominium documents, and such notices sent in writing to the address listed in the most recent notice of name and address, if relied upon in good faith, shall be deemed sufficiently given, provided that the organization or mortgagee, as the case may be, has complied with other requirements, if any, of this chapter and the loan or condominium documents.

(5) The organization of unit owners shall provide to each mortgagee holding a recorded mortgage upon a unit, written notice of the organization's name and mailing address. The organization shall provide written notice to each such mortgagee of any changes in the name or mailing address previously provided by the organization. Each mortgagee holding a recorded mortgage upon a unit shall give written notice of the mortgagee's name and mailing address to the organization of unit owners. Thereafter, each mortgagee shall provide written notice to the organization of any changes in said name and address for the purpose of providing notices to the mortgagee under this chapter or under the provisions of the loan documents or condominium documents. The organization and mortgagees may rely in good faith upon the most recent notice of name and address for the purpose of providing notices to the organization and mortgagees, as the case may be, under this chapter or under the provisions of the loan documents or condominium documents. In addition, any first mortgagee may at any time give notice to both the unit owner and the organization of unit owners of its desire to receive notice regarding the granting of an easement or other interest or the granting or designation of a limited common area, or the taking of other action by the organization of unit owners all as provided for in paragraph (2) of subsection (b) of section 5. Notice to the governing body of the organization of unit owners shall be deemed notice to the organization of unit owners. Any notices sent in writing to a mortgagee or to the governing body of the organization of unit owners, as listed in the most recent notice of name and address, if relied upon in good faith, shall be deemed sufficiently given, provided that the organization or mortgagee, as the case may be, has given notice as required by this chapter.

(6) Each unit owner shall provide in writing to the organization of unit owners the name or names of any tenants or occupants of the unit, other than visitors for less than thirty days.

Added by St.1963, c. 493, § 1. Amended by St.1985, c. 788, §§ 5, 6; St.1992, c. 400, § 6; St.1998, c. 242, § 4.

### Historical and Statutory Notes

St.1985, c. 788, § 5, an emergency act, approved Jan. 9, 1986, in cl. (1), added "or any lease which is submitted to the provisions of this chapter".

Section 6 of St.1985, c. 788, in cl. (3) added "and with each lease which is submitted to the provisions of this chapter".

213

§ 4, an emergency act, ap-
, inserted '', whether or not
on owned or leased land''.

eries § 22:55, Enforcement
ations, Bylaws, And Restric-
Deed And Unit Deeds.
ries § 22:57, Condominiums
enant Relationship.
Series § 22:58, Ownership
Of Condominium Units.
ries § 22:68, Cooperatives.

d control is reserved to unit
eet Condominium Ass'n v.
Boston (1998) 688 N.E.2d
5. Condominium ⬤ 13

ership and possession
f sections seventeen,

master deed or any

shall have access to
or the maintenance,
facilities therein or
herein necessary to
nother unit or units;

with any administra-
er of the same may
nts, conditions and
s unit and with each

unit owners and to
t, within sixty days
isition of title to the
owner's name and

## tes of Decisions

Condominium development partnership could retain affirmative easement interest in garage parking spaces through amendment to master deed rather than through prior recorded instrument; partnership had not sold any units when amendments were put in place. CBK Brook House I Ltd. Partnership v. Berlin (2005) 834 N.E.2d 1251, 64 Mass. App.Ct. 913, review denied 838 N.E.2d 576, 445 Mass. 1106. Common Interest Communities ⟺ 48

## or descent

### rch References

Restrictions of Master Deed and Unit Deeds.

34 Mass. Prac. Series § 22:57, Condominiums and Landlord-Tenant Relationship.

34 Mass. Prac. Series § 22:68, Cooperatives.

14C Mass. Prac. Series § 15.47, General Characteristics.

14C Mass. Prac. Series § 15.48, Unit Deed.

## possession; restrictions

### rch References

34 Mass. Prac. Series § 22:55, Enforcement of Rules, Regulations, Bylaws, and Restrictions of Master Deed and Unit Deeds.

34 Mass. Prac. Series § 22:58, Ownership and Possession of Condominium Units.

34 Mass. Prac. Series § 22:59, Restrictions on the Use of Condominium Units.

34 Mass. Prac. Series § 22:68, Cooperatives.

14C Mass. Prac. Series § 15.36, Declarant's Retention of Nonownership Interest.

14C Mass. Prac. Series § 15.47, General Characteristics.

14C Mass. Prac. Series § 15.49, Required Notices.

## s of Decisions

the owner to both exclusive ownership and possession of his unit and an undivided interest as tenant in common, together with all the other unit owners, in the common areas. Busalacchi v. McCabe (2008) 883 N.E.2d 966, 71 Mass.App.Ct. 493. Common Interest Communities ⟺ 4

70

---

Ownership of a condominium unit is a hybrid form of interest in real estate, entitling the owner to both exclusive ownership and possession of his unit and an undivided interest as tenant in common together with all the other unit owners in the common areas. Berish v. Bornstein (2002) 770 N.E.2d 961, 437 Mass. 252, on remand 21 Mass.L.Rptr. 530. Common Interest Communities ⟺ 4

### 4. Doctrine of merger

Doctrine of merger did not apply to extinguish beach access easement through beachfront condominium property, although grantor owned all the condominium units and also owned dominant inland parcel, as the two estates were neither coextensive nor coexistence at the time of his ownership; inland parcel was held individually in fee simple absolute, while condominium parcel ownership was subject to limitations and obligations, including obligation to use units in a way conforming to master deed provisions. Busalacchi v. McCabe (2008) 883 N.E.2d 966, 71 Mass.App.

---

Ct. 493. Common Interest Communities ⟺ 43; Water Law ⟺ 1292

### 5. Hybrid interests

Ownership of a condominium unit is a hybrid form of interest in real estate, entitling the owner to both exclusive ownership and possession of his unit and an undivided interest, as tenant in common together with all the other unit owners, in the common areas. Board of Managers of Old Colony Village Condominium v. Preu (2011) 956 N.E.2d 258, 80 Mass.App.Ct. 728, review denied 964 N.E.2d 985, 461 Mass. 1110. Common Interest Communities ⟺ 4; Common Interest Communities ⟺ 43

Ownership of a condominium unit is a hybrid interest in real estate, entitling the owner to both exclusive possession of his unit and an undivided interest as tenant in common with other unit owners in the common areas. Lallo v. Szabo (2009) 911 N.E.2d 788, 75 Mass.App.Ct. 1. Common Interest Communities ⟺ 4

## § 5. Interest in common areas or facilities; percentage; division

(a) Each unit owner shall be entitled to an undivided interest in the common areas and facilities in the percentage set forth in the master deed. Such percentage shall be in the approximate relation that the fair value of the unit on the date of the master deed bears to the then aggregate fair value of all the units and may include determinations of whether and how to weigh a restriction relating to value imposed on 1 or more, but fewer than all, units by covenant, agreement or otherwise.

(b)(1) The percentage of the undivided interest of each unit owner in the common areas and facilities as expressed in the master deed shall not be altered without the consent of all unit owners whose percentage of the undivided interest is materially affected, expressed in an amendment to the master deed duly recorded; provided, however, that the acceptance and recording of the unit deed shall constitute consent by the grantee to the addition of subsequent units or land or both to the condominium and consent to the reduction of the undivided interest of the unit owner if the master deed at the time of the recording of the unit deed provided for the addition of units or land and made possible an accurate determination of the alteration of each unit's undivided interest that would result therefrom; and provided, further, that readjustment of 1 or more unit's percentage interest solely to reflect release or termination of a restriction previously imposed on the unit by covenant, agreement or otherwise that was a factor for reduction of that percentage interest, with proportionate adjustment only to each other unit's percentage interest, if not otherwise provided for in the master deed, may be made by vote of 75 per cent or such other percentage of unit owners as is required to amend the master deed generally, whichever is less, and the consent of 51 per cent of the number of all mortgagees holding first mortgages on units within the condominium who have given notice of their desire to be notified as provided in clause (5) of section 4 is obtained; provided further, that any such re-adjustment shall be effective on the date the amendment is recorded in the appropriate registry of deeds or land registration office or such later date as may be stated in the amendment; and provided further, that in the case of readjustment following expiration of a term of

71

years stated in the restriction, that readjustment shall be effective on the date as aforesaid or 1 year after termination of the restriction, whichever is later.  The percentage of the undivided interest in the common areas and facilities shall not be separated from the unit to which it appertains, and shall be deemed to be conveyed or encumbered with the unit even though such interest is not expressly mentioned or described in the conveyance or other instrument.  The granting of an easement by the organization of unit owners, or the designation or allocation by the organization of unit owners of limited common areas and facilities, or the withdrawal of a portion of the common areas and facilities, all as provided for in this subsection, shall not be deemed to affect or alter the undivided interest of any unit owner.

(2) The organization of unit owners, acting by and through its governing body, shall have the power and authority, as attorney in fact on behalf of all unit owners from time to time owning units in the condominium, except as provided in this subsection, to:

(i) Grant, modify and amend easements through, over and under the common areas and facilities, and to accept easements benefiting the condominium, and portions thereof, and its unit owners, including, without limitation, easements for public or private utility purposes, as the governing body of the organization shall deem appropriate; provided, however, that the consent of at least 51 per cent of the number of all mortgagees holding first mortgages on units within the condominium who have requested to be notified thereof, as provided in subsection (5) of section 4 is first obtained; and provided, further, that at the time of creation of such easement and at the time of modification or amendment of any such easement, such easement and any such modification or amendment shall not be inconsistent with the peaceful and lawful use and enjoyment of the common condominium property by the owners thereof.  Such grant, modification, amendment, or acceptance shall be effective on the thirtieth day following the recording, within the chain of title of the master deed, of an instrument duly executed by the governing body of the organization of unit owners setting forth the grant, modification, amendment or acceptance with specificity, and reciting compliance with the requirements of this subsection.

(ii) Grant to or designate for any unit owner the right to use, whether exclusively or in common with other unit owners, any limited common area and facility, whether or not provided for in the master deed, upon such terms as deemed appropriate by the governing body of the organization of unit owners; provided, however, that consent has been obtained from (a) all owners and first mortgagees of units shown on the recorded condominium plans as immediately adjoining the limited common area or facility so designated and (b) 51 per cent of the number of all mortgagees holding first mortgages on units within the condominium who have given notice of their desire to be notified thereof as provided in subsection (5) of section 4.  In such case as the limited common area or facility shall directly and substantially impede access to any unit, the consent of the unit owner of such unit and its first mortgagee, if such mortgagee has requested notice as aforesaid, shall also be required.  Such grant or designation, and the acceptance thereof, shall be effective 30 days following the recording, within the chain of title of the master deed or of the declaration of trust or by-laws, of an instrument duly executed by the governing body of the organization of unit owners and the grantee or designee and his mortgagees, which instrument shall accurately designate, depict and describe the area affected and the rights granted and designated, and shall recite compliance with the requirements of this subsection.  Such grant or designation shall be considered an appurtenance to the subject unit and shall be deemed to be conveyed or encumbered with the unit even though such interest is not expressly mentioned or described in the conveyance or other instrument.

72

(iii) Extend, revive or grant rights to develop right to add additional units or land to the condo the rights to add additional units are set forth in master deed, and, notwithstanding any provision withdraw any portion of the common area of the time of said withdrawal, no unit has been added t with the master deed; and provided further, that prohibited by the master deed.  Any action take shall be taken upon such terms and conditions a may deem appropriate, including the method or interest of each unit is to be set in accordance wit accordance with another method which the organ determines is fair and equitable under the circum revival, grant, addition or withdrawal if not speci further, that the consent thereto, including the te less than 75 per cent of owners of units within percentage, if any, as the master deed may provi of all mortgagees holding first mortgages on units given notice of their desire to be notified thereo section 4 is obtained for such extension, revival, g action taken pursuant to this subparagraph may b adding land, units or common facilities, or fo withdrawal of common areas pursuant to this sub affect the percentage interest of each unit.  Such or withdrawal shall be effective 30 days after the of the master deed or of the declaration of trust executed by the organization of unit owners setti revival, grant, addition or withdrawal, and recit ments of this subsection; and

(iv) Sell, convey, lease or mortgage any rights exercise of rights established under subparagraph proceeds obtained by the organization of unit conveyance, lease, or mortgage may be paid by t common expenses of the condominium, and c accordance with subparagraph (iii) of subsection with another method which the organization of un fair and equitable under the circumstances.  The not affect the rights reserved by the declarant extent such rights have expired.

Any consent required by this subsection shal written notice by certified and first class mail, the organization of unit owners of a proposed acti mortgagee whose consent is required, such unit within 60 days of the date of mailing of su mortgagee, to the extent required hereunder, sha unit upon which such mortgagee holds a mortga unit.  In no event may a consent required of a m withheld unless the interests of the mortgagee w action proposed.  In the event of any conflic subsection and of the master deed, trust or by-la the condominium, this subsection shall control. said condominium or condominium unit or unit

73

267

CONDOMINIUMS    CONDOMINIUMS

readjustment shall be effective on the date as n of the restriction, whichever is later. The in the common areas and facilities shall not be ppertains, and shall be deemed to be conveyed ough such interest is not expressly mentioned her instrument. The granting of an easement r the designation or allocation by the organiza-on areas and facilities, or the withdrawal of a cilities, all as provided for in this subsection, ter the undivided interest of any unit owner.

rs, acting by and through its governing body, as attorney in fact on behalf of all unit owners the condominium, except as provided in this

ements through, over and under the common easements benefiting the condominium, and s, including, without limitation, easements for the governing body of the organization shall r, that the consent of at least 51 per cent of the st mortgages on units within the condominium reof, as provided in subsection (5) of section 4 rther, that at the time of creation of such ion or amendment of any such easement, such r amendment shall not be inconsistent with the t of the common condominium property by the ication, amendment, or acceptance shall be g the recording, within the chain of title of the y executed by the governing body of the forth the grant, modification, amendment or ing compliance with the requirements of this

it owner the right to use, whether exclusively any limited common area and facility, whether d, upon such terms as deemed appropriate by ion of unit owners; provided, however, that l owners and first mortgagees of units shown as immediately adjoining the limited common 51 per cent of the number of all mortgagees n the condominium who have given notice of provided in subsection (5) of section 4. In ea or facility shall directly and substantially t of the unit owner of such unit and its first equested notice as aforesaid, shall also be and the acceptance thereof, shall be effective n the chain of title of the master deed or of n instrument duly executed by the governing ers and the grantee or designee and his ccurately designate, depict and describe the nd designated, and shall recite compliance ction. Such grant or designation shall be ect unit and shall be deemed to be conveyed gh such interest is not expressly mentioned instrument.

72

(iii) Extend, revive or grant rights to develop the condominium, including the right to add additional units or land to the condominium; provided, however, that the rights to add additional units are set forth in or specifically authorized by the master deed, and, notwithstanding any provision in section 19 to the contrary, withdraw any portion of the common area of the condominium upon which, at the time of said withdrawal, no unit has been added to the condominium in accordance with the master deed; and provided further, that said withdrawal is not specifically prohibited by the master deed. Any action taken pursuant to this subparagraph shall be taken upon such terms and conditions as the organization of unit owners may deem appropriate, including the method or formula by which the percentage interest of each unit is to be set in accordance with subsection (a) of section 5, or in accordance with another method which the organization of unit owners reasonably determines is fair and equitable under the circumstances, following such extension, revival, grant, addition or withdrawal if not specified in the master deed; provided further, that the consent thereto, including the terms and conditions thereof, of not less than 75 per cent of owners of units within the condominium, or such lower percentage, if any, as the master deed may provide, and 51 per cent of the number of all mortgages holding first mortgages on units within the condominium who have given notice of their desire to be notified thereof as provided in subsection (5) of section 4 is obtained for such extension, revival, grant, addition or withdrawal. Any action taken pursuant to this subparagraph may be taken even if the time period for adding land, units or common facilities, or for withdrawal has expired. The withdrawal of common areas pursuant to this subparagraph shall not be deemed to affect the percentage interest of each unit. Such extension, revival, grant, addition or withdrawal shall be effective 30 days after the recording, within the chain of title of the master deed or of the declaration of trust or by-laws, of an instrument duly executed by the organization of unit owners setting forth accurately the extension, revival, grant, addition or withdrawal, and reciting compliance with the require-ments of this subsection; and

(iv) Sell, convey, lease or mortgage any rights or interest created as a result of exercise of rights established under subparagraph (iii); provided, however, that any proceeds obtained by the organization of unit owners as a result of such sale, conveyance, lease, or mortgage may be paid by the organization of unit owners for common expenses of the condominium, and otherwise shall be distributed in accordance with subparagraph (iii) of subsection (a) of section (6), or in accordance with another method which the organization of unit owners reasonably determines is fair and equitable under the circumstances. The provisions of paragraph (2) shall not affect the rights reserved by the declarant in the master deed except to the extent such rights have expired.

Any consent required by this subsection shall be deemed to be given if, upon written notice by certified and first class mail, provided by the governing body of the organization of unit owners of a proposed action hereunder, to the unit owner or mortgagee whose consent is required, such unit owner or mortgagee fails to object within 60 days of the date of mailing of such notice. The consent of each mortgage, to the extent required hereunder, shall be counted separately as to each unit upon which such mortgage holds a mortgage, based upon one vote for each unit. In no event may a consent required of a mortgagee under this subsection be withheld unless the interests of the mortgagee would be materially impaired by the action proposed. In the event of any conflict between the provisions of this subsection and of the master deed, trust or by-laws or other governing documents of the condominium, this subsection shall control. Any third party interested in title to said condominium or condominium unit or units may conclusively rely upon the

73

**183A § 5**                    CONDOMINIUMS

recitation of compliance contained within any instrument recorded pursuant to this subsection.

(c) The common areas and facilities shall remain undivided and no unit owner or any other person shall bring any action for partition or division of any part thereof, except as provided in sections seventeen, eighteen and nineteen. The use of limited common areas and facilities may be designated by the organization of unit owners in the same manner as set forth herein relative to the granting of easements; provided, however, that such designation shall take the form of an amendment to the master deed, executed by said organization and the unit owner or owners to whom the designation is made, upon the written consent of the owner or owners of the unit or units directly abutting the limited common area and facility or whose unit or units are directly affected thereby and upon the payment by the unit owner to whom the designation is being granted of the reasonable costs of the preparation, execution and the recordation thereof. Said amendment shall be recorded in the appropriate registry of deeds or land registration office in the names of the parties and the condominium. Nothing contained herein shall be construed to require the consent of one hundred percent of the beneficial interest and the mortgagees to the granting of an easement by the organization of unit owners, or the designation or allocation of limited common areas and facilities. Except as expressly provided herein, the provisions hereof may not be varied by agreement and rights conferred hereby may not be waived. In the event of a conflict between this section and the master deed, or declaration of trust, or bylaws of any condominium submitted to the provisions of this chapter, the language hereof shall control. Any covenant or provision to the contrary shall be null and void.

(d) Each unit owner may use the common areas and facilities in accordance with their intended purposes without being deemed thereby to be hindering or encroaching upon the lawful rights of the other unit owners.

(e) The necessary work of maintenance, repair and replacement of the common areas and facilities shall be carried out as provided in the by-laws.

(f) Unless the by-laws otherwise provide, whenever the common areas and facilities shall require emergency works of repair, replacement or maintenance, any unit owner may undertake the same at his expense and recover his reasonable costs as a common expense.

(g) No work which would jeopardize the soundness or safety of the building shall be done in a unit or in the common areas and facilities unless in every such case the unanimous consent of all unit owners is first obtained.

Added by St.1963, c. 493, § 1. Amended by St.1987, c. 87; St.1994, c. 365, §§ 2, 3; St.1998, c. 242, § 5; St.2010, c. 183, §§ 1, 2, eff. Oct. 24, 2010.

### Historical and Statutory Notes

**2010 Legislation**

St.2010, c. 183, § 1, approved July 26, 2010, effective Oct. 24, 2010, in subsec. (a), in the second sentence, added "and may include determinations of whether and how to weigh a restriction relating to value imposed on 1 or more, but fewer than all, units by covenant, agreement or otherwise".

Section 2 of St.2010, c. 183, in subsec. (b), in par. (1), in the first sentence, added "; and provided, further, that readjustment of 1 or more unit's percentage interest solely to re-

flect release or termination of a restriction previously imposed on the unit by covenant, agreement or otherwise that was a factor for reduction of that percentage interest, with proportionate adjustment only to each other unit's percentage interest, if not otherwise provided for in the master deed, may be made by vote of 75 per cent or such other percentage of unit owners as is required to amend the master deed generally, whichever is less, and the consent of 51 per cent of the number of all mortgagees holding first mort-

CONDOMINIUMS

gages on units within the condominium who have given notice of their desire to be notified as provided in clause (5) of section 4 is obtained; provided further, that any such readjustment shall be effective on the date the amendment is recorded in the appropriate registry of deeds or land registration office

or i
ame
the
of a
that
date
of t

### Research Refe

**Encyclopedias**

39 Am. Jur. Proof of Facts 2d 261, Acquisition of Title to Property by Adverse Possession.

93 Am. Jur. Trials 405, Condominium Construction Litigation: Representing the Community Association.

**Treatises and Practice Aids**

14 Causes of Action 2d 315, Cause of Action to Enforce, or Declare Invalid, Restriction on Use of Condominium Property.

28 Mass. Prac. Series § 14.2, Theory.

28 Mass. Prac. Series § 14.5, Common Areas.

28 Mass. Prac. Series § 14.9, Organization of Unit Owners.

28 Mass. Prac. Series § 14.16, Phasing.

28 Mass. Prac. Series § 14.21, Claims.

33 Mass. Prac. Series § 3:1, Historical Summary.

34 Mass. Prac. Series § 22:48, Condominiums--Introduction.

34 Mass. Prac. Series § 22:50, Master Deed Requirements.

3

3

3

3

1

1

1

1

1

28

### Notes of Deci

In general  ½
Adverse possession  1.5
Arbitration  9
Purpose  ½
Revival of development rights  8
Waiver  10

com
and
Scul
Mas
⇔ 4

Se
unit
mon
valu
inte
not
righ
agre
trus
to i
mas
ing
facil
that
sect
vidu

**½.  In general**

Condominium statute sets forth certain minimum requirements for the establishment of condominiums, but those matters that are not specifically addressed in the statute are to be worked out by the involved parties. Scully v. Tillery (2010) 926 N.E.2d 154, 456 Mass. 758. Common Interest Communities ⇔ 4; Common Interest Communities ⇔ 20

**½.  Purpose**

The condominium statute is essentially an enabling statute, setting out a framework for the development of condominiums in the

356 B.R. 81, reversed 509 F.3d 15.   Common Interest Communities ⇐ 33

## 8.   Revival of development rights

Under Massachusetts law, as predicted by the Court of Appeals, condominium development's master deed made possible an accurate determination of the alteration of each unit's percentage interest that would result from the completion of further phases of the development and so, when unit owners recorded their unit deeds, they consented to the future alteration of their percentage interests, and bankrupt condominium developer could exercise its development rights, which had been legitimately extended by condominium association; master deed clearly provided for additional units, master deed stated how percentage interests would be calculated and provided enough information about future phases to allow a reasoned and reasonable approximation of what aggregate fair market value of all units might be, and, given statute's underlying policies of flexibility and pragmatism, its "accurate determination" requirement did not require the ability to make "precise calculations." In re Northwood Properties, LLC, C.A.1 (Mass.)2007, 509 F.3d 15.   Common Interest Communities ⇐ 5; Common Interest Communities ⇐ 33

Under Massachusetts law, the extension of the time to exercise condominium development rights is distinct from the ability to exercise those rights under the condominium statute.  In re Northwood Properties, LLC, C.A.1 (Mass.)2007, 509 F.3d 15.   Common Interest Communities ⇐ 33

Bankrupt condominium developer successfully revived its phasing rights in accordance with Massachusetts law, when it obtained approval of 83% of unit owners to this revival.  In re Northwood Properties, LLC, D.Mass.2006, 356 B.R. 81, reversed 509 F.3d 15.   Common Interest Communities ⇐ 33

Under Massachusetts law, whether condominium developer's phasing rights have been revived, and whether developer may exercise those rights to add additional units, are two distinct inquiries, and must be analyzed independently of each other.  In re Northwood Properties, LLC, D.Mass.2006, 356 B.R. 81, reversed 509 F.3d 15.   Common Interest Communities ⇐ 33

Under Massachusetts law, while it may sometimes be the case that condominium developer must obtain express consent of every unit owner prior to exercising its revived phasing rights, this need not always be the case, as when unit owners have given their constructive consent, or when, even in absence of any such constructive consent, some unit owners' percentage interests will not be materially affected.  In re Northwood Properties, LLC, D.Mass.2006, 356 B.R. 81, reversed 509 F.3d 15.   Common Interest Communities ⇐ 33

Under Massachusetts law, condominium developer that seeks to revive and exercise its expired phasing rights must obtain express consent of any unit owner whose percentage interest in common areas or in facilities will be materially affected by addition of new units, if master deed did not, at time unit owner's deed was recorded, make possible the precise calculation of unit owner's new percentage interest following completion of additional phases.  In re Northwood Properties, LLC, D.Mass.2006, 356 B.R. 81, reversed 509 F.3d 15.   Common Interest Communities ⇐ 33

Under Massachusetts law, condominium developer whose phasing rights have expired must seek condominium association's approval to revive those rights, and if developer wishes to exercise those revived rights, it must also obtain consent of any unit owners whose percentage interests in common areas or in facilities will be materially affected by addition of new units in any subsequent phase of development.  In re Northwood Properties, LLC, D.Mass.2006, 356 B.R. 81, reversed 509 F.3d 15.   Common Interest Communities ⇐ 33

## 9.   Arbitration

Lower condominium owners were not required to enter into binding arbitration pursuant to condominium trust agreement to resolve dispute with upper unit owners over proposed changes to upper unit and common areas that included finishing the attic, and modifying roof by installing dormers and a roof deck for the sole benefit of the upper unit owners; condominium statute required all owners to give consent before their percentage interest in common areas was affected, all portions of upper unit owners' proposed changes were impermissible without lower unit owners' consent pursuant to condominium statute, and lower unit owners refused to consent to proposed changes.  Lallo v. Szabo (2009) 911 N.E.2d 788, 75 Mass.App. Ct. 1.   Alternative Dispute Resolution ⇐ 115

## 10.   Waiver

Owners of second phase of two-phase condominium development were bound by waiver contained in agreement between developer and condominium board of trustees of statutory rights, requiring developer to record amendments to condominium's master deed and declaration of trust allocating percentage interest in common areas and facilities of the condominium to each unit owner in proportions that did not conform to section of condominium statute entitling unit owners to a percentage interest in common areas in same proportion as that of value of unit in relation to other units; purchasers of units in second phase had notice of the recorded amendments.  Scully v. Tillery (2010) 926 N.E.2d 154, 456 Mass. 758.   Common Interest Communities ⇐ 27

## § 6.   Profits and expenses; lien

(a) (i) Except as provided in paragraph (ii), all common expenses shall be assessed against all units either in accordance with their respective percentages of undivided interest in the common areas and facilities or, if stated in the master deed or an amendment thereto duly recorded in the approximate relation that the area of the unit bears to the aggregate area of all the units, which may take into account unit location, amenities in the unit, and limited common areas and facilities benefiting the unit; provided, however, that such an amendment shall require the consent of all unit owners whose common expense assessment is materially affected.  The organization of unit owners shall have a lien on a unit for any common expense assessment levied against that unit from the time the assessment becomes due.  Common expense assessments must be made at least annually, based on a budget adopted at least annually in accordance with the master deed, trust, or by-laws.

(ii) If any expense is incurred by the organization of unit owners as a result of the unit owner's failure to abide by the requirements of this chapter or the requirements of the master deed, trust, by-laws, restrictions, rules or regulations, or by the misconduct of any unit owner, or his family members, tenants, or invitees, the organization of unit owners may assess that expense exclusively against the unit

owner and such assessment shall constitute a lien against that unit from the time the assessment is due, and such assessment shall be enforceable as a common expense assessment under this chapter. Notwithstanding the provisions of paragraph (i), the organization of unit owners may assess the cost of maintaining, repairing or replacing a limited common area and facility, solely to the owner of the unit to which a limited common area and facility is appurtenant, allocated, or designated, and such assessment shall be enforceable as a common expense assessment under this chapter; in the alternative, the organization of unit owners may require the owner of the unit to which a limited common area and facility is appurtenant, allocated, or designated to maintain, repair, or replace such limited common area and facility without the intervention of the organization of unit owners. Notwithstanding the provisions of paragraph (i), the organization of unit owners may assess to each unit owner the direct cost of any energy conservation device installed in a unit, not already separately metered for water and utilities, including but not limited to the installation of separate water meters, low-flow toilets and showerheads, faucet aerators, windows and storm windows; provided, however, that a unit owner required to install such energy conservation device hereunder may appeal to the board of trustees of the organization of unit owners or if there is no board of trustees, the entity performing its duties. Said board or entity of said organization, in its sole and reasonable discretion, may grant to such unit owner a waiver of such required installation upon such terms and conditions as the organization of unit owners shall deem fit. The cost thereof shall be collected in the same manner as common expense assessments under this chapter. The organization of unit owners may assess to each unit owner his proportionate share of the costs for water and other utilities, as measured by the meter attached to the unit; provided however, that the board of trustees of the organization of unit owners receives the approval of the majority of unit owners in attendance at a meeting, for which notice was duly given and which was held for the purposes of issuing such an assessment. A unit owner assessed costs hereunder may appeal the assessment to said board or entity of said organization of unit owners. Such appeal shall be in writing and shall set forth a clear and concise statement of reasons for an exemption from the assessment for the unit owners. Said board or entity of said organization, in its sole and reasonable discretion, may grant to said unit owner a waiver of the assessment provided herein upon such terms and conditions as the organization of unit owners shall deem fit. In the event of a conflict between this subsection and the master deed, trust, or bylaws, and any amendment thereto, of any condominium submitted to the provisions of this chapter, the provisions of this subsection shall control. Notwithstanding the aforesaid, nothing contained herein shall be construed to be in conflict with the provisions of the state sanitary code. The organization of unit owners may also assess any fees, attorneys' fees, charges, late charges, fines, costs of collection and enforcement, court costs, and interest charged pursuant to this chapter against the unit owner and such assessment shall constitute a lien against the unit from the time the assessment is due, and shall be enforceable as common expense assessments under this chapter.

(iii) Common profits shall be distributed among unit owners in the same manner as common expenses are charged to the unit owners.

(b) The unit owner shall be personally liable for all sums assessed for his share of the common expenses including late charges, fines, penalties, and interest assessed by the organization of unit owners and all costs of collection including attorneys' fees, costs, and charges.

(c) When any portion of the unit owner's share of the common expenses has been delinquent for at least sixty days subsequent to April 1, 1993, the organization of unit owners shall send a notice stating the amount of the delinquency to the unit

owner by certified and first class mail. The org[...] send a notice stating the amount of the delinq[...] certified and first class mail, provided, that the [...] organization of unit owners of its name and mail[...] days prior to the filing of an action by the organiz[...] lien for delinquent common expenses, the organi[...] notice stating its intention to file said action to th[...] first class mail, provided that the first mortgagee [...] unit owners of its name and mailing address. In [...] receiver for the condominium pursuant to the pro[...] eleven, the lien for charges imposed for the pay[...] receiver shall have priority over all other liens [...] liens.

A lien under this section shall be enforced in th[...] and five A of chapter two hundred and fifty-four. [...] and encumbrances on a unit except (i) liens and e[...] recordation of the master deed, (ii) a first mortga[...] date on which the assessment sought to be enf[...] liens for real estate taxes and other municipal a[...] unit. This lien is also prior to the mortgages de[...] extent of the common expense assessments based[...] to subsection (a) above which would have become[...] during the six months immediately preceding inst[...] lien and to the extent of any costs and reasonabl[...] action to enforce the lien, provided however, th[...] incurred prior to January 1, 1993 which shall be p[...] clause (ii) above shall be limited to no more tha[...] dollars, and provided further, that payment of the[...] six month period, and to the extent of any cos[...] incurred in said action, shall serve to discharge su[...] is prior to such mortgages described in clause (ii)[...] not include any amounts attributable to special [...] penalties, and interest assessed by the organizatio[...] the organization of unit owners to send the first m[...] day delinquency of common expenses, as described[...] intent to file an action to enforce the lien for [...] described above, shall not affect the priority lien [...] for up to six months' common expenses, but the [...] any costs or attorneys' fees incurred in the a[...] subsection does not affect the priority of mechani[...] priority of liens or other assessments made by [...] Recording of the master deed constitutes record [...] no further recordation of any claim of lien for [...] required.

Neither this section nor anything contained in [...] two hundred and fifty-four shall be deemed to pr[...] which this subsection creates a lien or to prohibi[...] from taking a deed in lieu of enforcement of t[...]

The organization of unit owners shall take no fu[...] liens against a particular unit for common expense[...] writing that a priority lien exists without the requi[...] to such enforcement and pays, within 60 days [...] prescribed amounts: (1) so much of any delinqu[...]

itute a lien against that unit from the time
ssment shall be enforceable as a common
r. Notwithstanding the provisions of para-
ners may assess the cost of maintaining,
1 area and facility, solely to the owner of the
1 and facility is appurtenant, allocated, or
be enforceable as a common expense assess-
iative, the organization of unit owners may
ich a limited common area and facility is
o maintain, repair, or replace such limited
rvention of the organization of unit owners
agraph (i), the organization of unit owners
ect cost of any energy conservation device
ly metered for water and utilities, including
eparate water meters, low-flow toilets and
nd storm windows; provided, however, that
energy conservation device hereunder may
rganization of unit owners or if there is no
g its duties. Said board or entity of said
discretion, may grant to such unit owner a
n such terms and conditions as the organiza-
cost thereof shall be collected in the same
ts under this chapter. The organization of
ner his proportionate share of the costs for
by the meter attached to the unit; provided
he organization of unit owners receives the
n attendance at a meeting, for which notice
the purposes of issuing such an assessment.
may appeal the assessment to said board or
s. Such appeal shall be in writing and shall
e of reasons for an exemption from the
ard or entity of said organization, in its sole
said unit owner a waiver of the assessment
nditions as the organization of unit owners
ct between this subsection and the master
ent thereto, of this condominium submitted
provisions of this subsection shall control.
ontained herein shall be construed to be in
e sanitary code. The organization of unit
eys' fees, charges, late charges, fines, costs
ests, and interest charged pursuant to this
assessment shall constitute a lien against
s due, and shall be enforceable as common

ed among unit owners in the same manner
nit owners.

liable for all sums assessed for his share of
ges, fines, penalties, and interest assessed
all costs of collection including attorneys'

's share of the common expenses has been
uent to April 1, 1993, the organization of
he amount of the delinquency to the unit

78

owner by certified and first class mail. The organization of unit owners shall also send a notice stating the amount of the delinquency to the first mortgagee by certified and first class mail, provided, that the first mortgagee has informed the organization of unit owners of its name and mailing address. Furthermore, thirty days prior to the filing of an action by the organization of unit owners to enforce its lien for delinquent common expenses, the organization of unit owners shall send a notice stating its intention to file said action to the first mortgagee by certified and first class mail, provided that the first mortgagee has informed the organization of unit owners of its name and mailing address. In the event of the appointment of a receiver for the condominium pursuant to the provisions of chapter one hundred and eleven, the lien for charges imposed for the payment of expenses incurred by the receiver shall have priority over all other liens and mortgages, except municipal liens.

A lien under this section shall be enforced in the manner provided in sections five and five A of chapter two hundred and fifty-four. Such lien is prior to all other liens and encumbrances on a unit except (i) liens and encumbrances recorded before the recordation of the master deed, (ii) a first mortgage on the unit recorded before the date on which the assessment sought to be enforced became delinquent, and (iii) liens for real estate taxes and other municipal assessments or charges against the unit. This lien is also prior to the mortgages described in clause (ii) above to the extent of the common expense assessments based on the budget adopted pursuant to subsection (a) above which would have become due in the absence of acceleration during the six months immediately preceding institution of an action to enforce the lien and to the extent of any costs and reasonable attorneys' fees incurred in the action to enforce the lien, provided however, that the amount of attorneys' fees incurred prior to January 1, 1993 which shall be prior to the mortgage described in clause (ii) above shall be limited to no more than two thousand and five hundred dollars, and provided further, that payment of the assessments with respect to such six month period, and to the extent of any costs or reasonable attorneys' fees incurred in said action, shall serve to discharge such lien to the extent that such lien is prior to such mortgages described in clause (ii) above. The priority amount shall not include any amounts attributable to special assessments, late charges, fines, penalties, and interest assessed by the organization of unit owners. The failure of the organization of unit owners to send the first mortgagee either the notice of sixty day delinquency of common expenses, as described above, or the thirty day notice of intent to file an action to enforce the lien for delinquent common expenses, as described above, shall not affect the priority lien of the organization of unit owners for up to six months' common expenses, but the priority amount shall not include any costs or attorneys' fees incurred in the action to enforce the lien. This subsection does not affect the priority of mechanics' or materialmen's liens, or the priority of liens or other assessments made by the organization of unit owners. Recording of the master deed constitutes record notice and perfection of this lien; no further recordation of any claim of lien for assessment under this section is required.

Neither this section nor anything contained in sections five or five A of chapter two hundred and fifty-four shall be deemed to prohibit actions to recover sums for which this subsection creates a lien or to prohibit an organization of unit owners from taking a deed in lieu of enforcement of the lien created by this section.

The organization of unit owners shall take no further action to enforce its priority liens against a particular unit for common expenses if the first mortgagee agrees in writing that a priority lien exists without the requirement of instituting an action, as to such enforcement and pays, within 60 days of said writing, the following prescribed amounts: (1) so much of any delinquent assessments on that unit for

79

regularly recurring budgeted common expenses over a period for six months immediately preceding the notice of delinquency that would constitute a priority amount if an action had been commenced on the date the organization gives its delinquency notice to the mortgagee; (2) costs and reasonable attorney's fees incurred by the organization at the time of said writing by the first mortgagee to collect outstanding common expenses, including, but not limited to, costs and fees to ascertain the first mortgagee's identity, examine title, and prepare and send to the unit owner and mortgagee the notices referred to in this paragraph; and to pay within 30 days of their due date; (3) all future common expenses, and special assessments other than special assessments for improvements made pursuant to section 18, assessed against that unit from the date of said notice until such time as the mortgagee's mortgage is foreclosed or otherwise no longer encumbers the unit. The amount which the first mortgagee, if it so elects, would be required to pay to cause the organization not to proceed to enforce its priority liens shall not include any amounts attributable to late charges, fines, penalties, and interest assessed by the organization of unit owners and shall only include amounts attributable to special assessments due and payable after the giving of the delinquency notice pursuant to this paragraph, and then only to the extent the special assessment is not made with respect to any improvement authorized under section 18. If the amounts described in clauses (1) and (2) are not received within said 60 day period, or if the amount of any future assessments under clause (3) is not received within 30 days of their due date, the organization may proceed to take further action to enforce its liens without voiding the first mortgagee's obligation to pay as provided in this subsection. The agreement by the first mortgagee to make payments in the amounts and for the duration specified in this paragraph shall be binding upon its successors and assigns and the successful bidder at any foreclosure but no such successor, assign, bidder or purchaser shall have any liability by virtue of the first mortgagee's undertaking pursuant to this paragraph for any amount first arising, assessed or becoming due after the mortgage is foreclosed or otherwise no longer encumbers the unit. The first mortgagee shall not be liable for the amounts described in clauses (1), (2) and (3) which arise after the first mortgagee ceases to have an interest in the unit. Such amounts shall then become the obligation of the successors and assigns of the first mortgagee.

Within ten days after receipt of the written request of the first mortgagee, the organization of unit owners shall provide a written statement in reasonable detail of the actual dollar amounts the first mortgagee would be required to pay, if it so elected, to cause the organization of unit owners not to take further action to enforce its priority liens against the unit as provided in this section. The first mortgagee shall have 14 days following the mailing of said written statement to enter into the written agreement provided for in the previous paragraph. Unless the organization of unit owners has notice of a first mortgagee's foreclosure sale actually scheduled within 30 days, the organization of unit owners shall take no further action to enforce its priority liens against a particular unit for common expenses for a period of 24 days from the receipt of the written request by the first mortgagee or 14 days following mailing of the written statement by the organization of unit owners, whichever is less. The failure of the organization of unit owners to send the written statement to the first mortgagee, as described above, shall not affect the priority lien of the organization of unit owners for up to six months' common expenses, but the priority amount shall not include any costs or attorneys' fees incurred to collect or enforce the liens.

If a unit owner fails to pay his share of the common expenses to the organization of unit owners for at least twenty-five days from the date it was due, the organization of unit owners may, as a separate and additional remedy, subject to the

existing rights of a holder of a first mortgage renting the unit any rent then or thereafter due organization shall apply such rent collected aga unit owner. Prior to taking any action hereund shall give to the delinquent unit owner written n owed. Such notice shall be sent by any form of providing a signed receipt, shall set forth the ex owners claims is due and owing by the unit owne organization to collect such amount from rent, a become due within the current fiscal year and w days after they become due. Further, a copy o to any first mortgagee of record on such unit writing that the organization of unit owners n payment amounts due to the organization by the

The unit owner shall have ten days after rece response with the organization of unit owners. S the pains and penalties of perjury; shall, in th common expenses, include proof, in the form of document, that the installment was paid or shal state in short and plain terms all grounds upon w the amount claimed to be owed to the organiz charged and shall state exactly what amount, if to the organization of unit owners.

If the unit owner fails to timely file a respons requirements or admits in such response that he tion of unit owners, the organization shall be direct each tenant renting such unit from suc portion of the rent otherwise due by such unit o or portion thereof to be limited to the lesser o claimed is due on its notice to the unit owner, if t response in compliance with the requirements s such unit owner admitted was due in his timely shall have a continuing right to collect any rent such unit owner, until such amount, plus any cha satisfied in full; provided, however, that nothi owner from seeking equitable relief from a c seeking a judicial determination of the amount nothing herein shall prevent the organization of u under section five of chapter two hundred and the amount owed to it by the unit owner or othe requiring the tenant in such unit or tenants in ot in the condominium to pay to the organization re If in any action brought to establish the amo organization, it is established that such unit owe material fact on any response filed pursuant to organization shall be entitled to recover from amount determined to be owed by said unit o Further, the organization of unit owners shall thereafter becoming due and all of the organiz attorneys' fees, incurred in such action.

In no event shall a unit owner take any retali pays rent, or any portion thereof, to the organiz this section. The provisions of section eighteen

ion expenses over a period for six months
delinquency that would constitute a priority
ienced on the date the organization gives its
e; (2) costs and reasonable attorney's fees
ime of said writing by the first mortgagee to
including, but not limited to, costs and fees to
ty, examine title, and prepare and send to the
es referred to in this paragraph; and to pay
(3) all future common expenses, and special
ssments for improvements made pursuant to
from the date of said notice until such time as
d or otherwise no longer encumbers the unit.
e, if it so elects, would be required to pay to
l to enforce its priority liens shall not include
ges, fines, penalties, and interest assessed by
l shall only include amounts attributable to
e after the giving of the delinquency notice
nly to the extent the special assessment is not
l authorized under section 18. If the amounts
t received within said 60 day period, or if the
er clause (3) is not received within 30 days of
proceed to take further action to enforce the
agee's obligation to pay as provided in this
first mortgagee to make payments in the
d in this paragraph shall be binding upon its
ssful bidder at any foreclosure but no such
shall have any liability by virtue of the first
this paragraph for any amount first arising,
ortgage is foreclosed or otherwise no longer
tgagee shall not be liable for the amounts
hich arise after the first mortgagee ceases to
ounts shall then become the obligation of the
tgagee.

written request of the first mortgagee, the
de a written statement in reasonable detail of
ortgagee would be required to pay, if it so
it owners not to take further action to enforce
rovided in this section. The first mortgagee
g of said written statement to enter into the
previous paragraph. Unless the organization
ortgagee's foreclosure sale actually scheduled
nit owners shall take no further action as
icular unit for common expenses for a period
en request by the first mortgagee or 14 days
ement by the organization of unit owners,
ganization of unit owners to send the written
escribed above, shall not affect the priority
for up to six months' common expenses; but
y costs or attorneys' fees incurred to collect

of the common expenses to the organization
ive days from the date it was due, the
parate and additional remedy, subject to the
80

existing rights of a holder of a first mortgage of record, collect from any tenant renting the unit any rent then or thereafter due to the owner of such unit. Such organization shall apply such rent collected against the amount owed to it by the unit owner. Prior to taking any action hereunder, the organization of unit owners shall give to the delinquent unit owner written notice of its intent to collect the rent owed. Such notice shall be sent by any form of mail or other delivery requiring or providing a signed receipt, shall set forth the exact amount the organization of unit owners claims is due and owing by the unit owner and shall indicate the intent of the organization to collect such amount from rent, along with any other amounts which become due within the current fiscal year and which remain unpaid for twenty-five days after they become due. Further, a copy of such notice shall also be provided to any first mortgagee of record on such unit who has previously requested in writing that the organization of unit owners notify it of any delinquency in the payment amounts due to the organization by the owner of such unit.

The unit owner shall have ten days after receipt of such notice to file a written response with the organization of unit owners. Such response shall be signed under the pains and penalties of perjury; shall, in the case of monthly installments of common expenses, include proof, in the form of a cancelled check, receipt or other document, that the installment was paid or shall, in the case of any other charge, state in short and plain terms all grounds upon which said unit owner maintains that the amount claimed to be owed to the organization was incorrectly calculated or charged and shall state exactly what amount, if any, the unit owner admits he owes to the organization of unit owners.

If the unit owner fails to timely file a response in compliance with the foregoing requirements or admits in such response that he owes any amount to the organization of unit owners, the organization shall be entitled to immediately notify and direct each tenant renting such unit from such owner to thereafter pay all or a portion of the rent otherwise due by such unit owner to the organization, such rent or portion thereof to be limited to the lesser of: (i) the amount the organization claimed is due on its notice to the unit owner, if the unit owner failed to timely file a response in compliance with the requirements set forth above; or (ii) the amount such unit owner admitted was due in his timely filed response. The organization shall have a continuing right to collect any rent otherwise payable by the tenant to such unit owner, until such amount, plus any charges thereafter becoming due, are satisfied in full; provided, however, that nothing herein shall preclude the unit owner from seeking equitable relief from a court of competent jurisdiction or seeking a judicial determination of the amount owed; and, provided further, that nothing herein shall prevent the organization of unit owners from bringing an action under section five of chapter two hundred and fifty-four or to otherwise establish the amount owed to it by the unit owner or otherwise to seek and obtain an order requiring the tenant in such unit or tenants in other units owned by the unit owner in the condominium to pay to the organization rent otherwise due to the unit owner. If in any action brought to establish the amount owed by a unit owner to the organization, it is established that such unit owner knowingly misrepresented any material fact on any response filed pursuant to the provisions of this section, the organization shall be entitled to recover from such unit owner three times the amount determined to be owed by said unit owner at the time of his response. Further, the organization of unit owners shall be entitled to collect any charges thereafter becoming due and all of the organization's costs, including reasonable attorneys' fees, incurred in such action.

In no event shall a unit owner take any retaliatory action against any tenant who pays rent, or any portion thereof, to the organization of unit owners as provided in this section. The provisions of section eighteen of chapter one hundred and eighty-
81

six and section two A of chapter two hundred and thirty-nine shall apply to any reprisal taken by a unit owner against a tenant who made or expressed an intention to make a payment to the organization pursuant to this section. Any waiver of the provisions of this section in any lease or rental agreement shall be void and unenforceable as against public policy.

Nothing herein shall be construed to prevent an organization of unit owners from adopting or amending its master deed, trust, by-laws or rules and regulations to provide additional protections, remedies, or rights for said organization.

To the extent that any first mortgagee of record is entitled to an assignment of rents and to the extent that it exercises its rights by written notice recorded at the registry of deeds or the registry district of the land court in which the property lies and by written notice sent by certified or registered mail to the presiding officer of the governing board of the condominium, then commencing with the next rental period, but not for any prior period, the first mortgagee may collect such rents. If the first mortgagee commences collection of such rents, it shall be obligated to pay all prospective expenses lawfully assessed by the organization of unit owners, including late fees, interest, late charges, collection costs, reasonable attorneys' fees, assessments and special assessments and shall be subject to all other provisions of this chapter, the master deed, trust, by-laws and rules and regulations. Further, the first mortgagee shall be obligated to pay any such expenses or other charges which were, prior to the commencement of the collection of rents by the first mortgagee, due and payable to the organization, to the extent that the rent collected monthly by the first mortgagee exceeds the installment of principal and interest which was due monthly to the first mortgagee prior to default, the monthly installments of real estate taxes and mortgage insurance, the monthly share of common expenses, and the customary and ordinary unit repair, operation and maintenance costs, until such time as all arrearages due to the organization by the prior unit owner are paid in full. The organization shall have priority to receive funds collected from the tenant of a delinquent unit owner as to any junior lien holder.

Except as provided in section twenty-one, in the event of a conflict between this subsection and the master deed, trust, or by-laws, and any amendment thereto, the provisions of this subsection shall govern, notwithstanding the date on which the condominium was submitted to the provisions of this chapter.

(d) A statement from the organization of unit owners setting forth the amount of unpaid common expenses and any other sums which have been assessed against a unit owner, including a statement of the amount which the organization of unit owners claims it is entitled to priority with respect to any mortgage under subsection (c), shall operate to discharge the unit from any lien for other sums then unpaid when recorded in the appropriate registry of deeds; provided, however, that any statement or document issuing from an unincorporated organization of unit owners may be recorded in a registry of deeds and if so recorded shall indicate and specify therein the book and page, or document number if registered land, within such registry of the instrument from which the signatory or signatories of the statement obtained authority to sign on behalf of the unincorporated organization. The statement shall be furnished within ten business days after receipt of a written request, upon payment of a reasonable fee, and shall be binding on the organization of unit owners, the governing body of the organization of unit owners, and every unit owner; provided, however, that no fee shall be required of any mortgagee, who has given the organization notice of its intention to foreclose a mortgage upon the unit.

Added by St.1963, c. 493, § 1. Amended by St.1964, c. 731, § 1; St.1987, c. 290; St.1987, c. 338, §§ 1, 1A; St.1991, c. 554, § 1; St.1992, c. 8; St.1992, c. 400, §§ 7 to 10; St.1992, c. 407,

---

§ 11; St.1993, c. 1, §§ 1, 2; St.1994, c. 319, § 1; St.19 St.1998, c. 242, §§ 6, 7; St.2010, c. 183, § 3, eff. Oct. 2 Jan. 14, 2011.

### Historical and Statuto

**2010 Legislation**

St.2010, c. 183, § 3, approved July 26, 2010, effective Oct. 24, 2010, in subsec. (a), in par. (i), rewrote the first sentence, which prior thereto read, "Except as provided in clause (ii) herein, all common expenses must be assessed against all units in accordance with their respective percentages of undivided interest in the common areas and facilities."

St.2 approv 2011, i senten "claus

Sect in par "parag

### Research Refere

**ALR Library**

154 ALR, Federal 1, Avoidance, Under § 545(2) of Bankruptcy Code of 1978 (11 U.S.C.A. § 545(2)), of Statutory Lien Not Perfected or Enforceable at Date of Bankruptcy as to Bona Fide Purchasers of Property at Time of Commencement of Case.

39 ALR 4th 114, Liability of Owner of Unit in Condominium, Recreational Development, Time-Share Property, or the Like, for Assessment in Support of Common Facilities Levied Against and Unpaid by Prior Owner.

77 ALR 3rd 1290, Expenses for Which Condominium Association May Assess Unit Owners.

**Treatises and Practice Aids**

16 Mass. Prac. Series § 44:12, Complaint to Foreclose Mortgage--No Statutory Power of Sale.

18 Mass. Prac. Series § 14.1, Civil Rights--Generally.

28 Mass. Prac. Series § 14.9, Organization of Unit Owners.

28 Mass. Prac. Series § 11.15, Condominium Liens.

28 Mass. Prac. Series § 11.28, Lien Priorities.

28 Mass. Prac. Series § 14.13, Condominium Liens.

28 Mass. Prac. Series § 14.19, Foreclosure of Mortgages.

34 Mass. Prac. Series § 22:55, Enforcement of Rules, Regulations, Bylaws, and Restrictions of Master Deed and Unit Deeds.

34 Mass. Prac. Series § 22:57, Condominiums and Landlord-Tenant Relationship.

34 a 34 U n 34 e o 5A A 14C 14C a a p 14C a p 14C a p o 14C 15A A M 15A S 1 15A ti 15A C C 15A A I 15A I M 15A I

Case: 13-1814   Document 00116612414   Page: 341   Date Filed: 11/18/2013   Entry ID: 5780656

Generation Co. (2005) 831 N.E.2d 349, 64 Mass.App.Ct. 37. Mechanics' Liens ⟐ 45

**12. Tools**

"Tools," under mechanic's lien statute, furnished for erection, alteration, repair, or removal of a building, structure or other improvement of real property, are typically manual devices ordinarily used by workmen and mechanics, such as a hammer or saw. Mammoet USA, Inc. v. Entergy Nuclear Generation Co. (2005) 831 N.E.2d 349, 64 Mass.App.Ct. 37. Mechanics' Liens ⟐ 45

**13. Rental equipment**

A mechanic's lien does not cover the total value of the rental equipment, appliances or tools furnished where, under the contract, the equipment is intended to be returned to the subcontractor to be used in other projects; rather, the lien is intended to protect the value of the use of such equipment during the process of construction. John Marini Management Co. v. Butler (2007) 873 N.E.2d 1150, 70 Mass.App.Ct. 142, review denied 878 N.E.2d 567, 450 Mass. 1106. Mechanics' Liens ⟐ 47

Subcontractor's mechanic's lien on concrete forms and other items retained by general contractor after it terminated subcontractor's contract did not cover the entire value of the items, but instead only covered the rental value of the forms and other items. John Marini Management Co. v. Butler (2007) 873 N.E.2d 1150, 70 Mass.App.Ct. 142, review denied 878 N.E.2d 567, 450 Mass. 1106. Mechanics' Liens ⟐ 47

**13.5. Survival of liens**

Mechanics' liens held by contractors and subcontractors on lessee's leasehold interest did not survive lessee's surrender of lease to lessor, since surrender of lease was involuntary; even though lessee and lessor had agreed to the surrender of lease, surrender was caused by lessee's failure to pay rent, and was not the product of collusion between lessee and lessor. Trace Const., Inc. v. Dana Barros Sports Complex, LLC (2011) 945 N.E.2d 833, 459 Mass. 346. Mechanics' Liens ⟐ 233

**14. Presumptions and burden of proof**

Mechanic's lienholder, not homeowners, had burden to prove amount due or to become due on contract for construction of home at time that lienholder gave homeowners notice of the filing of subcontract, as required to entitle lienholder to enforce lien for value of materials lienholder had supplied to subcontractor. National Lumber Co. v.

Inman (2010) 933 N.E.2d 675, 77 Mass.App. Ct. 916, review denied 936 N.E.2d 435, 458 Mass. 1108. Mechanics' Liens ⟐ 279

## § 5. Enforcement of lien; procedure

*[ Text of section applicable as provided by 2010, 424, Sec. 20.]*

A lien upon land for the erection, alteration, repair or removal of a building or other structure or other improvement of real property or for professional services relating thereto or a lien established under section seventy-six of chapter sixty-three, or section 6 of chapter 183A shall be enforced by a civil action brought in the superior court for the county where such land lies or in the district court in the judicial district where such land lies. The plaintiff shall bring his action in his own behalf and in behalf of all other persons in interest who shall become parties. An attested copy of the complaint, which shall contain a brief description of the property sufficient to identify it, and a statement of the amount due, shall be filed in the registry of deeds and recorded as provided in section nine within thirty days of the commencement of the action, or such lien shall be dissolved. All other parties in interest may appear and have their rights determined in such action, and at any time before entry of final judgment, upon the suggestion of any party in interest that any other person is or may be interested in the action, or of its own motion, the court may summon such person to appear in such cause on or before a day certain or be forever barred from any rights thereunder. The court may in its discretion provide for notice to absent parties in interest. The terms "party in interest" and "person in interest", as used in this chapter, shall include mortgages and attaching creditors.

Amended by St.1954, c. 461, § 2; St.1963, c. 493, § 3; St.1973, c. 1114, § 318; St.1987, c. 338, § 2; St.1987, c. 760, § 2; St.1989, c. 341, § 100; St.1996, c. 364, §§ 6, 7; St.2010, c. 350, § 7, eff. Jan. 4, 2011; St.2010, c. 424, § 9, eff. July 1, 2011.

### Historical and Statutory Notes

**2010 Legislation**

St.2010, c. 350, § 7, approved Oct. 6, 2010, effective Jan. 4, 2011, in the first sentence, substituted "or section 6 of chapter 183A" for "section six of chapter one hundred and eighty-three A, or subsection (a) of section twenty-nine of chapter one hundred and eighty-three B".

St.2010, c. 424, § 9, approved Jan. 5, 2011, and by § 21 made effective July 1, 2011, in

the first sentence, inserted "or for professional services relating thereto".

Section 20 of St.2010, c. 424, provides:

"This act shall apply to liens for professional services, as defined in section 1, for which any person has filed or recorded a notice of contract on an interest in real property on or after the effective date of this act; provided, however, that this act shall not apply to any mortgage filed or recorded before the effective date of this act."

### Law Review and Journal Commentaries

Mechanic's lien law: More clarity from the Supreme Judicial Court. R. Paul Faxon, 88 Mass. L. Rev. 107 (Fall, 2003).

### Research References

**ALR Library**

154 ALR, Federal 1, Avoidance, Under § 545(2) of Bankruptcy Code of 1978 (11 U.S.C.A. § 545(2)), of Statutory Lien

Not Perfected or Enforceable at Date of Bankruptcy as to Bona Fide Purchasers of Property at Time of Commencement of Case.

nclusive in law that he did so
ngly claim.  Sexton v. Weav-
57, 141 Mass. 273.  Mechan-
)

urpose of enforcing a lien for
of account was filed, embrac-
due for materials as well as
g a sum paid generally on
progress of the work, it was
ven if the debt incurred for
ight be shown approximately
tatement was defective, inas-
were offered of determining
debt the payment should be
quently how much remained
scoll v. Hill (1865) 93 Mass.

no fence, nor any mark or
of land, to show the bound-
which a house was being
was no plan in the possession
showing any division of the
ots, a petition describing the
lien was sought by the de-
it was conveyed to the owner
gh one orally contracting to
vided it into lots.  Bordier v.
N.E. 171, 239 Mass. 448.
271(3)

enforce a lien for labor and
for a building standing on
described only the front lot
he building standing thereon
id not belong to defendant,
tract under which the lien
ne contract provided for the
sum for labor and materials
hout distinguishing in the plead-
ding described in the plead-
the back lot and other labor
to be paid for by the piece,
ay of determining what pro-
work was done on one part
what on the other, it was
imant was not entitled to a
r State Distilling Co. (1901)
ass. 163.  Mechanics' Liens

rce a lien on buildings and
ssed if the land is described
age of the deed conveying it
d not according to different
nds established by the re-
nveyance; but the superior
petition to be so amended
d correctly and the lien to
shed.  Pollock v. Morrison
176 Mass. 83.  Mechanics'
Mechanics' Liens ⇐ 276(2)

Where respondent purchased a tract of land,
and mortgaged a part of it and petitioner, for
work on the land not mortgaged, was entitled to
a mechanic's lien, and, in filing his statement,
described the land on which he claimed the lien
by metes and bounds; following the description
in the mortgage, and also reciting that it was
the same land as that described in the deed and
mortgage, it was determined that the descrip-
tion was insufficient to support a lien, as a
description by metes and bounds is not con-
trolled by reference to a prior conveyance, and
as it would also not be sufficient for the reason
that the description in the deed and in the
mortgage did not agree, except as to the land on
which he had no lien.  Muto v. Smith (1900) 55
N.E. 1041, 175 Mass. 175.  Mechanics' Liens
⇐ 136(2)

The fact that a building on which a lien was
claimed extended over the line of the land de-
scribed in the petition will not defeat the lien on
that part of the building standing on the land
described for the value of the labor thereon, if
this can be ascertained.  Batchelder v. Hutchin-
son (1894) 37 N.E. 452, 161 Mass. 462.  Me-
chanics' Liens ⇐ 73(8)

Where the certificate of a petitioner to enforce
a lien described the lot as it was when the
contract was made under which the lien arose,
and as it was described in the petition, the
conveyance of a portion of the premises after
the making of the contract did not affect the
lien.  Collins v. Patch (1892) 31 N.E. 295, 156
Mass. 317.  Mechanics' Liens ⇐ 197

A statement of lien, otherwise sufficient, de-
scribed the land as being owned, to the best of
petitioner's knowledge and belief, by A., who
was not, in fact, the owner was sufficient.
McPhee v. Broderick (1888) 14 N.E. 923, 145
Mass. 565.  Mechanics' Liens ⇐ 137(2)

**12.  Foreclosure of lien**

Condominium trust could seek foreclosure of
lien on owner's unit for nonpayment of com-
mon expenses totaling less than $3,000, despite
contention that unit was $350,000 marital
home.  Baker v. Monga (1992) 590 N.E.2d
1162, 32 Mass.App.Ct. 450, review denied 597
N.E.2d 444, 413 Mass. 1101.  Condominium ⇐
12

Under M.G.L.A. c. 254, §§ 5, 5A, liens for
unpaid common expenses did not have priority
over mortgage to defendant; on date com-
plaints were filed, prior mortgage, which was
satisfied in full, was no longer in effect and
therefore defendant's mortgage was the "first
mortgage of record."  Tessier v. Salem Five
Cents Sav. Bank (App. Div. 1992) 1992 Mass.
App.Div. 135.  Mortgages ⇐ 163(2)

**13.  Review**

The Supreme Judicial Court would look to the
statutory provisions concerning the creation,
perfection, and enforcement of a lien to deter-
mine whether general contractor met the statu-
tory prerequisites for a valid and enforceable
mechanic's lien.  Tremont Tower Condomini-
um, LLC v. George B.H. Macomber Co. (2002)
767 N.E.2d 20, 436 Mass. 677.  Mechanics'
Liens ⇐ 116

## § 5A.  Court order authorizing sale of real estate; procedure

When the amount of a lien under section six of chapter 183A or under section
29 of chapter 183B has been established by a court, the court shall enter an
order authorizing the sale of the real estate to satisfy such lien.  The lienor may
do all acts authorized by such order, but no sale pursuant to such order shall be
effectual unless, previous to such sale, notice thereof has been published once
in each of three successive weeks, the first publication to appear not less than
twenty-one days before the date of such sale, in a newspaper published in the
town where the land lies or, if no newspaper is published in such town, in a
newspaper published in the county where the land lies, and this provision shall
be implied in every court order for sale hereunder in which it is not expressly
set forth.  A newspaper which by its title page purports to be printed or
published in such town, city or county, and having a circulation therein, shall
be sufficient for the purpose.

For a lien under chapter 183A, such form shall be printed in substantially the
following form:

254 § 5A

**LIENS ON BUILDINGS AND LAND**

## SALE OF REAL ESTATE
### UNDER GLM 183A:6

By virtue of a Judgment and Order of the _____ Court (docket no. _____) in favor of _____ against _____ establishing a lien pursuant to GLM 183A:6 on the real estate known as Unit _____ of the _____ Condominium for the purpose of satisfying such lien, the real estate will be sold at Public Auction at _____ o'clock _____. M. on the _____ day of _____ A.D. (insert year) at _____. The premises to be sold are more particularly described as follows:

Description: (Describe premises exactly as in the deed, including all references to title, restrictions, encumbrances, etc.)

Terms of sale: (State the amount, if any, to be paid in cash by the purchaser at the time and place of the sale, and the time or times for payment of the balance or the whole as the case may be.)

Other terms to be announced at the sale.

(Signed)_____

_____
Lienholder

_____(insert year)

For a lien under chapter 183B, such form shall be printed in substantially the following form:

## SALE OF REAL ESTATE
### UNDER GLM 183B:29

By virtue of a Judgment and Order of the _____ Court (docket no, _____) in favor of _____ against _____ establishing a lien pursuant to GLM 183B:29 on the time-share known as _____ of the _____ for the purpose of satisfying such lien, the time-share will be sold at Public Auction at _____ o'clock _____.M. on the _____ day of _____ A.D. 19_____ at _____. The premises to be sold are more particularly described as follows:

Description: (Describe premises exactly as in the deed, including all references to title, restrictions, encumbrances, etc.)

Terms of sale: (State the amount, if any, to be paid in cash by the purchaser at the time and place of the sale, and the time or times for payment of the balance or the whole as the case may be.)

Other terms to be announced at the sale.

(Signed)_____

_____
Lienholder

_____ 19

Such notice of sale in the above form, published in accordance with the provisions of this section, together with such other or further notice, if any, required by the court, shall be deemed a sufficient notice of the sale and the

164

premises shall be convey the premi easements, improv taxes, assessments, complaint, whethe ments, outstandin first mortgages is bound to complete included in the not in the auctioneer's ing, the premises shall convey the pr mortgages, if as of assessments, costs, priority over said fi hundred and eighty premises free of any

The person or en and an affidavit, st section have been thereto on the mar such affidavit or a evidence that the sa

For the purposes the registry of deed the land lies.

Added by St.1987, c. St.1998, c. 242, §§ 8 t

St.1987, c. 338, § 3, 1987.

St.1991, c. 153, appr the third paragraph, dele ing "together" and subst gages recorded prior t "liens or claims in the existing encumbrances o to the filing" and "outsta ipal or other public taxe mortgages" for "liens or fourth paragraph, delete deeds or land registratio or district where the land recorded"; and added the

St.1992, c. 400, § 17, i added the second and thi

St.1992, c. 400, was a Emergency declaration filed April 6, 1993.

premises shall be deemed to have been sold, and the deed thereunder shall convey the premises, subject to, and with the benefit of, all restrictions, easements, improvements, outstanding tax titles, municipal or other public taxes, assessments, and first mortgages recorded prior to the recording of the complaint, whether or not reference to such restrictions, easements, improvements, outstanding tax titles, municipal or other public taxes, assessments, or first mortgages is made in the deed; but no purchaser at such sale shall be bound to complete the purchase if there are encumbrances, other than those included in the notice of the sale, which are not stated at the sale and included in the auctioneer's contract with the purchaser. Notwithstanding the foregoing, the premises shall be deemed to have been sold, and the deed thereunder shall convey the premises, as otherwise provided above but free of said first mortgages, if as of the date of such sale there are unpaid common expense assessments, costs, or reasonable attorneys' fees the lien for which is given priority over said first mortgages in subsection (c) of section six of chapter one hundred and eighty-three A. Any sale pursuant to this section shall convey the premises free of any right of redemption.

The person or entity selling, or their attorney, may cause a copy of the notice and an affidavit, stating that the requirements of the court order and of this section have been complied with, to be recorded with a note of reference thereto on the margin of the record of the complaint previously recorded, and such affidavit or a certified copy of the record thereof shall be admitted as evidence that the sale was duly executed.

For the purposes of this section, the term "recorded" shall mean recorded in the registry of deeds or land registration office for the county or district where the land lies.

Added by St.1987, c. 338, § 3.  Amended by St.1991, c. 153; St.1992, c. 400, § 17; St.1998, c. 242, §§ 8 to 10; St.1998, c. 463; §§ 184, 185.

### Historical and Statutory Notes

St.1987, c. 338, § 3, was approved July 23, 1987.

St.1991, c. 153, approved July 23, 1991, in the third paragraph, deleted "herewith" preceding "together" and substituted "and first mortgages recorded prior to the recording" for "liens or claims in the nature of liens, and existing encumbrances of record created prior to the filing" and "outstanding tax titles, municipal or other public taxes, assessments, or first mortgages" for "liens or encumbrances"; in the fourth paragraph, deleted "in the registry of deeds or land registration office for the county or district where the land lies," following "to be recorded"; and added the fifth paragraph.

St.1992, c. 400, § 17, in the third paragraph, added the second and third sentences.

St.1992, c. 400, was approved Jan. 14, 1993. Emergency declaration by the Governor was filed April 6, 1993.

St.1998, c. 242, § 8, an emergency act, approved Aug. 7, 1998, in the first paragraph, in the first sentence, substituted "183A or under section 29 of chapter 183B" for "one hundred and eighty-three A".

Section 9 of St.1998, c. 242, in the second paragraph, in the first sentence, substituted "For a lien under chapter 183A, such" for "Such".

Section 10 of St.1998, c. 242, inserted the third paragraph.

Section 11 of St.1998, c. 242, provides:

"Except for section 6, this act shall apply to all master deeds, and amendments thereto, without regard to whether such master deed or amendment was recorded before, on or after the effective date of this act. The provisions of said section 6 shall apply only to priority liens and assessments first arising 90 days after the effective date of this act."

165

279

2. That the business of such seller is other than a private business enterprise operated for profit when such is not the fact; or

3. That such seller is a book publisher or a representative or distributor for a book publisher when such is not the fact; or

(b)  To misrepresent in any manner the character, extent or type of business of such seller.

(4)  <u>Misrepresentation as to Connection with Educational Institution.</u>  It is an unfair trade practice for any seller to represent through advertising or otherwise, that it or its sales representatives are connected in any manner with any school, college, university, or other educational institution, or with any board or committee thereof, or with any other organization, or that any book or service sold or offered by it is required, endorsed or approved by any such institution, board, committee, or organization when such is not the fact.

<u>3.15:  New for Used, Substitution of Products, Failure to Deliver</u>

(1)  <u>New for Used</u>.  It is unfair and deceptive trade practice to represent, directly or indirectly, that a product is new or unused, or that any part of a product is new or unused when such is not the fact, or to misrepresent the extent of previous use thereof.  It is further an unfair and deceptive trade practice for a seller to offer for sale or sell any product which is used, contains used parts; is rebuilt, remanufactured, reconditioned, or contains rebuilt, remanufactured, or reconditioned parts; or has the appearance of being new when it is not; unless prior, clear and conspicuous disclosure that such a product has been used, rebuilt, remanufactured or reconditioned, or that it contains used, rebuilt, remanufactured or reconditioned parts, is made to the buyer or prospective buyer.

The disclosure that a product has been used or contains used parts as required by the previous paragraph may be made by use of a word such as, but not limited to, "Used," "Second Hand," "Repaired," "Remanufactured," "Reconditioned," "Rebuilt," or "Relined," whichever is applicable to the product involved.

(2)  <u>Substitution of Products</u>.  It is an unfair and deceptive trade practice to make a substitution of products:

(a)  By shipping, delivering, or installing products which do not conform to samples submitted or to specifications upon which the sale is consummated to induced, or to the representations made prior to securing the order, without advising the purchaser of the substitution and obtaining his consent thereto prior to making shipment, delivery, or installation;

(b)  By falsely representing the reason for making the substitution in order to induce consent; or

(c)  When there was no intention to deliver the original merchandise ordered.

(3)  <u>Failure to Deliver</u>.  It is an unfair and deceptive act or practice:

(a)  To advertise or promise prompt delivery where delivery is neither prompt nor expeditious.

(b)  To fail to deliver merchandise ordered by mail or otherwise on which payment has been made or undertaken, in the form of a deposit, down payment or total payment where a definite delivery date has been set unless the seller can show circumstances beyond his control and not within his knowledge at the time the order was accepted which prevented the seller from meeting the delivery date.

(c)  To accept an order for goods, or services, where delivery is not, because of facts known to the seller, contemplated within four weeks, unless a later delivery date is specifically agreed upon by the buyer and the seller.

<u>3.16:  General</u>

Without limiting the scope of any other rule, regulation or statute, an act or practice is a violation of M.G.L. c.93A, § 2 if:

3.16: continued

(1) It is oppresive or otherwise unconscionable in any respect; or

(2) Any person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction; or

(3) It fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of this Commonwealth protection; or

(4) It violates the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other Federal consumer protection statutes within the purview of M.G.L. c. 93A, § 2.

3.17: Landlord-Tenant

(1) Conditions and Maintenance of a Dwelling Unit. It shall be an unfair or deceptive act or practice for an owner to:
   (a) Rent a dwelling unit which, at the inception of the tenancy
     1. contains a condition which amounts to a violation of law which may endanger or materially impair the health, safety, or well-being of the occupant; or
     2. is unfit for human habitation;
   (b) Fail, during the terms of the tenancy, after notice is provided in accordance with M.G.L. c. 111, § 127L, to
     1. remedy a violation of law in a dwelling unit which may endanger or materially impair the health, safety, or well-being of the occupant, or
     2. maintain the dwelling unit in a condition fit for human habitation; provided, however, that said violation of law was not caused by the occupant or others lawfully upon said dwelling unit;
   (c) Fail to disclose to a prospective tenant the existence of any condition amounting to a violation of law within the dwelling unit of which the owner had knowledge or upon reasonable inspection could have acquired such knowledge at the commencement of the tenancy;
   (d) Represent to a prospective tenant that a dwelling unit meets all requirements of law when, in fact, it contains violations of law;
   (e) Fail within a reasonable time after receipt of notice from the tenant to make repairs in accordance with a pre-existing representation made to the tenant;
   (f) Fail to provide services and/or supplies after the making of any representation or agreement, that such services would be provided during the term or any portion of the term of the tenancy agreement;
   (g) Fail to reimburse the tenant within a reasonable or agreed time after notice, for the reasonable cost of repairs made or paid for, or supplies or services purchased by the tenant after any representation, that such reimbursement would be made;
   (h) Fail to reimburse an occupant for reasonable sums expended to correct violations of law in a dwelling unit if the owner failed to make such corrections pursuant to the provisions of M.G.L. c. 111, § 127L, or after notice prescribed by an applicable law;
   (i) Fail to comply with the State Sanitary Code or any other law applicable to the conditions of a dwelling unit within a reasonable time after notice of a violation of such code or law from the tenant or agency.

(2) Notices and Demands. It shall be an unfair or deceptive practice for an owner to:
   (a) Send to a tenant any notice or paper which appears or purports to be an official or judicial document but which he knows is not;
   (b) Fail or refuse to accept any notice sent to any address to which rent is customarily sent, or given to any person who customarily accepts on behalf of the owner, or sent to the person designated in the rental agreement in accordance with 940 CMR 3.17(3)(b)2.

If you have issues viewing or accessing this file contact us at NCJRS.gov.

Case: 13-2181    Document: 00116512444    Page: 347    Date Filed: 11/18/2013    Entry ID: 5780656

PUBLIC LAW 95–109 [H.R. 5294]; Sept. 20, 1977

## CONSUMER CREDIT PROTECTION ACT

*For Legislative History of Act, see p. 1695*

An Act to amend the Consumer Credit Protection Act to prohibit abusive practices by debt collectors.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Consumer Credit Protection Act (15 U.S.C. 1601 et seq.) is amended by adding at the end thereof the following new title:

**Consumer Credit Protection Act, amendments.**

## "TITLE VIII—DEBT COLLECTION PRACTICES

**Fair Debt Collection Practices Act.**

"Sec.
"801. Short title.
"802. Findings and purpose.
"803. Definitions.
"804. Acquisition of location information.
"805. Communication in connection with debt collection.
"806. Harassment or abuse.
"807. False or misleading representations.
"808. Unfair practices.
"809. Validation of debts.
"810. Multiple debts.
"811. Legal actions by debt collectors.
"812. Furnishing certain deceptive forms.
"813. Civil liability.
"814. Administrative enforcement.
"815. Reports to Congress by the Commission.
"816. Relation to State laws.
"817. Exemption for State regulation.
"818. Effective date.

**15 USC 1601 note.**

"**§ 801. Short title**

"This title may be cited as the 'Fair Debt Collection Practices Act'.

**15 USC 1692.**

"**§ 802. Findings and purpose**

"(a) There is abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors. Abusive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy.

"(b) Existing laws and procedures for redressing these injuries are inadequate to protect consumers.

"(c) Means other than misrepresentation or other abusive debt collection practices are available for the effective collection of debts.

"(d) Abusive debt collection practices are carried on to a substantial extent in interstate commerce and through means and instrumentalities of such commerce. Even where abusive debt collection practices are purely infrastate in character, they nevertheless directly affect interstate commerce.

"(e) It is the purpose of this title to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses.

91 STAT. 874

Sept. 20    CONSUMER CREDIT PROTECTION ACT          P.L. 95–109

## "§ 803. Definitions

15 USC 1692a.

"As used in this title—

"(1) The term 'Commission' means the Federal Trade Commission.

"(2) The term 'communication' means the conveying of information regarding a debt directly or indirectly to any person through any medium.

"(3) The term 'consumer' means any natural person obligated or allegedly obligated to pay any debt.

"(4) The term 'creditor' means any person who offers or extends credit creating a debt or to whom a debt is owed, but such term does not include any person to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another.

"(5) The term 'debt' means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

"(6) The term 'debt collector' means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. Notwithstanding the exclusion provided by clause (G) of the last sentence of this paragraph, the term includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts. For the purpose of section 808(6), such term also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests. The term does not include—

"(A) any officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor;

"(B) any person while acting as a debt collector for another person, both of whom are related by common ownership or affiliated by corporate control, if the person acting as a debt collector does so only for persons to whom it is so related or affiliated and if the principal business of such person is not the collection of debts;

"(C) any officer or employee of the United States or any State to the extent that collecting or attempting to collect any debt is in the performance of his official duties;

"(D) any person while serving or attempting to serve legal process on any other person in connection with the judicial enforcement of any debt;

"(E) any nonprofit organization which, at the request of consumers, performs bona fide consumer credit counseling and assists consumers in the liquidation of their debts by receiving payments from such consumers and distributing such amounts to creditors;

"(F) any attorney-at-law collecting a debt as an attorney on behalf of and in the name of a client; and

91 STAT. 875

NCJRS

MAR 1 2 ...

ACQU......

P.L. 95-109    LAWS OF 95th CONG.—1st SESS.    Sept. 20

"(G) any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity (i) is incidental to a bona fide fiduciary obligation or a bona fide escrow arrangement; (ii) concerns a debt which was originated by such person; (iii) concerns a debt which was not in default at the time it was obtained by such person; or (iv) concerns a debt obtained by such person as a secured party in a commercial credit transaction involving the creditor.

"(7) The term 'location information' means a consumer's place of abode and his telephone number at such place, or his place of employment.

"(8) The term 'State' means any State, territory, or possession of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or any political subdivision of any of the foregoing.

15 USC 1692b. **"§ 804. Acquisition of location information**

"Any debt collector communicating with any person other than the consumer for the purpose of acquiring location information about the consumer shall—

"(1) identify himself, state that he is confirming or correcting location information concerning the consumer, and, only if expressly requested, identify his employer;

"(2) not state that such consumer owes any debt;

"(3) not communicate with any such person more than once unless requested to do so by such person or unless the debt collector reasonably believes that the earlier response of such person is erroneous or incomplete and that such person now has correct or complete location information;

"(4) not communicate by post card;

"(5) not use any language or symbol on any envelope or in the contents of any communication effected by the mails or telegram that indicates that the debt collector is in the debt collection business or that the communication relates to the collection of a debt; and

"(6) after the debt collector knows the consumer is represented by an attorney with regard to the subject debt and has knowledge of, or can readily ascertain, such attorney's name and address, not communicate with any person other than that attorney, unless the attorney fails to respond within a reasonable period of time to communication from the debt collector.

15 USC 1692c. **"§ 805. Communication in connection with debt collection**

"(a) COMMUNICATION WITH THE CONSUMER GENERALLY.—Without the prior consent of the consumer given directly to the debt collector or the express permission of a court of competent jurisdiction, a debt collector may not communicate with a consumer in connection with the collection of any debt—

"(1) at any unusual time or place or a time or place known or which should be known to be inconvenient to the consumer. In the absence of knowledge of circumstances to the contrary, a debt collector shall assume that the convenient time for communicating with a consumer is after 8 o'clock antimeridian and before 9 o'clock postmeridian, local time at the consumer's location;

"(2) if the debt collector knows the consumer is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address, unless

91 STAT. 876

Sept. 20    CONSUMER CREDIT PROTECTION ACT            P.L. 95–109

the attorney fails to respond within a reasonable period of time to a communication from the debt collector or unless the attorney consents to direct communication with the consumer; or

"(3) at the consumer's place of employment if the debt collector knows or has reason to know that the consumer's employer prohibits the consumer from receiving such communication.

"(b) COMMUNICATION WITH THIRD PARTIES.—Except as provided in section 804, without the prior consent of the consumer given directly to the debt collector, or the express permission of a court of competent jurisdiction, or as reasonably necessary to effectuate a postjudgment judicial remedy, a debt collector may not communicate, in connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector.

"(c) CEASING COMMUNICATION.—If a consumer notifies a debt collector in writing that the consumer refuses to pay a debt or that the consumer wishes the debt collector to cease further communication with the consumer, the debt collector shall not communicate further with the consumer with respect to such debt, except—

"(1) to advise the consumer that the debt collector's further efforts are being terminated;

"(2) to notify the consumer that the debt collector or creditor may invoke specified remedies which are ordinarily invoked by such debt collector or creditor; or

"(3) where applicable, to notify the consumer that the debt collector or creditor intends to invoke a specified remedy.

If such notice from the consumer is made by mail, notification shall be complete upon receipt.

"(d) For the purpose of this section, the term 'consumer' includes the consumer's spouse, parent (if the consumer is a minor), guardian, executor, or administrator.

## "§ 806. Harassment or abuse

15 USC 1692d.

"A debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

"(1) The use or threat of use of violence or other criminal means to harm the physical person, reputation, or property of any person.

"(2) The use of obscene or profane language or language the natural consequence of which is to abuse the hearer or reader.

"(3) The publication of a list of consumers who allegedly refuse to pay debts, except to a consumer reporting agency or to persons meeting the requirements of section 603(f) or 604(3) of this Act.

15 USC 1681a, 1681b.

"(4) The advertisement for sale of any debt to coerce payment of the debt.

"(5) Causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number.

"(6) Except as provided in section 804, the placement of telephone calls without meaningful disclosure of the caller's identity.

## "§ 807. False or misleading representations

15 USC 1692e.

"A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt.

91 STAT. 877

Without limiting the general application of the foregoing, the following conduct is a violation of this section:

"(1) The false representation or implication that the debt collector is vouched for, bonded by, or affiliated with the United States or any State, including the use of any badge, uniform, or facsimile thereof.

"(2) The false representation of—

"(A) the character, amount, or legal status of any debt; or

"(B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.

"(3) The false representation or implication that any individual is an attorney or that any communication is from an attorney.

"(4) The representation or implication that nonpayment of any debt will result in the arrest or imprisonment of any person or the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and the debt collector or creditor intends to take such action.

"(5) The threat to take any action that cannot legally be taken or that is not intended to be taken.

"(6) The false representation or implication that a sale, referral, or other transfer of any interest in a debt shall cause the consumer to—

"(A) lose any claim or defense to payment of the debt; or

"(B) become subject to any practice prohibited by this title.

"(7) The false representation or implication that the consumer committed any crime or other conduct in order to disgrace the consumer.

"(8) Communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed.

"(9) The use or distribution of any written communication which simulates or is falsely represented to be a document authorized, issued, or approved by any court, official, or agency of the United States or any State, or which creates a false impression as to its source, authorization, or approval.

"(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

"(11) Except as otherwise provided for communications to acquire location information under section 804, the failure to disclose clearly in all communications made to collect a debt or to obtain information about a consumer, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose.

"(12) The false representation or implication that accounts have been turned over to innocent purchasers for value.

"(13) The false representation or implication that documents are legal process.

"(14) The use of any business, company, or organization name other than the true name of the debt collector's business, company, or organization.

"(15) The false representation or implication that documents are not legal process forms or do not require action by the consumer.

91 STAT. 878

"(16) The false representation or implication that a debt collector operates or is employed by a consumer reporting agency as defined by section 603(f) of this Act.

15 USC 1681.

15 USC 1692f.

## "§ 808. Unfair practices

"A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

"(1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

"(2) The acceptance by a debt collector from any person of a check or other payment instrument postdated by more than five days unless such person is notified in writing of the debt collector's intent to deposit such check or instrument not more than ten nor less than three business days prior to such deposit.

"(3) The solicitation by a debt collector of any postdated check or other postdated payment instrument for the purpose of threatening or instituting criminal prosecution.

"(4) Depositing or threatening to deposit any postdated check or other postdated payment instrument prior to the date on such check or instrument.

"(5) Causing charges to be made to any person for communications by concealment of the true purpose of the communication. Such charges include, but are not limited to, collect telephone calls and telegram fees.

"(6) Taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if—

"(A) there is no present right to possession of the property claimed as collateral through an enforceable security interest;

"(B) there is no present intention to take possession of the property; or

"(C) the property is exempt by law from such dispossession or disablement.

"(7) Communicating with a consumer regarding a debt by post card.

"(8) Using any language or symbol, other than the debt collector's address, on any envelope when communicating with a consumer by use of the mails or by telegram, except that a debt collector may use his business name if such name does not indicate that he is in the debt collection business.

## "§ 809. Validation of debts

15 USC 1692g.

"(a) Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing—

"(1) the amount of the debt;

"(2) the name of the creditor to whom the debt is owed;

"(3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

"(4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and

"(5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

"(b) If the consumer notifies the debt collector in writing within the thirty-day period described in subsection (a) that the debt, or any portion thereof, is disputed, or that the consumer requests the name and address of the original creditor, the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the original creditor, is mailed to the consumer by the debt collector.

"(c) The failure of a consumer to dispute the validity of a debt under this section may not be construed by any court as an admission of liability by the consumer.

15 USC 1692h.

## "§ 810. Multiple debts

"If any consumer owes multiple debts and makes any single payment to any debt collector with respect to such debts, such debt collector may not apply such payment to any debt which is disputed by the consumer and, where applicable, shall apply such payment in accordance with the consumer's directions.

15 USC 1692i.

## "§ 811. Legal actions by debt collectors

"(a) Any debt collector who brings any legal action on a debt against any consumer shall—

"(1) in the case of an action to enforce an interest in real property securing the consumer's obligation, bring such action only in a judicial district or similar legal entity in which such real property is located; or

"(2) in the case of an action not described in paragraph (1), bring such action only in the judicial district or similar legal entity—

"(A) in which such consumer signed the contract sued upon; or

"(B) in which such consumer resides at the commencement of the action.

"(b) Nothing in this title shall be construed to authorize the bringing of legal actions by debt collectors.

15 USC 1692j.

## "§ 812. Furnishing certain deceptive forms

"(a) It is unlawful to design, compile, and furnish any form knowing that such form would be used to create the false belief in a consumer that a person other than the creditor of such consumer is participating in the collection of or in an attempt to collect a debt such consumer allegedly owes such creditor, when in fact such person is not so participating.

"(b) Any person who violates this section shall be liable to the same extent and in the same manner as a debt collector is liable under section 813 for failure to comply with a provision of this title.

288

**"§ 813. Civil liability**

"(a) Except as otherwise provided by this section, any debt collector who fails to comply with any provision of this title with respect to any person is liable to such person in an amount equal to the sum of—

"(1) any actual damage sustained by such person as a result of such failure;

"(2) (A) in the case of any action by an individual, such additional damages as the court may allow, but not exceeding $1,000; or

"(B) in the case of a class action. (i) such amount for each named plaintiff as could be recovered under subparagraph (A), and (ii) such amount as the court may allow for all other class members, without regard to a minimum individual recovery, not to exceed the lesser of $500,000 or 1 per centum of the net worth of the debt collector; and

"(3) in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court. On a finding by the court that an action under this section was brought in bad faith and for the purpose of harassment. the court may award to the defendant attorney's fees reasonable in relation to the work expended and costs.

"(b) In determining the amount of liability in any action under subsection (a), the court shall consider, among other relevant factors—

"(1) in any individual action under subsection (a) (2) (A), the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional; or

"(2) in any class action under subsection (a) (2) (B), the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, the resources of the debt collector, the number of persons adversely affected, and the extent to which the debt collector's noncompliance was intentional.

"(c) A debt collector may not be held liable in any action brought under this title if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

"(d) An action to enforce any liability created by this title may be brought in any appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction, within one year from the date on which the violation occurs.

"(e) No provision of this section imposing any liability shall apply to any act done or omitted in good faith in conformity with any advisory opinion of the Commission, notwithstanding that after such act or omission has occurred, such opinion is amended, rescinded, or determined by judicial or other authority to be invalid for any reason.

**"§ 814. Administrative enforcement**

"(a) Compliance with this title shall be enforced by the Commission, except to the extent that enforcement of the requirements imposed under this title is specifically committed to another agency under subsection (b). For purpose of the exercise by the Commission of its functions and powers under the Federal Trade Commission Act, a violation of this title shall be deemed an unfair or deceptive act or practice in violation of that Act. All of the functions and powers of

*Margin notes:*
15 USC 1692k.

Jurisdiction.

15 USC 1692l.

15 USC 58.

91 STAT. 881

289

P.L. 95–109          LAWS OF 95th CONG.—1st SESS.          Sept. 20

15 USC 58.

the Commission under the Federal Trade Commission Act are available to the Commission to enforce compliance by any person with this title, irrespective of whether that person is engaged in commerce or meets any other jurisdictional tests in the Federal Trade Commission Act, including the power to enforce the provisions of this title in the same manner as if the violation had been a violation of a Federal Trade Commission trade regulation rule.

"(b) Compliance with any requirements imposed under this title shall be enforced under—

12 USC 1818.

"(1) section 8 of the Federal Deposit Insurance Act, in the case of—

"(A) national banks, by the Comptroller of the Currency;

"(B) member banks of the Federal Reserve System (other than national banks), by the Federal Reserve Board; and

"(C) banks the deposits or accounts of which are insured by the Federal Deposit Insurance Corporation (other than members of the Federal Reserve System), by the Board of Directors of the Federal Deposit Insurance Corporation;

12 USC 1464.
12 USC 1730.
12 USC 1426,
1437.

"(2) section 5(d) of the Home Owners Loan Act of 1933, section 407 of the National Housing Act, and sections 6(i) and 17 of the Federal Home Loan Bank Act, by the Federal Home Loan Bank Board (acting directly or through the Federal Savings and Loan Insurance Corporation), in the case of any institution subject to any of those provisions;

12 USC 1751.

"(3) the Federal Credit Union Act, by the Administrator of the National Credit Union Administration with respect to any Federal credit union;

"(4) the Acts to regulate commerce, by the Interstate Commerce Commission with respect to any common carrier subject to those Acts;

49 USC 1301
note.

"(5) the Federal Aviation Act of 1958, by the Civil Aeronautics Board with respect to any air carrier or any foreign air carrier subject to that Act; and

7 USC 181.
7 USC 226, 227.

"(6) the Packers and Stockyards Act, 1921 (except as provided in section 406 of that Act), by the Secretary of Agriculture with respect to any activities subject to that Act.

"(c) For the purpose of the exercise by any agency referred to in subsection (b) of its powers under any Act referred to in that subsection, a violation of any requirement imposed under this title shall be deemed to be a violation of a requirement imposed under that Act. In addition to its powers under any provision of law specifically referred to in subsection (b), each of the agencies referred to in that subsection may exercise, for the purpose of enforcing compliance with any requirement imposed under this title any other authority conferred on it by law, except as provided in subsection (d).

"(d) Neither the Commission nor any other agency referred to in subsection (b) may promulgate trade regulation rules or other regulations with respect to the collection of debts by debt collectors as defined in this title.

15 USC 1692m.

"**§ 815. Reports to Congress by the Commission**

"(a) Not later than one year after the effective date of this title and at one-year intervals thereafter, the Commission shall make reports to the Congress concerning the administration of its functions under this title, including such recommendations as the Commission deems necessary or appropriate. In addition, each report of the Commission shall include its assessment of the extent to which compliance with this title

91 STAT. 882

Sept. 20   CONSUMER CREDIT PROTECTION ACT                    P.L. 95–109

is being achieved and a summary of the enforcement actions taken by
the Commission under section 814 of this title.

"(b)  In the exercise of its functions under this title, the Commission may obtain upon request the views of any other Federal agency which exercises enforcement functions under section 814 of this title.

15 USC 1692n.

"§ 816.  Relation to State laws

"This title does not annul, alter, or affect, or exempt any person subject to the provisions of this title from complying with the laws of any State with respect to debt collection practices, except to the extent that those laws are inconsistent with any provision of this title, and then only to the extent of the inconsistency. For purposes of this section, a State law is not inconsistent with this title if the protection such law affords any consumer is greater than the protection provided by this title.

15 USC 1692o.

"§ 817.  Exemption for State regulation

"The Commission shall by regulation exempt from the requirements of this title any class of debt collection practices within any State if the Commission determines that under the law of that State that class of debt collection practices is subject to requirements substantially similar to those imposed by this title, and that there is adequate provision for enforcement.

15 USC 1692
note.

"§ 818.  Effective date

"This title takes effect upon the expiration of six months after the date of its enactment, but section 809 shall apply only with respect to debts for which the initial attempt to collect occurs after such effective date.".

Approved September 20, 1977.

LEGISLATIVE HISTORY:

HOUSE REPORT No. 95–131 (Comm. on Banking, Finance, and Urban Affairs).
SENATE REPORT No. 95–382 (Comm. on Banking, Housing, and Urban Affairs).
CONGRESSIONAL RECORD, Vol. 123 (1977):
    Apr. 4, considered and passed House.
    Aug. 5, considered and passed Senate, amended.
    Sept. 8, House agreed to Senate amendment.
WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, Vol. 13, No. 39:
    Sept. 20. Presidential statement.

trict court of eastern Middlesex, the district court of Springfield, the third district court of eastern Middlesex, the district court of East Norfolk, the district court of southern Essex, the district court of Somerville and the central district court of Worcester.

SECTION 3. Said section 10 of said chapter 218 is hereby further amended by striking out the third paragraph, as amended by section 2 of said chapter 548, and inserting in place thereof the following paragraph: —

Fourth assistant clerks with salaries payable by the county may be appointed in the municipal court of the Dorchester district and in the municipal court of the West Roxbury district and, subject to the approval of the county commissioners, in the district court of East Norfolk.    *Approved December 26, 1967.*

---

**Chap. 813.** AN ACT PROVIDING PROTECTION FOR THE CONSUMER AGAINST UNFAIR TRADE PRACTICES.

*Be it enacted, etc., as follows:*

SECTION 1. The General Laws are hereby amended by inserting after chapter 93 the following chapter: —

CHAPTER 93A.

REGULATION OF BUSINESS PRACTICES FOR CONSUMERS PROTECTION.

*Section 1.* The following words, as used in this chapter unless the text otherwise requires or a different meaning is specifically required, shall mean: —

(a) "Person" shall include, where applicable, natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity.

(b) "Trade" and "commerce" shall include the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this commonwealth.

(c) "Documentary material" shall include the original or a copy of any book, record, report, memorandum, paper, communication, tabulation, map, chart, photograph, mechanical transcription, or other tangible document or recording, wherever situate.

*Section 2.* (a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

(b) It is the intent of the legislature that in construing paragraph (a) of this section the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5 (a) (1) of the Federal Trade Commission Act (15 U.S.C. 45 (a) (1)), as from time to time amended.

(c) The attorney general ma⟨ ⟩ 292 ⟨ ⟩es and regulations interpreting the provisions of subsection 2 (a) of this chapter. Such rules and regulations shall not be inconsistent with the rules, regulations and de-

cisions of the Federal Trade Commission and the Federal Courts interpreting the provisions of 15 U.S.C. 45 (a) (1) (The Federal Trade Commission Act), as from time to time amended.

*Section 3.* (1) Nothing in this chapter shall apply to

(*a*) transactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of the commonwealth or of the United States; or

(*b*) trade or commerce of any person of whose gross revenue at least twenty per cent is derived from transactions in interstate commerce, excepting however transactions and actions which (*i*) occur primarily and substantially within the commonwealth, and (*ii*) as to which the Federal Trade Commission or its designated representative has failed to assert in writing within fourteen days of notice to it and to said person by the attorney general its objection to action proposed by him and set forth in said notice; or

(*c*) transactions or actions of any person who shows that he has had served upon him by the Federal Trade Commission a complaint pursuant to 15 U.S.C. 45 (b) relating to said transactions or actions until the Federal Trade Commission has either dismissed said complaint, secured an assurance of voluntary compliance, or issued a cease and desist order relating to said complaint pursuant to 15 U.S.C. 45 (b).

(2) For purposes of (*b*) and (*c*) the burden of proving exemptions from the provisions of this chapter shall be upon the person claiming the exemptions.

*Section 4.* Whenever the attorney general has reason to believe that any person is using or is about to use any method, act or practice declared by section two of this chapter to be unlawful, and that proceedings would be in the public interest, he may bring an action in the name of the state against such person to restrain by temporary or permanent injunction the use of such method, act or practice. At least ten days prior to commencement of any action under this section, the attorney general shall notify the person of his intended action, and give the person an opportunity to confer with the attorney general in person or by counsel or other representative as to the proposed action. Notice shall be given the person by mail, postage prepaid, sent to his usual place of business, or, if he has no usual place of business, to his last known address. The action may be brought in the superior court of the county in which such person resides or has his principal place of business, or, with the consent of the parties, may be brought in the superior court of Suffolk county. The said courts are authorized to issue temporary or permanent injunctions to restrain and prevent violations of this chapter; provided, however, that no restraining order or injunction shall be issued except upon notice and an opportunity to be heard. Any district attorney or law enforcement officer receiving notice of any alleged violation of this chapter shall immediately forward written notice of the same with any other information that he may have to the office of the attorney general. Any person who violates the terms of an injunction issued under this section shall forfeit and pay to the commonwealth a civil pen~~alty of not~~ more than ten thousand dollars for each violation. For t~~he purposes~~ of this section, the court issuing such injunction shall retain jurisdiction, and the cause shall be continued, and in such cases the attorney general acting in the name of the state may petition for recovery of such civil penalty.

*Section 5.* In any case where the attorney general has authority to institute an action or proceeding under section four of this chapter, in lieu thereof he may accept an assurance of discontinuance of any method, act or practice in violation of this chapter from any person alleged to be engaged or to have been engaged in such method, act or practice. Such assurance may include a stipulation for the voluntary payment by such person of the costs of investigation, or of an amount to be held in escrow pending the outcome of an action or as restitution to aggrieved buyers, or both. Any such assurance of discontinuance shall be in writing and be filed with the superior court of Suffolk county. Matters thus closed may at any time be reopened by the attorney general for further proceedings in the public interest.

*Section 6.* The attorney general, whenever he believes any person to be or to have been in violation of this chapter, may examine or cause to be examined for that purpose any books, records, papers and memoranda of whatever nature relevant to such alleged violation. The attorney general may require the attendance of such person or of any other person having knowledge in the premises at any place in the county where such person resides or has a place of business or in Suffolk county if such person is a nonresident or has no place of business within the state, and may take testimony and require proof material for his information, and may administer oaths or take acknowledgment in respect of any book, record, paper or memorandum. The attorney general shall serve notice of the time, place and cause of such examination or attendance at least ten days prior to the date of such examination.

(*a*) Service of any such notice may be made by:

(1) Delivering a duly executed copy thereof to the person to be served or to a partner or to any officer or agent authorized by appointment or by law to receive service of process on behalf of such person;

(2) Delivering a duly executed copy thereof to the principal place of business in this state of the person to be served; or

(3) Mailing by registered or certified mail a duly executed copy thereof addressed to the person to be served at the principal place of business in this state or, if said person has no place of business in this state, to his principal office or place of business.

(*b*) Each such notice shall:

(1) State the time and place for taking the examination and the name and address of each person to be examined, if known, and, if the name is not known, a general description sufficient to identify him or the particular class or group to which he belongs.

(2) State the statute and section thereof, the alleged violation of which is under investigation and the general subject matter of the investigation;

(3) Describe the class or classes of documentary material to be produced thereunder with reasonable specificity so as fairly to indicate the material demanded;

(4) Prescribe a return date within which the documentary material is to be produced; and

(5) Identify the members of the attorney general's staff to whom such documentary material is to be made available for inspection and copying.

(*c*) No such notice shall:

(1) Contain any requirement which would be unreasonable or improper if contained in a subpoena duces tecum issued by a court of this state; or

(2) Require the disclosure of any documentary material which would be privileged, or which contains trade secret information, or which for any other reason would not be required by a subpoena duces tecum issued by a court of this state.

Documentary material demanded pursuant to the provisions of this section shall be produced for inspection and copying during normal business hours at the principal office or place of business of the person served, or at such other times and places as may be agreed upon by the person served and the attorney general. Any book, record, paper, memorandum or other information produced by any person pursuant to this section shall not, unless otherwise ordered by a court of this state for good cause shown, be disclosed to any person other than the authorized agent or representative of the attorney general, unless with the consent of the person producing the same.

At any time prior to the date specified in the notice, or within twenty-one days after the notice has been served, whichever period is shorter, the court may, upon motion for good cause shown, extend such reporting date or modify or set aside such demand. The motion may be filed in the superior court of the county in which the person served resides or has his usual place of business, or in Suffolk county. This section shall not be applicable to any criminal proceeding nor shall information obtained under the authority of this section be admissible in evidence in any criminal prosecution for substantially identical transactions.

*Section 7.* A person upon whom a notice is served pursuant to the provisions of section six shall comply with the terms thereof unless otherwise provided by the order of a court of this state. Any person who fails to appear, or with intent to avoid, evade, or prevent compliance, in whole or in part, with any civil investigation under this section, removes from any place, conceals, withholds, or destroys, mutilates, alters, or by any other means falsifies any documentary material in the possession, custody or control of any person subject of any such notice, or knowingly conceals any relevant information, shall be fined not more than five thousand dollars.

Whenever any person fails to comply with any notice served upon him under this section or whenever satisfactory copying or reproduction of any such material cannot be done and such person refuses to surrender such material, the attorney general may file, in the superior court of the county in which such person resides or has his principal place of business or of Suffolk county if such person is a nonresident or has no principal place of business in this state, and serve upon such person, or in the same manner as provided in section six, a petition for an order of such court for the enforcement of this section. Any disobedience of any final order entered under this section by any court shall be punished as a contempt thereof.

*Section 8.* Upon petition ___ ___ ___ ___ torney general, the court may for habitual violation of in **295** sued pursuant to section four order the dissolution, or suspension or forfeiture of franchise of any corporation or the right of any foreign corporation to do business in

the commonwealth whenever said corporation violates the terms of an injunction issued under section four of this chapter.

Section 2. This act shall be known and designated as the "Regulation of Business Practice and Consumer Protection Act."

*Approved December 26, 1967.*

---

**Chap. 814.** An Act providing that employees of the Massachusetts parking authority shall be members of the state employees retirement system.

*Be it enacted, etc., as follows:*

Section 1. The paragraph defining "Political subdivision" in section 1 of chapter 32 of the General Laws, as most recently amended by section 4 of chapter 597 of the acts of 1967, is hereby further amended by inserting after the word "Authority", in line 4, the words: — , Massachusetts Parking Authority.

Section 2. The fourth sentence of section 2 of said chapter 32, as most recently amended by section 6 of said chapter 597 of the acts of 1967, is hereby further amended by inserting after the word "Commission" in line 2, the words: — or of the Massachusetts Parking Authority.

Section 3. Any person who is an employee of the Massachusetts Parking Authority on the effective date of this act shall, if otherwise eligible, become a member in service of the state employees' retirement system and shall, upon paying into the annuity savings fund of such system an amount equal to five per cent of the total salary received by him during such period, plus regular interest to the date of payment, be allowed credit for all his service with said authority prior to said effective date.

Section 4. The Massachusetts Parking Authority shall annually reimburse the state board of retirement for its pro rata share of any retirement allowance paid by said board during the preceding calendar year which is based in whole or in part on service with said authority.

*Approved December 26, 1967.*

---

**Chap. 815.** An Act providing that a lease, under the law providing for the industrial development of cities and towns, may specify which improvements on or to a shipyard shall be treated as real estate and which as personal property for the purposes of taxation.

*Be it enacted, etc., as follows:*

Section 20 of chapter 40D of the General Laws, as appearing in section 1 of chapter 772 of the acts of 1967, is hereby amended by adding the following paragraph: —

If, and to the extent that, the governing body or bodies and the board or boards of assessors approve, a lease meeting the requirements of section twelve may as to improvements on or to real estate constituting a shipyard, a substantial portion of which is found by the state industrial finance board to be devoted to federal government contract work, specify which facilities are to be [treated as] real estate and which are to be treated as personal property [for such purpo]ses, and such classification shall be conclusive during the term of the lease.

*Approved December 26, 1967.*

296